# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

BELIZE SOCIAL DEVELOPMENT, : 
LIMITED, 
: 
    **Appellee,** 
:   **No. 14-7002**

v. 
:   **Consolidated with Nos. 14-7003**
GOVERNMENT OF BELIZE,   **and 14-7018**
: 
    **Appellant.** 
:

## APPELLANT'S EMERGENCY MOTION TO STAY PROCEEDINGS PENDING APPEAL

Pursuant to Fed.R.App.P. 8 and Local Rule 8, appellant Government of Belize ("GOB") hereby moves this Court for an emergency stay of all proceedings in the District Court, including but not limited to a stay of discovery in aid execution and of enforcement of the judgment below, pending resolution of GOB's consolidated appeals to this Court.

Appellee Belize Social Development Limited ("BSDL") commenced this action in the District Court to confirm a purported foreign arbitration award against GOB. GOB brought a motion to dismiss based, *inter alia*, on foreign sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"). After the District Court denied the motion, GOB filed an interlocutory appeal in this Court, which divested the District Court of jurisdiction. The District Court nevertheless entered an order awarding BSDL the sum of $22,484,961.94

and a judgment in favor of BSDL.  BSDL then served GOB with extensive post-judgment discovery concerning GOB's assets.  On April 29, 2014, the District Court denied GOB's motion to stay in a minute order.  Absent a stay, the discovery responses will be due on **May 19, 2014.**

The FSIA protects foreign states, like GOB, from the burdens of litigation until a final decision is made on the issue of sovereign immunity.  GOB requests that this Court stay all proceedings below until final resolution of the appeal.

## FACTUAL BACKGROUND

This matter involves an illegal and *ultra vires* Accommodation Agreement secretly entered into in 2005 between a former Belizean Prime Minister and a Belizean telecommunications company, Belize Telemedia Ltd. ("BTL").  The former Prime Minister purportedly agreed to provide BTL with preferential tax treatments, exempt BTL from import duties, and guarantee BTL a minimum rate of return on investments.  Tab 2 at 5-6; Tab 5 at 2.

At the time the Accommodation Agreement was executed, BTL was controlled by Lord Michael Ashcroft, a British lord with substantial political influence in Belize.  Tab 2 at 4-5; Tab 5 at 2, n.2.  To avoid the jurisdiction of Belizean courts and to force any disputes to be litigated in England, a venue favorable to Lord Ashcroft, BTL inserted a clause in the Accommodation

Agreement calling for arbitration under the rules of the London Court of International Arbitration ("LCIA").  Tab 5 at 3.

In 2008, Belize elected a new Prime Minister, who made the Accommodation Agreement public and noted its invalidity under the Belizean Constitution and Belizean law.  Tab 5 at 2; Tab 2 at 6.  The Accommodation Agreement was void *ab initio* because the former Prime Minister lacked actual authority to exempt a private company from applicable tax and duties or otherwise to enter into to the Accommodation Agreement.  Tab 3 at ¶¶ 10-18.

Three months after the new Prime Minister exposed the Accommodation Agreement, BTL, claiming breaches of the agreement, commenced an LCIA arbitration proceeding in London.  Tab 2 at 8; Tab 5 at 3.  Because the Accommodation Agreement is void *ab initio,* GOB did not participate in the arbitration.  *Id*.  The LCIA ultimately awarded BTL substantial damages.  *Id*.  In a further effort to protect the award from Belizean courts, BTL incorporated appellee BSDL in the British Virgin Islands two days after the LCIA rendered the award, and apparently assigned its arbitration award to BSDL.  Tab 5 at 4.  (The District Court refused to allow discovery on the assignment).

On April 6, 2009 (seven months before BSDL filed this action), GOB filed suit against BSDL in Belize seeking a judicial declaration that the Accommodation Agreement was illegal and that the award was unenforceable.  Tab 5 at 4.  The

Belizean Supreme Court issued an injunction against BSDL proceeding with enforcement of the award until after adjudication of that action. *Id.* The Belizean litigation is pending. *Id.*

The District Court, in a minute order, initially stayed this action pending the outcome of the litigation in Belize. Tab 1 (Oct. 18, 2010, Minute Order). A split panel of this Court remanded the case on the grounds that the stay was indefinite in *Belize Soc. Devel. Ltd. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2011) ("*BSDL*").

On December 11, 2013, the District Court entered an order denying GOB's motion to dismiss and confirming the award. Tab 5. On January 8, 2014, GOB filed a notice of appeal from that Order. Tab 7. Despite the interlocutory appeal divesting the District Court of jurisdiction, the District Court entered an Order awarding $22,484,961.94 to BSDL on January 9, 2014. Tab 8; Tab 1. The Clerk entered Judgment on February 4, 2014. Tab 1. GOB has also appealed from the second order and from the judgment. Tab 1.

On March 13, 2014, BSDL served 22 interrogatories and 21 document requests on GOB pertaining to the location and identity of GOB's assets. Tabs 9, 10. On April 3, 2014, GOB filed a motion with the District Court to stay all proceedings, including discovery. Tab 11. The parties agreed to toll the deadline to respond to the discovery until 18 days after the District Court ruled on the

motion.  On April 29, 2014, the Court denied the motion by minute order.  Tab 12.

The deadline for GOB to respond to the discovery is currently **May 19, 2014**.

## ARGUMENT

In this Circuit, a motion for stay involves consideration of four factors:

(1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal?  . . . (2) Has the petitioner shown that without such relief, it will be irreparably injured? . . . (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? . . . (4) Where lies the public interest?

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  All four factors strongly militate in favor of a stay in this action.

### A.    GOB is Likely to Succeed on Appeal.

"Likelihood of success" does not require a "mathematical possibility" of "ultimate success by the movant."  *Holiday Tours,* 559 F.2d at 843.  It is sufficient to establish that "*a serious legal question is presented*, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant."  *Id*. at 844 (emphasis added).  GOB raises several serious legal questions in its appeal.

-5-

1.  <u>GOB's Interlocutory Appeal Divested the District Court of
    Jurisdiction to Enter Judgment and Conduct Discovery.</u>

GOB's appeal from the December 11, 2013, Order denying its motion to

dismiss and confirming the award is interlocutory.  When filed, the District Court

had not yet issued its order determining the amount of the judgment or entering a

final judgment.  *See La Reunion Aerienne v. Socialist People's Libyan Arab*

*Jamahiriya*, 533 F.3d 837, 842-843 (D.C. Cir. 2008).  Further, an order denying a

motion to dismiss on FSIA grounds is immediately appealable under the collateral

order doctrine.  *See Kirkham v. Societe Air France*, 429 F.3d 288, 291 (D.C. Cir.

2005); *El–Hadad v. United Arab Emirates,* 216 F.3d 29, 31 (D.C. Cir. 2000).  9

U.S.C. § 16(D) of the Federal Arbitration Act ("FAA") also permits an

interlocutory appeal from an order "confirming . . . an award."  *See 14 Penn Plaza*

*LLC v. Pyett*, 556 U.S. 247, 254 (2009); *Janiga v. Questar Capital Corp.,* 615 F.3d

735, 740 (7th Cir. 2010).

GOB's interlocutory appeal divested the District Court of jurisdiction, as the

FSIA protects foreign states like GOB from the burdens attendant to litigation.  *See*

*Princz v. Fed. Rep. of Germany,* 998 F.2d 1 (D.C. Cir. 1993) (*per curiam*);

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1026 (D.C. Cir.

1997); *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 293 (1st Cir. 2005).

An appeal under FAA § 16 also divests a district court of jurisdiction.  *See*

*Bradford–Scott Data Corp. v. Physician Computer Network, Inc.,* 128 F.3d 504,

505 (7th Cir.1997) ("[c]ontinuation of proceedings in the district court largely [would] defeat[] the point of the appeal and creates a risk of inconsistent handling of the case by two tribunals"); *McCauley v. Halliburton Energy Servs., Inc.,* 413 F.3d 1158, 1162–63 (10th Cir. 2005). Discovery may not proceed in the District Court after filing of an interlocutory appeal. *Bradford-Scott,* 128 F.3d at 506.

Because GOB filed an interlocutory appeal on January 8, 2014, the District Court was without jurisdiction to enter its order of January 9, 2014, awarding BSDL $22,484,961.94, and to enter judgment on February 4, 2014. *See Garcia v. Burlington Northern Railroad Co*., 818 F.2d 713, 721 (10th Cir. 1987) (once a district court is divested of jurisdiction, "[a]ny subsequent action by it is null and void."); *DSMC Inc. v. Convera Corp.*, 2002 WL 31741498 at *1 (D.C. Cir. 2002) (a district court may not proceed following appeal). A determination of damages is precisely the type of action that is rendered void by a previously-filed interlocutory appeal. *Garcia*, 818 F.2d at 721.

BSDL's broad post-judgment discovery requests also are incompatible with the FSIA. *See Rubin v. Islamic Rep. of Iran,* 637 F.3d 783, 799 (7th Cir. 2011) ("The general-asset discovery order issued in this case is incompatible with the FSIA.").

The District Court's post-appeal order and entry of judgment are invalid as a matter of law. Moreover, BSDL cannot conduct "post-judgment" discovery during

the pendency of the appeal.  This establishes both a likelihood that GOB will prevail on the merits, and also a compelling reason to stay discovery and execution of the (invalid) judgment pending the outcome of the appeal.

> 2. <u>This Appeal Seeks Review of Whether the FSIA's Arbitration Exception Applies When the Underlying Agreement is Void *Ab Initio* and the Foreign State Is Not a Party to the Convention.</u>

The District Court incorrectly concluded that it was bound by this Court's opinion in *BSDL* to confirm the arbitration award without even considering whether the Accommodation Agreement (and its arbitration provision) was void *ab initio*, and despite the fact that a non-signatory to the New York Convention cannot be bound by the provisions of that Convention.  This is to be reviewed *de novo*.

A foreign state is "presumptively immune from the jurisdiction of United States courts."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1989).  The District Court, however, concluded that the FSIA's "arbitration exception," 28 U.S.C. § 1605(a)(6)(B), applied because the LCIA issued its award in England, which is a party to the New York Convention; the District Court, citing BSDL, concluded that "Belize's status under the convention is irrelevant."  Tab 5 at 8.  The analysis is flawed for several reasons.

First, the arbitration exception cannot be imputed to GOB if the former Prime Minister lacked actual authority to execute and bind GOB to the Accommodation Agreement.  *See Phaneuf v. Indonesia,* 106 F.3d 302, 308 (9th

Cir. 1997) (actual authority required to impute act to foreign state for purposes of

exceptions under the FSIA); *Velasco v. Gov't of Indonesia,* 370 F.3d 392, 400-402

(4th Cir. 2004) (same).  "If the foreign state has not empowered its agent to act, the

agent's unauthorized act cannot be attributed to the foreign state. . .."'  *Phaneuf,*

106 F.3d at 308.   Although this Circuit has not ruled on whether an FSIA

exception may be applied based on an unauthorized act of a foreign government

official, Judge Howell recently followed *Phaneuf* in *TJGEM LLC v. Rep. of*

*Ghana*, -- F. Supp.2d --, 2013 WL 6857988 at **4-7 (D.D.C. 2013).  Under

*Phaneuf*, for purposes of application of the FSIA, the LCIA arbitration cannot be

considered to have been an act by GOB (particularly given that GOB refused to

participate in the arbitration), and therefore that arbitration cannot be a basis to

apply the arbitration exception.

Second, the FSIA's arbitration exception cannot be applied, based on the

New York Convention, against a foreign sovereign, such as Belize, that has not

ratified the Convention.  If Belize were a party to the Convention or had

participated in the LCIA arbitration, then it could be said that Belize may have

anticipated being sued in other Convention states.  However, Belize is not a party

to the Convention and did not participate in the LCIA arbitration.  *See Creighton*

*Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999) ("when a

country becomes a signatory to the Convention, by the very provisions of the

Convention, the signatory state must have contemplated enforcement actions in other signatory states.") (citation omitted).  Indeed, Article XII of the Convention requires ratification before it "enters into force" as to a given state; thus, U.S. courts or the Congress cannot "impute" the Convention to non-signatories.  This Circuit has held that "a treaty … binds only those countries that have ratified it." *Doe v. Exxon Mobil Corp.,* 654 F.3d 11, 35-36 (D.C. Cir. 2011) (U.S. not bound by Rome Statute because it has not ratified it), *vacated on other grounds*, 527 Fed.Appx. 7 (D.C. Cir. 2013); *Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1489 (D.C. Cir. 1991) ("United States has not ratified the Hague or Montreal Protocols and they are not binding on us …"); *Owner-Operator Independent Drivers Ass'n, Inc. v. U.S. Dept. of Transp.*, 724 F.3d 230, 232 (D.D.C. 2013); *Haver v. Yaker*, 75 U.S. (9 Wall.) 32, 35, 19 L.Ed. 571 (1869) (U.S. is bound by treaty only after "Senate, in whom rests the authority to ratify it, agree[s] to it"); *Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 256 (2d Cir. 2003) ("state only becomes bound by -- that is, becomes a party to -- a treaty when it ratifies the treaty."); *Flores-Nova v. Attorney Gen. of U.S.*, 652 F.3d 488, 494 n. 6 (3d Cir. 2011) ("Unratified treaties are not binding on the United States and do not have the force of law."); *U.S. v. Best*, 304 F.3d 308, 215 (3d Cir. 2002); *Garza v. Lappin,* 253 F.3d 918, 925 (7th Cir. 2001).  This same rule applied to the U.S. government must be applied to a friendly foreign state, like Belize.  "In the field of

international law, where no single sovereign reigns supreme, the Golden Rule takes on added poignancy." *de Sanchez v. Banco Central De Nicaragua*, 770 F.2d 1385, 1398 (5th Cir. 1985).

Third, even if Belize *had* agreed to arbitrate in a country, such as England, that was a signatory to the New York Convention, any resulting arbitration award could only be enforced in the courts of the United States if it "waived its immunity . . . by implication." 28 U.S.C. § 1605(a)(1). This Court, however, follows "the 'virtually unanimous' precedents construing the implied waiver provision narrowly." *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d at 122 (quoting *Shapiro v. Rep. of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)). For the "implied waiver" exception to apply, "the foreign state [must] have intended to waive its sovereign immunity. *Id*. "[C]ourts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the foreign state intended." *Foremost–McKesson, Inc. v. Islamic Rep. of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990). There is no evidence that GOB intended to waive its sovereign immunity in the U.S.[1] As this Court has held, an agreement to arbitrate in a

_____

[1]      Despite its name, the LCIA is not a "court" but an arbitration center based in London. Under the Accommodation Agreement, GOB purportedly agreed to arbitrate under LCIA rules. Under analogous circumstances, this Court has held that an agreement to arbitrate before the International Center for Settlement of Investment Disputes cannot be deemed an implicit waiver of sovereign immunity in the United States, although such arbitrations normally take place in Washington

country that is a signatory to the New York Convention is insufficient to demonstrate an intent to waive sovereign immunity. *Id*. at 123 ("Qatar not having signed the Convention, we do not think that its agreement to arbitrate in a signatory country, without more, demonstrated the requisite intent to waive it sovereign immunity in the United States."); *see also First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 752 n.6 (5th Cir. 2013) ("We also reject any argument that the Fujian Entities were on notice that they might be haled into court in the United States, having willingly submitted to arbitration in the United Kingdom.  The D.C. Circuit considered, and rejected, a similar argument in *Creighton ...*").

Thus, the District Court's application of the arbitration exception on the basis of an unratified treaty is contrary to settled law, because such a waiver of immunity by Belize would necessarily be deemed to have been by implication, yet "most courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States." *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 377 (7th Cir. 1985).

---

D.C., since the agreement did not foresee a role for U.S. courts.  *Maritime Int'l Nominees Establishment v. Rep. of Guinea,* 693 F.2d 1094, 1104 (D.C. Cir. 1982). Here, nothing in the Accommodation Agreement foresees a role for U.S. courts.

The District Court ignored this precedent, and instead relied on footnote 3 in *BSDL* for the proposition that "[t]he LCIA's award in this case is clearly governed by the New York Convention because both England (where the arbitration took place) and the United States are parties to the Convention." Tab 5 at 8. Relying on the same footnote, the District Court added that "Belize's status under the convention is irrelevant." *Id.*

The District Court misread *BSDL*. Footnote 3 of *BSDL* held that Belize's status under the New York Convention was irrelevant *to the issue of whether this action should have been stayed pending resolution of litigation in Belize*, because Belizean courts lacked "primary jurisdiction" under the Convention; BSDL did not address the questions of whether the arbitration exception to the FSIA applied to an arbitration conducted pursuant to an agreement that is void *ab initio* or with respect to a foreign state that is not a party to the New York Convention.

The District Court also cited *Creighton Ltd.* for the proposition that "[i]f the place of the award is 'in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration.'" *BSDL,* 668 F.3d at 731. *Creighton Ltd.* does not hold, as *BSDL* suggested, that an arbitration award against a non-signatory to the New York Convention could be enforced under the Convention as long as arbitration itself took place in a signatory country. In *BSDL,*

-13-

unlike here, it was *undisputed* that the Convention applied.  *Creighton Ltd.*, 181

F.3d at 121.  Moreover, the quoted language is from the Restatement, but omits the

next two sentences that point out that the Restatement rule does not necessarily

apply to foreign states.  In short, *BSDL* did not address the questions raised here.

> 3.  This Appeal Seeks Review of a Federal Circuit Decision on *Forum Non Conveniens* That Has Created A Circuit Split.

This appeal raises a serious question regarding the doctrine of *forum non*

*conveniens* ("FNC").  The FNC doctrine applies if there is an adequate alternative

forum and the private and public factors favor dismissal.  *Agudas Chasidei Chabad*

*of U.S. v. Russian Fed.,* 528 F.3d 934, 950 (D.C. Cir. 2008).  GOB moved to

dismiss on FNC grounds, arguing that Belize is an adequate alternative forum and

the private and public interest favor dismissal.  *BSDL*, 2013 WL 6502416 at *5.

The District Court denied the motion, holding that "[u]nfortunately for

GOB, there is no adequate alternative forum for this case because 'only a court of

the United States (or one of them) may attach commercial property of a foreign

nation located in the United States.'"  Tab 5 at 10 (citing *TMR Energy Ltd. v. State*

*Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005)).

*TMR Energy* is at odds with decisions from the Second Circuit that have

dismissed confirmation actions under the New York Convention on FNC grounds.

*See Figueiredo Ferraz E. Engenieria de Projecto Ltda. v. Republic of Peru*, 665

F.3d 384, 389-394 (2d Cir. 2011); *see also, generally, In re Arbitration Between*

*Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488

(2d Cir. 2002).  The Second Circuit has held, disagreeing with *TMR Energy*, that

> "It is no doubt true that only a United States court may attach a defendant's
> particular assets located here, but that circumstance cannot render a foreign
> forum inadequate.  If it could, every suit having the ultimate objective of
> executing upon assets located in this country could never be dismissed
> because of FNC."

*Figueiredo Ferraz*, 665 F.3d at 390.  The District Court recognized the circuit split,

but held that *TMR Energy* "is the controlling law in our Circuit."  Tab 5 at 11 and

n. 9.  GOB respectfully submits that the Second Circuit's reasoning is better.  *TMR*

*Energy* essentially eviscerates the FNC doctrine, because plaintiffs will always

seek to enforce a judgment against assets in the U.S.  Further, *TMR Energy* is at

odds with Supreme Court precedent, which imposes no such limitation.  *See Piper*

*Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).  Had the District Court not been

bound by *TMR Energy*, the result would have been different, because the FNC

factors favor dismissal.  The parties to the Accommodation Agreement and award

(BTL and GOB) are Belizean, and the Belizean courts have a greater interest in

determining whether a former Prime Minister executed secret agreements allowing

unlawful tax and duty exemptions.

    4. <u>The District Court Erred In Refusing to Consider a CCJ Decision</u>
      <u>that Creates a Conflict Warranting Dismissal on Comity Grounds.</u>

  The District Court denied GOB's motion to dismiss on international comity

grounds stating that the *BSDL* "essentially forecloses these arguments, as the Court

held that litigation in Belize 'has no preclusive effect on the district court's disposition of the petition to enforce.'"  Tab 5 at 11 (citing *BSDL*, 668 F.3d at 730).  Whether the pending action in Belize has a "preclusive" effect is an entirely different issue from whether an action can be dismissed based on the doctrine of comity.  Comity is a discretionary doctrine.  Again, the District Court was under the incorrect impression that the panel in *BSDL* had "instructed me to proceed with enforcement anyway" and "regardless of whether our Circuit Court's holding has the potential for straining relations between the United States and Belize … I am, in the final analysis, bound by that decision."  *Id.*

The District Court's further conclusion that "I am not convinced that there is a 'true conflict' between U.S. and Belizean law," Tab 5 at 12 and n. 10, fails to appreciate the conflict.  The Caribbean Court of Justice ("CCJ"), the highest appellate body in Belize, issued a decision that accommodation agreements were illegal under the Belizean Constitution and statutes and, on that basis, refused to enforce an LCIA arbitration award against GOB.  Tab 4.  The District Court declined stating that the CCJ's "ruling would have no impact on my analysis" given its misreading of the *BSDL* "relevance" holding.  Tab 5 at 27, n. 31.  Even if the District Court was not bound by the CCJ determination that the award was unenforceable, comity required deference to the CCJ holding that accommodation agreements are illegal under Belizean law.

The District Court stated that "GOB ignores that 'the central precept of comity teaches that, *when possible, the decisions of foreign tribunals should be given effect in domestic courts,* since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability.' *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C. Cir. 1984)." Tab 5 at 12, n. 11. The District Court should have heeded its own advice and dismissed in deference to the CCJ decision. Instead, the District Court has confirmed an award based on a corrupt and illegal agreement.

> 5. On the Merits, the District Court Erred by Failing to Consider Whether the Accommodation Agreement, Containing the Arbitration Clause, Was Void *Ab Initio*.

The District Court did not address the merits of GOB's argument that the Accommodation Agreement was void *ab initio* under Belizean law, meaning that the award could not be confirmed against GOB. Instead, the District Court held that, even if a contract itself is void, an arbitration clause within that contract remains enforceable "[a]bsent a direct challenge to the arbitration clause itself," Tab 5 at 19, and that whether the Accommodation Agreement was void *ab initio* was a determination for the LCIA, not the District Court, to make.

The District Court's reasoning is contrary to well-established law. *See Snowden v. Checkpoint Check Cashing,* 290 F.3d 631, 637 (4th Cir. 2002) ("The severability doctrine has been held not to apply when the party seeking to avoid

-17-

arbitration contends that it never assented in the first place to the contract containing the arbitration provision."); *China Minmetals Import and Export Co., Ltd. v. Chi Mei Corp.,* 334 F.3d 274, 289 (3d Cir. 2003) ("a party that opposes enforcement of a foreign arbitration award under the [New York] Convention on the grounds that the alleged agreement containing the arbitration clause on which the arbitration panel rested its jurisdiction was void *ab initio* is entitled to present evidence of such invalidity to the district court, which must make an independent determination of the agreement's validity and therefore of the arbitrability of the dispute, at least in the absence of a waiver precluding the defense."); *BG Group PLC v. Rep. of Argentina*, 134 S.Ct. 1198, 1206-07 (2014)(courts, not arbitrators, to decide validity of arbitration agreements); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) (whether non-signatory of an agreement containing an arbitration provision is subject to arbitration is a question for courts, not arbitrator).  By contrast, *Buckeye Check Cashing, Inc. v. Cardegna*, 540 U.S. 440 (2006), upon which the District Court based its analysis, is inapposite, because "[i]n *Buckeye*, the formation of the parties' arbitration agreement was not at issue." *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 130 S.Ct. 2847, 2858 (2010).

      An invalid agreement cannot be enforced against a foreign state that is not a party to the Convention merely because the award was made in the territory of a

party to the Convention.  Otherwise, corrupt foreign officials could ensure that their illegal agreements receive unquestioning validation by U.S. courts simply by inserting clauses calling for arbitration in signatory states.[2]

### B. Absent a Stay, GOB Will Suffer Irreparable Harm.

GOB would be irreparably harmed if forced to respond to BSDL's "post judgment discovery," which seeks detailed and vast information concerning Belize's assets in the U.S.  As cited above, the FSIA is intended to protect foreign states like GOB from the burdens attendant to litigation.  In particular, "general-asset discovery … is incompatible with the FSIA."  *Rubin,* 637 F.3d at 799.

It is also unlikely that GOB, if paid the $22 million Judgment, would be able to recover those monies back from BSDL if GOB prevailed on appeal.  BSDL is a special purpose entity incorporated in the British Virgin Islands two days after LCIA issued the award solely for the purpose of being the assignee of the award.  Those funds would disappear after they are collected leaving BSDL a mere shell.

### C. A Stay Would Not Harm Any Other Party.

Neither BSDL nor any other party would be harmed by a stay.  Any "delay" in payment to BSDL can be accommodated through post-judgment interest.

---

[2]     It is particularly important for a court to adjudicate claims that an underlying contract was void *ab initio* for lack of authority in the case of a foreign state, because a government cannot be bound when the government official lacked actual authority.  *See Fed. Crop. Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *U.S. v. Walcott*, 972 F.2d 323, 327 (11th Cir. 1992).

**D.    The Public Interest Supports Issuance of a Stay.**

Forcing GOB to pay $22 million based on a secret agreement that violates Belizean laws – and a Judgment entered without consideration of the validity of that agreement – would be offensive to recognized notions of international comity and relations among nations.  *See Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Court for Southern Dist. of Iowa,* 482 U.S. 522, 544 (1987) (comity refers to the "spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."); *Cunard Steamship Co. v. Salen Reefer Servs. AB,* 773 F.2d 452 (2d Cir. 1985) (U.S. courts ordinarily defer to proceedings taking place in foreign countries). Comity militates strongly against a U.S. court compelling a foreign sovereign state to pay $22 million pursuant to an agreement that is repugnant to Belize's own laws, as held by the CCJ, before the validity of the judgment based on that illegal agreement and corresponding illegitimate arbitration award can be ascertained by this Court.

## CONCLUSION

Because all four of the *Virginia Petroleum Jobbers* factors weigh in favor of a stay, this Court should stay all proceedings in the District Court, including but not limited to discovery and attempts to execute the void judgment entered below.

-20-

Respectfully submitted,

DATE:  May 9, 2014                    /s/ Creighton R. Magid
                                      Creighton R. Magid (#49713)
                                      DORSEY & WHITNEY LLP
                                      1801 K Street, N.W., Suite 750
                                      Washington, D.C.  20006
                                      Telephone: (202) 442-3555
                                      Fax:  (202) 442-3199
                                      magid.chip@dorsey.com

                                      Juan C. Basombrio
                                      (*pro hac vice* application to be filed)
                                      DORSEY & WHITNEY LLP
                                      600 Anton Boulevard, Suite 2000
                                      Costa Mesa, California  92626
                                      Telephone:  (714) 800-1405
                                      Fax:  (714) 800-1499
                                      basombrio.juan@dorsey.com

                                      Attorneys for Appellant Government of
                                      Belize

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 9th day of May, 2014, I electronically filed the foregoing APPELLANT'S EMERGENCY MOTION TO STAY PROCEEDINGS PENDING APPEAL with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system, which automatically served all counsel in this case.

/s/ Creighton R. Magid
Creighton R. Magid

# TAB 1

USCA Case #14-7002     Document #1492424     Filed: 05/09/2014     Page 24 of 231

APPEAL,CLOSED,STAYED,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:09-cv-02170-RJL

BELIZE SOCIAL DEVELOPMENT LIMITED v.
GOVERNMENT OF BELIZE
Assigned to: Judge Richard J. Leon
Case in other court:  10-07167
                      14-07002
                      14-07003
                      14-07018
Cause: 09:0202 Award under Convention on Foreign Arbitral
Awards

Date Filed: 11/17/2009
Date Terminated: 01/16/2014
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Petitioner**

**BELIZE SOCIAL DEVELOPMENT**
**LIMITED**

represented by **Joseph S. Hall**
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036
(202) 326-7983
Fax: (202) 328-7999
Email: jhall@khhte.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Chris Todd**
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036
(202) 326-7900
Fax: (202) 326-7999
Email: ctodd@khhte.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin Graham Koehler**
SIDLEY AUSTIN, LLP
1501 K Street, NW
Washington, DC 20005-1401
(202) 736-8359
Fax: (202) 736-8711
Email: kkoehler@sidley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

USCA Case #14-7002      Document #1492424      Filed: 05/09/2014      Page 25 of 231

**Dana C. MacGrath**
SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-7319
Fax: (212) 839-5599
Email: dmacgrath@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Louis B. Kimmelman**
SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
Fax: (212) 839-5599
Email: bkimmelman@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**GOVERNMENT OF BELIZE**      represented by  **Creighton R. Magid**
DORSEY & WHITNEY LLP
1801 K Street NW
Suite 750
Washington, DC 20006
(202) 442-3555
Fax: (202) 442-3199
Email: magid.chip@dorseylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jay Christopher Johnson**
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
(202) 344-4698
Fax: (202) 344-8300
Email: jcjohnson@venable.com
*TERMINATED: 01/31/2013*

**Juan C. Basombrio**
DORSEY & WHITNEY LLP
600 Anton Boulevard
Suite 2000
Costa Mesa, CA 92646
714-800-1400
Fax: 714-800-1499
Email: basombrio.juan@dorsey.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Timothy J. Koeppl**
DORSEY & WHITNEY, L.L.P.
1801 K Street, NW
Suite 750
Washington, DC 20006
(202) 442-3510
Email: koeppl.timothy@dorsey.com
*TERMINATED: 07/28/2010*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/17/2009 | 1 | PETITION TO CONFIRM ARBITRATION AWARD against GOVERNMENT OF BELIZE ( Filing fee $ 350 receipt number 4616025534.) filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Louis B. Kimmelman, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Declaration Stephen J. Ruzika, # 17 Exhibit A, # 18 Exhibit B, # 19 Exhibit C, # 20 Exhibit D, # 21 Notice of Filing of Petition to Confirm Foreign Arbitration Award and to Enter Judgment, # 22 Civil Cover Sheet)(jf, ) (Entered: 11/18/2009) |
| 11/17/2009 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests NONE by BELIZE SOCIAL DEVELOPMENT LIMITED. (jf, ) (Entered: 11/18/2009) |
| 11/17/2009 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Dana C. MacGrath, :Firm- Allen & Overy LLP, :Address- 1221 Avenue of the Americas, New York, New York 10020. Phone No. - 212-610-6300. Fax No. - 212-610-6399 by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(jf, ) (Entered: 11/18/2009) |
| 11/17/2009 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Louis B. Kimmelman, :Firm- Allen & Overy LLP, :Address- 1221 Avenue of the Americas, New York, New York 10020. Phone No. - 212-610-6300. Fax No. - 212-610-6399 by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(jf, ) (Entered: 11/18/2009) |
| 11/17/2009 | 5 | REQUEST from Petitioner for the Clerk to effect service of one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (Attachments: # 1 Notice of Suit) (jf, ) (Entered: 11/18/2009) |
| 11/20/2009 | 7 | CERTIFICATE OF CLERK of mailing one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state on Defendant, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (Attachments: # 1 Receipt of Mailing) (jf, ) (Main Document 7 replaced on 11/30/2009) (jf, ). (Entered: 11/27/2009) |
| 11/23/2009 | | MINUTE ORDER granting 3 Motion of LOUIS B. KIMMELMAN for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GRANTED. Signed |

| | | by Judge Richard J. Leon on 11/23/09. (lcrjl3) (Entered: 11/23/2009) |
|---|---|---|
| 11/23/2009 | | MINUTE ORDER granting 4 Motion of DANA C. MACGRATH for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 11/23/09. (lcrjl3) (Entered: 11/23/2009) |
| 11/25/2009 | 6 | STANDING ORDER. Signed by Judge Richard J. Leon on 11/25/09. (lcrjl3) (Entered: 11/25/2009) |
| 12/17/2009 | 8 | MOTION for Order *to Resend* by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Text of Proposed Order)(Hall, Joseph) (Entered: 12/17/2009) |
| 12/28/2009 | | MINUTE ORDER granting 8 Motion to Resend. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 12/28/09. (lcrjl3) (Entered: 12/28/2009) |
| 01/07/2010 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to GOVERNMENT OF BELIZE served on 12/2/2009, answer due 2/1/2010. (jf, ) (Entered: 01/07/2010) |
| 01/07/2010 | 10 | Summons Returned Unexecuted as to Attorney General for the GOVERNMENT OF BELIZE. (jf, ) . (Entered: 01/07/2010) |
| 01/22/2010 | 11 | NOTICE of Appearance by Timothy J. Koeppl on behalf of GOVERNMENT OF BELIZE (Koeppl, Timothy) (Entered: 01/22/2010) |
| 01/22/2010 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Juan C. Basombrio, :Firm- Dorsey & Whitney LLP, :Address- 38 Technology Drive, Suite 100, Irvine, California 92618-5310. Phone No. - 949-932-3650. Fax No. - 949-932-3601 by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order)(Koeppl, Timothy) (Entered: 01/22/2010) |
| 01/22/2010 | 13 | Joint MOTION for Extension of Time to File Response/Reply *to Petition* by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order)(Koeppl, Timothy) (Entered: 01/22/2010) |
| 01/25/2010 | | MINUTE ORDER granting 12 Motion of JUAN C. BASOMBRIO for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 1/25/10. (lcrjl3) (Entered: 01/25/2010) |
| 03/29/2010 | 14 | NOTICE *of Rule 44.1 Intent to Rely on Foreign Law* by GOVERNMENT OF BELIZE (Koeppl, Timothy) (Entered: 03/29/2010) |
| 03/29/2010 | 15 | MOTION to Dismiss for Lack of Jurisdiction or Stay by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order, # 2 Declaration Claire L. Jones, # 3 Declaration Michael C. Young - Part A, # 4 Declaration Michael C. Young - Part B, # 5 Declaration Michael C. Young - Part C, # 6 Declaration Michael C. Young - Part D, # 7 Declaration Michael C. Young - Part E, # 8 Declaration Michael C. Young - Part F, # 9 Declaration Gian C. Ghandi - Part A, # 10 Declaration Gian C. Ghandi - Part B, # 11 Declaration Gian C. Ghandi - Part C, # 12 Declaration Gian C. Ghandi - Part D, # 13 Declaration Gian C. Ghandi - Part E, # 14 Declaration Gian C. Ghandi - Part F, # 15 Declaration Gian C. Ghandi - Part G, # 16 Declaration Gian C. Ghandi - Part H, # 17 Declaration Gian C. Ghandi - Part I, # 18 Declaration Gian C. Ghandi - Part J, # 19 Declaration Gian C. Ghandi - Part K, # 20 Declaration Gian C. Ghandi - Part L, # 21 Declaration Gian C. Ghandi - Part M, # 22 Declaration Gian C. Ghandi - Part N, # 23 Declaration Gian C. Ghandi - Part O, # 24 Declaration Gian C. Ghandi - Part P, # 25 |

| | | |
|---|---|---|
| | | Declaration Juan C. Basombrio - Part A, # 26 Declaration Juan C. Basombrio - Part B, # 27 Declaration Juan C. Basombrio - Part C, # 28 Declaration Juan C. Basombrio - Part D, # 29 Declaration Juan C. Basombrio - Part E, # 30 Declaration Juan C. Basombrio - Part F, # 31 Declaration Juan C. Basombrio - Part G, # 32 Declaration Juan C. Basombrio - Part H, # 33 Declaration Juan C. Basombrio - Part I, # 34 Declaration Juan C. Basombrio - Part J, # 35 Declaration Juan C. Basombrio - Part K, # 36 Declaration Juan C. Basombrio - Part L, # 37 Declaration Juan C. Basombrio - Part M, # 38 Declaration Juan C. Basombrio - Part N, # 39 Declaration Juan C. Basombrio - Part O, # 40 Declaration Juan C. Basombrio - Part P)(Koeppl, Timothy). Added MOTION to Stay on 3/30/2010 (znmw, ). (Entered: 03/29/2010) |
| 03/29/2010 | 16 | RESPONSE re 1 Petition to Confirm Arbitration Award,, *Preliminary Response to Petition* filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Text of Proposed Order Dismissing Petition, # 2 Declaration Claire L. Jones, # 3 Declaration Michael C. Young - Part A, # 4 Declaration Michael C. Young - Part B, # 5 Declaration Michael C. Young - Part C, # 6 Declaration Michael C. Young - Part D, # 7 Declaration Michael C. Young - Part E, # 8 Declaration Michael C. Young - Part F, # 9 Declaration Gian C. Ghandi - Part A, # 10 Declaration Gian C. Ghandi - Part B, # 11 Declaration Gian C. Ghandi - Part C, # 12 Declaration Gian C. Ghandi - Part D, # 13 Declaration Gian C. Ghandi - Part E, # 14 Declaration Gian C. Ghandi - Part F, # 15 Declaration Gian C. Ghandi - Part G, # 16 Declaration Gian C. Ghandi - Part H, # 17 Declaration Gian C. Ghandi - Part I, # 18 Declaration Gian C. Ghandi - Part J, # 19 Declaration Gian C. Ghandi - Part K, # 20 Declaration Gian C. Ghandi - Part L, # 21 Declaration Gian C. Ghandi - Part M, # 22 Declaration Gian C. Ghandi - Part N, # 23 Declaration Gian C. Ghandi - Part O, # 24 Declaration Gian C. Ghandi - Part P, # 25 Declaration Juan C. Basombrio - Part A, # 26 Declaration Juan C. Basombrio - Part B, # 27 Declaration Juan C. Basombrio - Part C, # 28 Declaration Juan C. Basombrio - Part D, # 29 Declaration Juan C. Basombrio - Part E, # 30 Declaration Juan C. Basombrio - Part F, # 31 Declaration Juan C. Basombrio - Part G, # 32 Declaration Juan C. Basombrio - Part H, # 33 Declaration Juan C. Basombrio - Part I, # 34 Declaration Juan C. Basombrio - Part J, # 35 Declaration Juan C. Basombrio - Part K, # 36 Declaration Juan C. Basombrio - Part L, # 37 Declaration Juan C. Basombrio - Part M, # 38 Declaration Juan C. Basombrio - Part N, # 39 Declaration Juan C. Basombrio - Part O, # 40 Declaration Juan C. Basombrio - Part P)(Koeppl, Timothy) (Entered: 03/29/2010) |
| 03/29/2010 | 17 | MOTION to Bifurcate by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order Granting Respondents Motion to Bifurcate)(Koeppl, Timothy) (Entered: 03/29/2010) |
| 04/12/2010 | | MINUTE ORDER GRANTING 13 Joint Motion for Extension of Time to Respond to Petition nunc pro tunc. Signed by Judge Richard J. Leon on 4/12/2010. (lcrjl3) (Entered: 04/12/2010) |
| 04/13/2010 | 18 | Joint MOTION for Extension of Time to *File Reply And/Or Opposition Papers With Respect To (1) Petition To Confirm Foreign Arbitration Award, (2) Motion To Stay/Dismiss Petition, And (3) Motion To Bifurcate* by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Text of Proposed Order)(Hall, Joseph) (Entered: 04/13/2010) |
| 04/14/2010 | | MINUTE ORDER granting 18 Joint Motion for Extension of Time to File Reply And/Or Opposition Papers. It is hereby ORDERED that the motion is GRANTED. Petitioner shall file by May 28, 2010, its: (a) Reply in support of the Petition to Confirm Foreign Arbitration Award and to Enter Judgment; (b) Opposition to Respondent's Motion to Stay Action or, in the Alternative, Dismiss Petition; and (c) |

| | | |
|---|---|---|
| | | Opposition to Respondent's Motion to Bifurcate. Respondent shall file by July 2, 2010, its: (a) Reply in support of the Motion to Stay Action or, in the Alternative, Dismiss Petition; and (b) Reply in support of the Motion to Bifurcate. Signed by Judge Richard J. Leon on 4/14/2010. (lcrjl3) (Entered: 04/14/2010) |
| 05/10/2010 | 19 | ERRATA *To Provide Corrected PDF Of Memorandum Of Points And Authorities In Support Of Petition To Confirm Arbitration Award And To Enter Judgment* by BELIZE SOCIAL DEVELOPMENT LIMITED 1 Petition to Confirm Arbitration Award,, filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Exhibit)(Hall, Joseph) (Entered: 05/10/2010) |
| 05/11/2010 | 20 | NOTICE of Appearance by Kenneth Christy Todd on behalf of BELIZE SOCIAL DEVELOPMENT LIMITED (Todd, Kenneth) (Entered: 05/11/2010) |
| 05/25/2010 | 21 | MOTION To Suspend The April 14, 2010 Scheduling Order And For A Status Conference by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Hall, Joseph) (Entered: 05/25/2010) |
| 05/26/2010 | 22 | Memorandum in opposition to re 21 MOTION To Suspend The April 14, 2010 Scheduling Order And For A Status Conference filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Text of Proposed Order)(Koeppl, Timothy) (Entered: 05/26/2010) |
| 05/27/2010 | 23 | REPLY to opposition to motion re 21 MOTION To Suspend The April 14, 2010 Scheduling Order And For A Status Conference filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Hall, Joseph) (Entered: 05/27/2010) |
| 06/10/2010 | 24 | REPLY to opposition to motion re 15 MOTION to Dismiss for Lack of Jurisdiction *or stay action* MOTION to Stay filed by GOVERNMENT OF BELIZE. (Koeppl, Timothy) (Entered: 06/10/2010) |
| 06/14/2010 | 25 | SURREPLY to re 15 MOTION to Dismiss for Lack of Jurisdiction *or stay action* MOTION to Stay filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Hall, Joseph) (Entered: 06/14/2010) |
| 06/21/2010 | | MINUTE ORDER denying 21 Motion to Suspend the April 14, 2010 Scheduling Order and for a Status Conference. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 6/21/2010. (lcrjl3) (Entered: 06/21/2010) |
| 06/24/2010 | 26 | MOTION To Clarify The June 21, 2010 Minute Order To Ensure A Fair Hearing by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Hall, Joseph) (Entered: 06/24/2010) |
| 07/08/2010 | 27 | Memorandum in opposition to re 26 MOTION To Clarify The June 21, 2010 Minute Order To Ensure A Fair Hearing filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Text of Proposed Order)(Koeppl, Timothy) (Entered: 07/08/2010) |
| 07/16/2010 | 28 | REPLY to opposition to motion re 26 MOTION To Clarify The June 21, 2010 Minute Order To Ensure A Fair Hearing filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Hall, Joseph) (Entered: 07/16/2010) |
| 07/28/2010 | 29 | NOTICE of Appearance by Jay Christopher Johnson on behalf of GOVERNMENT OF BELIZE (Johnson, Jay) (Entered: 07/28/2010) |
| 07/28/2010 | 30 | NOTICE OF WITHDRAWAL OF APPEARANCE as to GOVERNMENT OF BELIZE. Attorney Timothy J. Koeppl terminated. (Koeppl, Timothy) (Entered: 07/28/2010) |

| | | |
|---|---|---|
| 10/18/2010 | | MINUTE ORDER granting 15 Motion to Stay or, in the Alternative, Dismiss Petition. It is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the proceedings in this case shall be STAYED pending resolution of the parties' case before the Belize Supreme Court. Signed by Judge Richard J. Leon on 10/18/2010. (lcrjl3) (Entered: 10/18/2010) |
| 10/18/2010 | | MINUTE ORDER denying 17 Motion to Bifurcate as moot. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 10/18/2010. (lcrjl3) (Entered: 10/18/2010) |
| 10/18/2010 | | MINUTE ORDER denying 26 Motion To Clarify the June 21, 2010 Minute Order to Ensure a Fair Hearing. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 10/18/2010. (lcrjl3) (Entered: 10/18/2010) |
| 11/16/2010 | 31 | NOTICE OF APPEAL as to Order on Motion for Miscellaneous Relief, Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Stay,, by BELIZE SOCIAL DEVELOPMENT LIMITED. Filing fee $ 455, receipt number 0090-2353925. Fee Status: Fee Paid. Parties have been notified. (Todd, Kenneth) (Entered: 11/16/2010) |
| 11/17/2010 | 32 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 31 Notice of Appeal,. (znmw, ) (Entered: 11/17/2010) |
| 12/03/2010 | | USCA Case Number 10-7167 for 31 Notice of Appeal, filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (jf, ) (Entered: 12/03/2010) |
| 08/16/2011 | 33 | NOTICE of Change of Address by Jay Christopher Johnson (Johnson, Jay) (Entered: 08/16/2011) |
| 07/20/2012 | | Set/Reset Hearings: Status Conference set for 9/24/2012 11:00 AM in Courtroom 18 before Judge Richard J. Leon. (kc ) (Entered: 07/20/2012) |
| 09/24/2012 | | Minute Entry for proceedings held before Judge Richard J. Leon. Status Conference held on 9/24/2012. Plaintiff's Pleadings due by 10/9/2012; Defendant's Response due by 10/23/2012; Plaintiff's Reply due by 11/2/2012. (Court Reporter Pat Kaneshireo-Miller.) (kc ) (Entered: 09/24/2012) |
| 10/09/2012 | 34 | SUPPLEMENTAL MEMORANDUM to re Status Conference, Set Deadlines,, *Petitioner's Memorandum Regarding the Resolution of this Case on Remand Following the Court of Appeals' Grant of Mandamus* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (MacGrath, Dana) (Entered: 10/09/2012) |
| 10/23/2012 | 35 | SUPPLEMENTAL MEMORANDUM to re Status Conference, Set Deadlines,, 34 Supplemental Memorandum, *Regarding Proposed Procedural Steps After Remand* filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8) (Johnson, Jay) (Entered: 10/23/2012) |
| 11/02/2012 | 36 | REPLY re 34 Supplemental Memorandum, *Petitioner's Reply Memorandum Regarding the Resolution of This Case on Remand Following the Court of Appeals' Grant of Mandamus* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Text of Proposed Order)(Kimmelman, Louis) (Entered: 11/02/2012) |
| 12/13/2012 | 37 | ORDER, Ordered that oral argument on the Petition to Confirm Arbitration Award and to Enter Judgment 1 , and all of the related submissions by the parties including the papers filed by the parties relating to the Motion to Stay Action or, in the Alternative, |

| | | |
|---|---|---|
| | | Dismiss 15 , and the Response to Petition to Confirm Arbitration Award 16 , shall be held on the 25th day of February, 2013, at 11:00 AM. in Courtroom 18 of the United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. SO ORDERED. Signed by Judge Richard J. Leon on 12/11/2012. (see order) (kc ) (Entered: 12/13/2012) |
| 12/14/2012 | 38 | Unopposed MOTION for Extension of Time to *File Briefs* by GOVERNMENT OF BELIZE (Johnson, Jay) (Entered: 12/14/2012) |
| 12/19/2012 | | MINUTE ORDER granting 38 Motion to Modify Briefing Schedule. It is hereby ORDERED that Respondent Government of Belize shall file any further papers in support of its Motion to Stay Action or, in the Alternative, Dismiss and its Response to Petition to Confirm Arbitration Award filed in March 2010, to the extent Respondent deems necessary, by January 14, 2013; and it is further ORDERED that Petitioner BSDL shall file its opposition to the Motion to Stay Action or, in the Alternative, Dismiss and its reply to the Response to Confirm Arbitration Award by February 15, 2013. Signed by Judge Richard J. Leon on 12/19/2012. (lcrjl3) (Entered: 12/19/2012) |
| 12/19/2012 | | Set/Reset Deadlines: Government of Belize shall file any further papers in support of its Motion to Stay Action or, in the Alternative, Dismiss and its Response to Petition to Confirm Arbitration Award by 1/14/2013; BSDL shall file its opposition to the Motion to Stay Action or, in the Alternative, Dismiss and its reply in support of the Petition to Confirm Arbitration Award by 2/15/2013. (jth) (Entered: 12/19/2012) |
| 01/14/2013 | 39 | SUPPLEMENTAL MEMORANDUM to re 15 MOTION to Dismiss for Lack of Jurisdiction *or stay action* MOTION to Stay filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Declaration of Michael C. Young (Second), # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K)(Johnson, Jay) (Entered: 01/14/2013) |
| 01/14/2013 | 40 | MOTION for Discovery by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order)(Johnson, Jay) (Entered: 01/14/2013) |
| 01/31/2013 | 41 | NOTICE OF WITHDRAWAL OF APPEARANCE as to GOVERNMENT OF BELIZE. Attorney Jay Christopher Johnson terminated. (Johnson, Jay) (Entered: 01/31/2013) |
| 01/31/2013 | 42 | NOTICE of Appearance by Creighton R. Magid on behalf of GOVERNMENT OF BELIZE (Magid, Creighton) (Entered: 01/31/2013) |
| 01/31/2013 | 43 | Memorandum in opposition to re 40 MOTION for Discovery *Petitioner's Opposition to Respondent's Motion for Discovery* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Kimmelman, Louis) (Entered: 01/31/2013) |
| 02/07/2013 | 44 | REPLY to opposition to motion re 40 MOTION for Discovery filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Declaration of Michael C. Young) (Magid, Creighton) (Entered: 02/07/2013) |
| 02/08/2013 | | MINUTE ORDER denying 40 Respondent Government of Belize's Motion for Leave to Conduct Limited Discovery. It is hereby ORDERED that respondent's motion is DENIED. Signed by Judge Richard J. Leon on 2/8/2013. (lcrjl3) (Entered: 02/08/2013) |
| 02/15/2013 | 45 | SUPPLEMENTAL MEMORANDUM to re 15 MOTION to Dismiss for Lack of Jurisdiction *or stay action* MOTION to Stay filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Text of Proposed Order, # 2 |

| | | |
|---|---|---|
| | | Declaration of Louis B. Kimmelman in Opposition to Respondent's Motion, and in Support of the Petition, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Declaration of Eamon H. Courtenay, S.C., # 7 Exhibit A, # 8 Exhibit B, # 9 Exhibit C, # 10 Exhibit D, # 11 Exhibit E, # 12 Exhibit F, # 13 Exhibit G, # 14 Exhibit H, # 15 Exhibit I, # 16 Opinion of Marcus Smith QC on English Law, # 17 Exhibit A, # 18 Exhibit B, # 19 Exhibit C, # 20 Exhibit D, # 21 Exhibit E, # 22 Exhibit F, # 23 Exhibit G, # 24 Exhibit H, # 25 Exhibit I, # 26 Exhibit J, # 27 Exhibit K, # 28 Exhibit L, # 29 Exhibit M, # 30 Exhibit N, # 31 Exhibit O, # 32 Exhibit P, # 33 Exhibit Q, # 34 Rule 44.1 Notice of Intention to Rely Upon Foreign Law)(Kimmelman, Louis) (Entered: 02/15/2013) |
| 02/22/2013 | 46 | ERRATA *Notice of Errata Regarding the Declaration of Eamon H. Courtenay, S.C. and Petitioner's Memorandum in Opposition to Respondent's Motion to Stay or Dismiss and in Further Support of Petition to Confirm Foreign Arbitration Award and to Enter Judgment* by BELIZE SOCIAL DEVELOPMENT LIMITED 45 Supplemental Memorandum,,,, filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Kimmelman, Louis) (Entered: 02/22/2013) |
| 02/25/2013 | | Minute Entry for proceedings held before Judge Richard J. Leon.Oral Argument Hearing held on 2/25/2013. The Court takes matter under advisement. (Court Reporter Patty Gels.) (kc ) (Entered: 02/25/2013) |
| 09/30/2013 | 47 | MOTION for Leave to File *Additional Briefing* by GOVERNMENT OF BELIZE (Attachments: # 1 Declaration of Juan Basombrio, # 2 Exhibit 1, # 3 Text of Proposed Order)(Magid, Creighton) (Entered: 09/30/2013) |
| 10/02/2013 | 48 | ERRATA *to Declaration of Juan Basbombrio* by GOVERNMENT OF BELIZE 47 MOTION for Leave to File *Additional Briefing* filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Declaration of Juan Basombrio, # 2 Exhibit 1)(Magid, Creighton) (Entered: 10/02/2013) |
| 10/15/2013 | 49 | RESPONSE re 47 MOTION for Leave to File *Additional Briefing* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Declaration Kimmelman Declaration, # 2 Exhibit A)(Kimmelman, Louis) (Entered: 10/15/2013) |
| 10/17/2013 | 50 | REPLY to opposition to motion re 47 MOTION for Leave to File *Additional Briefing* filed by GOVERNMENT OF BELIZE. (Magid, Creighton) (Entered: 10/17/2013) |
| 12/11/2013 | 51 | MEMORANDUM AND OPINION. Signed by Judge Richard J. Leon on 12/11/13. (tb, ) (Entered: 12/11/2013) |
| 12/11/2013 | 52 | ORDER: For the reasons set forth Memorandum Opinion entered this date: It is hereby ordered that 1 Petition to Confirm Arbitration Award and to Enter Judgment is GRANTED; it is further ordered that judgment shall be entered in favor of Petitioner and against Respondent for the monetary portion of the Final Award[3-1]. It is further ordered the parties shall within seven (7) days of this Order submit proposed judgment amounts with conversion and interested calculated in accordance with the Memorandum Opinion; it is further ordered that respondent's 15 Motion to Stay Action is DENIED; and it is further ordered that respondent's 47 Motion for Leave to Submit Additional Briefing is DENIED. SEE ORDER FOR FULL DETAILS. Signed by Judge Richard J. Leon on 12/11/13. (tb, ) (Entered: 12/11/2013) |
| 12/18/2013 | 53 | NOTICE *OF FILING OF PETITIONER'S PROPOSED JUDGMENT AMOUNTS* by BELIZE SOCIAL DEVELOPMENT LIMITED (Kimmelman, Louis) (Entered: 12/18/2013) |

| 12/19/2013 | 54 | MEMORANDUM re 52 Order on Motion for Leave to File,,, by GOVERNMENT OF BELIZE. (Magid, Creighton) (Entered: 12/19/2013) |
| 12/23/2013 | 55 | REPLY re 54 Memorandum *filed by Respondent Responding to the Court's December 11, 2013 Order* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Kimmelman, Louis) (Entered: 12/23/2013) |
| 12/27/2013 | 56 | REPLY *TO BSDL 56 "REPLY" CONCERNING PROPOSED JUDGMENT AMOUNTS* filed by GOVERNMENT OF BELIZE. (Magid, Creighton) . (Entered: 12/27/2013) |
| 01/08/2014 | 57 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion to Bifurcate, 51 Memorandum & Opinion, Order on Motion for Discovery, 52 Order on Motion for Leave to File,,, by GOVERNMENT OF BELIZE. Filing fee $ 505, receipt number 0090-3585618. Fee Status: Fee Paid. Parties have been notified. (Magid, Creighton) (Entered: 01/08/2014) |
| 01/09/2014 | 58 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 57 Notice of Appeal to DC Circuit Court,. (znmw, ) (Entered: 01/09/2014) |
| 01/09/2014 | 59 | MEMORANDUM ORDER: Upon consideration of the petitioner's 53 Notice of Proposed Judgment Amounts and the response by the Respondent the next day. It is hereby ordered that the petitioner is awarded $22,484,961.94 in U.S. dollars. Signed by Judge Richard J. Leon on 01/08/14. (tb, ) (Entered: 01/09/2014) |
| 01/09/2014 | 60 | Supplemental Record on Appeal, consisting of a copy of the Memorandum Order filed 1/9/14 and docket sheet transmitted to US Court of Appeals re 57 Notice of Appeal to DC Circuit Court. USCA Case Number U.S.C.A. No. not assigned. (mlp) (Entered: 01/09/2014) |
| 01/13/2014 | 61 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 59 Order, by GOVERNMENT OF BELIZE. Filing fee $ 505, receipt number 0090-3590213. Fee Status: Fee Paid. Parties have been notified. (Magid, Creighton) (Entered: 01/13/2014) |
| 01/14/2014 | 62 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 61 Notice of Appeal to DC Circuit Court. (znmw, ) (Entered: 01/14/2014) |
| 01/23/2014 | 63 | NOTICE *of Filing of Transcript Order* by GOVERNMENT OF BELIZE re 61 Notice of Appeal to DC Circuit Court (Magid, Creighton) (Entered: 01/23/2014) |
| 01/23/2014 | 64 | NOTICE *Confirmation of Prior Transcript Filing* by GOVERNMENT OF BELIZE re 61 Notice of Appeal to DC Circuit Court, 57 Notice of Appeal to DC Circuit Court, (Magid, Creighton) (Entered: 01/23/2014) |
| 01/24/2014 | | USCA Case Number 14-7002 for 57 Notice of Appeal to DC Circuit Court, filed by GOVERNMENT OF BELIZE. (jf, ) (Entered: 01/24/2014) |
| 01/24/2014 | | USCA Case Number 14-7003 for 61 Notice of Appeal to DC Circuit Court filed by GOVERNMENT OF BELIZE. (jf, ) (Entered: 01/24/2014) |
| 02/03/2014 | 65 | MOTION for Entry of Final Judgment *in a Separate Document* by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Exhibit Proposed Judgment) (Kimmelman, Louis) (Entered: 02/03/2014) |
| 02/04/2014 | 66 | CLERK'S JUDGMENT in favor of petitoner against respondent. SO ORDERED- Judge Richard J. Leon on 01/09/14. (tb, ) (Main Document 66 replaced on 2/4/2014) |

|            |    | (tb, ). (Entered: 02/04/2014) |
|------------|----|-------------------------------|
| 02/04/2014 | 67 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 66 Clerk's Judgment by GOVERNMENT OF BELIZE. Filing fee $ 505, receipt number 0090-3612412. Fee Status: Fee Paid. Parties have been notified. (Magid, Creighton) (Entered: 02/04/2014) |
| 02/05/2014 | 68 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 67 Notice of Appeal to DC Circuit Court. (znmw, ) (Entered: 02/05/2014) |
| 02/14/2014 | 69 | NOTICE of Appearance by Kristin Graham Koehler on behalf of All Plaintiffs (Koehler, Kristin) (Entered: 02/14/2014) |
| 02/21/2014 |    | USCA Case Number 14-7018 for 67 Notice of Appeal to DC Circuit Court filed by GOVERNMENT OF BELIZE. (jf, ) (Entered: 02/21/2014) |
| 03/14/2014 | 70 | NOTICE *of Confirmation of Prior Transcript Filing* by GOVERNMENT OF BELIZE (Magid, Creighton) (Entered: 03/14/2014) |
| 03/28/2014 | 71 | TRANSCRIPT OF PROCEEDINGS before Judge Richard J. Leon held on 9/24/12; Page Numbers: 1-17. Date of Issuance:3/28/14. Court Reporter/Transcriber Patricia Kaneshiro-Miller, Telephone number 202-354-3243, Court Reporter Email Address : patfromhawaii@aol.com.<P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at ww.dcd.uscourts.gov.<P></P> Redaction Request due 4/18/2014. Redacted Transcript Deadline set for 4/28/2014. Release of Transcript Restriction set for 6/26/2014.(Kaneshiro-Miller, Patricia) (Entered: 03/28/2014) |
| 04/03/2014 | 72 | Emergency MOTION to Stay by GOVERNMENT OF BELIZE (Attachments: # 1 Declaration of Creighton R. Magid, # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration, # 4 Text of Proposed Order)(Magid, Creighton). Added MOTION for Emergency Relief on 4/4/2014 (znmw, ). (Entered: 04/03/2014) |
| 04/21/2014 | 73 | Memorandum in opposition to re 72 Emergency MOTION to Stay filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Text of Proposed Order, # 2 Declaration Of Louis B. Kimmelman in Support of Petitioners Opposition to Respondents Motion to Stay., # 3 Exhibit A, # 4 Exhibit B)(Kimmelman, Louis) (Entered: 04/21/2014) |
| 04/28/2014 | 74 | REPLY to opposition to motion re 72 Emergency MOTION to Stay *and for Emergency Relief* filed by GOVERNMENT OF BELIZE. (Magid, Creighton) (Entered: 04/28/2014) |
| 04/29/2014 |    | MINUTE ORDER denying 72 Respondent's Motion to Stay Proceedings Pending Appeal and for Emergency Relief. It is hereby ORDERED that Respondent's motion is DENIED. Signed by Judge Richard J. Leon on 4/29/2014. (lcrjl3) (Entered: 04/29/2014) |

USCA Case #14-7002      Document #1492424      Filed: 05/09/2014      Page 35 of 231

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/09/2014 16:03:01 | | | |
| **PACER Login:** | dw3170 | **Client Code:** | 3805/486078-2 |
| **Description:** | Docket Report | **Search Criteria:** | 1:09-cv-02170-RJL |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

**TAB 2**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BELIZE SOCIAL DEVELOPMENT LIMITED )
Craigmuir Chambers, P.O. Box 71 )
Road Town, Tortola, British Virgin Islands, )
)                    Civil Action No. 1:09-CV-02170-RJL
      Petitioner, )
)
v. )
)
THE GOVERNMENT OF BELIZE )
Attorney General, Attorney General's Ministry )
New Administration Building, Belmopan, Belize )
Central America, )
)
      Respondent. )

## DECLARATION OF MICHAEL C. YOUNG, S.C.

I, **MICHAEL C. YOUNG, S.C.** of **YOUNGS LAW FIRM**, #28 Regent Street, Belize

City, Belize, hereby declare as follows:

1.    I am an attorney-at-law, duly admitted to practice law and practicing law in

Belize, and legal counsel of record for the Government of Belize ("GOB") in the case of

Attorney General [of Belize] v. Belize Telemedia Limited, Claim No. 3N of 2009, currently

pending before the Supreme Court of Belize ("Belize Action").

2.    I have personal knowledge of certain of the facts stated herein and in relation to

other stated facts they are true to the best of my information and belief. Insofar as the statements

herein relate to legal principles or positions, they represent opinions which I hold to the best of

my knowledge and belief.

3.    The Belize Action was initiated by the GOB, which is the party-in-interest,

against Belize Telemedia Limited ("BTL") and Belize Social Development Limited ("BSDL").

By Section 42 (5) of the Constitution of Belize, "Legal proceedings for or against the State shall be taken, in the case of civil proceedings, in the name of the Attorney General and, in the case of criminal proceedings, in the name of the Crown."

    4.     The records attached as exhibits to this declaration are true and correct copies of records filed by the parties in the Belize Action, which were filed either by the Attorney General's Ministry, or by Youngs Law Firm (to the extent that they are documents filed by the GOB) or obtained (to the extent that they are documents filed by BTL) in my capacity as legal counsel for the GOB.

    5.     Attached hereto as Exhibit 1 is a true and correct copy of the Fixed Date Claim Form (or, complaint) filed by the GOB in the Belize Action on April 6, 2009.

    6.     The GOB initiated the Belize Action seeking a judicial declaration that the arbitration award dated March 18, 2009 and rendered by the London Court of International Arbitration ("LCIA") in LCIA Arbitration No. 81079 between BTL and the GOB ("Arbitration Award") is contrary to the Belize Constitution, Belize law and Belize public policy and, therefore, is unenforceable. This Arbitration Award also is the subject of the instant enforcement action before the United States District Court for the District of Columbia ("D.C. Action"). In addition, the GOB seeks a judicial declaration that the Arbitration Award also is unenforceable because the underlying agreements (between the GOB and BTL), which were the basis of the Arbitration Award, also are contrary to the Belize Constitution, Belize law and Belize public policy. See Exhibit 1 hereto at pages 2-5 (Fixed Date Claim).

    7.     When it initiated the Belize Action, the GOB filed an Application for an interim injunction prohibiting BTL and BSDL from enforcing the Arbitration Award in any judicial proceeding in Belize, the United Kingdom or any other state or territory until after the Belize

2

Supreme Court adjudicates the Belize Action. A true and correct copy of said Notice of Application, filed on or about April 6, 2009, is attached hereto as Exhibit 2.

8.     Together with the Application, the GOB filed the Affidavit of Mr. Gian C. Gandhi, Director General of the International Financial Services Commission of Belize and also Legal Counsel to the Ministry of Finance, Government of Belize, dated April 6, 2009 ("4/6/09 Gandhi Aff."), a true and correct copy of which is attached hereto as Exhibit 3.

9.     On April 7, 2009 a Second Affidavit of Mr. Gandhi ("4/7/09 Gandhi Aff.") was filed attaching submitting a copy of the Arbitration Award. A true and correct copy of the 4/7/09 Gandhi Affidavit is attached hereto as Exhibit 4.

10.     As set forth in the April 6, 2009 Affidavit of Mr. Gandhi, this dispute arises from a series of four agreements entitled: (1) Government Telecommunications Accommodations Agreement (dated September 19, 2005); (2) Amendment to the Accommodation Agreement (dated November 21, 2005); (3) Settlement Deed in relation to the Government Telecommunications Accommodation Agreement (dated December 15, 2006); and (4) Settlement Deed in relation to the Government Telecommunications Accommodation Agreement (dated January 7, 2008). (4/6/09 Gandhi Aff. ¶ 11.) Copies of the four agreements are attached to the 4/6/09 Gandhi Aff. and designated as exhibits "GCG5," "GCG6," "GCG7" and "GCG8," and are collectively referred to herein as the "Accommodation Agreements."

11.     It is the official position of the GOB that the Accommodation Agreements were improperly executed and entered into in secret by the prior Prime Minister, the Honorable Said Musa, and representatives of BTL. As is discussed below, the prior Prime Minister, without authority to do so, purported to give BTL favorable tax treatments, duty exemptions and a virtual monopoly over certain aspects of telecommunications in Belize, encroaching into the

3

constitutional authority of the Belize Legislature and statutory authority of the Belize Public Utilities Commission, among other things. Only after the General Election of February 2008, when the new administration of the Honorable Prime Minister Dean Barrow took control of the government, determined to eradicate past preferential treatments and abuses, did the nature of the Accommodation Agreements become known to the public. Public policy require that public contracts be negotiated in a spirit of transparency and public accountability, be properly authorized and approved, and not be contrary to the Constitution and laws of Belize, but these requirements were not followed with respect to the Accommodation Agreements.

12.    Further, as Mr. Gandhi explains, the original Accommodation Agreement contained secrecy provisions which were incorporated by reference into the three subsequent Accommodation Agreements, in order to keep them out of the reach of public knowledge. Secrecy provisions in public agreements have been outlawed and invalidated by the Belize Freedom of Information (Amendment) Act, 2008.

13.    The secret Accommodation Agreements, as well as the subject Arbitration Award, violate various provisions of the Belize Constitution and laws of Belize, as well as Belize public policy, as is contended by the GOB in the Belize Action and is summarized below.

14.    First, enforcement of the Arbitration Award, including its award of monetary damages, would be contrary to the Constitution and laws of Belize, including but not limited to section 114 of the Belize Constitution; section 3 of the Belize Finance and Audit (Reform) Act, 2005 (No. 12 of 2005); and sections 106, 109 and 110 of the Belize Income and Business Tax Act (CAP. 55). The irreparable fallacy of the Arbitration Award is that it has held that the Prime Minister can enter into an agreement with a private party that allows that private party to avoid its tax liabilities, among other things. It is well-settled that taxes are set by the Legislature and a

tax payer must pay the rates set by the legislature. Former Prime Minister Musa had no authority to enter into an agreement that would exempt TBL from its tax liabilities under Belize law. Indeed, under the Belize Constitution (as reiterated in the Finance and Audit Reform Act), taxes must be collected by the Government and paid into the Consolidated Fund. The levy of tax and obligation to pay under the Income and Business Tax Act (including the sections cited above) are compulsory and do not provide for set offs or deductions, despite the misguided conclusion of the Arbitration Award. Similarly, the Arbitration Award improperly sets aside or purports to nullify assessment notices, judgment summonses and magistrates court proceedings in Belize, and going forward any and all future notices, summonses and magistrates court proceedings, also in contravention of the laws of Belize including the Income and Business Tax Act, which at sections 65 et seq. provides for the process of enforcement and collection of tax. The Arbitration Award is contrary to rules of international law and comity – that a tribunal will not adjudicate the tax and revenue laws of another country. Those matters must be adjudicated in the local courts -- in this case in Belize.

15.     Second, enforcement of the Arbitration Award also would be improper, because the Accommodation Agreements between the GOB and BTL, upon which the Arbitration Award are based, violate the Belize Constitution, Belize law and Belize public policy including, among other things, as follows:

(a)     As discussed above, the entirety of the Accommodation Agreements are null and void, ab initio, because the Prime Minister had no authority to enter into an agreement that would exempt TBL from its tax liabilities under Belize law. BTL is obligated to pay the taxes and duties set by the Legislature without offset.

(b)     The application of the "Agreed Rate" of business tax payable by BTL is contrary

to the Belize Income and Business Tax Act.  Section 107 prescribes the rates of tax.  The tax

that are set by the Legislature.  The Executive Branch of government cannot change the rate

prescribed under the Act.  Otherwise, the Prime Minister or Minister of Finance could effectively

re-write the tax code from the privacy of his office by entering into agreements with corporations

and individuals, like the subject secret agreement between BTL and the GOB purport to do.

(c)     The exemption of BTL from custom duties is contrary to the Belize Customs and

Excise Duties Act.  By section 3 of the Act, the Legislature provides for the raising, levying and

collection of duties on imported goods at rates set out in a Schedule to the Act.  Again, the rates

cannot be changed by the Executive except where such power is given under the Act or another

Act (in other words, the Executive cannot grant an exemption except when empowered by

statute), and there is no such grant of power applicable to the instant matter.

(d)     The unilateral entitlement of BTL to use the frequencies 2.496 Ghz to 2.69 Ghz is

contrary to the Belize Telecommunications Act of 2002 ("BTA").  The BTA at section 3(j) states

that it together with the Public Utilities Commission ("PUC") Act "ensure the efficient use of

radio frequency," at section 3 states that the PUC "shall regulate the telecommunications section

in accordance with this Act," and at section 6(j) provides that the PUC is to manage and

administer the use of the radio frequency spectrum, and thus the Executive does not have the

power to grant unilateral entitlements as those purportedly granted to BTL.

(e)     The requirement that only the "Individual License Holders, Telemedia [TBL] and

Speednet be granted or permitted to hold any permit in Belize to legally carry on, conduct or

provide telecommunications services in Belize involving or allowing the provisions of VoIP

services in Belize, and that customers of VoIP services can only use such services under written

permission of the relevant License Holder, TBL or Speednet, are contrary to the BTA and the Public Utilities Commission Act. The BTA provides that it is the PUC that has the power to receive and process applications for licenses, as set forth in sections 6(2)p and 15(6). Further, at section 42(4) there is a prohibition against licensees entering into any agreement which has the effect of significantly lessening competition in the market for the supply of telecommunications services. Further, under the PUC Act, the PUC is an autonomous body, and thus the Executive cannot encroach on said powers of the PUC.

(f)     The "setting off" of various sums (including setting off the "short fall" difference between the actual return in profit to BTL and the return purportedly guaranteed by the government in the Accommodation Agreements, and the setting off of sums allegedly due to the GOB under a loan note against business taxes due) against the tax liability of BTL under the Accommodation Agreements also violates the Constitution and laws of Belize for the various reasons discussed above, including that the GOB must collect the taxes at the rates set by the Legislature without set offs or offsets.

16.     The Arbitration Award not only purports to award monetary damages but also contains "declarations" which actually would serve as improper prospective injunctions, and purports to make findings, including regarding the applicability or non-applicability of Belize tax laws to BTL, that would have serious impacts and ongoing consequences on Belize, the GOB and the people of Belize, including:

(a)     Incapacity on the part of GOB to impose on BTL the tax rate mandated by law passed by the Legislature.

(b)     Incapacity on the part of the GOB to collect full revenue as contemplated by the Constitution provided for by the Legislature.

7

(c)     An enforced preferential tax status for BTL and/or its assignee through an agreement with the executive and not by authority of statute or regulation with the resultant negative revenue impact.

(d)     Incapacity on the part of the GOB to impose on BTL the customs duties mandated by law passed by the Legislature.

(e)     Incapacity on the part of the PUC to manage and regulate the assignment of frequencies as mandated by law passed by the Legislature.

(f)     Incapacity on the part of the PUC to exercise the power granted by the Legislature to receive and process applications for licences for the provision of telecommunication services.

(g)     Incapacity on the part of the PUC and the GOB to promote competition in the supply of telecommunications which would benefit consumers and promote development of the industry, and

(h)     Incapacity on the part of the PUC to regulate rates which has a direct impact on consumers, businesses and the economy.

Accordingly, enforcement of the Arbitration Award also would violate the public policy of Belize.

17.     Notwithstanding the illegality of the Accommodation Agreements under Belize law, BTL improperly submitted for determination by private arbitrators in a foreign country (the United Kingdom) the issue whether the Accommodation Agreements are legal and whether the GOB must honor these secret agreements.  As discussed above, these private arbitrators also were asked to pass judgment on tax matters relative to Belize tax laws, including whether BTL could be relieved from its tax liabilities by agreement, although the issue of interpretation of local tax laws can properly be brought only before the courts of Belize.  Despite the foregoing,

after unilaterally obtaining the Arbitration Award, BTL issued a press release proclaiming that: "The LCIA has made it clear that the Accommodation Agreement is lawful and a valid and binding agreement. The LCIA has also found no evidence of corruption or that the Accommodation Agreement was a secret agreement." 4/6/09 Gandhi Aff. CGC4.

18.    The official position of the GOB is that no arbitrator or foreign court may determine the legality or adjudicate the enforceability of the Accommodation Agreements to which the GOB is a party or interpret the effect, if any, of the Accommodation Agreements on BTL's obligations and liabilities under local revenue, tax and duty laws other than the courts of Belize. It was for this reason that, shortly after being informed of the LCIA's decision, the GOB initiated its aforementioned action in Belize.

19.    On April 7, 2009, the Belize Supreme Court heard the GOB's interim injunction application ex parte (Exhibit 2), and granted an interim injunction in an Order which provided in pertinent part:

> The First Defendant, BELIZE TELEMEDIA LIMITED, and the Second Defendant, BELIZE SOCIAL DEVELOPMENT LIMITED [Collectively "the Respondents"], their successors, assigns and subsidiaries, whether by themselves, their officers, servants, affiliates, agents or howsoever, shall be and are hereby restrained until further order from enforcing or causing to be enforced the 'Final Award' issued on the 18th March 2009 by the Arbitration Tribunal constituted by the London Court of International Arbitration (LCIA) to hear claims in Arbitration number 81079 (or 81709) between Belize Telemedia Limited (the First Defendant herein) and the Attorney General of Belize (the Claimant herein), whether in Belize or any other jurisdiction outside Belize, or from commencing or continuing any other legal or arbitral proceedings in any country or jurisdiction whether in or outside of Belize, relating to or arising out of the said Final Award.

20.    A true and correct copy of said Order, dated April 7, 2009, granting said interim injunction is attached hereto as Exhibit 5.

21. Both BTL and BSDL were thereafter served with copies of the April 7, 2009 Order and related documents by delivery at No. 212 their known addresses in Belize. True and correct affidavits of service on both entities are attached hereto as Exhibit 6 and Exhibit 7 respectively.

22. The April 7, 2009 Order set a return date of May 5, 2009. By that date, BTL and BSDL were obligated to present their arguments if they contended that the interim injunction should be dissolved and a preliminary injunction should not be entered.

23. BTL thereafter appeared in, and is defended, the Belize Action. BTL appeared in the Belize Action represented by Belize attorney Eamon Courtenay S.C.

24. On or about April 28, 2009, BTL filed a Notice of Application accompanied by a declaration of Dean C. Boyce, then-Chairman of the Executive Committee of the Board of Directors of BTL. A true and correct copy of the Notice of Application and accompanying documents is attached hereto as Exhibit 8. The Notice of Application sought to consolidate with the Belize action two other related judicial proceedings pending in Belize which, like the Belize action, challenged the lawfulness of the Accommodation Agreements. Id.

25. On or about May 20, 2009, BTL filed an Amended Notice of Application accompanied by a declaration of Ediberto Tesucum, a then-member of the Board of Directors of BTL. A true and correct copy of the Amended Notice of Application is attached hereto as Exhibit 9. The Amended Notice of Application requested (a) a declaration that the Arbitration Award is valid and binding on the GOB, and (b) requesting that the proceedings be stayed. Id.

26. On July 3, 2009, the BTL submitted a Skeleton (summary) Argument, a true correct copy of which is attached hereto as Exhibit 10.

27. On July 8, 2009, the GOB submitted a Skeleton (summary) Argument on behalf of the Claimant, a true and correct copy of which is attached hereto as Exhibit 11.

28. On July 9, 2009, the Belize Supreme Court held a hearing in the Belize Action. Mr. Courtenay S.C. and Mr. Nigel Plemming, Q.C, appeared at the hearing as counsel for BTL. Mr. Michael Young, S.C. appeared at the hearing as counsel for the GOB. The parties presented their arguments to the Belize Supreme Court, and the Supreme Court took the matter under submission.

29. Thereafter, on July 20, 2009, the Belize Supreme Court issued an Order and Decision granting, in part, the Application of the GOB for an interim injunction until the conclusion of the Belize Action. Attached hereto as Exhibit 12 is a true and correct copy of the Order of, and attached hereto as Exhibit 13 is a true and correct copy of said Decision of, the Belize Supreme Court.

30. The Order (Exhibit 12) extended the ex parte restraining order until conclusion of the Belize action provides, in relevant part:

> 1. Belize Telemedia Limited and Belize Social Development Limited or their successors, assigns or subsidiaries, are hereby restrained by themselves, their agents or representatives howsoever, from enforcing, or commencing or continuing in the United Kingdom or any other jurisdiction, proceedings for enforcing the award of the London Court of International Arbitration (LCIA), made on the 18th of March 2009; in Arbitration Number 81079, or from commencing or continuing in the United Kingdom or in any other jurisdiction, any proceedings relating to the enforcement of said award.
>
> 2. The Injunction Order above shall continue until the conclusion of the Claim herein or until further Order.

31. On the morning of 18th March 2010 Rowdane Morris, who is employed as a process server for Youngs Law Firm, went to No. 212 North Front Street, Belize City Belize in accordance with instructions from Youngs Law Firm to serve on BSDL a copy of the Injunction

11

Order issued on the 20th of July 2009 and perfected on the 25th of November 2009 [referred to above]. Upon arriving at the said address Mr. Morris inquired on whether that was the registered address for BSDL and was told "no". He was told further that BSDL was an overseas company and does not have a registered office in Belize. This statement is included by way of duty to the Court and does not constitute any admission or agreement on the part of the Government of Belize with any position taken or advocated by BSDL or attorneys on its behalf.

32.     The Belize Supreme Court's Decision (Exhibit 13) supporting its Order holds, in part:

> From the above, it is obvious that serious questions arise in the several contentions of illegality of the agreement, raised by the Attorney General. That in turn raises a serious question as to whether enforcement of the award will not be contrary to the Constitution, the other statutory laws and public policy. ***Section 20 of Arbitration Act***, requires that for an award to be enforced, "*the arbitration agreement must be valid under the law by which it was governed*", and the enforcement, "*must not be contrary to public policy or the law of Belize*".

33.     With respect to the question of whether an injunction should be issued, the Supreme Court held in the Decision, as follows:

> The application, the subject of this decision, is for an order to preserve the *status quo* until trial of the claim of the Attorney General, in which he claims relief against enforcement of the foreign arbitration award made on 18.3.2009, by the LCIA. The *status quo* at the moment is that no enforcement proceedings have been commenced in courts in Belize or in courts in England or elsewhere, although an application has been filed for an order of this court for a declaration that the "award is valid and binding..."
>
> I have decided that serious issues of illegality and of public policy, have been raised in the claim to resist enforcement. I must proceed to consider whether in the circumstances of the claim, including the fact that the restraining order is sought in respect of

12

proceedings outside Belize as well, it is appropriate to exercise discretion in favour of granting an interim restraining order.

It is my view that, in the interest of justice, the *status quo* should obtain until the determination of the claim of the Attorney General.

34.    It should be noted that  one basis for restraining both BTL and BSDL arose from

BTL's own argument, as expressly noted in the Decision:

There is a further reason in favour of granting an order restraining both respondents from enforcing the award or commencing or continuing claims related to the award in the UK and in any other jurisdiction. According to an application dated 28.4.2009, filed the same day by BTL, there are already three claims: No. 317 of 2009, No. 275 of 2009 and No. 279 of 2009, in the Supreme Court of Belize, in which both the Attorney General and BTL are parties with others.  BTL has asked that the claims be consolidated with this claim.  It said that the same ground of illegality concerning the same and similar agreements are in issue.

In my view, it would be oppressive and vexatious to have enforcement of an award in which the same ground was considered proceed with outside Belize, while the proceedings in Belize were still pending.

35.    The instant confirmation action would improperly require this Court to enforce an

Arbitration Award that improperly purports to adjudicate tax liabilities of BLT under Belize law.

36.    As counsel for the GOB, and on its behalf, I respectfully submit to this District

Court that the Order and Decision of the Belize Supreme Court are well reasoned and valid under

Belize law, and respectfully request that this District Court dismiss the instant confirmation

13

action, or at least stay this confirmation action until after the final adjudication of the Belize
Action, in deference to the Belize Supreme Court.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED IN BELIZE CITY, BELIZE

ON: $2 6^{th}$ MARCH 2010

MICHAEL C. YOUNG
of YOUNGS LAW FIRM
#28 Regent Street, Belize City, Belize

14

# TAB 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BELIZE SOCIAL DEVELOPMENT LIMITED<br>Craigmuir Chambers, P.O. Box 71<br>Road Town, Tortola, British Virgin Islands<br><br>Petitioner**,**<br><br>v.<br><br>THE GOVERNMENT OF BELIZE<br>Attorney General, Attorney General's Ministry<br>New Administration Building, Belmopan, Belize<br><br>Respondent**.** | Civil Action No. 1:09-CV-02170-RJL |

## RESPONDENT'S MOTION TO STAY ACTION OR, IN THE ALTERNATIVE, DISMISS PETITION

## ORAL ARGUMENT REQUESTED

Pursuant to the Federal Rules of Civil Procedure, Rules 12(b)(1), 12(b)(2) and12(b)(6), and the inherent powers of this Court, *inter alia*, Respondent Government of Belize ("GOB") hereby moves to stay this enforcement action until after a prior parallel judicial proceeding currently pending between the parties in Belize is finally adjudicated or, alternatively, dismiss the Petition of Belize Social Development Limited ("BSDL"), on each of the following grounds:

1.      A prior action has been filed by GOB against BSDL before the Belize Supreme Court, entitled <u>Attorney General v. Belize Telemedia Ltd. and Belize Social Development Ltd.</u>, Claim No. 317 of 2009, currently pending in Belize.  The Belize Supreme Court has issued an injunction prohibiting BSDL from enforcing the subject arbitration award while the Belize action is pending.  The New York Convention states that a court may refuse to confirm an award when it has been suspended by a court of competent jurisdiction.  The action before this Court should be stayed until after the Belize judicial proceedings are concluded.  This result also was reached by this Court in the recent case of <u>Newco Ltd. v. Government of Belize</u>, no. 1:08-cv-02010-RJL.

2.      This action must be stayed or dismissed pursuant to the Revenue Rule.  U.S. courts cannot interpret or adjudicate foreign tax liabilities.  They must be resolved in the local courts.  If this Court were to confirm the subject arbitration award, it would be doing just that.

3.      This action should be stayed or dismissed on international comity principles.

4.      Other than BSDL (created in BVI after-the-fact), all parties are Belizean and the dispute involves Belizean matters.  Dismissal on forum non-conveniens grounds is appropriate.

5.      This action must be dismissed based on the Act of State and Political Question doctrines.  At the root of this petition lies the GOB's exercise of its sovereign power and political will, and the assignment of the arbitration award to BSDL was nothing more than an artifice to attempt to circumvent that power, and give effect to illegal agreements.  This Court should not pass judgment on the sovereign acts of another nation and, thus, abstention is appropriate.

6.      Dismissal is appropriate since BSDL lacks standing.  The subject arbitration award was in favor of non-party Belize Telemedia Limited ("BTL").  BTL's purported assignment of the "payment portion" of the arbitration award to BSDL is invalid.

7.      Dismissal is warranted since Belize is not a party to the New York Convention.

8.      Dismissal is required under the Foreign Sovereign Immunities Act ("FSIA").  The arbitration exception does not apply since Belize has not acceded to the New York Convention.  The waiver exception does not apply since the Accommodation Agreement is invalid but, even if it were valid, the Agreement contains a waiver only in favor of non-party BTL.

9.      Dismissal is appropriate because the Court lacks personal jurisdiction over GOB.

10.     And, this action also must be dismissed for failure to name an indispensable party, Dunkeld Int'l Investment Ltd., which also has asserted claims referencing the Arbitration Award.

11.     GOB also requests such further relief as this Court deems to be just and proper.

This motion is based on this motion, and the memorandum in support of the motion, the declarations of Michael C. Young, Gian C. Ghandi, Claire L. Jones and Juan C. Basombrio, and the proposed order filed herewith, all records in this action, and the arguments of GOB's counsel.

Petitions to confirm an arbitration award are treated as motions. 9 U.S.C. § 6. Thus, Respondent GOB's counsel conferred with Petitioner BSDL's counsel regarding this motion. GOB asked whether BSDL would stipulate to bifurcation of this Petition, so that GOB may move to stay or dismiss without also having to oppose the Petition until after the Court ruled on the instant motion. BSDL declined the stipulation. Thus, herewith GOB has filed a motion to bifurcate and, in an abundance of caution, and in the alternative to the instant motion to stay or dismiss, also a preliminary response and opposition to the Petition in order to avoid any potential default claim, but not as a waiver of any of the objections, defenses or arguments raised herein.

GOB requests oral argument on the instant motion, if the Court deems it necessary.

Respectfully submitted,

Dated:  March 29, 2010
   __/s/ Timothy J. Koeppl_____
Timothy J. Koeppl (D.C. Bar # 983307)
Dorsey & Whitney LLP
1801 K Street, NW, Suite 750
Washington, DC 20006
(202) 442-3510 (telephone)
(202) 442-3199 (facsimile)
koeppl.timothy@dorsey.com

Juan C. Basombrio(Admitted *Pro Hac Vice*)
Dorsey & Whitney LLP
38 Technology Drive, Suite 100
Irvine, California 92618
(949) 932-3650 (telephone)
(949) 932-3601 (facsimile)
basombrio.juan@dorsey.com

Counsel for Respondent
**GOVERNMENT OF BELIZE**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BELIZE SOCIAL DEVELOPMENT LIMITED<br>Craigmuir Chambers, P.O. Box 71<br>Road Town, Tortola, British Virgin Islands<br><br>       Petitioner**,**<br><br>       v.<br><br>THE GOVERNMENT OF BELIZE<br>Attorney General, Attorney General's Ministry<br>New Administration Building, Belmopan, Belize<br><br>       Respondent**.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 1:09-cv-02170-RJL |

**MEMORANDUM IN SUPPORT OF
RESPONDENT'S MOTION TO STAY ACTION OR,
IN THE ALTERNATIVE, DISMISS PETITION**

Respectfully submitted,

Timothy J. Koeppl (D.C. Bar # 983307)
Dorsey & Whitney LLP
1801 K Street, NW, Suite 750
Washington, DC 20006
(202) 442-3510 (telephone)
(202) 442-3199 (facsimile)
koeppl.timothy@dorsey.com

Juan C. Basombrio (Admitted *Pro Hac Vice*)
Dorsey & Whitney LLP
38 Technology Drive, Suite 100
Irvine, California 92618
(949) 932-3650 (telephone)
(949) 932-3601 (facsimile)
basombrio.juan@dorsey.com

Counsel for Respondent
**GOVERNMENT OF BELIZE**

## <u>TABLE OF CONTENTS</u>

Table of Authorities .......................................................................................................... i

I.      INTRODUCTION ............................................................................................1

II.     FACTUAL BACKGROUND ...........................................................................4

        A.      LORD MICHAEL ASHCROFT AND HIS HISTORY IN BELIZE. ....................4

        B.      POLITICAL CONTROVERSY IN BELIZE OVER SECRET
                AGREEMENTS........................................................................................5

        C.      THE LCIA ARBITRATION PROCEEDS DESPITE REVENUE RULE.............8

        D.      CREATION OF BSDL IN BVI TO CIRCUMVENT THE BELIZE
                COURTS...................................................................................................9

        E.      LITIGATION IN BELIZE RELATED TO BTL, BSDL AND THE
                AWARD, AND INJUNCTION BY BELIZE SUPREME COURT.......................9

        F.      GOB ASSUMES CONTROL OVER TELECOMMUNICATIONS IN
                BELIZE AND ACQUIRES CONTROLLING INTEREST IN BTL. ..................13

        G.      PRIOR LITIGATION AGAINST GOB IN THE UNITED STATES. .................14

III.    ARGUMENT ..................................................................................................15

        A.      THIS COURT SHOULD STAY THIS ACTION OR DISMISS THE
                PETITION BECAUSE ENFORCEMENT OF THE ARBITRATION
                AWARD HAS BEEN SUSPENDED BY A COMPETENT AUTHORITY
                OF THE COUNTRY UNDER THE LAW OF WHICH THE AWARD
                WAS MADE:  BELIZE. ...........................................................................15

        B.      THIS ACTION SHOULD BE STAYED OR DISMISSED PURSUANT
                TO THE REVENUE RULE.  UNDER THIS SETTLED PRINCIPLE,
                THIS COURT SHOULD NOT INTERPRET AND APPLY BELIZE TAX
                LAWS OR ADJUDICATE BTL'S OBLIGATIONS UNDER THE
                SAME.  HOWEVER, CONFIRMATION OF THE ARBITRATION
                AWARD WOULD IMPROPERLY DO JUST THAT.........................................19

        C.      THIS ACTION SHOULD BE STAYED OR DISMISSED UNDER
                PRINCIPLES OF INTERNATIONAL COMITY AND/OR ON
                GROUNDS OF ABSTENTION. ..................................................................24

        D.      THE PETITION SHOULD BE DISMISSED BASED ON THE
                DOCTRINE OF INCONVENIENT FORUM IN FAVOR OF THE
                BELIZE COURTS. ..................................................................................26

E.      THIS ACTION MUST BE DISMISSED BECAUSE IT DOES NOT
        PRESENT A JUSTICIABLE CONTROVERSY.  IT IS BARRED BY
        THE ACT OF STATE AND POLITICAL QUESTION DOCTRINES. ..............28

        1.      Act Of State Doctrine..................................................................................28

        2.      Political Question Doctrine.....................................................................30

F.      THE ACTION MUST BE DISMISSED FOR LACK OF STANDING. ..............33

G.      THE NEW YORK CONVENTION DOES NOT BIND THE
        GOVERNMENT OF BELIZE BECAUSE IT IS NOT A PARTY TO THE
        CONVENTION. .......................................................................................................34

H.      THIS ACTION MUST BE DISMISSED AS THERE IS NO SUBJECT
        MATTER JURISDICTION UNDER THE FOREIGN SOVEREIGN
        IMMUNITIES ACT...................................................................................................37

I.      THE ACTION MUST BE DISMISSED BECAUSE THE COURT
        LACKS PERSONAL JURISDICTION OVER THE GOVERNMENT OF
        BELIZE.....................................................................................................................41

J.      THE ACTION MUST BE DISMISSED FOR A FAILURE TO JOIN A
        NECESSARY AND INDISPENSABLE PARTY.................................................43

IV.  CONCLUSION...........................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

Agudas Chasidei Chabad v. Russian Fed.
    466 F.Supp.2d 6 (D.D.C. 2006) ........................................................................38

Aktepe v. U.S.
    105 F.3d 1400 (11th Cir.1997) ...................................................................32, 33

Alfred Dunhill of London v. Rep. of Cuba
    425 U.S. 682 (1976).................................................................................29, 38

American Banana Co. v. United Fruit Co.
    213 U.S. 347 (1909)........................................................................................30

Amorrortu v. Rep. of Peru
    570 F.Supp.2d 916 (S.D.Tex. 2008) ...............................................................37

Argentine Republic v. Amerada Hess Shipping Corp.
    488 U.S. 428 (1989).................................................................................37, 38

Attorney General v. Belize Telemedia Ltd. and Belize Social Development Ltd.
    (Belize Supreme Court) ..............................................................................9, 25

Attorney General v. R.J. Reynolds Tobacco Holdings, Inc.
    268 F.3d 103 (2nd Cir. 2001)..................................................................20, 23

Baker Marine (Nigeria) Ltd. v. Chevron (Nigeria) Ltd.
    191 F.3d 194 (2nd Cir. 1999)....................................................17, 30, 31, 32

Baker v. Carr
    369 U.S. 186 (1962)..................................................................................30, 31

Banco Nacional de Cuba v. Sabbatino
    376 U.S. 398 (1964)..................................................................................28, 30

Base Metal Trading Limited v. OJSC Novokuznetsky Aluminum Factory
    283 F.3d 208 (4th Cir. 2002) ...................................................................41

Belize Telecom, Ltd. et al. v. Government of Belize
    528 F.3d 1298 (11th Cir. 2008) ...........................................14, 19, 25, 26

Belize Telemedia Ltd. v. Attorney General
    (Belize Supreme Court) ..............................................................................22, 23

BP Chemicals Ltd. v. Jiangsu SOPO Corp.
    420 F.3d 810 (8th Cir. 2005) ...................................................................42

CINAR Corp. Securities Lit.,
    186 F.Supp.2d 279 (E.D.N.Y. 2002) ...........................................................19

Coen v. Coen
    509 F.3d 500 (8th Cir. 2007) ......................................................................41

Conn. Bank of Commerce v. Republic of Congo
    309 F.3d 240 (5th Cir. 2002) ......................................................................39

Corsi v. Eagle Publ., Inc.
    2008 WL 239581 (D.D.C. 2008) ................................................................44

Creighton Ltd. v. Government of Qatar
    181 F.3d 118 (D.C. Cir. 1991) ..................................................34, 35, 40, 41

de Sanchez v. Banco Central de Nicaragua
    770 F.2d 1385 (5th Cir. 1985) ......................................................37, 38, 40

Dreyfus v. VonFink
    534 F.2d 24 (2nd Cir. 1976) ......................................................................36

Earth Island Inst. v. Christopher
    6 F.3d 648 (9th Cir. 1993) ..........................................................................40

EDF Intern. S.A. v. YPF S.A.,
    Slip copy, 2008 WL 5045915 (D.Del. 2008) ..............................................17

Europcar Italia S.p.A. v. Maiellano Tours
    156 F.3d 310 (2nd Cir. 1998) ......................................................................17

European Community v. RJR Nabisco, Inc.
    424 F.3d 175 (2nd Cir. 2005) ......................................................................19

Flores v. Southern Peru Copper Corp.
    414 F.3d 233 (2nd Cir. 2003) ................................................................35, 36

Fogade v. ENB Revocable Trust
    263 F.3d 1296 (11th Cir. 2001) ..................................................................30

Fountain v. U.S.
    357 F.3d 250 (2nd Cir. 2004) ......................................................................20

Freud v. France
    2008 WL 5272744 (S.D.N.Y. 2008) ............................................................24

Frontera Resources Azerbajan Corp. v. State Oil Co.
    582 F.3d 393 (2nd Cir. 2009) ......................................................................42

Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.
    284 F.3d 1114 (9th Cir. 2002) ........................................................41

Gulf Petro Trading, Inc. v. Nigerian National Petroleum Co.
    288 F.Supp.2d 783 (N.D. Tex. 2003) ...............................................16

Haver v. Yaker
    76 U.S. 32 (1869) ...........................................................................36

Hayburn's Case,
    2 U.S. 408 (1792) ...........................................................................40

Hegna v. Islamic Rep. of Iran
    287 F.Supp. 2d 608 (D.Md. 2003) ...................................................35

Her Majesty the Queen of England v. Gilberson, et al.
    597 F.2d 1161 (9th Cir. 1979) .........................................................23

Hunt v. Mobil Oil Corp.
    550 F.2d 68 (2d Cir. 1977) ..............................................................29

In the Matter of Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine
    311 F.3d 488 (2nd Cir. 2002) ....................................................26, 27

International Insurance Co.v. Caja Nacional de Ahorro
    293 F.3d 392 (7th Cir. 2002) ..............................................36, 38, 40

Jogi v. Voges
    480 F.3d 822 (7th Cir. 2007) ...........................................................18

Jota v. Texaco, Inc.
    157 F.3d 156 (2nd Cir. 1998) ...........................................................24

Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi etc.
    500 F.3d 111 (2nd Cir. 2007) ...........................................................16

Marbury v. Madison
    5 U.S. (1 Cranch) 137 (1803) ..........................................................30

Moore v. Mitchell
    30 F.2d 600 (2nd Cir. 1929) .............................................................20

Moore v. United Kingdom
    384 F.3d 1079 (9th Cir. 2004) .........................................................42

Murray v. Schooner Charming Betsy
    2 Cranch 64, 2 L.Ed. 208 (1804) .....................................................39

Newco Limited v. Government of Belize,
    U.S. D.C., case no. 1:08-cv-02010-RJL ............................................................3

Pasquantino v. U.S.,
    544 U.S. 349 (2005).........................................................................................20

Permanent Mission of India v. N.Y., 551 U.S. 193 (2007) ......................................37

Pravin Assocs., Ltd. v. Banco Popular del Peru
    109 F.3d 850 (2nd Cir. 1997)............................................................................24

Price v. Socialist people's Lybian Arab Jamahiriya,
    294 F.3d 82 (D.C. Cir. 2002) ...........................................................................41

Provident Tradesmen's B&T Co. v. Patterson
    390 U.S. 102 (1968).........................................................................................44

Rep. of Austria v. Altmann
    541 U.S. 677 (2004).........................................................................................39

Rep. of Columbia v. Diageo North America Inc.
    531 F.Supp.2d 365 (E.D.N.Y. 2007) ....................................................19, 20, 23

Rep. of Mexico v. Hoffman
    324 U.S. 30 (1945)...........................................................................................39

Republic of Honduras v. Phillip Morris Cos., Inc.
    341 F.3d 1253 (11th Cir. 2003) ........................................................................20

Saudi Arabia v. Nelson
    507 U.S. 349 (1993).........................................................................................37

Scherk v. Alberto-Culver Co.
    417 U.S. 506 (1974).........................................................................................36

SeeTransport Wiking Trader v. Navimpex Centrala
    989 F.2d 572 (2nd Cir. 1993)............................................................................36

Societe Nationale Industrielle Aerospatiale v. U.S. District Court
    482 U.S. 522 (1987).........................................................................................24

Sosa v. Alvarez-Machain
    542 U.S. 692 (2004).........................................................................................39

Telcordia Tech Inc. v. Telkom S.A. Ltd.
    458 F.3d 172 (3rd Cir. 2006) ............................................................................24

Termorio S.A. E.S.P. v. Electroficadora del Atlantico S.A. et al.
    421 F.Supp.2d 87 (D.D.C. 2006) .....................................................................28

U.S. v. Curtiss-Wright Export Corp.
    299 U.S. 304 (1936)...............................................................................30

U.S. v. Harden,
    [1963] S.C.R. 366 (Can.) .......................................................................23

Underhill v. Hernandez
    168 U.S. 250 (1897)...............................................................................41

Verlinden B.V. v. Central Bank of Nigeria
    461 U.S. 480 (1983)...............................................................................36

Vieth v. Jubelirer
    541 U.S. 267 (2004)...............................................................................31

W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l
    493 U.S. 400 (1990)...........................................................................28, 29

Wahba v. Nat'l Bank of Egypt
    457 F.Supp. 2d 721 (E.D.Texas 2006).................................................32

World Wide Minerals, Ltd. v. Rep. of Kazakhstan
    296 F.3d 1154 (D.C. Cir. 2002) cert. denied 537 U.S. 1187 (2003)................................30, 37

Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.
    126 F.3d 15 (2nd Cir. 1997).................................................................16


**FEDERAL STATUTES**

Foreign Sovereign Immunities Act, 28 U.S.C. 1602, et seq. ("FSIA")................................. passim

F.R.C.P. 12.................................................................................................14

F.R.C.P.  19................................................................................................44


**OTHER AUTHORITIES**

H.R.Rep. 94-1487 ......................................................................................42, 43

Leonard V. Quigley, Accession by the U.S. to the Convention on the Recognition and
    Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1049, 1069 (1961) (Article
    V(1)(e)).................................................................................................16

Lord McNair, The Law of Treaties 162 (1961) .......................................................35

States and Their Property, 99 Am. J. Int'l L. 194, 194 (Jan. 2005)..................................................39

Strub, Jr., M.H., "Resisting Enforcement of Foreign Arbitral Awards under Article
      V(1)(E) and Article VI of the New York Convention:  A Proposal For Effective
      Guidelines," 68 Tex. L. Rev. 1031, 1048-1049 (April, 1990)..................................................18

William S. Dodge, <u>Breaking the Public Law Taboo</u>, 43 Harv. Int'l L.J. 161, 179 (Winter
      2002) ..............................................................................................................................................20

I.     INTRODUCTION

Respondent Government of Belize ("GOB") moves to stay this proceeding or, in the alternative, dismiss the instant Petition to confirm the subject arbitration award.

The matter before this Court is part of a significant political controversy within Belize. One of the most powerful men in Belize is Lord Michael Ashcroft, who has dual nationality in the U.K. and Belize.  He has amassed a fortune through various businesses in Belize, including the largest bank (Belize Bank) and largest telecommunications company (now, Belize Telemedia Limited ("BTL")).  His interests are held through various Belizean and offshore companies.

After the Belize election of 2008, when the new administration of the Honorable Prime Minister Dean Barrow took power, it learned that the government of the prior Prime Minister Said Musa had entered into secret "Accommodation Agreements" with BTL.  These Agreements purportedly granted to BTL preferential tax treatment, lower tax rates, offsets of tax liabilities, exemptions from duties, and other privileges in contravention of the Belize Constitution, Belize law, and public policy.  These Agreements are the basis of the subject arbitration award.

It is the position of the GOB that the Accommodation Agreements are null and void. There are and have been various judicial proceedings in Belize related to these issues that will ultimately be dispositive of the issues before this Court.  The Belize Supreme Court has already called into question the validity of such accommodation agreements, stating that the prior Prime Minister did not have authority to enter into them in contravention with Belize tax law.

When the current Belizean administration challenged the validity of the Accommodation Agreements, BTL initiated an arbitration before the London Court of International Arbitration ("LCIA") against the GOB, resulting in the subject arbitration award ("Arbitration Award"). GOB did not participate in the LCIA arbitration, because the Accommodation Agreements were contrary to law, and matters related to tax and duty liabilities must be adjudicated in the courts of

Belize under the Revenue Rule.  This rule, originating in the U.K. and followed in common law jurisdictions, including in Belize and the United States, bars courts or arbitral tribunals in one country from adjudicating tax obligations under the laws of another country.

Two days after the LCIA rendered the Arbitration Award, an entity was formed in the British Virgin Islands:  Petitioner, Belize Social Development Limited ("BSDL").  On the same day, BTL purported to assign to BSDL the "monetary portion" of the Arbitration Award, in a transparent, but flawed, attempt to place the Award outside of the reach of Belize courts.

On April 6, 2009, the GOB sued BTL and BSDL in the Belize Supreme Court, seeking a declaration that the Arbitration Award is unenforceable and the Accommodation Agreements are invalid, as contrary to the Belize Constitution and laws.  BTL (again, the assignor of Petitioner BSDL) appeared and requested that the Belize Supreme Court instead "confirm" the Arbitration Award.  On July 20, 2009, the Belize Supreme Court issued an injunction to maintain the *status quo* while it adjudicated these competing issues, prohibiting BTL and BSDL from enforcing said Award in any jurisdiction, until after conclusion of the judicial proceedings in Belize.

On August 25, 2009, the GOB exercised its sovereign power and passed legislation assuming control over telecommunications in Belize.  The GOB acquired 94% of the shares of BTL (including shares held by Ashcroft companies) and established a process for valuation and compensation for acquired shares.  Prime Minister Barrow indicated that the situation, created by the Accommodation Agreements, had become "intolerable."  The Prime Minister correctly stated that the GOB was exercising its rightful constitutional power in the national interest.

On November 17, 2009, BSDL responded by filing the instant Petition to confirm the "payment portion" of Arbitration Award, as purported assignee of BTL, in clear violation of the injunction issued by the Belize Supreme Court against BTL and BSDL.

GOB moves to stay this action, or dismiss the Petition, on various alternative grounds:

First, this action should be stayed until the Belize judicial proceedings are concluded. The New York Convention states that a court may refuse to confirm an award when it has been suspended by a court of competent jurisdiction; here, the Belize Supreme Court. This result also was reached by this Court in <u>Newco Limited v. Government of Belize</u>, no. 1:08-cv-02010-RJL.

Second, this action must be stayed or dismissed pursuant to the Revenue Rule. U.S. courts cannot interpret or adjudicate foreign tax liabilities. They must be resolved in the local courts. If this Court were to confirm the Arbitration Award, it would be doing just that.

Third, this action should be stayed or dismissed on international comity principles.

Fourth, other than BSDL (created in BVI after-the-fact), all parties are Belizean and the dispute involves Belizean matters. Dismissal on forum non-conveniens grounds is appropriate.

Fifth, this action must be dismissed based on the Act of State and Political Question doctrines. At the root of this Petition lies the GOB's exercise of its sovereign power and political will, and the assignment of the Arbitration Award to BSDL was nothing more than an artifice to attempt to circumvent that power, and give effect to illegal agreements. This Court should not pass judgment on the sovereign acts of another nation and, thus, abstention is appropriate.

Sixth, dismissal is appropriate since BSDL lacks standing. The Assignment is invalid.

Seventh, dismissal is warranted since Belize is not a party to the New York Convention.

Eighth, dismissal is required under the Foreign Sovereign Immunities Act ("FSIA"). The arbitration exception does not apply since Belize has not acceded to the New York Convention. The waiver exception does not apply since the Accommodation Agreements are invalid but, even if they were valid, the Agreements contain a waiver only in favor of non-party BTL.

Ninth, dismissal is appropriate because the Court lacks personal jurisdiction over GOB.

And, this action must be dismissed for failure to name an indispensable party, Dunkeld

Int'l Investment Ltd., which also has asserted claims referencing the Arbitration Award.

## II.      FACTUAL BACKGROUND[1]

A.      LORD MICHAEL ASHCROFT AND HIS HISTORY IN BELIZE.

As noted above, the instant dispute is part of a significant political controversy within

Belize, involving one of the most powerful men in the U.K. and Belize:  Lord Michael Ashcroft.

Lord Ashcroft is a member of the U.K. House of Lords [2] with dual nationality in Belize.[3]

He is a major and controversial political figure in the U.K.  For example, it was reported that his

tenure as Treasurer of the Conservative Party "was marked by a number of controversies:  he

was seen to pay little U.K. income tax due to his domicile in Belize; and he was at the centre of a

debate about openness and accountability of political funding."  Declaration of Juan C.

Basombrio, Esq. ("Basombrio Decl.") at Exhibit 11.  More recently, in March of 2010 the House

of Commons decided to hold a "special one-off inquiry" into Lord Ashcroft's tax affairs.  Id.[4]

Lord Ashcroft's website states that he is "a major investor in Belize."  Basombrio Decl.

at Exhibit 10.  He is described as "an active investor."  Id.  He is a former Belize Ambassador to

the U.N.[5]  He is one of the wealthiest persons in the U.K.[6], and the wealthiest in Belize[7], who

amassed his fortune through various businesses in Belize, including the largest bank (Belize

---

[1]   A court may consider facts outside the petition on motion to dismiss a confirmation action.
     E.g. TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 939-41 (D.C. Cir. 2007).
[2]   Basombrio Decl. at Exhibit 10 (Lord Ashcroft's personal web site).
[3]   Basombrio Decl. at Exhibit 11 (Wikipedia page on Lord Ashcroft).
[4]   Lord Ashcroft also has business activities in the United States.  He acquired ADT Inc. which
     was then acquired by U.S. conglomerate Tyko International, which was became the subject
     of securities lawsuits and investigations.  Basombrio Decl. at Exhibits 11 and 60-66.
[5]   Basombrio Decl. at Exhibit 10.
[6]   Basombrio Decl. at Exhibit 11 (37th wealthiest person in U.K. with fortune of £1.1 billion.).
[7]   Basombrio Decl. at Exhibit 11.  ("In 2009, the Prime Minister of Belize Dean Barrow told his
     parliament:  'Ashcroft is an extremely powerful man.  His net worth may well be equal to
     Belize's entire GDP.  He is nobody to cross.'")

Bank)[8] and largest telecommunications company (now, Belize Telemedia Limited). [9]  It has

been reported that his interests in these entities have been held through various Belizean and

offshore companies, like BCB Holdings of which he is Chairman,[10] but he is the ultimate

beneficiary.[11]

"Ashcroft has close business and other connections with the Commonwealth country of

Belize, and served as the country's ambassador to the United Nations between 1998 and 2000.

In his 2005 biography, he admitted that it is a country where his interests have been 'exempt

from certain taxes for 30 years.'"  Basombrio Dec. at Exhibit 11 (emphasis added).

B.      POLITICAL CONTROVERSY IN BELIZE OVER SECRET AGREEMENTS.

A political controversy has arisen within Belize relating to secret agreements entered into

by Belize Telemedia Limited ("BTL")[12] with the government of prior Prime Minister Said

Musa.

Starting in 2005, representatives of BTL entered into four secret agreements with Prime

---

[8]   Belize Bank is a subsidiary of BCB Holdings.  Ashcroft is Executive Chairman of BCB.
      Philip Osborn (who testified at the subject arbitration) is a director.  Allen & Overy, BSDL's
      counsel, is "legal adviser" to BCB.  Basombrio Dec. at Exhibit 12 (BCB Holdings website).

[9]   Basombrio Decl. at Exhibit 24 ("Belize is the smallest country on the American mainland,
      and one of the poorest in the Caribbean."  "If Lord Ashcroft is an influential man in Britain,
      in Belize he is a colossus.  His holding companies control … Belize Bank.").

[10]  Basombrio Decl. at Exhibit 10 ("BCB … is the parent company of a successful group of
      financial services businesses operating in Belize."  "It operates through Belize Bank.")

[11]  It has been reported that in 1984 Lord Ashcroft formed Belize Holdings (BHI), one of the
      largest holding companies in Belize, with telecommunications to banking interests.  In 1987,
      BHI formed Belize Bank Holdings (BBH) and took control of Belize Bank, the country's
      largest bank. Belize Bank held a majority stake in BTL.  Lord Ashcroft is reported to
      have interests in the parent of SpeedNet, Belize's rival telecommunications company.  In
      2005, BBH restructured and renamed itself BCB Holdings.  Basombrio Dec. at Exhibit 11.

[12]  BTL "was registered by a group of individuals and companies who work for BB Holdings
      Limited (formerly Carlisle Holdings Ltd.)  They "ensure[d] that BB Holdings … controlled
      by Ashcroft, consolidate[d] his control of the company."  "If you start out with an Ashcroft-
      controlled board in the first place, you, in effect, end up with him in perpetual control, while
      minority Belizean shareholders remain powerless."  Basombrio Decl. at Exhibit 18.

Minister Musa ("Accommodation Agreements") that purportedly granted to BTL preferential tax

treatments, lower tax rates, offsets of tax liabilities, exemptions from duties, and other privileges

in contravention of the Belize Constitution, Belize law, and public policy.[13]

Only after the General Election of 2008, when the new administration of the Honorable

Prime Minister Dean Barrow came into place, determined to eradicate preferential treatments

and past abuses, did the nature of the secret Accommodation Agreements become known to the

public.[14]  It is the GOB's position that these Agreements are null and void, and there are judicial

proceedings pending in Belize that will ultimately adjudicate the issues before this Court.

On April 30, 2008, the Belize newspaper Amandala reported that "[m]ore secret deals are

coming out of the closet of the former political administration."  Basombrio Decl. at Exhibit 23

("BTL refuses to pay $6 million business tax !!").  Prime Minister Barrow had disclosed to the

Legislature that "under a secret agreement that former Prime Minister Said Musa signed with

Belize Telecommunications Limited (now Belize Telemedia Limited), BTL is withholding

---

[13]  It has been claimed that Lord "Ashcroft allegedly gave the People's United Party [the party of former Prime Minister Musa] in Belize $1 m when it was in opposition.  During its period in power, it introduced laws that are claimed by opponents and media commentators to be financially advantageous to Ashcroft."  Basombrio Decl. at Exhibit 11.

[14]  More scandal surfaced related to Ashcroft companies. In May, 2008, the Economist reported that "a $10 million transfer [intended to assist slums in Belize] from Venezuela to [GOB] ended-up in the coffers of Belize Bank. The bank argue[d] that the money … constitutes repayment of a government-guaranteed debt; the current government says that Belize Bank had no right to hang on to it."  Basombrio Decl. at Exhibit 24; Exhibit 22 ("Administration and Belize Bank are presently locked in a dispute over US$10 million in grant funds from the government of Venezuela."); Exhibit 21 ("In addition to ten million dollars from Venezuela … the inquiry has discovered and disclosed that there was another ten million U.S. dollars gifted to the people and [GOB] by the Republic of China on Taiwan."); Exhibit 20 ("The story of US $10 million … in grant funds secretly diverted to … Belize Bank: it's one of the biggest political scandals ever – the fall out is massive."); and Exhibit 27 ("Ashcroft bank accused of diverting £5 million aid for poor of Belize to its own coffers").  Public protests took place.  After an warrant was issued, "bank's chairman handed over a cheque to refund the missing grant."  Id. at Exhibit 28 ("Peer who bankrolls the Tories from poor tax haven where he's the boss").  Internet blogs showed anger towards Ashcroft.  Id. at Exhibit 25.

business tax from the Government -- $6 million and counting …"  <u>Id.</u>  The article explained that:

> According to Barrow, he was first aware of the accommodation agreement after he took office in February. BTL's chairman, Keith Arnold, wrote him about a week after, making references to binding commitments that Government had made to BTL. Barrow said that he ignored the letter, but BTL's executive chairman, Dean Boyce, followed up with a letter, attaching that of Keith Arnold, and for the first time informing him of the accommodation agreement, which had been signed way back in 2005 by his predecessor, Said Musa. Barrow said that he checked the relevant government officials in the Ministry of Finance, which he heads, to see if he could lay hand on a copy of the agreement, but there was none. BTL had to supply them, but the company demanded that Barrow keeps silent on its contents, citing a secrecy clause.  Barrow said that he does not know how a central agreement like this cannot be in the public domain.  "This is so utterly against the interest of the people of this country, and I don't know how Musa and Fonseca could have signed such a thing," said Prime Minister Barrow.  [ …]

> According to PM Barrow, the so-called "accommodation agreement" makes it difficult to lower phone rates, because of a secret agreement the Musa administration had signed with BTL, which they only became aware of when they took office.  Barrow said, "…we were written to by BTL, referring to this so called 'accommodation agreement,' a secret agreement as it were, handcuffing the government, shackling the government, making it impossible, legally, contractually, for the government to do anything about rates because that agreement guaranteed BTL a rate of return of 15%, and said that if BTL didn't make that rate of return they could withhold the payment of their business tax—which they've done for the past three months."  According to Barrow, the CEO had said, "I am sending[15] you the agreement but I point out to you that the agreement commits you to secrecy, and if you dare tell the Belizean people about it, I will take legal action."  But it was a deal that was signed by the former administration, and Barrow said that his government would not tolerate any demands to keep it secret.

---

[15]  <u>See also</u> Basombrio Decl. at Exhibit 26 (quoting Prime Minister Barrow:  "That master agreement is one of course that we don't have. We remember had to quarrel with these people even to get the accommodation agreement. When they first said to us officially, 'oh we don't have to pay you business tax because of the commitments in the accommodation agreement, and we had to say which accommodation agreement. I remember writing them to tell them nobody currently in the Attorney General's Ministry of Finance or indeed the government of Belize has ever seen a copy of this accommodation agreement and that is how they agreed to send it to me on the condition that I not release it, which was a nonsensical position. It is the same thing with this so called master agreement. The current government, the new administration, has never seen it. It is that Said Musa, Ralph Fonseca, entered into these agreements and kept them hidden even from public officers. Financial Secretary had no sight of the accommodation agreement, had no sight of this master agreement. The legal consultant had no sight of the accommodation agreement and as far as I know had no sight of the master agreement. This is the way Musa and Fonseca and the PUP are operating.").

Id.  Prime Minister Barrow stated that "he has every desire to make the documents fully public,

but he has to be mindful also to protect the Government from lawsuits which the Belize Bank

have threatened if he speaks about its contents."  Id.  Amandala "could not reach Mr. Musa for

comment."   Former attorney general Fonseca "told us that he does not know what Barrow is

talking about.  He insisted that we should ask Barrow to show us the documents, as he, Fonseca,

is not aware of any such secret agreement."  Id.  Mr. Fonseca signed two such agreements.  See

Exhibits D & E to Declaration of BSDL counsel, Louis B. Kimmelman ("Kimmelman Decl.).

C.    THE LCIA ARBITRATION PROCEEDS DESPITE REVENUE RULE.

When the GOB challenged the Accommodation Agreements, BTL initiated arbitration in

the London Court of International Arbitration ("LCIA") against the GOB, resulting in a March

18, 2009 award issued in favor of BTL ("Arbitration Award").  Kimmelman Decl. at Exhibit A.

GOB did not participate in the LCIA arbitration, since the Accommodation Agreements

were contrary to law, and matters related to tax and duty liabilities must be adjudicated in Belize.

Prime Minister Barrow stated the GOB's position that "the secret agreement between Musa and

Ashcroft is illegal and he will not honor it."  Basombrio Decl. at Exhibit 29.

> The Government of Belize has learnt, through reports in the local media, that a ruling has
> been made by a London Arbitration panel awarding Belize Telemedia Limited $38.5
> million in damages to be paid by the Government for failing to honor the secret
> Accommodation Agreement signed by former Prime Minister Said Musa.
>
> That Agreement … prevented the introduction of telecommunications competition in
> Belize; outlawed voice over Internet Protocol as a way of bringing down rates; and
> exempted Telemedia from paying taxes under Belize law whenever it claimed not to have
> the minimum 15% rate of return that the … Agreement, without any reference to the PUC
> as the only legal rate setting authority in the country, gave Telemedia.  […]
>
> It has been and continues to be the government's position that the Accommodation
> Agreement is illegal and invalid.  In that connection government notes that our local
> courts have already rejected the Agreement to the extent that the Agreement purports to
> authorize Telemedia not to pay taxes. […]

> The government of Belize will not be bound by any ruling of a foreign arbitral tribunal where the ruling conflicts with the position taken by Belize's superior courts. […]

> Finally, government reiterates its commitment to the continued <u>protection</u> always of the <u>interests of Belize</u>.  <u>Arrangements</u> that <u>are immoral</u>, <u>made in secret</u> and that defy our very democracy, <u>will continue to be resisted</u> at all costs.

<u>Id.</u> (March 31, 2009 article in <u>The Reporter</u>) (emphasis added).

D.     CREATION OF BSDL IN BVI TO CIRCUMVENT THE BELIZE COURTS.

On March 20, 2009, two days after the LCIA rendered the Award, unknown persons (likely associated with Lord Ashcroft or BTL)[16] formed Petitioner, Belize Social Development Limited ("BSDL") in the British Virgin Islands.  Declaration of Stephen J. Ruzika at Exhibit A.  On the same day, BTL assigned to BSDL the "monetary portion" of the Award, <u>id.</u> at Exhibit C.  The assignment was prepared by BSDL counsel (Allen & Overy).  <u>Id.</u>  This was an artifice to attempt to give effect to illegal agreements and avoid the jurisdiction of the courts of Belize.

E.     LITIGATION IN BELIZE RELATED TO BTL, BSDL AND THE AWARD, AND INJUNCTION BY BELIZE SUPREME COURT.

On April 6, 2009, the GOB filed a complaint against BTL, <u>Attorney General v. Belize Telemedia Ltd. and Belize Social Development Ltd.</u>, No. 317 of 2009, in the Belize Supreme Court ("Belize Action").  Declaration of Michael C. Young, S.C. ("Young Decl.") at ¶¶ 1-5 & Exhibit 1.  GOB seeks a judicial declaration that the Arbitration Award is unenforceable and the Accommodation Agreements are invalid as contrary to Belize law and public policy.  <u>Id.</u> at ¶ 6.

GOB's position is that the Accommodation Agreements[17] are illegal and were

---

[16]   Mr. Ruzika, who has submitted a declaration herein as a director of BSDL, is a long time associate of Lord Ashcroft.  Mr. Rusika was also a director of U.S.-based ADT, Ltd., of which Lord Ashcroft was Chairman and CEO.  Basombrio Decl. at Exhibits 61 and 62.

[17]   As stated in ¶11 of the April 6, 2009 Affidavit of Mr. Gian C. Gandhi (Director General of the Int'l Financial Services Comm. and Legal Adviser to the Ministry of Finance, GOB – Young Decl. at Exhibit 3), this dispute arises from a series of four agreements entitled: Government Telecommunications Accommodation Agreement (dated September 19, 2005); Amendment to the Accommodation Agreement (November 21, 2005); Settlement Deed in

improperly entered into in secret by prior Prime Minister Musa and BTL.  The prior Prime

Minister, without authority, purported to give BTL favorable tax treatments, duty exemptions

and a monopoly over aspects of telecommunications, encroaching into the constitutional

authority of the Legislature and statutory authority of the Public Utilities Commission (PUC).

Belize law and public policy require public contracts be negotiated in an open and public

manner, be properly authorized, and not be contrary to Belize law, but these principles were not

respected.  Young Decl. at ¶ 11.

The Accommodation Agreements have secrecy clauses.  Such clauses in public contracts

were invalidated by the Freedom of Information (Amend.) Act, 2008.  Young Decl. at ¶ 12.

The Accommodation Agreements and Arbitration Award violate various provisions of

the Belize Constitution, Belize law and public policy, as is contended by the GOB in the Belize

Action, and is discussed in paragraphs 13-16 of the Young Declaration.  To summarize briefly:

First, enforcement of the Award is contrary to the Constitution, Finance & Audit (Ref.)

Act and Income & Business Tax Act (IBT).  The Award's fallacy is that it held that the Prime

Minister can contract with a private party to allow it to avoid tax liabilities.  Tax rates are set by

the Legislature.  A Prime Minister lacks power to exempt BTL from tax liabilities. [18]  The

Award seeks to nullify and bar future tax assessments and proceedings in Belize as to BTL,

violating the IBT (which sets a tax enforcement process) and the Revenue Rule.  Young Decl. at

---

relation to the Government Telecommunications Accommodation Agreement (December 15,
2006); and (4) Settlement Deed in relation to the Government Telecommunications
Accommodation Agreement (January 7, 2008).  Copies are attached to the Gandhi Aff.
designated as exhibits "GCG5," "GCG6," "GCG7" and "GCG8," and are collectively
referred to herein as the "Accommodation Agreements."  Young Decl. at ¶ 10.

[18]   In a 2009, the Belize Supreme Court denied a Belize Bank petition to enjoin GOB from
collecting taxes under another accommodation agreement signed by the prior government on
the ground that it was likely illegal since the Executive does not have power to grant tax
exemptions.  In Belize tax concessions are granted by legislation. Gandhi Decl. at Exhibit 24.

¶¶ 14 & 17.

Second, enforcement of the Award also would be improper, because the Accommodation

Agreements, upon which the Arbitration Award is based, re illegal, for various reasons:

    (a)    The Accommodation Agreements are null and void for the Prime Minister had no authority to exempt TBL from its tax liabilities under Belize law.

    (b)    The application of the "Agreed Rate" of business tax payable by BTL is contrary to the Belize Income and Business Tax Act, which prescribes the rates of tax.

    (c)    The exemption of BTL from custom duties is contrary to the Customs and Excise Duties Act, which provides for the raising, levying and collection of duties.

    (d)    The unilateral entitlement of BTL to use the frequencies 2.496 Ghz to 2.69 Ghz is contrary to the Belize Telecommunications Act of 2002 ("BTA").  The Executive does not have power to grant entitlements as those purportedly given to BTL.

    (e)    The requirement that only BTL and SpeedNet [another Ashcroft company] be permitted to provide telecommunications services involving VoIP in Belize, and that customers can only use their services, are contrary to the BTA and PUC Act.

    (f)    The "setting off" of various sums (like "short fall" differences between the actual return in profit to BTL and the return purportedly guaranteed by the GOB in the Accommodation Agreements) against BTL's tax liability violates Belize law because the GOB must collect taxes at rates set by the Legislature without offset.

Young Decl. at ¶ 15.  The Award also contains "declarations" which act as prospective

injunctions that would have serious impacts and ongoing consequences in Belize, including:

    (a)    Affect GOB's ability to impose on BTL the tax rates mandated by law.

    (b)    Affect GOB's ability to collect full revenue as mandated by the Legislature.

    (c)    Enforced a preferential tax status for BTL or its assignee through an agreement with the executive and not by authority of statute or regulation.

    (d)    Affect GOB's ability to impose on BTL the customs duties mandated by law.

    (e)    Affect PUC's ability to manage and regulate as mandated by the Legislature.

    (f)    Affect PUC's ability to exercise the power granted by the Legislature to receive and process applications for telecommunications licences.

    (g)    Affect PUC's and GOB's ability to promote competition in telecommunications.

(h)    Affect PUC's ability to regulate rates which impact consumers and businesses.

Young Decl. at ¶ 16.  Thus, enforcement of the Award also would violate Belize public policy.

GOB applied for an interim injunction prohibiting BTL and BSDL from enforcing the Award in any jurisdiction until the Belize Supreme Court adjudicated the Belize Action.  Young Decl. at ¶ 7 & Exhibit 2. On April 7, 2009, the Supreme Court entered an *ex parte* Order granting GOB's application for a temporary restraining order against BTL and BSDL, enjoining them from seeking to enforce the Award anywhere until further order of the Court. Id. at ¶ 19 & Exhibit 5.  The parties then submitted more pleadings, including an application by BTL requesting that the Supreme Court issue a declaration that the Arbitration Award is valid and binding on the GOB.  Id. at ¶¶ 24-25 & Exhibits 8-9.  Thus, BTL seeks confirmation in Belize.

On July 20, 2009, the Belize Supreme Court issued an Order and Decision granting a preliminary injunction prohibiting BTL and BSDL from enforcing the Arbitration Award until after conclusion of the Belize Action.  Young Decl. at ¶ 29, and Exhibits 12 (Order) & 13 (Decision).  The Order provides, in relevant part:

1.    Belize Telemedia Limited and Belize Social Development Limited or their successors, assigns or subsidiaries, are thereby restrained by themselves, their agents or representatives howsoever, from enforcing, or commencing or continuing in the United Kingdom or any other jurisdiction, proceedings for enforcing the award of the London Court of International Arbitration (LCIA), made on the 18th of March 2009; in Arbitration Number 81079, or from commencing or continuing in the United Kingdom or in any other jurisdiction, any proceedings relating to the enforcement of said award.

2.    The Injunction Order above shall continue until the conclusion of the Claim herein or until further Order.

The Supreme Court's Decision (Exhibit 13) supporting its Order indicates, in part:

[I]t is obvious that serious questions arise in the several contentions of illegality of the agreement, raised by the Attorney General.  That in turn raises a serious question as to whether enforcement of the award will not be contrary to the Constitution, the other statutory laws and public policy.  *Section 20 of Arbitration Act*, requires that for an award to be enforced, "*the arbitration agreement must be valid under the law by which it was*

*governed*", and the enforcement, "*must not be contrary to public policy or the law of Belize*".

The Decision further explains:

> The application, the subject of this decision, is for an order to preserve the *status quo* until trial of the claim of the Attorney General, in which he claims relief against enforcement of the foreign arbitration award made on 18.3.2009, by the LCIA.  The *status quo* at the moment is that no enforcement proceedings have been commenced in courts in Belize or in courts in England or elsewhere, although an application has been filed for an order of this court for a declaration that the "award is valid and binding..."

> I have decided that serious issues of illegality and of public policy, have been raised in the claim to resist enforcement.  I must proceed to consider whether in the circumstances of the claim, including the fact that the restraining order is sought in respect of proceedings outside Belize as well, it is appropriate to exercise discretion in favor of granting an interim restraining order.

> It is my view that, in the interest of justice, the *status quo* should obtain until the determination of the claim of the Attorney General.

F.   GOB ASSUMES CONTROL OVER TELECOMMUNICATIONS IN BELIZE AND ACQUIRES CONTROLLING INTEREST IN BTL.

On August 25, 2009, the GOB exercised its sovereign power and enacted legislation assuming control over telecommunications in Belize.  As part of said legislation, the GOB acquired 94% of the shares of BTL (including the shares held by Lord Ashcroft companies).  Gandhi Decl. at ¶¶ 5-6 and Exhibits 1 and 2.  In a August 24, 2009 speech to the Legislature, Prime Minister Barrow discussed the political will behind the bill.  Basombrio Decl. at Exhibit 34.  He explained the preferential tax treatments afforded to BTL under the Accommodation Agreements, and stated that the situation had become "intolerable."  For example, he explained that under the Agreements, "Ashcroft could in any year declare that BTL has not made [a 15% profit guaranteed under these agreements]; declare how much the shortfall was; and simply not pay his taxes until the so-called shortfall had been recovered."  The Prime Minister noted that the GOB was exercising a rightful power under the Constitution and doing so in the national interest.

The legislation sets forth a procedure for assessment of compensation for the acquired shares.[19]

On November 17, 2009, BSDL responded by filing the instant Petition to confirm the "payment portion" of Arbitration Award, as purported assignee of BTL, in clear violation of the aforementioned restraining order issued by the Belize Supreme Court against BTL and BSDL.[20]

## G.      PRIOR LITIGATION AGAINST GOB IN THE UNITED STATES.

The GOB has apparently only been sued twice before in the U.S.  Basombrio Decl. at ¶ 2.

The first case related to a dispute over control of Belize Telecom Ltd., a predecessor of BTL.  In that case, on comity grounds, the Eleventh Circuit deferred to the judgment of a Belize court relating to the subject matter of the dispute.  See Belize Telecom, Ltd. et al. v. Government of Belize, 528 F.3d 1298 (11th Cir. 2008) ("Belize Telecom Action").  Basombrio Decl. at ¶ 3.

The second case is pending before this Court, Newco Limited v. Government of Belize, no. 1:08-cv-02010-RJL, Hon. Judge Richard J. Leon presiding ("Newco Action.").  Basombrio Decl. at ¶ 4 and Exhibit 1.  It has many parallels to the case at bar.  Newco sought to confirm an arbitration award against the GOB.  GOB moved to stay or dismiss on the legal grounds invoked here.  GOB had brought an action in Belize to challenge aspects of the arbitration award.  The Belize Supreme Court issued an order enjoining Newco from enforcing the award anywhere until conclusion of the Belize proceedings.  Id. at ¶ 5, Exhibits 2, 3 & 4.  On June 30, 2009, this Court

---

[19]  These events were widely reported in the press.  Basombrio Decl. at Exhibit 34 ("dominance of BTL and resulting impediments to the arrival of new competition have delayed the spread of telecommunications services and discouraged investment"); Exhibit 36 (GOB acquired "94% of BTL currently owned by private sector interests controlled by UK's Lord Ashcroft, for which compensation would be given"); Exhibit 38 (move was necessary "to improve poor state of the country's telecom industry … strangled and prevented from growing because the monopoly BTL is controlled by businessman Michael Ashcroft."); Exhibits 40 ("Ashcroft 'subjugated nation' claims Belize Prime Minister."); Exhibits 39, 41, 43, 45, 46, 47 & 48.

[20]  Further, in December of 2009, BTL's new Chairman indicated that Lord Ashcroft is now trying to exert pressure on the GOB also from another angle:  "British Caribbean Bank (formerly Belize Bank), which is controlled by a company chaired by Ashcroft, is seeking to close down BTL on the basis that it neglected to pay USD25 million in debt."  The loan was taken out prior to the GOB assuming control of BTL.  Basombrio Decl. at Exhibits 52 & 53.

granted GOB's motion to stay: "This action is hereby stayed until after final adjudication of the action filed by the Government of Belize against Newco before the Supreme Court of Belize." Id. at Exhibit 1.  GOB submits that this Court should do the same in the case at bar, and afford comity to the Belize Supreme Court's injunction order against BTL and BSDL.

### III.    ARGUMENT

Pursuant to F.R.C.P. 12(b)(1), (2) and (6) and the Court's inherent powers, GOB moves to stay this action until conclusion of the Belize Action or to dismiss the instant Petition.

A.    THIS COURT SHOULD STAY THIS ACTION OR DISMISS THE PETITION BECAUSE ENFORCEMENT OF THE ARBITRATION AWARD HAS BEEN SUSPENDED BY A COMPETENT AUTHORITY OF THE COUNTRY UNDER THE LAW OF WHICH THE AWARD WAS MADE:  BELIZE.

Assuming *arguendo* that the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 ("Convention"), applies and can bind a non signatory country like Belize, it is clear that this Court should not enforce the Arbitration Award at this time.  Under the Convention, this Court should stay this action because enforcement of the Award has been suspended by a competent authority (Belize Supreme Court) of the country (Belize) under the law of which the Arbitration Award was made.

Under the Convention, a court may refuse to enforce an arbitration award if the award has been suspended by a competent authority of (1) the country in which that award was made, or (2) the country under the law of which that award was made.  Specifically, Article V(1)(e) of the Convention provides that a court may decline to enforce an arbitration award when:

> "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."

Article V(1)(e) of the New York Convention (emphasis added).

In the case at bar, the country "under the laws of which the award was made" is Belize,

because the Accommodation Agreements specifically provide that they are governed by the laws of Belize:  "15.1  This Agreement is governed by and shall be construed in accordance with Belize law."  <u>See</u> Accommodation Agreement, attached as Exhibit GCG5 to the Affidavit of Gian C. Gandhi in the Belize Action (submitted here as Exhibit 4 to the Young Declaration).

Thus, the courts of Belize (as a State of "primary jurisdiction" under the Convention) have the authority to modify the Award in accordance with the domestic law of Belize.  "The Convention specifically contemplates that the <u>state … under the law of which the award is made</u>, <u>will be free to</u> set aside or <u>modify</u> an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief."  <u>Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.</u>, 126 F.3d 15, 23 (2nd Cir. 1997) (emphasis added); <u>Gulf Petro Trading, Inc. v. Nigerian National Petroleum Co.</u>, 288 F.Supp.2d 783, 792 (N.D. Tex. 2003) (courts of State under the law of which the award was made have primary jurisdiction).

The Belize Supreme Court has enjoined BTL and BSDL suspending enforcement of the Arbitration Award.  This Court should refuse to enforce the Award on the basis of that order, entered by a competent authority of a jurisdiction under the laws of which the award was made.

Indeed, under the Convention, courts may refuse to enforce an arbitration award if the arbitration award has been suspended by a competent authority of the country under the law of which the award was made.  <u>See</u> <u>Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi etc.</u>, 500 F.3d 111, 124-125 (2nd Cir. 2007) (citing New York Convention, Article V(1)(e)); Leonard V. Quigley, <u>Accession by the U.S. to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards</u>, 70 Yale L.J. 1049, 1069 (1961) (Article V(1)(e) "provides that <u>when an award is rendered in one state</u> <u>under the law of a second state</u>, <u>the courts of that second state</u> may set aside or suspend the award.") (emphasis added).

As explained by the Belize Supreme Court in its well-reasoned July 20, 2009 Order and

Decision (Young Decl., Exhibits 12 & 13) prohibiting BSDL and BTL from enforcing the

subject Arbitration Award until after the Belize Action is adjudicated, the suspension of

enforcement of the Award in a country other than Belize is "in the interest of justice."

Under Article V(1)(e) of the Convention, "a district court may be acting <u>improvidently</u> by

enforcing an award prior to the completion of the foreign proceedings" where a parallel action to

set aside or modify an award is proceeding in a country of primary jurisdiction, like the <u>prior</u>

<u>Belize Action</u> in the case at bar.  <u>Europcar Italia S.p.A. v. Maiellano Tours</u>, 156 F.3d 310, 317

(2nd Cir. 1998) (Appellate court held that district court may be acting improvidently by enforcing

award prior to completion of a parallel foreign proceeding.) (Emphasis added).

Indeed, if the Belize Supreme Court holds that the Arbitration Award is unenforceable,

this Court may not ultimately enforce the Award at all (although that is an issue to be resolved

after the Belize Supreme Court enters a final judgment on the merits).  <u>See e.g.</u>, <u>Baker Marine</u>

<u>(Nigeria) Ltd. v. Chevron (Nigeria) Ltd.</u>, 191 F.3d 194, 196-197 (2nd Cir. 1999) (under Article

V(1)(e) of the New York Convention, the district court properly declined to enforce an arbitral

award because it had been set aside by a competent authority of another country.); <u>Termorio S.A.</u>

<u>S.p.A. v. Electranta S.P.</u>, 487 F.3d 928, 931 (D.C. Cir. 2007) (declining to enforce award after a

Colombian court held that arbitration was not conducted in accordance with Colombian law.);

<u>Spier v. Calzaturificio Tecnica, S.p.A.</u>, 21 F.Supp.2d 279, 281-282 (S.D.N.Y. 1999) (declining to

enforce award after Italian courts concluded that the arbitral body exceeded its powers.)

In the meanwhile, the prudent course of action is to stay or dismiss this petition since the

Belize Supreme Court has suspended enforcement of the Award.  Dismissal is preferred, but stay

is appropriate.  <u>EDF Intern. S.A. v. YPF S.A.</u>, slip copy, 2008 WL 5045915 at *3-4, (D.Del.

2008) (declined to enforce an arbitration award, and dismissed rather than stayed action based on an Argentine court's suspension of enforcement of award pending resolution of an annulment proceeding in Argentina.  Court held that dismissal was preferable since the Argentinean court had suspended enforcement given that the award was being challenged as contrary to law.)

To argue that the Supreme Court of Belize is not a "competent authority" to review the Arbitration Award (although the Award was made under Belize law), BSDL argues that the two alternative provisions in Article V(1)(e) of the Convention mean the same thing – that the only competent authority is the one of the country in which the arbitration was made.  However, despite BSDL's contentions, these are two alternative provisions, and each must be given effect.  Like statutes, treaties are interpreted to give effect to their plain language.  E.g. Jogi v. Voges, 480 F.3d 822, 832-833 (7th Cir. 2007) (citing Vienna Convention on the Law of Treaties).  Again, Article V(1)(e) provides that a court may decline to enforce an award when:  "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  Article V(1)(e) of the Convention (emphasis added).  Thus, the plain language of the Convention states that a competent authority includes that of a country "under the law of which the award was made."  BSDL argues that this phrase only refers to the "procedural law."  However, the plain language of the Convention does not limit the "under the law of which" phrase only to the "procedural" law.  Instead, Article V(1)(e) more broadly states that competent authorities include those of the country "under the law of which" the "award was made," and said language is broad enough, on its face, to include substantive law.  As one commentator has correctly stated,

> [N]o one really gives much consideration to the phrase "under the law of which."
> Most commentators assume that a court may adjourn or deny enforcement of an
> award under Article V(1)(e) only if a dissatisfied party takes recourse against the
> award in the state that rendered it.  This assumption is false.  The wording of

> Article V(1)(e) clearly permits a party to stay enforcement of an award if it is rendered in State Y under the law of State X and then recourse is had against the award in State X.

Strub, Jr., M.H., "Resisting Enforcement of Foreign Arbitral Awards under Article V(1)(E) and Article VI of the New York Convention:  A Proposal For Effective Guidelines," 68 Tex. L. Rev. 1031, 1048-1049 (April, 1990) (emphasis added).

The Accommodation Agreements state that they are governed by "Belize law."  No distinction is made between substantive or procedural law.  Although the seat of arbitration was London and LCIA rules applied (the London Court of International Arbitration is an arbitration association despite its name and its rules are not law), the Agreements speak broadly to the application of Belize law.  Thus, Belize is properly the country under the "under the law of which" the arbitral "award was made."  The Belize Supreme Court is a competent authority.

Accordingly, under Article V(1)(e) of the Convention, this Court should stay this action until after the Belize Supreme Court enters a final judgment on the merits in the Belize Action or, in the alternative, dismiss the Petition without prejudice.  Such a ruling also would be consistent with prior rulings of the Eleventh Circuit in the Belize Telecom Action, and of this Court in the recent Newco Action, both discussed above in Part II of this Memorandum.

B.    THIS ACTION SHOULD BE STAYED OR DISMISSED PURSUANT TO THE REVENUE RULE.  UNDER THIS SETTLED PRINCIPLE, THIS COURT SHOULD NOT INTERPRET AND APPLY BELIZE TAX LAWS OR ADJUDICATE BTL'S OBLIGATIONS UNDER THE SAME.  HOWEVER, CONFIRMATION OF THE ARBITRATION AWARD WOULD IMPROPERLY DO JUST THAT.

Under the common law Evidence Rule, United States courts do not interpret or adjudicate foreign tax liabilities.  If this Court were to confirm the Arbitration Award, it would be doing just that.  Foreign tax liabilities must be resolved in local courts instead, i.e., in Belize.

"The revenue rule precludes a court from hearing a claim that would require the court to consider the validity of a foreign tax law."  Rep. of Columbia v. Diageo North America Inc., 531

F.Supp.2d 365, 384 (E.D.N.Y. 2007) (emphasis added).  The rule "mandates that courts <u>refrain from adjudicating</u> cases where they will have to <u>pass upon the validity</u> of the revenue laws of foreign nations."  <u>CINAR Corp. Securities Lit.</u>, 186 F.Supp.2d 279, 293 note 9 (E.D.N.Y. 2002) (emphasis added); <u>European Community v. RJR Nabisco, Inc.</u>, 424 F.3d 175, 177 (2nd Cir. 2005) ("U.S. courts generally <u>may not interpret</u> and enforce <u>foreign revenue laws</u>.") (emphasis added).

The Revenue Rule had its origins in 18th Century England.  "Since then, the rule has entered United States common law, international law and the national law of other common law jurisdictions."  <u>Attorney General v. R.J. Reynolds Tobacco Holdings, Inc.</u>, 268 F.3d 103, 111 (2nd Cir. 2001).  The "reluctance of courts to delve into such matters is based on a <u>desire to avoid embarrassing</u> another state <u>by scrutinizing</u> its … <u>revenue laws</u>."  <u>Id.</u> at 112 (emphasis added).

> "[W]hen it concerns the relations between a foreign state and its own citizens …
> To pass [judgment] upon the provisions for the public order of another state is, or
> at any rate should be, beyond the powers of the court; it involves the relations
> between the states themselves, with which the courts are incompetent to deal, and
> which are entrusted to other authorities … Revenue laws fall within the same
> reasoning; they affect a state in matters vital to its existence as its criminal laws."

<u>Moore v. Mitchell</u>, 30 F.2d 600, 604 (2nd Cir. 1929) (L. Hand, J. concurring) (cited with approval by the United States Supreme Court in <u>Pasquantino v. U.S.</u>, 544 U.S. 349, 368-369 (2005)).

The interpretation of foreign tax laws is, thus, "problematic" because tax laws "embody policy choices that are infused with moral and political judgments."  <u>Republic of Columbia</u>, 531 F.Supp.2d at 386.  As a result, the Revenue Rule has evolved from a stricter earlier construction to a broader interpretation based on the "strength of the analogy [described by Judge Hand] between a country's revenue laws and its penal ones."  <u>Pasquantino</u>, 544 U.S. at 366.  Today, two of the justifications for the revenue rule have evolved to be that enforcing foreign law is burdensome, and that the scrutiny of foreign law might cause offense to foreign nations.  <u>See</u> William S. Dodge, <u>Breaking the Public Law Taboo</u>, 43 Harv. Int'l L.J. 161, 179 (Winter 2002).

Indeed, the Revenue Rule bars even "indirect" attempts to have a court interpret or apply foreign tax laws.  "[W]here a domestic court is effectively passing on the <u>validity</u> and <u>operation</u> of the <u>revenue laws</u> of a foreign country, the important concerns underlying the revenue rule are implicated."  <u>Fountain v. U.S.</u>, 357 F.3d 250, 252 (2nd Cir. 2004) (emphasis added); <u>Republic of Honduras v. Phillip Morris Cos., Inc.</u>, 341 F.3d 1253, 1256 (11th Cir. 2003) ("the revenue rule is a long-standing common law rule that prevents the courts of one sovereign from enforcing or adjudicating tax claims from another sovereign," and therefore the rule requires abstention).

Here, the Revenue Rule bars confirmation of the Arbitration Award.  In the Award, the arbitrators in London were presented with a claim that called, not only for the interpretation and application of Belize tax laws, but blatantly for a declaration that BTL could supplant Belize tax laws on the basis of the Accommodation Agreements.  Even under British law, which follows the Revenue Rule as noted above, the arbitrators should have abstained from determining those issues, but they did not exhibit the required restraint.  Instead, the Arbitration Award held that the Accommodation Agreements (providing preferential tax treatments and duty exemptions to BTL despite the requirements of Belize tax and duty law) were valid, and effectively supplanting Belizean tax and duty law; BTL had a right to set off certain payments and losses against its tax liabilities despite Belize tax law; BTL had the right to be charged a negotiated tax rate lower than that mandated by the Belize Legislature; and BTL was exempt from paying import duties, among other things.  These findings were the basis of the damages award and were set forth in the form of declarations that purportedly have a going forward effect on the relationship between BTL and the GOB.  <u>See</u> <u>generally</u>, Arbitration Award, Exhibit A to Declaration of Kimmelman Decl.

The tribunal conceded in the Arbitration Award (at ¶ 180) that "enforcement of tax laws should be undertaken by the national courts of the jurisdiction in question."  Nonetheless, the

tribunal then ignores the rule by finding, in a summary discussion of no more than one short paragraph (¶ 180), that unidentified "authorities" "reviewed by the Tribunal" "do not restrict the ability of courts to determine contractual arrangements relating to the application of foreign revenue laws as opposed to the enforcement of laws themselves."  Since these "authorities" were not identified by the tribunal, there is no way to know what it had in mind.  Indeed, the tribunal was wrong, under British law just as it would be under U.S. law.  As discussed above, the Award interpreted, applied and adjudicated the effect of Belize tax laws on BTL.  The Award at ¶ 180 states that in "the Tribunal is being asked to determine the disputes that have arisen <u>as regards the application</u> of the bespoken <u>tax arrangements</u> included in the Accommodation Agreement relating to the <u>rate of Business Tax to be paid</u> by [BTL], its right to <u>set off the Shortfall Amount against its tax liabilities</u>, and its entitlement to be <u>exempted from import duties</u>."  (Emphasis added).  Thus, the tribunal's holding that the arbitration would not violate the Revenue Rule was irrational, yet that is exactly what BSDL is asking this Court to confirm and adopt as a judgment of this Court.  However, under U.S. law, this Court is barred by the Revenue Rule from doing so.

The Belize Supreme Court also has spoken on this issue.  In 2008, BTL filed a petition against GOB, <u>Belize Telemedia Ltd. v. Attorney General</u>, seeking to enjoin GOB from enforcing Belize tax laws pending an LCIA arbitration.  BTL had obtained an order from the Commercial Court of England prohibiting GOB from initiating proceedings in Belize against BTL for taxes and duties, and sought recognition of that order by the Belize Supreme Court.  The Supreme Court denied BTL's petition because it is not in "the province of <u>either the arbitral tribunal</u> or English Commercial Court" to "pronounce upon such a <u>fundamentally sovereign preserve</u> as the <u>taxation regime of a foreign sovereign state</u>."  Declaration of Gian C. Gandhi submitted herein ("Gandhi Decl.") at Exhibit 17 (Belize Supreme Court decision at ¶ 19.).  The Supreme Court

noted that "the applicant is a Belizean corporation liable to pay business taxes in Belize, doing business in Belize from whence all or most of its income is derived." <u>Id.</u> Decision at ¶ 4.  "Taxes and duties are quintessentially territorial.  I am therefore at a loss to understand how a foreign court, with the greatest respect, can enjoin a foreign government from the process of collecting taxes in its own domain." <u>Id.</u> at ¶ 9.  Moreover, the Supreme Court held that "Clause 15.2 [the Arbitration Clause] of the parties' [Accommodation Agreement] does not, in my humble view, comprehend the payment of taxes and custom duties, which is the substratum of the application of this case." <u>Id.</u> Decision at ¶ 10.  The foregoing decision binds BTL, and its assignee BSDL.

That this is a confirmation action does not change the result.  Arbitrations are a creature of contract, and parties cannot by contract avoid the Revenue Rule.  In <u>U.S. v. Harden,</u> [1963] S.C.R. 366 (Can.), the Canada Supreme Court rejected enforcement of a stipulation of settlement of a tax case as barred by the Revenue Rule, stating that the settlement agreement made "certain the fact and the amount of the respondent's liability to the appellant," and based on "the special principle that foreign States cannot directly or indirectly enforce their tax claims [in our courts]." <u>Id.</u> at 371 (cited by <u>Attorney General of Canada,</u> 268 F.3d at 111 n. 5 and 130).  Here too, the Award purports to adjudicate the fact and the amount of various aspects of BTL's tax and duties liability to GOB, including on a going forward basis by making declarations regarding the same.

Further, because under the Revenue Rule the GOB could not assert a counter-claim for unpaid taxes to enforce Belize tax laws, this Court should abstain and dismiss this Petition.  <u>See</u> <u>Republic of Columbia,</u> 531 F.Supp.2d 365 at 386 (it is "manifestly" unjust to allow action to proceed since foreign sovereign could not assert a claimed tax offset under Revenue Rule).

In sum, the "Revenue Rule has been with us for centuries and as such has become firmly embedded in the law.  There were sound reasons which supported its original adoption, and there

remain sound reasons supporting its continued validity.  When and if the rule is changed, it is a

more proper function of the policy-making branches of our government to make such a change."

Her Majesty the Queen of England v. Gilberson, et al., 597 F.2d 1161, 1166 (9th Cir. 1979).

Under the Revenue Rule, this matter should be stayed until the Belize Supreme Court adjudicates

the pending tax dispute, or the Petition must be dismissed on abstention and comity grounds.

C.    THIS ACTION SHOULD BE STAYED OR DISMISSED UNDER PRINCIPLES OF
      INTERNATIONAL COMITY AND/OR ON GROUNDS OF ABSTENTION.

Comity is the "recognition which one nation allows within its territory to the legislative,

executive and judicial acts of another nation."  Societe Nationale Industrielle Aerospatiale v.

U.S. District Court, 482 U.S. 522, 544 note 27 (1987).  "[C]ourts in this country have long

recognized the principles of international comity and have advocated them in order to promote

cooperation and reciprocity with foreign lands."  Pravin Assocs., Ltd. v. Banco Popular del Peru,

109 F.3d 850, 854 (2nd Cir. 1997).  Under the principle of comity, courts "defer to proceedings

taking place in foreign countries."  Jota v. Texaco, Inc., 157 F.3d 156, 159-160 (2nd Cir. 1998).

"Comity of courts" is where "judges decline to exercise jurisdiction over matters more

appropriately judged elsewhere."  Freud v. France, 2008 WL 5272744 at * 21 (S.D.N.Y. 2008).

"To justify abstention under these principles, the foreign proceedings must be parallel, the

alternative forum must be adequate and additional circumstances must be present that outweigh

courts' general obligation to exercise their jurisdiction …  Other relevant factors include the

similarity of parties, similarity of issues, the order in which the actions were filed, the potential

prejudice to either party, the convenience of the parties, the connection between the litigation and

the United States, and the connection between the litigation and the foreign jurisdiction."  Id.

Under the Convention, this Court has the power to stay or dismiss this petition under

principles of international comity, based on the pendency of the Belize Action.  E.g. Telcordia

Tech Inc. v. Telkom S.A. Ltd., 458 F.3d 172, 181 (3rd Cir. 2006) (dismissal without prejudice of enforcement action brought under Convention was appropriate under principles of international comity pending resolution of foreign lawsuit seeking to annul award).

This Court should stay or dismiss this petition based on comity or abstention grounds. There are previously filed parallel proceedings pending in Belize, and the Belize Supreme Court has already issued an injunction order prohibiting BTL and BSDL from seeking to enforce the Arbitration Award until the conclusion of the Belize Action. It must be underscored that BTL (assignor of BSDL) availed itself of the rights and obligations of conducting business in Belize, because it is a business entity incorporated in Belize, governed by the laws of Belize, and with its registered place of business in Belize. BSDL is just a shell created only to attempt to circumvent the jurisdiction of the courts of Belize. The Accommodation Agreements were with the GOB, and were to be performed within Belize, and subject to the laws of Belize. Further, because only the courts of Belize may adjudicate BTL's tax obligations under the Revenue Rule, it is only the Courts of Belize that can fully adjudicate all disputes between the parties and, thus, not only are they an adequate alternative forum, but the only proper forum. In that regard, BTL appeared in the Belize Action and actually petitioned the Belize Supreme Court to confirm the Arbitration Award. In addition, there is absolutely no nexus between the Accommodation Agreements, the dispute and the United States. In contrast, the nexus to Belize is clearly substantial. For these reasons, this Court should stay or dismiss this petition under comity and abstention principles.

It also should be noted that the Belize Supreme Court found it a particularly compelling factor in favor of granting the injunction that three other related actions are pending in Belize, and that BTL argued that the GOB's action against it should be consolidated with those actions.

There is a further reason in favor of granting an order restraining both respondents from enforcing the award or commencing or continuing claims related to the

award in the UK and in any other jurisdiction.  According to an application dated 28.4.2009, filed the same day by BTL, there are already three claims: No. 317 of 2009, No. 275 of 2009 and No. 279 of 2009, in the Supreme Court of Belize, in which both the Attorney General and BTL are parties with others.  BTL has asked that the claims be consolidated with this claim.  <u>It said that the same ground of illegality concerning the same and similar agreements are in issue.</u>

Young Dec. at Exhibit 13 (decision at ¶ 28) (emphasis added).

Finally, <u>Belize Telecom, Ltd. v. Government of Belize</u>, 528 F.3d 1298 (11th Cir. 2008), noted above, is on point.  A stock purchaser (BTL's predecessor) sued the stock seller (the GOB) alleging that their agreement was breached when the GOB removed six directors from the board and appointed new directors.  The Eleventh Circuit held that concerns of international comity, fairness, and judicial efficiency warranted deference to a Belizean court decision on the subject of the issue of the removal of the directors.  The Court rejected plaintiff's attacks on the Belizean judicial system and held: "[w]e see no evidence that the Belizean judicial system affords litigants treatment that is inconsistent with American notions of due process."  <u>Id.</u> at 1306.  The Court held that comity and abstention principles weighed in favor of deference to the Belizean court decision.  <u>Id.</u> at 1308.  Here too, based on principles of comity, fairness to litigants (BSDL's assignor BTL and GOB have already litigated in Belize the issue whether the Arbitration Award may be enforced prior to conclusion of the Belize Action), and on considerations regarding the efficient use of judicial resources, this Court should stay or dismiss the instant Petition.

D.     THE PETITION SHOULD BE DISMISSED BASED ON THE DOCTRINE OF INCONVENIENT FORUM IN FAVOR OF THE BELIZE COURTS.

An petition to confirm an arbitration award is subject to forum non conveniens analysis.

<u>In the Matter of Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine</u>, 311 F.3d 488 (2nd Cir. 2002), is on point.  A Monaco reinsurer petitioned under the New York Convention to confirm a Russian arbitration award against a Ukraine company and the Ukraine State.  Although the trial court had subject matter jurisdiction under the Convention, the Appeals Court affirmed

the dismissal of the enforcement petition on inconvenient forum grounds.  Id. at 497-498.  A confirmation petition is subject to that doctrine because "proceedings for enforcement of foreign arbitration awards are subject to the rules of procedure that are applied in the courts where enforcement is sought" and the doctrine of forum non conveniens is "procedural."  Id. at 495.

"The first level of inquiry in a forum non conveniens analysis is to determine what deference is owed a plaintiff's choice of forum.  A domestic petitioner's choice of its home forum receives a great deference, while a foreign petitioner's choice of a United States forum receives less deference."  Monegasque, 311 F.3d at 498.  BSDL, a British Virgin Islands entity, is not entitled to any deference in its selection of the United States forum.

"Our next inquiry .. is to determine whether an alternative forum exists."  Monegasque, 311 F.3d at 499.  "An alternative forum is ordinarily adequate if the defendants are amenable to service of process there and the forum permits litigation of the subject matter of the dispute."  Id.  The Courts of Belize meet this standard because GOB is subject to process there and, in fact, there is a prior pending action in Belize between GOB, BTL and BSDL relating to the Award.

Lastly, Monegasque noted that a court must balance private and public interest factors.

First, private factors "pertain to the convenience of the litigants –relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; … and all other practical problems that make trial of a case easy, expeditious and inexpensive."  Monegasque, 311 F.3d at 500.  Here, all witnesses and documents are in Belize, the dispute arises from events taking place within Belize, all of the parties are subject to the jurisdiction of the Belize courts, Belize law applies, and also the parties are already litigating in Belize so it must be convenient.  BSDL's BVI nationality must be discounted since it was clearly formed as an artifice to attempt to avoid Belize's jurisdiction.

Second, public interest factors "include administrative difficulties associated with court congestion; imposition of jury duty upon those whose community bears no relationship to the litigation; local interest in resolving local disputes; and problems implicated in the application of foreign law." <u>Monegasque</u>, 311 F.3d at 500.  This factor also weighs heavily in favor of the Belize forum.  Belize has an obvious and strong interest in adjudicating this dispute and the United States has no such interest.  Belizean courts are better suited to apply Belize law.  And, this Court should not allow to be brought into a dispute that has no relation to the United States.

Indeed, recently in <u>Termorio S.A. E.S.P. v. Electroficadora del Atlantico S.A. et al.</u>, 421 F.Supp.2d 87 (D.D.C. 2006), this Court dismissed, on inconvenient forum grounds, an action brought by a Colombian plaintiff against a state-owned Colombian entity and the Republic of Colombia (the latter on an alter ego basis) to enforce a Colombian arbitration award, although the court held it had subject matter jurisdiction under the New York Convention and the FSIA arbitration exception to sovereign immunity applied.  <u>Id.</u> at 103-104.  This Court held that "[t]his matter is a peculiarly Colombian affair, and should properly be adjudicated in that country."  <u>Id.</u>  The instant Petition also should be dismissed in favor of the Belize forum on the same grounds.

E.    THIS ACTION MUST BE DISMISSED BECAUSE IT DOES NOT PRESENT A JUSTICIABLE CONTROVERSY.  IT IS BARRED BY THE ACT OF STATE AND POLITICAL QUESTION DOCTRINES.

1.    Act Of State Doctrine

"The act of state doctrine declares that a United States court will not adjudicate a politically sensitive dispute which would require the court to judge the legality of the sovereign act of a foreign state.  The doctrine requires that a court, after exercising jurisdiction, decline to review certain issues, in particular, the validity or propriety of foreign acts of state, and applies only when the dispute implicates the legitimacy of public acts undertaken by a sovereign nation." 13A Fed. Proc., L. Ed. § 36:437 (2010), citing <u>Banco Nacional de Cuba v. Sabbatino</u>, 376 U.S.

398, 401 (1964) (emphasis added).  The act of state doctrine is based on "domestic separation of

powers, reflecting the strong sense of the Judicial Branch that its engagement in the task of

passing on the validity of foreign acts of state may hinder the conduct of foreign affairs." W.S.

Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l, 493 U.S. 400, 404 (1990).

The validity of official acts of a foreign state must necessarily be decided in this action.

BSDL asks this Court to determine the validity of actions of GOB, namely the "repudiation" of

the Accommodation Agreements and "expropriation" of BTL -- using BSDL's terms.  But better

stated, GOB's challenge to the Agreements and acquisition of BTL shares are central to this

action, such that this Court "must decide—that is, … the outcome of the case turns upon—the

effect of official action by" the GOB.  W.S. Kirkpatrick, 493 U.S. at 406.  GOB's challenge to

the Agreements clearly was not a mere "repudiation of a purely commercial obligation owed by

a foreign sovereign."  Alfred Dunhill of London v. Rep. of Cuba, 425 U.S. 682, 695 (1976).

For example, in Braka v. Bancomer, S.A., 589 F.Supp. 1472 (D.C. N.Y. 1984), the Court

rejected a plaintiff's request to extend Dunhill's holding to an act of the Mexican government

prohibiting use of dollars as legal tender, thus preventing a Mexican bank from complying with

its obligation to repay certificates of deposit in U.S. dollars.  "Plaintiffs here cannot rely on

[Dunhill], because Mexico's act in this instance cannot be construed as a simple repudiation of a

government entity's commercial debt.  While the ultimate result may seem similar—i.e., Mexico

has enriched itself at plaintiffs' expense—the mechanisms used by Mexico are conventional

devices of civilized nations faced with severe monetary crises, rather than the crude and total

confiscation by force of a private person's assets."  Braka, 589 F.Supp. at 1472.  Similarly, GOB

challenges the Accommodation Agreements pursuant to its laws and in its political interest in

rectifying the "intolerable" state of the communications industry, as the Prime Minister noted.

This Court cannot judge the issues presented in BSDL's Petition without reaching the question of the validity of this "official action" by a foreign government.  W.S. Kirkpatrick, 493 U.S. at 406.

BSDL's labeling of the foregoing as a mere "expropriation," Petition ¶¶ 52-53, further confirms that the act of state doctrine bars this case.  It is settled law that "[e]xpropriations of property of an alien within the boundaries of the sovereign state are traditionally considered to be public acts of the sovereign removed from judicial scrutiny by application of the act of state rubric."  Hunt v. Mobil Oil Corp., 550 F.2d 68, 73 (2d Cir. 1977) (emphasis added); accord, American Banana Co. v. United Fruit Co., 213 U.S. 347, 357-358 29 S.Ct. 511, 53 L.Ed. 826 (1909) (Justice Holmes noted that "a seizure by a state is not a thing that can be complained of … in the courts."); World Wide Minerals, Ltd. v. Rep. of Kazakhstan, 296 F.3d 1154, 1166 (D.C. Cir. 2002) ("[E]xpropriation of property is the classic act of state") cert. denied 537 U.S. 1187 (2003); Sabbatino, 376 U.S. at 439 (act of state doctrine "proscribe[d] a challenge to the Cuban expropriation decree"); Fogade v. ENB Revocable Trust, 263 F.3d 1296 (11th Cir. 2001) (act of state doctrine precluded challenge to confiscation by the Venezuela government).

The outcome of BSDL's Petition, therefore, turns upon the effect of the official actions by the GOB with respect to the Accommodation Agreements and acquisition of a controlling interest in BTL.  Thus, this Court must dismiss this action based on the act of state doctrine.

2.      Political Question Doctrine

The background of the instant dispute, described in Part II *supra*, need not be repeated here.  It clearly confirms that the issues raised here are part of a significant political controversy within Belize, and that this Petition is just a cleverly conceived artifice to further vex the GOB.

The political question doctrine holds that a court should abstain if a case raises questions better addressed by the political branches, Baker v. Carr, 369 U.S. 186, 210 (1962), rooted in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 164-66 (1803), where Chief Justice Marshall held:

"[q]uestions, in their nature political ... can never be made in this court."  The political question

doctrine distinguishes between cases encompassing foreign relations rather than addressing

purely domestic issues of this forum.  U.S. v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936).

The second and third of the Baker factors, examined to determine whether the doctrine

applies,[21] are implicated in BSDL's petition raising nonjusticiable political questions.

First, there are no judicially discoverable and manageable standards for resolving the

questions presented in BSDL's Petition (the second of the six Baker factors).

This doctrine is triggered when a claim suffers from "a lack of judicially discoverable and

manageable standards for resolving it." Baker, 369 U.S. at 217.  "One of the most obvious

limitations imposed by [Article III, § 1, of the U.S. Constitution] is that judicial action must be

governed by *standard,* by *rule*." Vieth v. Jubelirer, 541 U.S. 267, 278 (2004) (plurality opinion).

"The factor is a recognition that "courts are fundamentally under equipped to formulate national

policies or develop standards for matters not legal in nature." Japan Whaling, 478 U.S. at 230.

BSDL's allegations draw the Court into a consideration of whether GOB's actions were

proper and there are no judicially discoverable and manageable standards for doing so.

This Court is called upon to determine the validity of the GOB's decision to challenge the

Accommodation Agreements to protect the national interest, as Prime Minister Barrow stated.

While ostensibly BSDL limits inquiry to enforceability of the Award, to confirm it would require

this Court to conclude that GOB was obligated to honor the Agreements (and its arbitration

clause), failed to participate in the LCIA proceedings at is peril, and is bound by the ensuing

Award, despite its political will and exercise of sovereign power.  The Court cannot resolve this

---

21  Factor No. (2) the lack of judicially discoverable and manageable standards for resolving it;
or No. (3) the impossibility of making a decision without first making a policy determination
of the type clearly outside judicial discretion.  Baker, 369 U.S. at 217.  If any one of these
factors "is inextricable from the case," the Court should dismiss based on this doctrine.  Id.

Petition without reaching the propriety of GOB's policy of challenging the Agreements to protect the telecommunications industry.  This is not merely a task of applying a foreign law. The issue goes to the heart of whether GOB can take actions to invalidate preferential and illegal treatments by a prior government that are having profound and negative effects in the country, and stifling competition and investment.  There are no applicable judicial standards to adjudicate such matters.  This lack of a clear standard shows that this case presents a political question.

      This action also questions whether GOB's acquisition of a controlling interest in BTL was valid.  BSDL claims that this action was "[u]nlawful and unconstitutional."  See Petition ¶¶ 52-53.  Again, there is no clear legal standard for this Court to apply.  In fact, the United States Congress in enacting the Foreign Sovereign Immunity Act (discussed below) has instead held that foreign sovereigns are immune from actions in United States courts involving alleged expropriations by said sovereigns within their territories.  See e.g. Wahba v. Nat'l Bank of Egypt,  457 F.Supp. 2d 721, 731 (E.D.Texas 2006) (FSIA "expropriation exception does not apply, however, to a foreign state's dealings with property owned by its own nationals.").

      Second, thus, in adjudicating this Petition, it will be impossible for the Court to avoid making policy determinations of the type outside judicial discretion (third Baker factor).  This third factor is triggered for many of the same reasons discussed above—resolution of propriety of GOB's decision to challenge the Agreements in light of the reforms instituted in 2008 (like the Freedom of Information Act) and GOB's acquisition of BTL—require policy determinations.  In Aktepe v. U.S., 105 F.3d 1400, 1404 (11th Cir.1997), the Court refused to entertain tort suits by Turkish sailors against the U.S. Navy for injuries sustained during a training exercise because, resolution of the suits required the court to "render a policy determination regarding the necessity of simulating actual battle conditions."  Were the aforementioned acts by the GOB valid?  It is

impossible to answer the question without making policy determinations.  The Court must

decline to entertain these political questions, and should stay or dismiss this Petition.

F.       THE ACTION MUST BE DISMISSED FOR LACK OF STANDING.

BSDL claims to have standing by virtue of the "Deed of Assignment," prepared by its

counsel Allen & Overy, and attached as Exhibit C to the Declaration of Stephen J. Ruzika.

However, said Assignment violated the assignment clause in the Accommodation Agreement,

and thus it is invalid.  The assignment clause (§ 19) of the Accommodation Agreement provides:

> BTL shall have the right by notice to the Government, to assign <u>all of BTL's
> rights</u> and <u>delegate all of BTL's duties</u> under this agreement.  In the event of <u>such
> assignment</u>, <u>all references to BTL</u> in the Agreement <u>thereafter shall mean such
> assignee</u>, and upon assumption by the assignee, the <u>assignor BTL shall have no
> further liability under this Agreement;</u> *provided,* <u>the assignee may only be a new
> subsidiary of BTL</u>, or some other company within BTL's corporate group or
> under the control of BTL.

Exhibt B to Kimmelman Decl.  The purported Assignment, then, is invalid for two reasons:

First, as admitted in ¶48 of BSDL's Petition, BTL and BSDL "executed the Assignment,

whereby [BTL] assigned to BSDL <u>the monetary portion</u> of the Final Award, including the award

for damages and costs."  However, such a <u>partial</u> assignment is not allowed by the cited language

in the Accommodation Agreement, which requires that the assignment can be only of "all" of

BTL's "rights" and  "duties," as confirmed by the requirements that after such an assignment "all

references to BTL in the Agreement thereafter shall mean the assignee," and "assignor BTL shall

have no further liability under this Agreement."  Accordingly, the Deed of Assignment is invalid.

Second, the Accommodation Agreement requires that the "assignee may only be a new

subsidiary of BTL, or some other company within BTL's corporate group or under the control of

BTL."  The Assignment at ¶ 1.1 states that controlling shares of BSDL stock will be transferred

to BTL.  However, that never took place as confirmed by BSDL's lawyers.  As indicated in the

Declaration of Claire L. Jones at ¶¶ 2-10 and Exhibits 1-5, under BVI law if BTL held the BSDL

shares represented in the Assignment, it had the right to replace the BSDL directors.  BTL signed

the appropriate resolutions and forwarded them to the BVI Registrar and BSDL's counsel Allen

& Overy, asking whether Allen & Overy would take instructions from the new BTL-appointed

sole director of BSDL.  Allen & Overy refused, claiming that the BSDL shares (supposed to be

assigned to BTL) had instead been "distributed as dividends" to the prior BTL shareholders (the

Ashcroft companies) whose shares had been acquired by GOB.  Id.  In other words, BSDL is not

a subsidiary of BTL, assuming it ever was.  This admission by BSDL counsel renders the

Assignment invalid also on this ground.  The importance of a subsidiary requirement is obvious -

- to limit the obligations and rights to BTL or a company within its control.  However, that clause

has been blatantly violated by the purported Assignment to BSDL, which disclaims that BTL is

its parent or has any authority to act over it.  BSDL lacks standing to bring this Petition.

G.    THE NEW YORK CONVENTION DOES NOT BIND THE GOVERNMENT OF
      BELIZE BECAUSE IT IS NOT A PARTY TO THE CONVENTION.

The New York Convention cannot bind the GOB because Belize is not a party to the

Convention.  Belize became an independent and sovereign nation on September 21, 1981.

Belize has not ratified nor acceded to the Convention since it gained its independence.

Under the laws of Belize, the Executive Branch negotiates treaties, and for a treaty to

become binding, it must be ratified by the Senate, as required by the Constitution.  GOB then

completes the treaty process by depositing the formal instrument with the treaty depository.

None of these procedures have been followed with respect to the Convention.  Gandhi Decl. at

¶13.  Mr. Gandhi attaches to his declaration as Exhibit 9 a copy of correspondence that GOB

received, on December 18, 2008, from the United Nations confirming that it is the U.N. position

that Belize is not a party to the Convention:  "According to the records kept at the Treaty Section

of the United Nations Offices in New York, Belize is not considered to be a party to the New

York Convention as Belize has not deposited with the Secretary General an instrument of succession or accession after attaining independence in 1981." Id. at ¶ 14 & Exhibit 9.

To be candid, we disclose, however, that the D.C. Circuit has applied the Convention against a foreign sovereign (Qatar) that arbitrated in a Convention State (France), although that sovereign was not a party to the Convention. See Creighton Ltd. v. Government of Qatar, 181 F.3d 118, 121 (D.C. Cir. 1991) (dismissed for lack of personal jurisdiction). Creighton is dicta because the parties did not dispute whether the Convention applied. Id. at 121 ("That the New York Convention applies to the arbitral award Creighton obtained against Qatar in France, and that the award is therefore enforceable in United States courts, is undisputed.")  The decision is distinguishable on the facts too.  Qatar "filed a court action in France to set aside the award as invalid under French law, which the Supreme Court of France ultimately rejected," id. at 120, which suggested that Qatar consented to the jurisdiction of that forum.  Here, the GOB has not filed an action regarding the Award in the U.S., seeks to dismiss or stay this petition and disputes this Court's jurisdiction over it.  Instead, GOB has filed an action in Belize, not a signatory to the Convention.  Creighton also failed to address Article XIV of the Convention:  "A Contracting State shall not be entitled to avail itself of the present convention against other Contracting States except to the extent that it is itself bound to apply the Convention." (Emphasis added).  Thus, the United States cannot enforce the Convention against Belize, for it is not a contracting state.

If the United States were to impose a treaty on a non-signatory state, it could strain their relationship, particularly because U.S. courts have consistently held that the U.S. government is not bound by any treaty until it is ratified by the Senate as required by the Constitution.  Because international relations, and treaties in particular, are based on principles of reciprocity, it would be unadvisable to hold that different rules apply to the United States and foreign sovereigns.

Treaties, sometimes called conventions, "create legal obligations akin to contractual obligations on the States parties to them.  Like contracts, these instruments are legally binding only on States that become parties to them by consenting to be bound."  Flores v. Southern Peru Copper Corp., 414 F.3d 233, 256 (2nd Cir. 2003) (citing Lord McNair, The Law of Treaties 162 (1961) ("no State can be bound by any treaty provision unless it has given its assent.")); Hegna v. Islamic Rep. of Iran, 287 F.Supp. 2d 608, 610 (D.Md. 2003) (citing the Vienna Convention, noted that "[a]s treaties into which the United States has voluntarily entered, the conventions are part of the fundamental fabric of the nation's laws.") (emphasis added).  Under "treaty law, a State's signing of a treaty serves only to authenticate its text; it does not establish the signatory's consent to be bound."  Flores, 414 F.3d at 256.  "A State only becomes bound by – that is, becomes a party to – a treaty when it ratifies the treaty."  Id. (citing Haver v. Yaker, 76 U.S. 32, 35 (1869) (U.S. is bound by treaty only after Senate, vested with that power, ratifies it); Dreyfus v. VonFink, 534 F.2d 24, 27 note 3 (2nd Cir. 1976) (U.S. is not a party to an un-ratified treaty.)).

BSDL seeks to enforce the Arbitration Award against GOB pursuant to the New York Convention.  But because the GOB has not acceded to that Convention, it cannot be bound by it. Compare International Insurance Co.v. Caja Nacional de Ahorro, 293 F.3d 392, 400 (7th Cir. 2002) ("[b]ecause Argentina signed the New York and Panama Conventions, it has waived the immunity protections of the FSIA").  "[W]hen a country becomes a signatory to the Convention, [it can be said that] the signatory state may have contemplated enforcement actions in other signatory states."  SeeTransport Wiking Trader v. Navimpex Centrala, 989 F.2d 572, 578 (2nd Cir. 1993).  Thus, GOB cannot be said to have contemplated to be bound by the Convention and subject to an enforcement action in the U.S.  The Convention's purpose was to "encourage the recognition and enforcement of commercial arbitration agreements in international contracts."

Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 note 5 (1974) (emphasis added).  Thus, this

Court should dismiss this petition on this basis or, at the least, stay it on comity grounds.

H.    THIS ACTION MUST BE DISMISSED AS THERE IS NO SUBJECT MATTER
       JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT.

       The Foreign Sovereign Immunities Act, 28 U.S.C. 1602, et seq. ("FSIA") "contains a

comprehensive set of legal standards governing claims of immunity in every civil action against

a foreign state or its political subdivisions, agencies or instrumentalities."  Verlinden B.V. v.

Central Bank of Nigeria, 461 U.S. 480, 488 (1983).  Congress intended to codify "international

law at the time of the FSIA's enactment."  Perm. Mission of India v. N.Y., 551 U.S. 193 (2007).

The FSIA applies "in every action against a foreign sovereign, since subject matter jurisdiction

in any action depends on the existence of one of [its] specified exceptions."   Argentine Rep. v.

Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989); Saudi Arabia v. Nelson, 507 U.S. 349,

356 (1993) (a foreign state is immune from suit in the U.S. unless an FSIA exceptions applies).

       First, the FSIA commercial activities exception (28. U.S.C. § 1605(a)(2)) does not apply

because there was no commercial activity in the United States between BTL (or BSDL) and the

GOB, or outside of the United States between the parties with a direct nexus to the United States.

de Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1391 (5th Cir. 1985).

       Second, the expropriation exception (§ 1605(a)(3)) does not apply because, as noted

above, there was no expropriation by the GOB of any BTL or BSDL property located in the U.S.

       Third, the waiver exception (§ 1605 (a)(1)) does not apply because GOB did not waive its

immunity from litigation in the U.S.  Rather, the GOB has asserted its sovereign immunity in this

proceeding in its initial appearance, as well as through this motion.  Amorrortu v. Rep. of Peru,

570 F.Supp.2d 916, 921 (S.D.Tex. 2008) (foreign sovereign had not waived sovereign immunity,

because "it has explicitly objected to the court's jurisdiction in every filing it has made to date.").

Further, "explicit waivers of sovereign immunity are narrowly construed in favor of the sovereign and are not enlarged beyond what the language requires."  World Wide Minerals, Inc. v. Republic of Kazakhstan, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (emphasis added).  BSDL's Petition argues that the Accommodation Agreement contains a waive of immunity.  However, the waiver is expressly made in favor of only BTL.  See Accommodation Agreement at ¶ 15.5 (GOB "agrees that if BTL brings proceedings against it or its assets in relation to this Agreement no immunity from such proceedings … will be claimed with respect to itself or with respect to its assets"), attached as Exhibit B to the Kimmelman Decl.  BTL did not file this action.  The Accommodation Agreement does not provide for the waiver of immunity in favor of a purported assignee.  Thus, under D.C. Circuit authority, its language cannot be enlarged to cover BSDL.

Fourth, the arbitration exception (§ 1605(a)(6)) also is inapplicable because Belize is not a signatory to the New York Convention or to any other applicable convention on execution of arbitration awards.  Since the GOB is not a party to the Convention, it cannot be bound by it or what it purports to dictate under established principles, applicable in Belize as in the United States, that a sovereign must sign and ratify a treaty before it may be enforceable against it.

The FSIA exceptions also cannot be interpreted to apply to a dispute between a foreign sovereign and one of its own nationals, regardless of where the arbitration took place.  FSIA was intended to codify existing international law, and international law does not reach such disputes.  To the extent that the Congress attempted to create such jurisdiction in the courts that does not exist under international law and attempted to bind foreign sovereigns, it would have violated separation of powers under the Constitution. The FSIA thus cannot be interpreted in that fashion.

"Congress had violations of international law by foreign states in mind when it enacted the FSIA."  Amerada Hess, 488 U.S. at 435-436.  However, "[i]nternational law does not govern

disputes between a sovereign nation and its citizens." Agudas Chasidei Chabad v. Russian Fed., 466 F.Supp.2d 6, 16 (D.D.C. 2006); de Sanchez, 770 F.2d at 1397 ("doctrine that international law does not generally govern disputes between a country and its own nationals rests on fundamental principles."). The impetus for adoption of the restrictive theory, adopted in the FSIA, was the "participation by foreign sovereigns in the international commercial market." Alfred Dunhill of London v. Republic of Cuba, 425 U.S. 682, 703 (1976) (emphasis added).

On December 2, 2004, the U.N. General Assembly adopted the U.N. Convention on Jurisdictional Immunities of States and Their Property. The "new treaty is the first modern multilateral instrument to articulate a comprehensive approach to issues of state or sovereign immunity from suits in foreign courts." The UN Convention on Jurisdictional Immunities of States and Their Property, 99 Am. J. Int'l L. 194, 194 (Jan. 2005) (Stewart, D.). The U.N.'s International Law Commission comment on the Convention, indicates that this treaty:

> "concerns commercial transactions between a State and a foreign natural or juridical person when a court of another State is available and in a position to exercise its jurisdiction … The State engaging in a commercial transaction with a person, natural or juridical, other than its own national cannot invoke immunity from the exercise of jurisdiction …"

Draft Articles on Jurisdictional Immunities of States and their Property, with Commentaries, United Nations (1991) at p. 34 (emphasis added), Basombrio Decl. at Exhibit 11. Thus, the U.N. recognizes that international law does not extend jurisdiction to a suit by a State's own national.

"[A]n act of Congress ought never to be construed [or applied so as] to violate the Law of Nations if any other possible construction remains." Murray v. Schooner Charming Betsy, 2 Cranch 64, 118, 2 L.Ed. 208 (1804).[22] Because international law does not apply to a dispute

---

[22] "[T]he domestic law of the U.S. recognizes the Law of Nations." Sosa v. Alvarez-Machain, 542 U.S. 692, 729 (2004). "International law is part of our law, and must be ascertained and administered by the courts ..." The Paquete Habana, 175 U.S. 677, 700 (1900).

between a state and its nationals, the FSIA cannot be interpreted to apply to disputes like the case at bar.  The FSIA "does not create jurisdiction where there was none before."  Rep. of Austria v. Altmann, 541 U.S. 677, 723 (2004).  "It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize."  Rep. of Mexico v. Hoffman, 324 U.S. 30, 35 (1945).

Indeed, "FSIA shifted the responsibility to make determinations about foreign sovereign immunity from the State Department to the courts."  Conn. Bank of Commerce v. Republic of Congo, 309 F.3d 240, 252 (5th Cir. 2002).  Hence, if the FSIA is interpreted to allow courts to expand on or create exceptions to immunity not accepted by international law, it would violate separation of powers by encroaching on the executive branch's treaty making power.  Neither the legislative or executive branches "can constitutionally assign to the judicial any duties, but such as are properly judicial."  Hayburn's Case, 2 U.S. 408, 410 (1792).  "The Constitution commits the Power to make treaties to the President."  Earth Island Inst. v. Christopher, 6 F.3d 648, 652-653 (9th Cir. 1993).  "The President alone has the authority to negotiate treaties."  Id. Determinations of immunity implicate treaty power since, by definition, the issue of immunity bears on the power of the United States over a sovereign.  "The doctrine that international law does not generally govern disputes between a state and its own nationals rests on fundamental principles."  De Sanchez, 770 F.2d at 1397.  As a result, the FSIA should not be interpreted to confer jurisdiction over a dispute between a foreign state and its own nationals.

As noted above, International Insurance, 293 F.3d at 400 held that "[b]ecause Argentina signed the New York and Panama Conventions, it has waived the immunity protections of the FSIA."  Also as noted by the District of Columbia Court of Appeals in Creighton, supra:

"Qatar not having signed the Convention, <u>we do not think that its agreement to arbitrate in a signatory country, without more, demonstrates the requisite intent to waive its sovereign immunity in the United States.</u>"

181 F.3d at 123 (emphasis added).  Here, the arbitration agreement was between GOB and a Belizean entity, BTL, and the tribunal rendered an award in the context of arbitration between a foreign sovereign and one of its nationals.  The after-the-fact creation of BSDL in BVI and purported (and invalid *infra*) assignment of the Award did not change the national nature of the arbitration.  The FSIA arbitration and waiver exceptions thus cannot apply to these proceedings.

"Every sovereign State is bound to respect the independence of every other sovereign State … courts of one country will not sit in judgment on the acts of the government of another done within its own territory."  <u>Underhill v. Hernandez</u>, 168 U.S. 250, 252 (1897).

I.    THE ACTION MUST BE DISMISSED BECAUSE THE COURT LACKS PERSONAL JURISDICTION OVER THE GOVERNMENT OF BELIZE.

Even if a court has subject matter jurisdiction to enforce an arbitration award, the court must have personal jurisdiction over the defendant.  If it does not, it must dismiss the petition to confirm an arbitral award.  <u>Creighton</u>, 181 F.3d at 124-125; <u>Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.</u>, 284 F.3d 1114, 1119-1128 (9th Cir. 2002); <u>Base Metal Trading Limited v. OJSC Novokuznetsky Aluminum Factory</u>, 283 F.3d 208, 211-216 (4th Cir. 2002).

The Due Process Clause of the Fifth Amendment of the U.S. Constitution requires that a defendant have such "minimum contacts" with the forum such that the maintenance of the suit "will not offend traditional notions of fair play and substantial justice."  <u>International Shoe v. Washington</u>, 326 U.S. 310, 316 (1945).  Sufficient minimum contacts exist when a defendant should reasonably expect to be haled into a forum's courts because it purposefully availed itself of the privilege of conducting business in the forum and, thus, of invoking the benefits and protections of the forum's laws.  <u>Coen v. Coen</u>, 509 F.3d 500, 509 (8th Cir. 2007).  Here, it is

evident that GOB does not have sufficient contacts with the District of Columbia under this analysis.  The subject agreement was between the GOB and a Belizean entity to be performed in Belize under Belize law.  The only reference to a foreign jurisdiction was London as the seat of arbitration.  There is no nexus whatever to the United States, so there are no minimum contacts.

The issue is that the D.C. and Second Circuits have held that foreign sovereigns are not entitled to Due Process.  These Courts held that because States of the Union are not "persons" under the Fifth Amendment and thus not entitled to Due Process, foreign sovereigns also should not be afforded due process protections "absent some compelling reason to treat sovereigns more favorably than States in the Union."  See Price v. Socialist people's Lybian Arab Jamahiriya, 294 F.3d 82, 95-100 (D.C. Cir. 2002); Frontera Resources Azerbajan Corp. v. State Oil Co., 582 F.3d 393, 396 (2nd Cir. 2009).  Compelling reasons exist.  Comity is the Golden Rule of international relations:  one state will treat another in like kind.  The United States would want to be afforded due process in the courts of foreign states.  Moreover, foreign states (unlike State of the Union) lack representation in Congress thus they have no say in the enactment of the laws to which they would be subjected if haled into United States courts.  In addition, the D.C. and Second Circuit's emphasis on a sovereign's status as a "person" is misplaced, because the Congress incorporated due process considerations and protections into the FSIA.  See Moore v. United Kingdom, 384 F.3d 1079, 1090 (9th Cir. 2004) (FSIA "codifies" the "long-standing presumption that due process requires plaintiffs seeking default judgments to make out a prima facie case."); BP Chemicals Ltd. v. Jiangsu SOPO Corp., 420 F.3d 810, 818 (8th Cir. 2005) (the nexus requirement in the commercial exception satisfies due process).  But perhaps the most direct evidence of said Congressional intent is found in House report on the enactment of the FSIA, which states:

> "The requirements of minimum jurisdictional contacts and adequate notice are embodied in the [FSIA].  Significantly, each of the immunity provisions in the bill

> … requires some connection between the lawsuit and the United States, or an
> expressed or implied waiver by the foreign state of its immunity from jurisdiction.
> These immunity provisions, then, prescribe the necessary contacts which must
> exist before our courts can exercise personal jurisdiction."

See H.R.Rep. 94-1487 at 13, reprinted in 1976 U.S.C.A.N.N. at 6612 (citing International Shoe).

Accordingly, this petition must be dismissed for lack of personal jurisdiction over GOB.

J.     THE ACTION MUST BE DISMISSED FOR A FAILURE TO JOIN A NECESSARY
       AND INDISPENSABLE PARTY.

Starting in June 2009, BSDL's counsel (Allen & Overy ("A&O")) wrote to the GOB

claiming to represent another "investor who has an interest in [BTL]," Dunkeld International

Investments Ltd. ("Dunkeld"), this time threatening a Bilateral Treaty ("BIT") arbitration under a

UK-Belize Treaty.  On December 4, 2009, A&O sent the GOB a BIT Notice of Arbitration by

Dunkeld under UNCITRAL rules.[23]  Gandhi Decl. at Exhibits 4, 6, 7 & 8.  Dunkeld's Notice of

Arbitration states that "Dunkeld was the beneficial owner of approximately 69% of the shares of

[BTL]."  Dunkeld claims that GOB's acquisition of said shares "was in breach of [the GOB's]

obligations to Dunkeld."  Id. at Exhibit 8, p.2 of Notice.  Dunkeld then makes reference to the

Accommodation Agreement between GOB and BTL, the LCIA arbitration, the Arbitration

Award, the assignment to BSDL, and claims that GOB "has not complied with [the] LCIA

Award."  Id. at Exhibit 8, pp. 9-10.  Dunkeld claims that GOB has "expropriated" its investment

in BTL and allegedly damaged Dunkeld, relying again on the Arbitration Award and challenging

GOB's "entitlement to deduct sums allegedly due as arrears of taxes, duties and charges, in

circumstances where [BTL] has established in LCIA Award No. 81079 its entitlement to apply

for specified taxation rates and set-off provisions of the Accommodation Agreement.".  Id. at

---

[23]  The press reported the new claim focusing on the connection between Dunkeld and Ashcroft.
Basombrio  Decl. at Exhibits 42 ("Ashcroft Revives Old Treaty!"), 54 ("arbitration is by
another of those shadow shells – this one called Dunkeld") & 55 ("Ashcroft Company resorts
to Arbitration.").  To stop this multiplication of claims, GOB obtain an injunction preventing
also this BIT arbitration from going forward.  Gandhi Decl. at Exhibits 18-23.

Exhibit 8, p.15.  Dunkeld seeks monetary damages for the foregoing.  Id. at Exhibit 8, p.18.

Accordingly, Dunkeld asserts damages from the non-payment of the same Arbitration Award that BSDL seeks to collect (giving these Ashcroft companies an opportunity for double recovery).  Although Dunkeld and BSDL are represented by the same counsel (Allen & Overy), BSDL has failed to disclose the Dunkeld claims to this Court.  BSDL also has failed to disclose that to this Court that the Belize Supreme Court has also enjoined Dunkeld from proceeding with a BIT arbitration, holding that the threatened arbitration proceedings were "vexatious and frivolous" and an effort to multiply litigation.  Gandhi Decl. at Exhibits 18-23.  Because Dunkeld has asserted such claims, it is clearly a necessary and indispensable party under Rule 19(a).

F.R.C.P. 19 requires joinder of a party, or dismissal of the suit absent a party, where the party is necessary under Rule 19(a) and indispensable under Rule 19(b).  Corsi v. Eagle Publ., Inc., 2008 WL 239581 at *3 (D.D.C. 2008); Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Washington, 699 F.2d 1274, 1278-79 (D.C. Cir. 1983).  Only one of the three criteria in Rule 19(a) is required for a party to be considered necessary.  Corsi, 2008 WL 239581 at * 3.

Under Rule 19(a), Dunkeld is a necessary party because complete relief cannot be accorded in its absence and the existing parties will be subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations without it.  Cloverleaf Standardbred, 699 F.2d at 1278-79.  If joinder of a necessary party is not feasible (Dunkeld cannot be joined because, as noted above, the Belize Supreme Court has enjoined it from proceeding with its claims), courts consider whether a necessary party is indispensable.  Dunkeld is an indispensable party under Rule 19(b) [24] because a judgment rendered in this proceeding (if it was not stayed or

---

[24]  Interests promoted by Rule 19(b): (1) plaintiff's interest in having a forum; (2) defendant's interest in avoiding inconsistent relief or multiple litigation; (3) interests of the absent party;

dismissed, as it should be) in the absence of Dunkeld would be inadequate to adjudicate the

competing claims of BSDL and Dunkeld related to the Award, and could be prejudicial to GOB

by exposing it to double payment obligations which risk cannot be avoided by this Court.  If this

action were dismissed, BSDL also would have an alternative and adequate remedy.  Like BTL,

BSDL also can respond to the Belize Action and assert that the Arbitration Award be confirmed

by the Belize Supreme Court.  Fed. R. Civ. P. 19(b)(1)-(4); Corsi, 2008 WL 239581 at * 3.

       Thus, this action must be dismissed also for failure to join a necessary and indispensable

party.

<div align="center">

IV.    <u>CONCLUSION</u>

</div>

       For the foregoing reasons, this Court should stay these proceedings until after the Belize

Action is finally adjudicated or, in the alternative, dismiss the instant Petition.

Respectfully submitted,

Dated:  March 29, 2010

    /s/ Timothy J. Koeppl

Timothy J. Koeppl (D.C. Bar # 983307)
DORSEY & WHITNEY, LLP
1050 Connecticut Avenue, NW, Suite 1250
Washington, DC 20036
(202) 442-3510 (telephone)
(202) 442-3199 (facsimile)
koeppl.timothy@dorsey.com

Juan C. Basombrio (Admitted *Pro Hac Vice*)
Dorsey & Whitney LLP
38 Technology Drive, Suite 100
Irvine, California 92618
(949) 932-3650 (telephone)
(949) 932-3601 (facsimile)
basombrio.juan@dorsey.com

Counsel for Respondent
**GOVERNMENT OF BELIZE**

and (4) interests of the public and courts in consistent, complete, and efficient settlement of
cases.  <u>Provident Tradesmen's B&T Co. v. Patterson</u>, 390 U.S. 102, 108-11 (1968)).

# TAB 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BELIZE SOCIAL DEVELOPMENT LIMITED,** | ) ) ) |
| **Petitioner** | ) ) |
| | ) Case No. 1:09-cv-02170-RJL |
| **v.** | ) ) |
| **GOVERNMENT OF BELIZE,** | ) ) |
| **Respondent.** | ) ) ) |

## RESPONDENT GOVERNMENT OF BELIZE'S MOTION
## FOR LEAVE TO SUBMIT ADDITIONAL BRIEFING

### INTRODUCTION

Respondent Government of Belize ("GOB") hereby respectfully submits this motion for leave to provide additional briefing to Court regarding the effect of the recent decision of the Caribbean Court of Justice ("CCJ") in *BCB Holdings Ltd. et al. v. Attorney General of Belize* (hereinafter referred to as "*BCB Holdings*") on the Petition to Confirm Arbitration Award filed by Petitioner Belize Social Development Limited ("BSDL") (Docket No. 1).[1]

GOB brings this motion on the grounds that the decision from the CCJ (which is the highest Court to which an appeal can be taken from the courts of Belize) is directly relevant to this proceeding and warrants consideration by this Court. In *BCB Holdings*, the CCJ declined to enforce an arbitration award against GOB for U.S. $44 million, on the ground that the underlying agreement was illegal under Belizean law. Here, GOB has raised the same contention against enforcement of the subject arbitration award, and the result should be the same.

---

[1]    Pursuant to Local Civil Rule 7(m), counsel for Respondent GOB discussed this motion with counsel for Petitioner via electronic mail correspondence on September 5, 2013. As a result of that conversation, counsel for GOB understands that Petitioner intends to oppose this motion.

For this reason, GOB requests that the Court grant the parties leave to file simultaneous briefs of no more than 10 pages in length on the import of the *BCB Holdings* decision with respect to these proceedings.

## BACKGROUND

In 2005, the GOB executed an agreement for the provision of telecommunications services with a Belizean company called Belize Telecommunications Limited ("BTL").  *See Belize Social Dev. Ltd. v. Government of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012).  This accommodation agreement was kept secret by a prior administration in Belize.[2]  When the current Belizean Prime Minister took office in 2008, he brought the secret agreement to light and declared it invalid under Belize law, the Belize Constitution and the public policy of Belize.  *Id.*

On March 18, 2009, an arbitration panel of the London Court of International Arbitration ("LCIA") ruled that BTL was entitled to an Arbitration Award of 38 million Belize dollars under the accommodation agreement.  *BSDL*, 668 F.3d at 727.  Two days later, BTL purported to assign the monetary portion (although the accommodation agreement allows only for a complete assignment) of the Arbitration Award to BSDL, a newly incorporated company in the British Virgin Islands, apparently for the sole purpose of becoming the assignee of the Award.  *Id.*

BSDL then initiated this action, seeking confirmation of the Arbitration Award.  (Docket No. 1).  GOB filed a Motion to Dismiss the Petition to Confirm Arbitration Award (Docket No. 15) and a Response to the Petition to Confirm Arbitration Award (Docket No. 16).  The Court has not yet ruled on the Motion to Dismiss or the Petition to Confirm Arbitration Award.

---

[2]        In essence, the agreement purported to guarantee BTL a 15% minimum rate of return on its holdings in Belize, along with preferential tax treatment, in exchange for BTL's acquisition of certain telecommunications properties.  *BSDL*, 668 F.3d at 728.

**ARGUMENT**

On July 26, 2013, the CCJ in *BCB Holdings* declined to enforce an arbitration award against GOB on the grounds that the underlying accommodation agreement was illegal and violated the Belizean Constitution. *BCB Holdings Ltd. v. Attorney General of Belize*, [2013] CCJ 5 (AJ) (attached as Exhibit 1 to the accompanying Declaration of Juan C. Basombrio). The CCJ concluded that enforcing the arbitration award would violate public policy. *Id.*

The *BCB Holdings* decision counsels in favor of denial of BDSL's Petition to Confirm Arbitration Award in this matter, and GOB requests leave to submit briefing on that contention. In this case, as in *BCB Holdings*, GOB has raised as a ground for denying confirmation of the Arbitration Award that the subject underlying agreement is illegal. Because Belizean law applies to the instant dispute, the decision in *BCB Holdings* – which is controlling authority on the subject under Belizean law – compels denial of the motion to confirm the Arbitration Award in this action. Consequently, the *BCB Holdings* decision warrants this Court's consideration prior to issuance of a decision on the Petition to Confirm Arbitration Award. GOB believes that briefing by each party, limited to no more than 10 pages, regarding the impact of the *BCB Holdings* decision on the pending motion would be of great assistance to the Court.

## CONCLUSION

For the reasons stated above, GOB requests that this Court grant leave to the parties simultaneously to file briefs of up to 10 pages regarding the effect of the *BCB Holdings* decision on these proceedings.

Dated:  September 30, 2013                    Respectfully submitted,

                                             /s/ Creighton R. Magid
                                             Creighton R. Magid (D.C. Bar #476961)
                                             DORSEY & WHITNEY LLP
                                             1801 K Street, N.W., Suite 750
                                             Washington, D.C.  20006
                                             Telephone: 202-442-3555
                                             Fax: 202-442-3199
                                             magid.chip@dorsey.com

                                             Juan C. Basombrio (Admitted *Pro Hac Vice*)
                                             DORSEY & WHITNEY LLP
                                             600 Anton Boulevard, Suite 2000
                                             Costa Mesa, California  92626
                                             Telephone: 714-800-1405
                                             Fax: 714-800-1499
                                             basombrio.juan@dorsey.com

                                             Counsel for Respondent
                                             GOVERNMENT OF BELIZE


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of September, 2013, I electronically filed the foregoing Motion for Leave to Submit Additional Briefing and the accompanying Declaration of Juan C. Basombrio with the Clerk of the Court for the United States District Court for the District of Columbia using the CM/ECF system, which automatically served all counsel in this case.

                                             /s/ Creighton R. Magid
                                             Creighton R. Magid

-4-

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BELIZE SOCIAL DEVELOPMENT LIMITED,** )<br>)<br>) | |
| **Petitioner** )<br>) | |
| ) | Case No. 1:09-cv-02170-RJL |
| **v.** )<br>) | |
| **GOVERNMENT OF BELIZE,** )<br>) | |
| **Respondent.** )<br>) | |

### DECLARATION OF JUAN C. BASOMBRIO IN SUPPORT OF RESPONDENT GOVERNMENT OF BELIZE'S MOTION FOR LEAVE TO SUBMIT ADDITIONAL BRIEFING

I, Juan C. Basombrio, declare that if called as a witness in this action, I could and would competently testify to the following matters, based on my personal knowledge.

1.    I am an attorney at law, a partner with the law firm of Dorsey & Whitney LLP, and am admitted as counsel *pro hac vice* in this action on behalf of Respondent Government of Belize.

2.    Attached hereto as Exhibit 1 is a true and correct copy of the July 26, 2013, decision of the Caribbean Court of Justice in *BCB Holdings Ltd. v. Attorney General of Belize*, [2013] CCJ 5 (AJ).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed in Costa Mesa, California.

Dated:  September 30, 2013

Juan C. Basombrio

# EXHIBIT 1

[2013] CCJ 5 (AJ)

## IN THE CARIBBEAN COURT OF JUSTICE
### Appellate Jurisdiction

## ON APPEAL FROM THE COURT OF APPEAL OF BELIZE

CCJ Appeal No CV 7 of 2012
BZ Civil Appeal No 4 of 2011

BETWEEN

      BCB HOLDINGS LIMITED
      THE BELIZE BANK LIMITED                 **APPELLANTS**

AND

      THE ATTORNEY GENERAL OF BELIZE        **RESPONDENT**

| | |
|---|---|
| Before The Rt Honourable | Mr Justice Byron, President |
| And The Honourables | Mr Justice Saunders |
| | Mme Justice Bernard |
| | Mr Justice Wit |
| | Mr Justice Anderson |

<u>Appearances</u>

**Mr Edward Fitzgerald QC, Mr Eamon Courtenay SC and Mrs Ashanti Arthurs-Martin for the Appellants**

**Mr Michael Young QC, Ms Magalie Perdomo and Ms Iliana Swift for the Respondent**

### JUDGMENT
of
The President and Justices Saunders, Bernard, Wit and Anderson
Delivered by
The Honourable Mr Justice Adrian Saunders
and
The Honourable Mr Justice Winston Anderson
on the 26th day of July 2013

EXHIBIT 1

**EXHIBIT 1**

## JUDGMENT OF THE HONOURABLE MR JUSTICE SAUNDERS

[1]    The London Court of International Arbitration ("the Tribunal") determined that the State of Belize should pay damages for dishonouring certain promises it had made to two commercial companies, namely, BCB Holdings Limited and The Belize Bank Limited ("the Companies"). The promises were contained in a Settlement Deed as Amended ("the Deed") executed in March 2005. The Deed provided that the Companies should enjoy, from the 1st day of April, 2005, a tax regime specially crafted for them and at variance with the tax laws of Belize.

[2]    This unique regime was never legislated but it was honoured by the State for two years until it was repudiated in 2008 after a change of administration in Belize following a General Election. The Companies then commenced arbitration. The Tribunal found the State of Belize in breach and awarded damages against Belize in addition to arbitration costs and legal, professional and other fees ("the Award"). The Award totalled approximately $44 million and it carried interest at the rate of 3.38% compounded annually. The damages were calculated on the hypothesis that the Companies would have continued to benefit from the special tax regime at least until 2020; the year when, in keeping with the laws of Belize, BCB Holdings Limited's status as a public investment company was due to expire.

[3]    The Companies are applying now to enforce the award. The State resists enforcement. The critical question is whether it is or is not contrary to public policy for the Court to enforce the same. For the reasons that follow it is our judgment that it would be contrary to public policy to recognise the Award and accordingly we decline to enforce it.

## A brief background

[4]    The Deed arose, at least in part, out of the stated intention of the Minister of Finance and the Companies to settle a pre-existing dispute between them. The prior dispute had to do with a share purchase deed and an option deed the parties had previously negotiated. That initial dispute had itself been submitted to the Tribunal for resolution by arbitration

**EXHIBIT 1**

because of certain claims made by the Companies against the State. The Deed recorded the Companies' agreement not to pursue further these existing claims. In return, the Minister agreed to grant the Companies the special tax regime to which reference was earlier made. The Deed expressed that its provisions were to be governed by English law and it contained an arbitration clause stipulating that either party could refer to the Tribunal for resolution of disputes that were not amicably settled.

[5]     The Deed was executed by the Prime Minister (the then Minister of Finance) and also by the Attorney General of Belize. The document was expressed to be "confidential". The parties agreed not to make any announcement concerning its contents or any ancillary matter. That did not, however, prevent any announcement being made or any confidential information being disclosed by a party -

  "a) with the written approval of the other parties, which in the case of any announcement shall not be unreasonably withheld or delayed; or

  b) to the extent required by law or any competent body or stock exchange."

[6]     For well over a year after its execution, the Commissioner of Income Tax was unaware of the Deed's existence or its implications. On 10th July, 2006 the Commissioner wrote to the Companies seeking their compliance with the published tax laws of the land. The Companies responded by instructing the Commissioner to liaise directly with the Minister of Finance. Three months later the Commissioner wrote back to the Companies accepting the Companies' position and retracting what initially was his. For a period of two years, the Companies enjoyed the tax regime set out in the Deed.

[7]     In February, 2008, following a general election, a new administration was sworn into office in Belize. A few months later the Commissioner of Income Tax assessed the Companies for tax on the basis of Belize law in respect of the period the Companies had enjoyed the benefits under the Deed. The Commissioner rejected the tax returns filed by the Companies for the two previous years and required the Companies to comply with the law. The Commissioner informed the Companies that the Deed did not supersede the country's revenue laws. This turn-around by the Government constituted a repudiation of

**EXHIBIT 1**

the promises made in the Deed and motivated the Companies once again to resort to arbitration.

## The Arbitral Award

[8]     The Tribunal was duly constituted but the State did not participate in the arbitration. It did not appear. It did not make any submissions to the Tribunal. It did not enter a defence to, nor did it comment upon, the Companies' submissions. The Tribunal nonetheless rightly felt that it still had an obligation to take into account such matters as it considered might represent Belize's position on the issues in dispute. There was some material that enabled it so to do. Satellite proceedings had been tried in the Belize courts in which the State had participated and been legally represented. The Tribunal concluded that the submissions made in those proceedings and the judgments of the courts provided an indication of what arguments the State of Belize would have likely pursued before the Tribunal in relation to the matters in dispute.

[9]     The Tribunal considered that it had jurisdiction to entertain the dispute. It dismissed any notion that the dispute was not arbitrable whether because tax-related matters were involved or because of the alleged incompatibility of the promises made to the Companies with Belize law.  In making these findings the Tribunal emphasised that it was pronouncing not upon the taxation regime of Belize but instead upon the contractual warranties the Government, in the exercise of its sovereign power, had made to the Companies. The Tribunal noted that the Crown at common law had a wide prerogative power to enter into contracts and this power was unfettered by restrictions as to subject matter or persons. The Tribunal asserted that the only constraint on this wide prerogative power is that any such contract: (i) should be entered into in the ordinary or necessary course of Government administration; (ii) must be authorised by the responsible Minister, and that (iii) any payments by the Government to honour any such contract must be covered by, or referable to, an appropriate Parliamentary grant.

**EXHIBIT 1**

[10]    The Tribunal decided that the first of these three conditions was demonstrably established as the Deed gave the Government considerable financial benefits, including the Companies' agreement not to re-open the previous disputes between the parties. The Tribunal reasoned that it was not unusual for governments to enter into settlement arrangements which involved concessions or reductions. As to the second condition, according to the Tribunal, the Prime Minister clearly had actual and ostensible authority both to make the contractual warranties that were made and to assure the Companies that they would indeed enjoy the promised benefits. The Tribunal stated that the third condition did not apply in this case. No specific reason was given for this finding but one can infer that it was because the Deed did not require the Government to make un-appropriated payments to anyone.

[11]    The Tribunal did not justify their decision only on the wide prerogative power of the Government. The Tribunal also held that section 95 of the *Income and Business Tax Act*[1] expressly authorised the Government, through the Minister of Finance, to make and guarantee the promises contained in the Deed. As section 95 is a short section we take the liberty of setting it out in full:

> "(i) The Minister may remit the whole or any part of the income tax payable by any person if he is satisfied that it would be just and equitable to do so.
>
> (ii) Notices of such remission shall be published in the Gazette".

In support of its findings that the Agreement was not illegal and the dispute was arbitrable the Tribunal cited several authorities.[2]

---

[1] *Income and Business Tax Act*, Cap 55 [Belize]

[2] These included but were not limited to *The Attorney General of New South Wales v Bardolph* [1934] 52 CLR. 455; *The Attorney General of Saint Lucia v Martinus Francois*, Civil Appeal No 37 of 2003; *In re D.H. Curtis (Builders) Ltd* [1978] 2 WLR 28; *Marubeni Hong Kong and South China Ltd v. Government of Mongolia* [2004] 2 Lloyd's Rep. 198; *Attorney-General v.Silver* [1953] AC 461, Arbitral awards made in *Alcoa Minerals of Jamaica, Inc. v. Government of Jamaica, Engineering Company (Italy) v. Engineering Company (Greece) and Producer (Greece), TCSB Inc. v Iran and Paushok and Others v. the Government of Mongolia* and an Article by Emmanuel Gaillard on *Tax Disputes Between States and Foreign Investors* "Tax Disputes Between States and Foreign Investors" [1997] NYLJ 217

**EXHIBIT 1**

### The decisions of the Courts below

[12]     The Tribunal's award cannot be enforced in Belize without an application first being made to the court to enforce it. The legislative basis for enforcement is the *Arbitration (Amendment) Ordinance* No 21 of 1980[3] ("the Act"). The application to enforce was made to a trial judge in Belize. On this occasion the State appeared and made several submissions strenuously resisting the application.

[13]     In essence, the State submitted to the judge that (a) the relevant provisions of the Act were in fact not part of the law of Belize; (b) the subject matter of the arbitration was non-arbitrable and (c) it would be contrary to public policy to enforce the Award. The judge rejected each of these arguments. The judge noted that section 28 of the Act enshrines the principle that an arbitral award, made pursuant to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention")[4] is, for all purposes, binding on those who are parties to the Convention. The judge held that this Award is a Convention Award. The judge therefore weighed this principle against the provisions of section 30 of the Act which enjoins the court not to refuse enforcement of a Convention award except upon very limited grounds which are specifically prescribed. Citing the case of *P T Asuransi Jasa Indonesia (Persero) v. Dexia Bank SA*[5], the judge explained that the courts in Belize ought to lean toward enforcement of Convention awards unless to allow enforcement would "shock the conscience" or "is clearly injurious to the public good or wholly offensive to the ordinary reasonable and fully informed member of the public". The judge concluded that the Deed was a lawful and legally binding commercial agreement and that to refuse enforcement would transgress established applicable legal principles and practices. He therefore ordered that the Companies be at liberty to enforce the Award in the same manner and to the same effect as a local judgment. The State appealed the judge's decision to the Court of Appeal.

---

[3] Arbitration Act, Cap 125 [Belize]
[4] *Convention on the Recognition and Enforcement of Foreign Arbitral Awards* (adopted 10 June 1958, entered into force on 7 June 1959) 330 UNTS 3 (New York Convention)
[5] [2007] 1  SLR (Reissue) 597

**EXHIBIT 1**

[14]    It is a matter of great regret that the Court of Appeal determined the appeal on a consideration only of the State's submission (discussed more fully in the judgment delivered by Justice Anderson), that the Act was invalid and that for this reason enforcement of the Award should be refused. Two of the three judges upheld that submission. The third, Mendes JA, dissented. In his opinion the Act was valid and therefore the other submissions regarding enforceability were not at all moot.

[15]    No other issues were discussed in the judgment of the Court of Appeal. Mendes JA expressed his willingness to pronounce on the other issues in the case which, given his opinion that the Act was valid, would have arisen. Since his views on those other issues would have been otiose, given that the opinions of his colleagues had already determined the appeal, he considered ultimately that it was superfluous to express them in his judgment.

**The issues**

[16]    Three central issues arise from the appeal of the Companies to this Court:

1.  Is the Act valid? Was its passage an improper encroachment by the Belize colonial legislature upon the preserve of the Crown? Should the claim for enforcement be dismissed on this ground?

2.  If the first point is decided in favour of the Companies and the Act is valid and applicable, should this Court remit the case to the Court of Appeal so that it can first pronounce on the questions whether the Award should not be enforced because it is non-Arbitrable and/or because it is contrary to public policy?

3.  If the Act is not invalid and the case is not remitted, should the application to enforce the Award be refused either because it would be contrary to public policy to do so (the public policy point) or because it is in respect of a matter which was not capable of settlement by arbitration (the non-Arbitrability point)?

[17]    For the reasons set out by Justice Anderson, we are of the view that the Act is not invalid and the case should not be remitted. As our opinion on the public policy point is

**EXHIBIT 1**

dispositive of the appeal we consider it unnecessary to consider the non-Arbitrability point.

## The Public Policy Point

*The submissions of the parties*

[18]    On this point, the State submits that it was never bound by the agreement that gave rise to the Deed because implementation of the same without parliamentary approval violates the country's fundamental law. While the Minister, in making agreements, could ordinarily be taken to have implicitly promised that he would secure any necessary legislative approval, the Award on its face discloses that no such approval was ever sought or obtained and there never was any intention to seek or obtain such approval. In these circumstances, counsel submits, the Court should not enforce the Award as it is repugnant to the Belize legal order.

[19]    The Companies, on the other hand, argue that the State benefited from the Agreement because the Deed amicably settled prior and pending claims of the Companies against the Government. The Tribunal has definitively ruled that the Agreement was not illegal and the Court should not now re-open the merits of what has already been determined. The State could and should have raised, before the Tribunal or before the English supervisory courts, any arguments it now wishes to raise on the legality of the Deed. The Award is final and, in keeping with the pro-enforcement bias courts should have towards Convention Awards, this Court should enforce it. The Companies support their submissions with reference to several authorities[6].

*The broad approach to the public policy exception*

[20]    Competing policies are invariably at play when a court is called upon to decide whether to enforce an arbitral Award. The court must balance divergent policies and interests and apply to them principles of proportionality.

---

[6] These included: *Soinco SACI and Another v Novokuznetsk Aluminium Plant and Others* [1998] 2 Lloyd's Rep. 337; *Westacre Investments Inc v Jugoimport-SPDR Holding Co. Ltd* [2000] 1 QB 288; and *Kersa Holding Company Luxembourg v Infancourtage, Famajuk Investment and Isny Kersa Holding Company Luxembourg v Infancourtage, Famajuk Investment and Isny* 24 November 1993, reported in Yearbook Commercial Arbitration, A.J. van den Berg ed., Vol. XXI, 1996, p.624

**EXHIBIT 1**

[21]   Almost two hundred years ago, Burrough J. in *Richardson v. Mellish*[7] famously noted that "public policy" is a very unruly horse. Once you get astride it, he warned, you never know where it will carry you. This admonition is especially prescient because the concept of public policy is fluid, open-textured, encompassing potentially a wide variety of acts. It is conditioned by time and place. Religion and morality, as well as the fundamental economic, social, political, legal or foreign affairs of the State in which enforcement is sought, may legitimately ground public policy concerns. Whether those concerns are of a substantive or procedural nature, if they are fundamental to the polity of the enforcing State, they may successfully be invoked.

[22]   Since the Award here in question is a foreign Award governed by English law, the question that naturally arises is, whose public policy is being interrogated? Is there some international public policy which must be used as a yardstick against which to measure those matters which it is said are contrary to public policy?

[23]   Public policy in this case must in the first instance be assessed with reference to the values, aspirations, mores, institutions and conception of cardinal principles of law of the people of Belize. It is in Belize that the Companies seek to enforce the Award and it is the courts of Belize that must make the assessment as to what, if anything, is offensive to public policy. It is also in Belize that the underlying obligations and promises were to be performed. Article V. 2(b) of the Convention provides that enforcement of an award may be refused, if enforcement would be contrary to "the public policy of *that country*"; that is, in this case, the State of Belize. But this does not mean that, although there is no universal standard of "public policy"[8], it would be appropriate for courts to adopt a parochial approach. As Cardozo J. reminds us in *Loucks v Standard Oil Co. of New York*[9], the courts are not free to refuse to enforce a foreign judgment at the pleasure of the judges or to suit the individual notion of expediency or fairness.

---

[7] (1824) 2 Bing 229, 252
[8] See: International Law Association's Final Report on Public Policy 2002 at [21]
[9] 224 N.Y. 99

**EXHIBIT 1**

[24]     Where enforcement of a foreign or Convention award is being considered, courts should apply the public policy exception in a more restrictive manner than in instances where public policy is being considered in a purely domestic scenario. This is because, as a matter of international comity, the courts of one State should lean in favour of demonstrating faith in and respect for the judgments of foreign tribunals. In an increasingly globalised and mutually inter-dependent world, it is in the interest of the promotion of international trade and commerce that courts should eschew a uniquely nationalistic approach to the recognition of foreign awards.

[25]     The Court must be alive to the fact that public policy is often invoked by a losing party in order to re-open the merits of a case already determined by the arbitrators[10]. Courts must accordingly be vigilant not to be seen as frustrating enforcement of the Award or affording the losing party a second bite of the cherry. To encourage such conduct would cut straight across the benefits to be derived from the arbitral process and undermine the efficacy of the parties' agreement to pursue arbitration[11].

[26]     An expansive construction of the public policy defence would vitiate the Convention's attempt to remove pre-existing obstacles to enforcement and to accommodate considerations of reciprocity[12]. For all these and other reasons the Convention has a definite pro-enforcement bias and interpretation of what is contrary to public policy under the Belize statute should also reflect this bias. There is universal consensus that courts will decline to enforce foreign arbitral Awards only in exceptional circumstances. In particular, this restrictive approach is adopted in relation to Convention Awards therefore, only where enforcement would violate the forum state's most basic notions of morality and justice[13] would a court be justified in declining to enforce a foreign Award based on public policy grounds. Enforcement would be refused, for example, if the Award is "at variance to an unacceptable degree with the legal order of the State in which

---

[10] See: *A v. R (Arbitration: Enforcement)* [2009] 3 HKLRD 389 at page 395 [24]
[11] *A v. R* [2009] 3 HKLRD 389 at page 395 [25]
[12] *Parsons & Whittemore Overseas Co. Inc v. Societe Generale De L'Industrie Du Papier (Rakta) and Bank of America* 508 F.2d 969(2d Cir. 1974)
[13] *Parsons & Whittemore Overseas Co. Inc v. Societe Generale De L'Industrie Du Papier (Rakta) and Bank of America* 508 F.2d 969 (2d Cir. 1974)

**EXHIBIT 1**

enforcement is sought inasmuch as it infringes a fundamental principle".[14] In such a case the infringement must constitute "a manifest breach of a rule of law regarded as essential in the legal order".[15] In this vein, the Indian Supreme Court has stated that it will decline to enforce an Award only if enforcement would be contrary to (i) the fundamental policy of Indian law; or (ii) the interests of India; or (iii) justice or morality.[16]

[27]    The International Law Association (the "ILA") has recommended the use of the phrase "international public policy" as an appropriate description of the restrictive scope of public policy that should be applied to Convention Awards.[17] The phrase is used in contra-distinction to "domestic public policy". Its content includes such matters as (i) fundamental principles, pertaining to justice or morality, that the State wishes to protect even when it is not directly concerned; and (ii) rules designed to serve the essential political, social or economic interests of the State.

[28]    We agree that to claim the public policy exception successfully the matters cited must lie at the heart of fundamental principles of justice or the rule of law and must represent an unacceptable violation of those principles. The threshold that must be attained by the State to establish the public policy exception is therefore a very high one.

*Public Policy and the underlying Agreement*

[29]    The rival submissions of the parties raise two important preliminary questions. Is it permissible for the Court now to examine the underlying Agreement reflected in the Deed? Should the Court re-examine the legality of the Deed even after the Tribunal has specifically addressed that issue and found the Deed to be valid?

[30]    In our view, the circumstances of this case lend themselves to a positive answer to both questions. There is no controversy as to the conduct of the parties in the making of the

---

[14] *Krombach v. Bamberski* [2001] 3 WLR 488 at [37]
[15] *Krombach v. Bamberski* [2001] 3 WLR 488 at [37]
[16] See: *Renusagar Power Company Ltd v. General Electric Company* (1994) AIR 860 at [66]
[17] See: ILA Final Report on Public Policy 2002, http://www.newyorkconvention.org/publications/full-text-publications/general/ila-report-on-public-policy-2002

**EXHIBIT 1**

Agreement. No one has any quarrel with the manner in which the Award sets out the basic terms of the Minister's Agreement with the Companies. The warranties and promises made to the Companies, the consideration given in exchange, these are all agreed. There is no dispute that in 2008, when a new Minister of Finance assumed office, further implementation of the Agreement was halted. The reasons put forward to justify premature termination of the Agreement are also undisputed. In short, this is a case where all the relevant facts are uncontested matters of public record accepted by both sides. It is necessary only to decide whether, on the basis of these uncontroverted matters, enforcement of the Award will violate "some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal".[18]

[31]    It may be possible here to make that decision by confining oneself to the dispositive aspect of the Award, but given the circumstance that the factual background is agreed and since the court is performing, essentially, a balancing exercise between the competing public policies of finality and illegality, the nature and seriousness of the alleged illegality and the extent to which it can be seen that the same was addressed by the arbitral tribunal are factors we must take into account.[19] If there is illegality we must also consider the extent to which it impacts on the society at large and is offensive to primary principles of justice.

[32]    We respectfully disagree with the opinion of the trial judge that, because the Tribunal had considered and rejected the idea that the Deed was illegal, we are necessarily precluded from considering afresh that issue. We agree with Colman J who held in *Westacre* that any such estoppel must yield to the public policy against giving effect to transactions obviously offensive to the court[20]. In the context of the credible allegations of illegality put forward by the Government, in order to assess whether this transaction is truly offensive the court *must* examine the Agreement and the promises the Minister made to the Companies against the backdrop of fundamental principles and rules.

---

[18] See Cardozo J in *Loucks v Standard Oil Co. of New York* 224 N.Y. 99 at 111
[19] *Westacre Investments Inc v Jugoimport-SPDR Holding Co. Ltd* [1999] 3 All ER 864 at 885 H
[20] See *Westacre Investments Inc v Jugoimport-SPDR Holding Co. Ltd* [1998] 2 Lloyd's Rep. 111, 118

**EXHIBIT 1**

*The promises made by the Minister*

[33]   The promises made by the Minister were designed to affect, indeed to alter, the Companies' tax obligations under existing law. The Deed looked to past as well as future obligations. As to those of the past, whatever may have been the factual position in relation to the Companies' liabilities as at the date of its execution, the Deed determined that, for "all periods up to and including 31st March 2005", the Companies had "satisfied in full all and any such liabilities, assessments or claims". The Deed further assured the Companies that all their filings, in relation to any form of taxation required to be made on their behalf, were complete and up to date.

[34]   As to the future, the Deed recites at Clause 4.1(c) that

> "to the extent that [the Companies] are liable to pay any Business Tax and/or Income Tax in respect of any period beginning on or after 1st April 2005, the calculation of the raising of any assessments or claims in respect of such Business Tax and/or Income Tax shall be calculated solely and exclusively on the basis that ... "

The Deed at this point goes on at some length to construct in careful detail a special tax regime reserved for the Companies; a regime that all parties readily acknowledge is at variance with the extant revenue laws of Belize and one which conferred significant benefits on the Companies. To cite just one example of this variation, section 21(3) of the Income and Business Tax Act states:

> "The excess of any business tax paid by any person other than an employed person during the basis year over the income tax due on the chargeable income of such person shall be carried forward as an expense to the next basis year."

On the other hand Clause 4.1(c)(iii) of the Deed states

> "Business tax is a withholding tax and an advance payment of final Income Tax and any amount paid in Business Tax which is in excess of the amount due in Income Tax will constitute an overpayment of Income Tax and shall be offset on a quarterly basis against Business Tax and payable in subsequent financial years."

**EXHIBIT 1**

[35]    The Award discloses that the Deed was buttressed by other assurances made to the Companies.  The Deed was accompanied by a letter dated 21st June 2006 addressed to the Chairman of the Companies in which the Minister of Finance "*irrevocably confirmed*" that all business and income tax obligations of the Companies would be governed by the terms of the Deed. The Minister also confirmed that the Deed had "*irrevocably fixed*" the rate of income tax payable by the Companies for as long as BCB Holdings remained a Public Investment Company *notwithstanding anything contained in the Income and Business Tax Act to the contrary*" (the italics are all those of the Tribunal in its published Award).

[36]    In sum, in exchange for settling the prior arbitral proceedings, the Deed purported to create and guarantee to the Companies a unique tax regime that was unalterable by Parliament. So, for the sake of argument, if BCB remained a Public Investment Company for the next 15 years, the State of Belize would be in breach of contract if its National Assembly, at any time during that period, without the Companies' concurrence, enacted any revenue measure applicable to the Companies that diverged from the Deed. The promises made by the Minister were thus intended to supplant and supersede all current and any future statutes enacted by the National Assembly.

[37]    The Tribunal addressed the issue of the legality of the Deed by asking itself whether the Minister had actual and/or ostensible authority to make these promises to the Companies. The Tribunal held that the Minister did have such authority. The Tribunal rested this conclusion on two premises, firstly, the extensive prerogative powers of the Executive to make agreements and secondly, section 95 of the Income and Business Tax Act[21]. The Tribunal noted that it is commonplace in international investment contracts for a host country to promise a foreign investor or contractor tax incentives as an inducement to make the investment or carry out an activity which is the subject of such agreements. The judge at first instance affirmed these conclusions of the Tribunal.

---

[21] See [11] above where the section is set out

**EXHIBIT 1**

[38]   We agree that the Minister does indeed possess wide prerogative powers to enter into agreements. The Executive may do so even when those agreements require legislative approval before they can become binding on the State. This was also the opinion of the Eastern Caribbean Court of Appeal in the Saint Lucian case of *The Attorney-General v. Francois*[22], an authority cited by the Tribunal. The judge's focus, however, ought logically to have extended beyond the issue of whether it was lawful *to make* the promises. The making of a Government contract may be a matter quite distinct from its enforceability against the State as the *Francois* case also demonstrates.

[39]   It was necessary for the judge to consider whether the Award was contrary to public policy given the *implementation* of the underlying agreement *without parliamentary approval and without any intention on the part of the contracting parties to seek such approval*. This was an issue that was not at all considered by the Tribunal and the judge failed to advert to it. *Francois* concerned a guarantee entered into by the Saint Lucia Minister of Finance. No parliamentary approval had been given for the grant of the guarantee. The State was subsequently obliged to make good on the instrument. A citizen challenged its legality. The court held that nothing prevented the Minister from *giving* the guarantee, but the State only became *bound* by the same *after* Parliament had approved the funds necessary to discharge it. As Parliament had done so before the guarantee was honoured there was no basis for the citizen's complaint.

*Executive prerogative and the Separation of Powers*

[40]   If it turns out that the Minister had no power to make or implement the promises he made, his lack of authority would be a potent factor in any assessment of the legality of the Agreement and the question whether enforcement of the Award is contrary to public policy. The Companies accept that the Minister's authority to make the Agreement could only have been premised either on prerogative power or on section 95 of the Income and Business Tax Act[23]. As to the former, the Companies submit that the Deed was "a detailed commercial agreement" between two parties dealing with matters of "a

---

[22] Civil Appeal No 23 of 2003, Judgment of the Court of Appeal delivered 29th March 2004
[23] See [11] above where the section is set out in full

**EXHIBIT 1**

significant financial value"; that both sides must have sought legal advice with its drafting; and that it was entered into in order to settle prior arbitral proceedings in which claims amounting to "considerable sums of money" were being made against the State. None of these points is disputed although it must be emphasised that this Court has no material before it to indicate the reasonableness or strength of the claims the Companies allegedly had against the Government. The Court also has no evidence before it of an approximate figure that might reasonably represent the "considerable sums" mentioned by the Companies for which the State may have been liable if the prior dispute had been settled or arbitrated upon terms favourable to the Companies. These are, however, not matters of great significance. The crucial question is whether any of the points made above to justify the exercise of prerogative power, or all of them taken together, serves to render enforceable an agreement made by the Executive branch of government, without parliamentary approval, to except a taxpayer from obligations contained in current and future revenue statutes.

[41]     To negotiate an agreement with a company that can properly be described as a "detailed commercial" or "business" agreement or "settlement deed" does nothing to enhance the capacity of the Executive unilaterally to provide exceptions from the country's revenue laws on the strength of Executive prerogative. The Government either has or lacks such capacity. It is trite that whatever legal advice the Minister procured does not bind a court and, interestingly, the State today actually has radically different advice from that which apparently informed the making of the Deed. The idea that the Minister who signed the Deed (or his Government) was attempting, in good faith, to settle a prior dispute is also quite beside the point. Neither a noble motive, as may have been the case, nor an executed Deed excuses or repairs an obvious excess of jurisdiction or serious breach of the fundamental principle of Separation of Powers.

[42]     The latter principle goes back to the writings of Montesquieu. So far as it relates to a strict division between the Executive and the Legislature, with the growing complexity of the machinery of government, the principle may have lost some of its lustre. In particular, in relatively small Parliaments like Belize's, and where the Executive is largely drawn

**EXHIBIT 1**

from the legislature, the separation between these two bodies often appears blurred. But it is erroneous to assume that there is not an important division between the functions performed by each branch. The struggle to maintain this important distinction is as old as the epic battles waged between Chief Justice Coke and King James I who sought to use Royal proclamations to make law without Parliament's approval.[24] The structure and content of the Belize Constitution reflects and reinforces the distinction. The Constitution carefully distributes among the branches the unique functions that each is authorised to exercise.[25] The rights and freedoms of the citizenry and democracy itself would be imperilled if courts permitted the Executive to assume unto itself essential law-making functions in the absence of constitutional or legislative authority so to do. It would be utterly disastrous if the Executive could do so, selectively, via confidential documents. In young States especially, keen observance by the courts of the separation of powers principle remains vital to maintaining the checks and balances that guarantee the rule of law and democratic governance. Caribbean courts, as part of their general function of judicial review, have a constitutional obligation to strike down administrative or executive action that exceeds jurisdiction or undermines the authority of the legislature.[26]

[43]   Section 68 of the Constitution empowers the National Assembly to make laws. The power to impose, alter, regulate or remit taxes and duties is a power constitutionally vested in the legislature. Only Parliament, or a body specifically delegated by Parliament, may lawfully grant exceptions to the obligation to obey the country's revenue laws. Counsel for the Companies submitted that the Deed merely resolved "uncertainties and ambiguities" in the law, but the Executive Branch, whether for the purpose of "settling" claims made against it or otherwise, has no sovereign power to resolve such uncertainties and ambiguities. That is the function of the parliament and the courts. Governments in the region are authorised to make promises to public or private bodies that the latter may enjoy derogations from the revenue laws of the State, but whenever this occurs the

---

[24] See *Case of Proclamations* (1611) 12 Co. Rep. 74 which established the principle that the Executive has no general inherent power to alter the law of the land
[25] See in relation to the Constitution of Jamaica the judgment of Harrison JA in *Independent Jamaica Council for Human Rights and others v. The Attorney General*, Civil Appeals Nos 36-39 of 2004, at pages 11-13, judgment of the Court of Appeal delivered 12th July, 2004
[26] See for example: *J Astaphan & Co. (1970) Ltd v Comptroller of Customs of Dominica* (1996) 54 WIR 153 K

**EXHIBIT 1**

on any person for any offence…" If the Tribunal's views on remission are correct, then the Governor-General would be acting within the scope of the power if he/she remitted all the future sentences likely to be imposed upon a known recidivist. This would be an absurd interpretation of the Governor-General's power.

[49]   In the exercise of the statutory power to remit, section 95 imposes upon the Minister the obligation to comply with two rather weak safeguards. Failure so to conform would impugn and automatically render void the exercise of the power. Here, the Minister flouted *both* measures. Firstly, the Minister's power under the section is constrained to the extent that the Minister needs to satisfy himself, on objective criteria, that it is just and equitable to remit tax payable. Fore-knowledge of the actual tax payable (which may be remitted in whole or part) constitutes a crucial, if not indispensable, factor informing the Minister's exercise of discretion. Just as it would be perverse for the Governor-General (whose discretion is not ostensibly limited by what is "just and equitable") to remit punishment when no crime has as yet been committed, far less a sentence imposed, so too the Minister cannot properly satisfy himself of the justice or equity in remitting tax payable by a company where the business activity upon which the tax may or may not accrue has not yet commenced and there is no knowing whether the company would even be in business for the period the tax is supposedly "remitted". Apart from its absurdity, to construe the power to remit tax as capable of being exercised in respect of tax that may or may not become payable throughout the lifetime or existence of the taxpayer, evades section 95's first safeguard and easily opens the door to the arbitrary and unlawful exercise of the power delegated.

[50]   Section 95 also required Notices of any remission to be published in the Gazette. Given the cloak of confidentiality that surrounded the making and implementation of the Deed, it is reasonable to conclude that there was never an intention on the part of the Minister to publish the required Notice. At any rate, the Minister had two years to fulfil this statutory obligation and no attempt was made to comply with it during that time. The trial judge accepted the Tribunal's view that the requirement of publication is merely "an administrative formality" and that publication may lawfully be done at any time. In light

**EXHIBIT 1**

of the importance the Constitution attaches to the remission of tax, we disagree. Parliament in its wisdom has decreed publication in the gazette so that the Minister's decisions on remission are open to public scrutiny. This might be a mild, after-the-fact legislative safeguard. But to strip it of all its content, to render it devoid of any force only emphasises the grave danger to public policy that flows from interpreting the first limb of section 95 in the manner in which the Companies suggest.

[51]     Finally, as the Constitution clearly suggests, there is a distinction between the imposition, repeal, remission, alteration or regulation of taxation.[30]  Even if one assumes that the Minister was entitled, by section 95, to remit tax in respect of future business activity; if one is prepared to assume further that the exercise of "remitting tax payable" includes excusing statutory obligations to   pay tax, the jurisdiction exercised by the Minister exceeded each of these dubious ways of exercising the power delegated.   The Deed purported to alter and regulate the manner in which the Companies should discharge their statutory tax obligations. The Deed impacted on a host of filing, administrative and other obligations imposed by Parliament's revenue laws. In essence, the framers of the Deed conceptualised and designed a whole new *tax policy* for the benefit of the Companies. This policy was then embodied in the Deed, executed by the parties and implemented with the objective of overriding all current and any future statutes enacted by the National Assembly.

[52]     It is not the Court's function in this case to assess the wisdom of this special tax policy. The Government does of course have the power to settle, and to settle in confidence if it so desires, and on terms it considers prudent, claims made against it. But transforming the policy conceived here, effectively into the status of a Money Bill, necessitated the intervention of the National Assembly so that legislation consistent with the imperatives of the Constitution could be enacted to give force to it.

---

[30] See s 80(1) of the Constitution

**EXHIBIT 1**

[53]   Prime Ministerial governance, a paucity of checks and balances to restrain an overweening Executive, these are malignant tumours that eat away at democracy. No court can afford to encourage the spread of such cancer.[31] In our judgment, implementation of the provisions of the Deed, without legislative approval and without the intention on the part of its makers to seek such approval, is indeed repugnant to the established legal order of Belize. In a purely domestic setting, we would have regarded as unconstitutional, void and completely contrary to public policy any attempt to implement this Agreement.

### Should the Award be enforced?

[54]   As stated before, competing policies contend with each other when one must decide whether the public policy exception may successfully be invoked to render a foreign Award not enforceable. Even if a judge determines that there are features of an award that may seem inconsistent with public policy, it does not at all follow that the court *must* decline to enforce the Award. Reference has already been made to the pro-enforcement bias that informs the court's approach and to the restrictive manner in which the public policy exception should be applied in the case of foreign awards.

[55]   There is also the fact here that the State treated with indifference the arbitral process to which it had agreed. This was far from exemplary conduct and it is a factor to which one should have regard. For this purpose no useful distinction can be made between the Administration in Belize which occupied the seat of government prior to 2008 and the one which held the reins immediately after the General Elections of that year. The latter was contractually bound by the warranties of the former, provided that the implementation of those warranties was not by law, impliedly or expressly, subject to parliamentary or judicial approval. The agreement to arbitrate was a free standing agreement separable from the remainder of the Deed and it is unfortunate that the Government approached its obligations *under that agreement* in the way it did.

---

[31] See in this regard [2013] UKPC 24 at [51] – [60]

**EXHIBIT 1**

[56]    We do not consider, however, that in each and every case, a failure to participate in the arbitral process should preclude a party from successfully arguing the public policy exception at the enforcement stage. The case law on this issue is far from coherent and it would not be right to lay down hard and fast rules. It seems to us that here also, a tension exists between various public interests. In resolving that tension the nature, quality and seriousness of the matters alleged to give rise to the public policy concerns must be weighed and placed alongside the court's desire to promote finality and certainty with respect to arbitral awards.

[57]    There is actually nothing in the Act that suggests that a pre-condition for invoking the public policy exception is prior participation in the arbitral process. The Convention envisages that a court may *on its own motion* decline to enforce an Award on public policy grounds. This is hardly surprising. While it is public policy that arbitral awards, and in particular foreign awards, should be enforced, it is also public policy that awards which collide with foundational principles of justice ought *not* to be enforced. These two facets of public policy may sometimes appear to be, but are really not, mutually inconsistent. When a municipal court considers whether to decline to enforce an Award on public policy grounds, the court is not concerned with favouring or prejudicing *a party* to the arbitral proceedings. The Court is concerned with protecting the integrity of its executive function. In the process, the Court seeks simultaneously to guarantee public confidence in arbitral processes generally and to respect the institutional fabric of the country where the Award is to be enforced.

[58]    This is a case where, as we have noted, it is clear that the Minister had no power to guarantee fulfilment of the promises he gave. It is equally clear that the signatories to the Deed, including the Companies' representatives, had no intention to seek the requisite parliamentary approval. There was nothing in the Deed to suggest any such intention. Implementation of the promises made, far from being suspended pending possible legislative approval, took effect immediately upon execution of the Deed. But even if Parliament had ratified the promises made, not even Parliament could have bound itself to legislation that was "irrevocable".

**EXHIBIT 1**

[59]    The grounds for not enforcing this Award are compelling. The sovereignty of Parliament subject only to the supremacy of the Constitution is a core constitutional value[32]. So too is the principle of the Separation of Powers the observance of which one is entitled to take for granted[33]. To disregard these values is to attack the foundations upon which the rule of law and democracy are constructed throughout the Caribbean. It is said that public policy amounts to no less than those principles and standards that are so sacrosanct as to require courts to maintain and promote them at all costs and without exception.[34] The Committee on International Commercial Arbitration has endorsed "tax laws" as an example of an area that might fall within the scope of public policy, the breach of which might justify a State court refusing enforcement of an Award.[35] In our judgment, especially as the underlying agreement was to be performed in Belize, the balance here undoubtedly lies in favour of not enforcing this Award. This is a case where the Court actually has a duty to invoke the public policy exception.

[60]    We have considered whether, notwithstanding all of the above, we should still enforce the Award because if we did not, the State of Belize may be unjustly enriched. There are powerful factors that weigh against this view. As mentioned above at [47], we have no evidence of the strength of the Companies' claims relating to the prior dispute between the parties. There is therefore only a tenuous basis for presuming any unjust enrichment. Even assuming there could conceivably be *some* unjust enrichment, there is no way of assessing its likely quantum. It is also significant that the Companies are *not* foreign entities. They are Belizean companies cognizant of and constrained by the public policy of special tax rates, exemptions and concessions being granted by Parliament. The Companies themselves are currently the beneficiaries of tax concessions which were obtained, not from the Minister but through the National Assembly.

[61]    The public policy contravened in this case falls well within the definition of "international public policy" recommended by the ILA that might justify the non-

---

[32] See *Methodist Church v Symonette* [2000] 5 LRC 196 at 208; (2000) 59 WIR 1 at 13
[33] See *Moses Hinds v. The A.G. of Jamaica* [1976] 1 All ER 353 at 359
[34] See Report, Committee on International Commercial Arbitration, International Law Association – London Conference (2000) pages 4-5
[35] See ILA Final Report on Public Policy 2002 at [30]

**EXHIBIT 1**

enforcement of a Convention Award. If this Court ordered the enforcement of this Award we would effectively be rewarding corporate citizens for participating in the violation of the fundamental law of Belize and punishing the State for refusing to acquiesce in the violation. No court can properly do this. Responsible bodies, including the Attorney General, have a right and duty to draw attention to and appropriately challenge attempts to undermine the Constitution.

## JUDGMENT OF THE HONOURABLE MR JUSTICE ANDERSON

[62]    An interesting question of general public importance raised by this case is the following: Did the enactment by the Parliament of Belize of the 1980 Arbitration Ordinance to give effect to the New York Convention before that treaty had been accepted by the Executive constitute a breach of the separation of powers doctrine thereby making the legislation unconstitutional?

## Constitutionality of the 1980 Arbitration Ordinance

[63]    In order to properly examine the constitutionality of the 1980 Arbitration Ordinance it is necessary to engage in a brief review of the historical background to the constitutional and legislative order in Belize. British Honduras was acquired by Great Britain by settlement becoming part of Her Majesty's dominions by 1817, at the latest. The British Honduras Constitution of 1870 vested power to make laws "for the peace, order and good governance of the ... Colony" in the Governor "with the advice and consent of the ... Legislative Council..." On 1st January 1964, the Colony achieved self-government through the British Honduras Letters Patent ("Letters Patent") and the enactment of the British Honduras Constitution Ordinance ("Constitution Ordinance"). These instruments, together with the common law relating to the Crown prerogative and executive power, delineated and delimited the boundaries of the three arms of governmental power in British Honduras: executive power was vested in the Monarch headed by Queen Elizabeth II; legislative authority vested in the colonial legislature; and judicial authority vested in the colonial judiciary.

**EXHIBIT 1**

[64] British Honduras became Belize on 1st June 1973. For ease of reference the Court will henceforth refer to "Belize" regardless of the date of the relevant event. Belize became independent on 21st September 1981. By letter dated 29th September 1982, the Prime Minister informed the Secretary General of the United Nations that Belize would continue to apply provisionally and on the basis of reciprocity, the treaties extended to it by the United Kingdom.

[65] On 10th October 1980, during the era of self-government, the Belize Legislature enacted the Arbitration (Amendment) Ordinance[36] ("the 1980 Ordinance") which came into effect on the same day. By the 1980 Ordinance the Legislature added Part III, sections 25 – 30 and a Fourth Schedule titled *New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards*" to the Arbitration Ordinance of 1932. The 1980 Ordinance was expressed to be: "*An Ordinance to amend the Arbitration Ordinance Chapter 13 of the Laws to give effect to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.*" It provided for the staying of court proceedings in the absence of proof that the arbitration agreement was null and void and the enforcement in Belize of an arbitration award made in the territory of a country (other than Belize) which is a party to the New York Convention ("Convention Award"). The New York Convention had been ratified by the United Kingdom on 24th September 1975 and made applicable to Belize by Notice of Territorial Application (in the form of a Declaration by the United Kingdom) which was received by the Secretary General of the United Nations on 26th November 1980, some six weeks *after* the enactment of the 1980 Ordinance.

[66] The Appellants contend that the LCIA Final Award of 29th August 2009 was made in the United Kingdom, a party to the New York Convention and is therefore a Convention Award that ought to be enforced in Belize in accordance with the provisions of the 1980 Arbitration Ordinance inserted into the Arbitration Act. This is opposed by the Respondent who argues that the Ordinance was *ultra vires* the powers of the Legislature and therefore unconstitutional at the time of its enactment.  In response the Appellants

---

[36] No. 21 of 1980

**EXHIBIT 1**

say that even *if* the 1980 Arbitration Ordinance was defective at its passage, which they strenuously deny, it could nevertheless be characterized as "having effect" immediately before Independence Day and was therefore "saved" as existing law by Section 134 (1) of the Constitution. Finally, the Appellants argue that Belize is estopped from contending that the New York Convention is not applicable given the 29th September 1982 letter of the Prime Minister to the Secretary General of the United Nations.

**(a) Is *ultra vires* legislation saved as existing law?**

[67]    If the Appellants are correct that any defect in the passage of the 1980 Arbitration was cured by its being "saved" under the Independence Constitution then the issue would be resolved in their favour and this resolution would foreclose on the need to discuss whether the Ordinance was *ultra vires* the powers of the colonial legislature. For this reason it is convenient to consider this point first.

[68]    Section 134 of the Independence Constitution of 1981 made provision for the saving of "existing laws" and where necessary, for the Governor General and the courts to bring those laws into conformity with the 1981 Constitution. "Existing laws" meant any Act, Ordinance, rule, regulation, order or other instrument "having effect as part of the law of Belize immediately before Independence Day." The Appellants argue that even if the 1980 Ordinance was *ultra vires*, it was still capable of being saved on the basis that section 136 (6) does not require that an Ordinance be "valid" to qualify as an existing law but only that it be an Ordinance "having effect" immediately before Independence Day. Having been saved by section 134 the only basis on which the Ordinance could be declared unconstitutional was for want of compatibility with the 1981 Constitution, since the section gave the same effect to saved laws "as if they had been made in pursuance of this Constitution."

[68]    There is no merit in this argument. In order for a law to be saved as "existing" law that law must first exist. The purported enactment of a law by a legislature that has no power to enact that law does not result in the creation of law. Such a "law" does not exist and

**EXHIBIT 1**

never did; it is void *ab initio*: see *Murphy v R*.[37] There is therefore nothing to be saved. If the 1980 Ordinance was outside the legislative competence of the colonial Legislature then the Court agrees entirely with Pollard JA that the Ordinance could "not constitute 'existing law' within the meaning of Section 134 (1) of the Belize Constitution and amenable to being saved at the time of independence of Belize".[38] The real question, therefore, is whether the enactment of the 1980 Ordinance was in fact outside of the legislative powers of the Legislature.

**(b)   Was the 1980 Ordinance ultra vires the powers of the legislature?**

[69]    The Respondent argues that by enacting the 1980 Ordinance the colonial legislature acted outside its legislative competence and encroached on the authority of the Executive thereby breaching the Separation of Powers doctrine and thus rendering the legislation unconstitutional. The competence of the colonial legislature derived from the Letters Patent and from the Constitutional Ordinance, section 16 of which provided: "Subject to the provisions of this Ordinance, the Legislature may make laws for the peace order and good government of the Territory." Under the Royal Prerogative executive power was vested in the Crown and exercised by the Governor of Belize. For centuries it has been accepted that executive powers in the Royal Prerogative included the power to make international treaties, although the legislative implementation of the treaty was a matter for the legislature: *Roberts v Minister of Foreign Affairs*;[39] and *Attorney General v Joseph and Boyce*.[40] Section 16 of the Letters Patent and Section 2 (4) of the Constitutional Ordinance confirmed that the Governor acting in his discretion was responsible for "external affairs".

[70]    The difficulty in this case arises from the fact that the 1980 Ordinance was expressly enacted "to give effect to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards" at a time when the Executive had not yet accepted the

---

[37] 1982 Ir. 241
[38] At paragraph 46 of the Judgment in the court below
[39] [2007] UKPC 56
[40] [2006] CCJ 3 (AJ)

**EXHIBIT 1**

Convention. Pollard JA, who delivered the majority judgment in the court below, held as follows:

> "Section 16 of the Constitutional Ordinance 1963 empowered the colonial legislature of Belize to make laws for the peace, order and good government of Belize. However, when the colonial legislature purported to pass an ordinance "to give effect to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards" the colonial legislature was clearly encroaching on the royal prerogative in respect of the matter relating to foreign affairs. The enactment of the Convention by the colonial legislature necessarily involved interference in foreign affairs which was exclusively the domain of the Crown.
>
> ...
>
> On the evidence before this Court, the colonial legislative assembly of Belize presumed to apply in its domestic law, and I would venture to say without proper executive authority, express or implied, an international treaty, the New York Convention, which had not yet been extended by the Crown in the exercise of its exclusive prerogative powers to Belize..."

[71]    The Appellants argue that the 1980 Ordinance dealt with the internal affairs of Belize, that is, the recognition and enforcement of arbitration agreements and arbitral awards by the courts of Belize within the territory of Belize. It does not purport to regulate or govern external affairs or the external relationships between the State and other States. This line of reasoning found favour with Mendes JA who put the matter this way:

> "The establishment of obligations on the international plane is the domain of the executive. The enactment of laws for the peace and good government of the people of [Belize] was the responsibility of the [Belize] Legislature. It seems clear to me that these plenary powers include the power to provide for the enforcement of arbitration awards, no matter where made and no matter who the parties to the award might be. It was also within the competence of the legislature to place such limitations on the enforcement of such awards as it deem fit. In this particular instance, it chose to identify the awards which are enforceable by reference in part to whether the country in which the award was made was a party to the New York Convention. That too was clearly within its plenary powers. It does not seem to me to make one jot of difference that the terms in which the legislative will of the [Belize] Legislature was expressed was inspired or was intended to replicate or indeed was intended to give effect to an existing treaty by which [Belize] was not yet bound. Such a legislative act does not intrude into the domain of external affairs. It concerns entirely the development of the domestic law of [Belize]."

**EXHIBIT 1**

[72]     This Court finds the views expressed by Mendes JA utterly convincing and prefers them to those articulated by Pollard JA. The 1980 Ordinance in no way interfered with the exercise of the executive authority in foreign affairs. In legislating the 1980 Ordinance, the legislature was not engaged in the negotiation, signature or ratification of the New York Convention; matters which belonged to the prerogative powers of the Crown. Nothing in the 1980 Ordinance purported to make Belize a party to the New York Convention. The annexure of the Convention to the Ordinance appeared to have been for purposes of identifying the categories of foreign awards that would be recognized and enforced in Belize, not to undertake international law obligations on behalf of the State. By giving force to the obligations in a treaty at the domestic level the legislature does not usurp the executive's functions. Belize could not, by virtue of the 1980 Ordinance, assert an international law right to compel other parties to the Convention to enforce awards made in favour of Belizean nationals; equally, an amendment to or repeal of the 1980 Arbitration Ordinance could not engage the international responsibility of Belize. There is a normative separation between international rights and obligations under the New York Convention and domestic legislative enactment of that Convention.

[73]     Further, the 1980 Ordinance was within the broad powers of the Belize legislature, "to make laws for the peace, order and good government of the Territory". These words are apt to connote the widest plenary law-making powers appropriate to a sovereign (*Ibralebbe v The Queen*[41] and *Regina (Bancoult) v Secretary of State for Foreign and Commonwealth Affairs (No. 2)*[42]. It is, indeed, unanimously agreed that this law-making power includes the power to legislate for the incorporation of international treaties. What the Respondent argues, and Pollard JA accepted, was that there was state practice in so-called "dualist" jurisdictions that established a requirement for the prior executive act of acceptance of the treaty by the Executive.

[74]     There is no such requirement. At best, state practice could amount to a customary rule of international law recognized as part of the common law but such a common law rule

---

[41] [1964] AC 900 at 923 (PC)
[42] [2009] 1 AC 453 at 486

EXHIBIT 1

could scarcely override the clear vesting by the Constitution of the widest plenary law-making powers in the Legislature. Furthermore, the emergence of customary law requires uniformity of state practice and state practice is by no means uniform on whether treaty acceptance must precede legislative incorporation. There are undoubtedly many instances in which the executive act of treaty acceptance has preceded legislative enactment of the treaty, although the authorities cited for the proposition that the timing of the 1980 Ordinance made it *ultra vires*, i.e., being enacted six weeks before executive acceptance of the New York Convention, do not establish that principle. *Attorney-General for Canada v Attorney General for Ontario*[43] held that the legislative enactment by the Dominion Parliament of the Versailles Treaty was *ultra vires* not because of a sequencing issue but, rather, because the domestic implementation of the relevant treaty obligations was within the exclusive competence of the legislatures of the provinces. The Dominion Parliament had therefore sought to usurp the jurisdiction of the Provincial Legislatures.

[75]    It is also the case that there are many occasions where legislative incorporation of a treaty has *preceded* executive acceptance of that treaty.[44] The Arbitration Act 1975 of England was enacted to give effect to the New York Convention before the United Kingdom had acceded to the Convention, although in *Channel Group v Balfour Beatty Ltd*[45] it was said that "strictly speaking" the legislation should have followed Executive acceptance of the Convention. The UK Act to implement the Warsaw Convention for the Unification of Certain Rules Relating to International Carriage by Air was passed before the Convention was ratified by the Executive.[46] In some instances the New York Convention has been given effect in domestic law even though the State is not a party to the Convention, as in the British Virgin Islands,[47] an important Caribbean jurisdiction for the settlement of transnational commercial disputes. Pre-acceptance enactment has also been

---

[43] [1937] AC 326 (PC)
[44] McNair, The Law of Treaties, (Oxford University Press, 8th Edition, 1961) at p. 86, footnote 3; *Salomon v Commissioner of Customs and Excise* [1967] 2 QB 116, at p. 143-D; *The Hollandia* [1982] 1 QB 872 (CA) and [1983] 1 AC 565 at p. 571 per Lord Diplock
[45] [1993] AC 334 at 354 (HL)
[46] Judgment in the court below, Pollard JA at paragraph 52
[47] The UK colony of the British Virgin Islands enacted its Arbitration Ordinance dated 6 September 1976 to give effect to the New York Convention in domestic law although the Convention has never been extended to the BVI by the British Government.

**EXHIBIT 1**

recommended by colonial legal advisors as well as modern academic writers.[48] The rationale appears to be that if domestic legislation is required to enable the State to give effect to its treaty obligation then the legislation should be in place before the treaty comes into force so as to avoid a breach of the international obligation at the point when the treaty enters into force. In an ideal world both the treaty and the incorporating legislation would enter into operation at the same time. But the sequencing of these events has never, prior to the decision below, been held to displace the constitutional competence in the legislature to enact incorporating legislation. We do not think that any such fettering of the legislative competence was intended by the Constitution.

[76]    We do not think that the majority in the court below gave sufficient weight to the Governor's assent to the 1980 Ordinance. The colonial Constitution vested executive authority in the Crown and provided for its exercise by the Governor; the Governor acting in his discretion had responsibility for "external affairs". The Governor could interrupt the legislative passage (section 27 (1)) or refuse his assent or reserve the Bill for the signification of Her Majesty's pleasure (section 28 (3)) if he felt the Bill infringed upon the prerogative powers or his special responsibilities. While not conclusive, it is reasonable to assume that by assenting to the Bill providing for the giving of effect to the New York Convention, the Governor must have considered that the legislation did not usurp the treaty making prerogative of Her Majesty or his special responsibilities. More crucially, the Bill was only fully enacted upon Assent of the Crown in the exercise of the Royal Prerogative. It is therefore difficult to see how a law which can only become so on the exercise of the Royal Prerogative could be inconsistent with the Royal Prerogative. It is not without significance that the Crown exercised its executive power to extend the Convention to Belize a mere six weeks after the enactment.

---

[48]See Diplomatic Telegram dated 31 December 1980 by the UK F&CO Advisers; UKFCO, Treaty Section, Information Management Department, "Treaties and MOUs, Guidance on Practice and Procedures," (2nd edition, May 2004), at p. 7; Joanna Harrington, "Scrutiny and approval: the Role for Westminster-style Parliaments in Treaty-making" in *International and Comparative Law Quarterly* (2006) Vol. 55 at p. 125).

**EXHIBIT 1**

[77]    For these reasons the Court concludes that the enactment of the 1980 Ordinance was *intra vires* the powers of the legislature and did not encroach into the domain of the Royal Prerogative in treaty-making. We therefore find the 1980 Ordinance to be constitutional and saved as "existing law" under the 1981 Independence Constitution.

### (c) Is Belize estopped from arguing that the New York Convention is not applicable?

[78]    The Appellants argue that the declaration made by the Prime Minister of Belize in the *Note Verbale* of 29th September 1982 was legally binding and estopped Belize from denying the applicability of the New York Convention. In the *Note Verbale*, the Prime Minister informed the Secretary General of the United Nations that the Government of Belize, "…. had decided to continue to apply provisionally and on the basis of reciprocity, all treaties to which the Government of the United Kingdom of Great Britain and Northern Ireland was a party, the application of which was extended either expressly or by necessary implication to the then dependent territory of Belize." The Prime Minister requested that his letter be circulated to all Member States of the United Nations. The Appellants contend that this declaration fulfilled the conditions for estoppel to arise in International Law, namely, (a) the meaning of the statement is clear and unambiguous; (b) the statement or representation is voluntary, unconditional, and authorised; and (c) there is reliance in good faith upon the representation of one party by the other party to his detriment (or to the advantage of the party making the representation).[49]

[79]    This issue of the binding nature of the declaration made by the Government of Belize raises very complex issues and not only those relating to estoppel in International Law. Diverse theories underpinning the law of treaties, state responsibility, state succession, and of unilateral declarations also come into play. Since this Court has already held that the 1980 Ordinance giving effect to the New York Convention was constitutional and

---

[49] These conditions are discussed by Professor Bowett, "Estoppel before International Tribunals and its Relation to Acquiescence", British Yearbook of International Law (1957) Vol. 33 at pp. 188-194.

**EXHIBIT 1**

saved as existing law at the time of independence, we consider it unnecessary and unwise in the circumstances to decide on the issue of estoppel.

### Why the case was not remitted to the Court of Appeal

[80] There was no common ground between the parties as to the consequential disposal of the appeal in the event that this Court found the Arbitration Act to be constitutional, as we have. The Appellants submit that we should decide the issue of enforcement of the award without further ado while the Respondent seeks a remittal to the Court of Appeal. The remittal would enable the court below to decide the two other objections raised by the Respondent to enforcement, that is, that the subject matter of the dispute was not capable of settlement by arbitration, and enforcement would be contrary to public policy.

[81] The issues of constitutionality, arbitrability, and public policy were the subject of comprehensive written submissions and were fully argued over a three-day period in October 2011, before the Court of Appeal.  At the request of the Court of Appeal made on 26th January 2012, the parties made further written submissions on the question of the constitutionality of the 1980 Ordinance. The judgment of the Court of Appeal was handed down on 8th August 2012, and dealt exclusively with the question of constitutionality. The judgment did not at all address the issues of arbitrability or public policy. This approach was lamented by Mendes JA who observed that ".... if there is an appeal and the decision of the majority is overturned, their Honours of the Caribbean Court of Justice are very likely to require the views of this court particularly on the question whether the enforcement of the award would be contrary to public policy."[50]

[82] We deeply regret that the Court of Appeal declined to make their views on these matters available to us. This Court places considerable weight on the opinions expressed in the Court of Appeal; opinions which are pre-eminent in providing vital juridical material to inform and shape the views of this final Court especially on such innate questions as

---

[50] At paragraph [30] of the judgment in the court below

EXHIBIT 1

arbitrability and public policy: *Boyce v Attorney General and Minister of Public Utilities*.[51] The scheme of adjudication in the Constitution contemplates review by this Court of decisions of the Court of Appeal. But this Court does have explicitly in relation to any appeal, all the jurisdiction and powers possessed in relation to that case by the Court of Appeal.[52] The Court's overriding objective is "to deal with cases fairly and expeditiously so as to ensure a just result".[53] In every case the most important objective is for the Court to ensure a fair and just result. Subject to that requirement, the question which arises is whether the natural reluctance to decide the issues without the benefit of the views of the Court of Appeal should prevail over the judicial impulse to settle litigation with expedition and finality.

[83]     This question cannot be answered in the abstract but only by reference to the particular circumstances of the case at hand.  In this case the arbitral award was made on 20th August 2009 and finalized on 29th August 2009, almost four years ago. Each subsequent cycle of litigation before the courts of Belize occasions additional substantial costs and expense.  Under the terms of the award interest continues to accrue. The arguments on arbitrability and public policy were fully ventilated before the Supreme Court and in the judgment of the trial judge. That the Court of Appeal was aware of its responsibility to address the outstanding issues but chose not to do so argues against remitting the case: *Re James McDonald*.[54] Remitting the matter to the Court of Appeal could require a full rehearing before a new panel as Pollard JA is no longer a Judge of the Court of Appeal.

[84]     It is also significant that there are no relevant disputes of fact and that the issues to be decided do not derive from peculiar constitutional or legislative provisions in Belize. Whether an agreement that includes matters relating to the imposition and collection of taxes is properly submitted to international arbitration and whether enforcement of an award resulting from such arbitration would be contrary to public policy are

---

[51] [2012] CCJ 1
[52] Section 11 (6), Caribbean Court of Jurisdiction Act 2010
[53] Rule 1.3 of the Caribbean Court of Justice (Appellate Jurisdiction) Rules
[54] (1975) 13 JLR 12 especially at p 27 per Graham-Perkins, JA

**EXHIBIT 1**

quintessentially matters of judicial policy. Access to the views of the judges below remains important but the matters for decision are of broad significant public importance to the Caribbean polity as a whole. In these circumstances this Court must pay some attention to its determinative role in the further development of Caribbean jurisprudence through the judicial process.[55]

[85]    For these reasons the Court decides that the balance was tilted in favour of deciding the outstanding issues in dispute rather than remitting them to the Court of Appeal.

## Conclusion

[86]    For the reasons so eloquently articulated in the judgment of our brother Saunders JCCJ the Court orders that enforcement of the arbitral award should be declined under section 30 (3) of the Arbitration Act.

## Costs

[87]    The award of costs in this case is complicated by a number of factors. The Respondent has prevailed on the central issue that enforcement of the Convention Award would be contrary to the public policy of Belize. However, the Respondent had sought to have this Court defer decision on the public policy issue and instead to remit the matter to the Court of Appeal. The Appellants succeeded on the primary ground of appeal arising from the decision of the Court of Appeal, namely, that the Arbitration Act of 1980 was constitutional and saved as existing law under the Independence Constitution. A further factor that complicates the issue was the non-participation by the Respondent in arbitration proceedings despite numerous invitations and opportunities to do so. It is not beyond the realm of possibility that had the Respondent mounted vigorous and comprehensive arguments before the arbitral tribunal as it did before us the tribunal might have been persuaded to decline to adjudicate upon the matter thereby saving

---

[55] Cf. *Eco Swiss China Time Ltd v Benetton International NV* [2000] 5 CMLR 816, 832

**EXHIBIT 1**

considerable expense. It is also the case that this Court has and must encourage the greatest respect for international commercial under the Arbitration Ordinance and by extension as well the New York Convention. In the circumstances we consider that the most appropriate award would be for each party to bear its own costs.

### Disposition

[88]    The appeal is dismissed. There is no order as to costs.


_____/s/_____

The Right Hon Mr Justice Dennis Byron, President


_____/s/_____          _____/s/_____

The Hon Mr Justice A Saunders                  The Hon Mme Justice D Bernard


_____/s/_____          _____/s/_____

The Hon Mr Justice J Wit                      The Hon Mr Justice W Anderson


**EXHIBIT 1**

**TAB 5**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BELIZE SOCIAL DEVELOPMENT        )
LIMITED,                          )
                                  )
    Petitioner,               )
                                  )
    v.                        )    Civil Case No. 09-2170 (RJL)
                                  )
THE GOVERNMENT OF BELIZE,         )
                                  )
    Respondent.               )

**FILED**

DEC 1 1 2013

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(December **11**, 2013) [##1, 15, 47]

Petitioner Belize Social Development Limited ("petitioner" or "BSDL") brings this action against respondent the Government of Belize ("respondent" or "GOB"), seeking the confirmation and enforcement of a foreign arbitral award pursuant to § 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207, and Article III of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "N.Y. Conv.").[1]  Before the Court are petitioner's Petition to Confirm Arbitration Award and to Enter Judgment [Dkt. #1] and respondent's Motion to Stay Action or, in the Alternative, Dismiss Petition [Dkt. #15].  Upon consideration of the pleadings, relevant law, and the entire record, the petition to confirm and enter judgment is GRANTED, and the motion to stay or dismiss is DENIED.

---

[1] *Opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 (entered into force for the U.S. Dec. 29, 1970), *available at* http://treaties.un.org/doc/Treaties/1959/06/ 19590607%2009-35%20PM/Ch_XXII_01p.pdf.

# FACTUAL BACKGROUND

## A.    Accommodation Agreements

On September 19, 2005, respondent GOB and Belize Telecommunications

Limited ("BTL")[2] entered into the first of four "Government Telecommunications

Accommodation Agreement[s] . . . to improve telecommunications for the people of

Belize and better accommodate the GOB's telecommunications needs."  Pet'r's Mem. of

Points and Authorities in Supp. of Pet. to Confirm Arb. Award & Enter J. ("Pet'r's

Mem.") at 2 [Dkt. #1-1]; Resp't's Mem. in Supp. of Mot. to Stay Action or, in the Alt.,

Dismiss Pet. ("Resp't's Mem.") at 5–6 [Dkt. #15].  As part of the agreements

(hereinafter, "original agreements"), BTL would acquire certain properties owned by

GOB for 19,200,000 Belize dollars.  Pet'r's Mem. at 2.  In exchange, GOB would give

BTL preferential tax treatment, exempt BTL from import duties on goods and equipment,

guarantee BTL a minimum rate of return on investments, pay any shortfall that may

occur between the minimum rate of return and the actual rate of return, and allow BTL to

control the use of "Voice Over Internet Protocol."  *Id.*; *see also* Pet. to Confirm Arb.

Award & Enter J., Ex. A ("Final Award" or "LCIA Award") at 20–23 [Dkt. #1-3]

(explaining class license holders and their customers were not permitted to use voice over

internet protocol services unless permitted by the individual license holder (BTL)).

---

[2] Belize Telecommunications Ltd. (now "Belize Telemedia Limited") is owned by Lord
Michael Ashcroft, who is a member of the United Kingdom House of Lords and has dual
nationality in Belize.  Resp't's Prelim. Resp. to Pet. to Confirm Arb. Award ("Resp't's
Prelim. Resp.") at 3 [Dkt. #16].  He is one of the wealthiest people in the United
Kingdom and Belize and is a major investor in Belize.  *Id.*

The Accommodation Agreements also contained a clause which provided that any dispute would be referred to and resolved by arbitration under the London Court of International Arbitration ("LCIA") Rules.  Pet'r's Mem. at 4.  Over the next few years, the parties amended the original agreement three times and on May 29, 2007, under the third agreement, Belize Telemedia Limited ("Telemedia") "assumed all of BTL's rights and obligations under the Accommodation Agreement."  *Id.* at 3.

On February 8, 2008, Dean Barrow was appointed the new Prime Minister of Belize and his administration refused to acknowledge Telemedia's rights as set forth in the Accommodation Agreements or to comply with its obligations under the agreements. *Id.* at 5.  Telemedia, on the other hand, complied with its obligations under the Accommodation Agreements by purchasing GOB properties for 19,200,000 Belize dollars.  *Id.*

### B.    Arbitration Proceedings in the LCIA

Telemedia submitted a request for arbitration to the LCIA on May 9, 2008, claiming multiple breaches of the Accommodation Agreements.  Pet'r's Mem. at 6.  The LCIA appointed a Tribunal comprised of three distinguished arbitrators to govern the arbitration proceedings.  *Id.* at 7.  GOB refused to participate in the arbitration proceedings, *id.* at 8; Resp't's Prelim. Resp. at 6, and on March 18, 2009, following a three day evidentiary hearing, "the Tribunal unanimously ruled in favor of Telemedia and issued its Final Award," which granted Telemedia both declaratory and monetary relief, Pet'r's Mem. at 8; Resp't's Mem. at 8.  The Tribunal found that: (i) the Accommodation Agreements are legal and binding under Belize law, (ii) "GOB . . . violated numerous

3

provisions of the Accommodation Agreement[s]," and (iii) "Telemedia was entitled to relief." Pet'r's Mem. at 9.

Two days after the Tribunal issued its Final Award, on March 20, 2009, BSDL was created in the British Virgin Islands. Resp't's Prelim. Resp. at 7. That same day, Telemedia assigned to BSDL the monetary portion of the Tribunal's Final Award, *id.* at 7–8, thereby allowing BSDL "to enforce and receive the monetary portion of the Final Award," Pet'r's Mem. at 9.

## C.    Belize Litigation and GOB Legislation

In Belize, GOB filed a lawsuit against Telemedia on April 6, 2009, Pet'r's Mem. in Opp'n to Resp't's Mot. to Stay or Dismiss and in Supp. of Pet. To Confirm Arb. Award ("Pet'r's Suppl. Mem.") at 3 [Dkt. #45], seeking a declaratory judgment that the Tribunal's arbitration award is "unenforceable and the Accommodation Agreements are invalid as contrary to Belize law and public policy," Resp't's Prelim Resp. at 8.[3]  On July 20, 2009, the Belize Supreme Court issued a preliminary injunction barring Telemedia and BSDL from enforcing the arbitration award until after the court issued its ruling in the pending action. *Id.* at 9.  The parties dispute whether that injunction remains valid after the April 2009 lawsuit was discontinued and a February 2012 lawsuit instituted in its place. *See* Resp't's Suppl. Br. at 3 [Dkt. #39] (claiming that "the injunction remains in

---

[3] The lawsuit was captioned *Attorney General v. Belize Telemedia Ltd. & Belize Social Development Ltd.*, Claim No. 317 of 2009. *See* Resp't's Mot. to Stay Action or, in the Alt., Dismiss Pet. ("Resp't's Mot.") at 1 [Dkt. #15].

place"); Pet'r's Suppl. Mem. at 4 (claiming that "the Belize Supreme Court ordered . . .

the discharge of the injunction").[4]

GOB also enacted legislation in 2009 to assume control over telecommunications

in Belize and obtained 94% of Telemedia's shares as part of that legislation. Resp't's

Prelim. Resp. at 9; Resp't's Suppl. Br. at 12. In 2010, the Belize Supreme Court of

Judicature (Amendment) Act ("SCJA") made it a criminal offense punishable by fine,

imprisonment of at least five years, or both "to disobey or fail to comply with an

injunction" issued by the Belize Supreme Court. Pet'r's Suppl. Mem. at 5. GOB also

made it a crime for BSDL and its counsel to respond to the pleadings that GOB had

already filed in this case. *Id.* In August 2012, "the Belize Court of Appeal struck down

several sections of the SCJA as unconstitutional," including the sections giving SCJA

extraterritorial effect[5] and the sections imposing criminal penalties. *Id.* at 6.

---

[4] GOB's April 2009 lawsuit was discontinued because "the Claim had not been served within the required period and had expired." Decl. of Eamon H. Courtenay ("Courtenay Decl."), Ex. B (Apr. 19, 2012 Order of the Belize Supreme Court) [Dkt. #45-8]; *see also* Courtenay Decl. ¶ 9 [Dkt. #45-6]. The Order discontinuing the case also explicitly discharged the injunction against BSDL. *Id.* Ex. B ¶ 3. In GOB's February 2012 suit— *Attorney General v. Belize Social Development Ltd.*, Claim No. 140 of 2012—the court entered an injunction, but it expired on March 29, 2012. *See* Courtenay Decl. ¶¶ 10–13 & Ex. C. ¶ 6. As of February 2013, that case was still pending before the Belize Supreme Court. *See id.* ¶ 15; Tr. of Oral Arg., Feb. 25, 2013 ("Tr.") at 45–46.

[5] The SCJA purported "to have extraterritorial effect, making it a criminal offense if any person, whether in Belize or elsewhere, directly or indirectly 'instigates, commands, counsels, procures, solicits, advises or in any manner whatsoever aids, facilitates or encourages' violation of an injunction or similar order issued by the Supreme Court of Belize." Pet.'s Suppl. Mem. at 5.

### D.    United States Litigation

BSDL filed its petition in this Court on November 17, 2009.  On October 18,

2010, this court stayed the proceeding pending resolution of the case in Belize.  *Id.* at 7.

BSDL appealed the stay order and, alternatively, sought a writ of mandamus.  *Id.*

The United States Court of Appeals for the District of Columbia Circuit granted

the writ of mandamus and held that this court's indefinite "stay order as issued exceeded

the proper exercise of authority of the district court."  *Belize Soc. Dev. Ltd. v. Gov't of*

*Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012), *cert denied*, 133 S. Ct. 274 (2012).  In

addition, the D.C. Circuit held that this case is governed by the New York Convention,

and litigation in Belize is irrelevant to enforcement of the arbitration award in this

proceeding.  *See id.* at 730 ("[T]he pending action in Belize has no preclusive effect on

the district court's disposition of the petition to enforce pursuant to the FAA and the New

York Convention . . . .").  The case was remanded, and I was instructed to "conduct

further proceedings not inconsistent with [the] opinion."  *Id.* at 734 (internal quotation

marks omitted).

### LEGAL ANALYSIS

At oral argument, BSDL took the position that "in the world of foreign arbitration

awards that are brought to the United States for confirmation under 9 USC section 207,

this is what you would call run of the mill," and that "the D.C. Circuit has given . . . a

very clear template as to what is to be done, because section 207 says that when an award

is brought for confirmation, the District Court shall confirm unless one of the grounds for

6

either stay or non-enforcement under the [New York] convention is established." Tr. at

20. This is in line with my reading of our Circuit Court's opinion in this case:

> [T]he FAA, by codifying the New York Convention, provides a carefully structured scheme for the enforcement of foreign arbitral awards and represents an "emphatic federal policy in favor of arbitral dispute resolution," which "applies with special force in the field of international commerce." The plain terms of the FAA instruct a district court reviewing a foreign arbitral award to "confirm the award unless it *finds* one of the grounds for refusal or deferral of recognition or enforcement . . . specified in the [New York] Convention."

*Belize Soc. Dev. Ltd.*, 668 F.3d at 733 (quoting *Mitsubishi Motors Corp. v. Soler*

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), and 9 U.S.C. § 207).[6]

GOB nevertheless argues that, even after the Circuit Court's ruling, there are at

least five distinct grounds on which I could dismiss the petition, including lack of subject

matter jurisdiction, lack of standing, and *forum non conveniens*. *See* Resp't's Suppl. Br.

at 1–26; Resp't's Mem. at 15–45; Oral Arg. Tr. at 4–19. I am confident that if this case

raised such significant jurisdictional and justiciability concerns, our Circuit Court would

have flagged them, rather than emphasizing that "the district court's task [is] to review

and grant BSDL's petition to confirm the Final Award absent a finding that an

enumerated exception to enforcement specified in the New York Convention applie[s]."

*Belize Soc. Dev. Ltd.*, 668 F.3d at 733. Still, in an abundance of caution, I will consider

---

[6] This case does not involve "a number of complex factual and legal issues" warranting dismissal. Resp't's Suppl. Br. at 12. Even if I accepted the notion that a petition can be denied solely because it is complex, I would not do so here. Indeed, the length of this opinion is a result of the sheer number of meritless arguments that GOB has raised, not their complexity!

each of GOB's grounds for dismissal before turning to GOB's five arguments for why I should deny the petition on its merits. *See* Resp't's Suppl. Br. at 26–43.

In short, I am not persuaded by any of GOB's asserted bases for dismissing or denying BSDL's petition, and I will therefore grant the petition, confirm the arbitration award, and enter judgment in BSDL's favor.

## I.   GROUNDS FOR DISMISSING THE PETITION

### A.   Jurisdiction and Immunity Under Foreign Sovereign Immunities Act

This Court has subject matter jurisdiction over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under [the Foreign Sovereign Immunities Act ("FSIA")] or under any applicable international agreement." 28 U.S.C. § 1330(a). GOB takes the position that it is entitled to sovereign immunity under the FSIA because it has never waived immunity and none of the FSIA exceptions apply. *See* Resp't's Mem. at 37–41. GOB is mistaken.

Under the FSIA, a foreign sovereign enjoys no immunity from a suit "to confirm an award made pursuant to [] an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6)(B). The LCIA's award in this case is clearly governed by the New York Convention because both England (where the arbitration took place) and the United States are parties to the Convention. *Belize Soc. Dev. Ltd.*, 668 F.3d at 731 n.3. Belize's status under the convention is irrelevant. *Id.* Moreover, it is well settled that an action to

8

confirm an arbitration award under the New York Convention falls squarely within the

ambit of the § 1605(a)(6)(B) immunity exception. *Creighton Ltd. v. Gov't of the State of*

*Qatar*, 181 F.3d 118, 123–24 (D.C. Cir. 1999); *see also Cont'l Transfert Technique Ltd.*

*v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46, 55–56 (D.D.C. 2010) (applying 28 U.S.C.

§ 1605(a)(6) in case involving dispute between a foreign sovereign, Nigeria, and one of

its own nationals, a Nigerian corporation). Thus, this Court has subject matter

jurisdiction.[7]

    GOB challenges the application of § 1605(a)(6), claiming that the LCIA's final

arbitral award is unenforceable because the Accommodation Agreements containing the

arbitration clause "are void *ab initio* under Belizean law." *See* Resp't's Suppl. Br. at 25;

*see also* Final Award ¶ 17 (quoting relevant arbitration clause). I agree with my

colleague, Judge Boasberg, who recently noted a lack of authority for the proposition

"that the Court must conduct [] an independent, *de novo* determination of the arbitrability

of a dispute to satisfy the FSIA's arbitration exception." *Chevron Corp. v. Republic of*

*Equador*, --- F. Supp. 2d ----, 2013 WL 2449172, at *3 (D.D.C. June 6, 2013). Indeed,

the FSIA jurisdictional inquiry is a "cabined" one that focuses on the authority of the

---

[7] Any argument that this Court lacks personal jurisdiction over GOB is also meritless.
*See* Resp't's Mem. at 41–43. "[U]nder the FSIA, subject matter jurisdiction plus service
of process equals personal jurisdiction." *Practical Concepts, Inc. v. Republic of Bolivia*,
811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) (internal quotation marks omitted); *see also*
28 U.S.C. § 1330(b); *cf. GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir.
2012) ("[F]oreign sovereigns and their extensively-controlled instrumentalities are not
'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to
assert a personal jurisdiction defense." (citing *Price v. Socialist People's Libyan Arab
Jamahiriya*, 294 F.3d 82, 95–96 (D.C. Cir. 2002))). GOB does not dispute that it was
served process. *See* Oral Arg. Tr. at 23 (unrefuted argument by BSDL that "[t]here is no
dispute about service.").

court, not the contractual rights and obligations of the parties. *See id.* at \*4 (citing

*Creighton Ltd.*, 181 F.3d at 24). And regardless of whether I consider contract validity

now, the question will be addressed anyway—as it always is, though under a deferential

standard, *see id.* at \*5—when I turn to the Article V(1)(a) exception to the New York

Convention, *see infra* Part II.B.[8]

### B.   *Forum Non Conveniens*

GOB also argues for dismissal based on the relative inconvenience of litigating in

this forum. *See* Resp't's Mem. at 26–28; Resp't's Suppl. Br. at 5–13. Under the doctrine

of *forum non conveniens*, I "must decide (1) whether an adequate alternative forum for

the dispute is available and, if so, (2) whether a balancing of private and public interest

factors strongly favors dismissal." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,

528 F.3d 934, 950 (D.C. Cir. 2008) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235,

255 n.22 (1981)). The balancing of private and public interests occurs *only if* an adequate

alternative forum exists. *Id.*

Unfortunately for GOB, there is no adequate alternative forum for this case

because "only a court of the United States (or of one of them) may attach the commercial

property of a foreign nation located in the United States." *TMR Energy Ltd. v. State*

*Prop. Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005). Even if GOB has no

attachable property in the United States at this time, Resp't's Suppl. Br. at 8, "it may own

---

[8] GOB also argues that the assignment between Telemedia and BSDL is void, so GOB
remains immune to suits *brought by BSDL*. *See* Resp't's Suppl. Br. at 25–26. But GOB
cites no case—and I am aware of none—in which a foreign state's amenability to suit
under the FSIA turns on the validity of an assignment to the plaintiff.

property here in the future, and [BSDL's] having a judgment in hand will expedite the process of attachment," *TMR Energy*, 411 F.3d at 303. This is the controlling law in our Circuit, and I will therefore apply it faithfully.[9] Because GOB's *forum non conveniens* argument falters at the first step, I need not consider the second.

## C.    International Comity and Abstention

Convenience aside, GOB also urges me to dismiss BSDL's petition on international comity and abstention grounds for the following reasons: Belize is not a signatory to the New York Convention, this matter is already before the courts of Belize, Belize has a greater interest in the outcome of the case, and there are conflicts of law between the United States and Belize. *See* Resp't's Mem. at 24–26; Resp't's Suppl. Br. at 13–19. The Circuit Court's decision remanding this case essentially forecloses these arguments, as the Court held that litigation in Belize "has no preclusive effect on the district court's disposition of the petition to enforce," *Belize Soc. Dev. Ltd.*, 668 F.3d at 730, and "[t]he fact that Belize is not a party to the New York Convention is irrelevant," *id.* at 731 n.3. Our Circuit Court, of course, was well aware that courts in Belize were reaching conflicting decisions regarding the enforceability of the Final Award, *see id.* at

---

[9] *TMR Energy* is binding, unlike Second Circuit case law, *see* Resp't's Mem. at 26–28 (citing *In re Arbitration Between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002)); Resp't's Suppl. Br. at 6–10 (citing *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011)), and unlike an "in the alternative" decision rendered by another judge of this court that was not affirmed (or even considered) on appeal, Resp't's Mem. at 28 (citing *TermoRio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87 (D.D.C. 2006), *affd on other grounds*, 487 F.3d 928, 932 (D.C. Cir. 2007).

728–29, and it instructed me to proceed with enforcement anyway.[10]  Regardless of

whether our Circuit Court's "holding has the potential for straining relations between the

United States and Belize," Resp't's Suppl. Br. at 17, I am, in the final analysis, bound by

that decision.[11]

### D.    Standing

According to GOB, BSDL lacks standing to enforce the arbitration award because

Telemedia did not validly assign BSDL the right to the monetary portion of the award.

GOB challenges the assignment both under the terms of the Accommodation Agreement,

*see* Resp't's Mem. at 33–34; Resp't's Prelim. Resp. at 16–17; Resp't's Suppl. Br. at 20–

---

[10] I am also not convinced that there really is a "true conflict" between U.S. and Belizean law. *See* Resp't's Suppl. Br. at 18–19.  The Court of Appeal of Belize has held that, because Belize is not party to the New York Convention, "there is no legal obligation *on the part of Belize* to recognize and enforce domestically arbitral awards within the contemplation of the New York Convention in accordance with Article 3 of that instrument." Decl. of Michael C. Young, S.C. ("Young Decl."), Ex. K at ¶ 76 (*Att'y Gen. of Belize v. BCB Holdings Ltd.*, Civ. App. No. 4 of 2011 (Aug. 8, 2012)) [Dkt. #39-12] (emphasis added).  Our Circuit Court has, to my knowledge, never addressed whether *Belize's courts* must enforce awards under the New York Convention; it has merely held that *this Court* is required to do so unless a Convention exception applies. *See Belize Soc. Dev. Ltd.*, 668 F.3d at 733.

[11] GOB ignores that "the central precept of comity teaches that, *when possible, the decisions of foreign tribunals should be given effect in domestic courts*, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) (emphasis added).  The LCIA—located in England, a fellow signatory to the New York Convention—rendered a decision in BSDL's favor, and I will not dismiss this enforcement petition on the backwards notion that doing so will somehow advance the courts' interest in fostering international cooperation and reciprocity with foreign governments and their legal tribunals.

21, and under Belizean law, *see* Resp't's Suppl. Br. at 21–22 (citing Belizean case law

and regulations).[12]   Neither of these arguments is persuasive.

First, Section 19 of the Accommodation Agreement, on which GOB bases its

entire Accommodation Agreement argument, was "deleted in its entirety" and replaced

by a new provision on January 1, 2008, more than a year before the March 20, 2009

Telemedia-BSDL assignment even took place. *See* Decl. of Louis B. Kimmelman

("Kimmelman Decl."), Ex. E ¶¶ 7.2, 7.3 (Settlement Deed dated Jan. 7, 2008) [Dkt. #1-

7], *amending* Kimmelman Decl., Ex. B § 19 ("Accommodation Agreement") [Dkt. #1-4].

Paragraph 7.3 of the Settlement Deed, which was in effect at the relevant time, contains

*none* of the terms in Section 19 that GOB claims were offended by the assignment.

Second, GOB's reliance on the law of Belize is misplaced.  By its own terms, the

assignment "is governed by English law and shall be construed in accordance with

English law." *See* Decl. of Stephen J. Ruzika ("Ruzika Decl."), Ex. C ¶ 3.6 (Deed of

Assignment) [Dkt. #1-19].[13]   Curiously, GOB does not address English law at all in its

briefs, whereas BSDL has provided a thorough expert opinion, which explains that the

---

[12] GOB does not dispute that under the New York Convention, an assignee can enforce
an arbitration award in favor of the assignor. *See, e.g.*, *Global Distressed Alpha Fund I
LP v. Red Sea Flour Mills Co. Ltd.*, 725 F. Supp. 2d 198 (D.D.C. 2010).

[13] Precedent from this Circuit and others favors application of the law that the parties to a
contract agreed would apply. *See, e.g.*, *Telenor Mobile Commc'ns AS v. Storm LLC*, 584
F.3d 396, 411 n.11 (2d Cir. 2009) (in action to enforce arbitration award under New York
Convention, applying New York law pursuant to choice-of-law clause in agreement);
*Asia N. Am. Eastbound Rate Agreement v. BJI Indus., Inc.*, 923 F. Supp. 4, 4 (D.D.C.
1996) (applying Hong Kong law in arbitration enforcement case because "'[u]nder
American law, contractual choice-of-law provisions are usually honored.'" (quoting
*Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 767 (D.C. Cir. 1992))).

assignment "complies with the requirements of section 136 of the [English] Law of Property Act 1925" and "is sufficient to transfer the [monetary portion of the arbitration award] from Telemedia to BSDL pursuant to both section 136 and equity." Op. of Marcus Smith QC on English Law ("Smith Op.") ¶ 15 [Dkt. #45-16]; *see also id.* ¶¶ 10–14. Moreover, BSDL's expert details why "nothing in either section 19 [of the Accommodation Agreement] or in section 7.3 [of the Settlement Deed] . . . prevent[s] the assignment." *Id.* ¶ 9; *see also id.* at 6–8. Finding no basis to discredit BSDL's expert or to treat the assignment as invalid, I am satisfied that BSDL has standing.[14]

## E.     Failure to Join a Required Party Under Rule 19

I am also satisfied that there are no necessary parties missing from this case. Under Federal Rule of Civil Procedure 19, a case may be dismissed only if an absent party is "required" in the litigation, the absent party cannot be joined, and equitable factors weigh in favor of dismissal. *Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1495–96 (D.C. Cir. 1997) (citing FED. R. CIV. P. 19(a), (b)); *see also* FED. R. CIV. P. 12(b)(7) (allowing motion to dismiss for "failure to join a party under Rule 19"). A party is "required" if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or

> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

---

[14] As already explained, it is irrelevant that "BTL intends to file an action in the Belize Supreme Court seeking a declaration that the purported assignment between [Telemedia] and BSDL was void *ab initio*." Resp't's Suppl. Br. at 23; *see Belize Soc. Dev. Ltd.*, 668 F.3d at 730.

(i) as a practical matter impair or impede the person's
ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk
of incurring double, multiple, or otherwise inconsistent
obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

GOB contends that Telemedia and its former majority shareholder, Dunkeld

International Investments Ltd. ("Dunkeld"), are indispensable parties because Dunkeld

has brought a separate claim in Belize "assert[ing] damages from the non-payment of the

same Arbitration Award that BSDL seeks to collect," Resp't's Mem. at 44; *see also id.* at

43–45; Resp't's Suppl. Br. at 23–25, and because Telemedia "is the beneficiary of the

award on its face and . . . the purported assignment [from Telemedia to BSDL] was

invalid," Resp't's Suppl. Br. at 24.  These arguments are meritless.

There is no evidence in the record that Dunkeld has ever asserted the right to

enforce the LCIA arbitration award.  To the contrary, Dunkeld's December 4, 2009

Notice of Arbitration—which GOB cites as the sole piece of evidence that Dunkeld has

claimed an interest in the award—explicitly states that "[o]n 20 March 2009 Telemedia

assigned the benefit of the LCIA Award . . . insofar as it orders the payment of certain

damages and costs by [GOB] to Telemedia, to [BSDL]."  Decl. of Gian C. Ghandi

("Ghandi Decl."), Ex. 8 ¶ 7.13 (Notice of Arbitration) [Dkt. #15-10].  And as already

discussed, Telemedia in fact *did* assign to BSDL its right to the monetary portion of the

arbitral award, as well as the right to enforce that award.  *See supra* Part I.D; *see also*

Ruzika Decl., Ex. C ¶ 1.3 ("[T]he Assignee shall have the sole right to enforce any and

all rights which accrue in respect of the [damages and costs awarded by the LCIA] against [GOB].").  Dunkeld obviously agrees that there is a valid assignment.[15]

As a matter of both English and U.S. law, not to mention common sense, an absent party that has assigned its legal rights is not "required" in litigation brought by the assignee to enforce those rights.  *See* Smith Op. ¶ 11 ("BSDL can claim the [award] in its own name . . . ."); *Primax Recoveries, Inc. v. Lee*, 260 F. Supp. 2d 43, 51 (D.D.C. 2003) ("In light of [an assignee-]plaintiff's claim that it is the sole possessor of the rights being asserted against defendant, it is difficult to see how the Court will be unable to accord relief in the absence of [an assignor] or how defendant will incur multiple or inconsistent obligations by reasons of the claimed interest.").[16]  Conversely, an attempt by Telemedia or its former shareholder to enforce rights that it has assigned away would be patently

---

[15] Paragraph 7.33 of the Dunkeld-GOB Notice of Arbitration does not support GOB's argument that Dunkheld has asserted damages from the non-payment of the arbitration award.  *See* Resp't's Mem. at 43–44.  Rather, it appears to reflect a disagreement about whether GOB is entitled to deduct "sums allegedly due as arrears of taxes, duties and charges" when compensating Dunkeld for its shares in Telemedia and whether "the specified taxation rates and set-off provisions of the Accommodation Agreement" apply. Gandhi Decl., Ex. 8 ¶ 7.33.  It says nothing about Dunkeld's or Telemedia's right to enforce the LCIA award itself.

GOB also grossly mischaracterizes the record when it says that "In [a December 2009] letter, as a basis of its threatened claims against the GOB, Dunkeld asserts that the GOB 'has not complied with [the subject] LCIA award." Resp't's Suppl. Br. at 23.  The quoted statement about GOB's non-compliance with the award is not in the letter from Dunkeld's counsel, *see* Ghandi Decl., Ex. 8 at 3–4, but rather is found ten pages into Notice of Arbitration, which was attached to the letter, *see id.* ¶ 7.14.  Moreover, it is found in the "factual background to the dispute" section of the Notice, *see id.* ¶ 7, and is not at all presented as "a basis of [Dunkeld's] threatened claims."

[16] *Cf. Capitol Med. Ctr. v. Amerigroup Md., Inc.*, 677 F. Supp. 2d 188, 193 n.7 (D.D.C. 2010) ("Unlike the plaintiff in [*Primax*], [plaintiff] has not assumed the rights of the absent party.").

frivolous under English law (which, again, governs the assignment agreement) unless

BSDL were joined as a party in *that* case. *See* Smith Op., Ex. K ¶ 58 ("When there has

been an assignment that takes effect in equity, the general rule is that *it is the equitable*

*assignee who has the right to sue,* because it is the equitable assignee who is beneficially

entitled to the thing in action. *The assignor will not be allowed to maintain an action*

*regarding the thing in action unless the assignee is joined as a party to the claim.*"

(emphases added)).  GOB offers no evidence that BSDL has ever signaled a willingness

to assist Telemedia or Dunkeld in bringing duplicitous lawsuits to enforce the arbitration

award.  Telemedia and Dunkeld therefore have no "legally protected interest" worthy of

recognition under Rule 19(a)(1)(B).  *See Wach v. Byrne, Goldenberg & Hamilton, PLLC,*

910 F. Supp. 2d 162, 170 (D.D.C. 2012) ("legally protected interest" excludes claims that

are "patently frivolous" (quoting *Davis v. United States,* 192 F.3d 951, 959 (10th Cir.

1999); citing *Shermoen v. United States,* 982 F.2d 1312, 1318 (9th Cir. 1992))).

## II.   GROUNDS FOR DENYING THE PETITION[17]

### A.   Failure to Produce Copies of Arbitral Award and Accommodation Agreement (Article IV(1))

GOB claims that BSDL's petition should be denied because it does not comply

with Article IV of the New York Convention, which requires the petitioner, "at the time

---

[17] I note that under the New York Convention, "[r]ecognition and enforcement of the award *may* [not must] be refused . . . only if" the opposing party proves that certain conditions are met.  Art. V(1) (emphasis added).  As I will explain at length, I find that none of those conditions are met; however, even if I am mistaken, I would still exercise any discretion that I have to recognize and enforce the award in BSDL's favor, as I believe that is consistent with our federal treaty obligations and policies favoring arbitral dispute resolution, deference to arbitrators, and comity with fellow treaty signatories.

of the application, [to] supply: (a) The duly authenticated original award or a duly

certified copy thereof; [and] (b) The original agreement [to arbitrate] or a duly certified

copy thereof." Resp't's Suppl. Br. at 27 (quoting Article IV(1)).  BSDL concedes that it

did not provide original or duly certified copies of original documents, but says that

"signed copies . . . that were certified to be 'true and correct' copies 'under penalty of

perjury'" are enough.  Pet'r's Suppl. Mem. at 17–18 (citing Dkt. ##1-3, 1-4).

I agree with another judge who characterized an argument like GOB's as

"grasping at straws, attempting to persuade the Court to refuse to confirm the award on

the basis of a mere technicality." *Arbitration Between Overseas Cosmos, Inc. v. NR

Vessel Corp.*, No. 97 CIV. 5898(DC), 1997 WL 757041, at *5 (S.D.N.Y. Dec. 8, 1997).[18]

The purpose of Article IV's "original . . . or duly certified copy" requirement is to require

the petitioner to prove that the relevant documents exist.  *See id.*  Like the respondent in

*Overseas Cosmos*, GOB challenges only the enforceability—not the *existence* or

*genuineness*—of the arbitration agreement or award;[19] therefore, sworn and certified

copies of these documents are "sufficient to satisfy the requirements of Article IV." *Id.*;

*see also Cont'l Grain Co. v. Foremost Farms Inc.*, No. 97 Civ. 0848 (DC), 1998 WL

---

[18] In many, if not most, arbitration-confirmation cases, the respondent does not even raise
an Article IV argument, and my colleagues routinely confirm arbitral awards relying on
documents sworn and certified by petitioner's counsel. *See, e.g., Chevron Corp.*, 2013
WL 2449172 at *6; *id.*, CA No. 12-1247 (JEB), Decl. of Edward G. Kehoe & Exs. 1–5
[Dkt. ##4 to 4-5]; *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F.
Supp. 2d 12, 31 (D.D.C. 2011); *id.*, CA No. 09-791 (RBW), Decl. of Christopher R. Hart
& Exs. A, B [Dkt. ##1-2, 1-4].

[19] Petitioner's counsel presented originals at the February 25, 2013 oral argument, *see* Tr.
at 20, and respondent did not dispute their existence or authenticity.

18

132805, at *2 (S.D.N.Y. Mar. 23, 1998).  Under these circumstances, reading Article IV

to require anything more would create a rule that is "unnecessarily restrictive and at odds

with a common sense reading of the provision."  *Bergesen v. Joseph Muller Corp.*, 710

F.2d 928, 934 (2d Cir. 1983).[20]

### B.  Invalidity of Accommodation Agreement (Article V(1)(a))

Next, GOB argues that the arbitration award is unenforceable because "the alleged

arbitration agreement [between GOB and BTL] is invalid under the laws of Belize."  *See*

Resp't's Suppl. Br. at 28 (citing N.Y. Conv. Art. V(1)(a)).  In truth, however, GOB does

not challenge the legality of the *arbitration agreement* as a stand-alone provision; rather,

GOB fires attacks on at least a dozen *other* provisions of the Accommodation

Agreements.  *See id.* at 28–38; Resp't's Prelim. Resp. at 26–36.

Unfortunately for GOB, it is well-settled law that "an arbitration provision is

severable from the remainder of the contract."  *Buckeye Check Cashing, Inc. v.

Cardegna*, 546 U.S. 440, 445 (2006) (holding that arbitrator should decide whether

contract containing arbitration clause was void *ab initio* because terms other than the

arbitration clause violated state law and rendered the contract "criminal on its face").

Absent a direct challenge to the arbitration clause itself, the clause remains "enforceable

apart from the remainder of the contract," and GOB's challenge to the validity of the

contracts "should . . . be considered by an arbitrator, not a court."  *Id.* 446; *see also id.* at

---

[20] This case is unlike *Czarina, L.L.C. v. W.F. Poe Syndicate*, where the court held that an
"unsigned, unexecuted sample wording" of an arbitration clause was not sufficient.  358
F.3d 1286, 1289 (11th Cir. 2004).  BSDL's copies of the arbitration agreement and award
are signed, executed, and in final form.  *See* Accommodation Agreement at 25; Final
Award at 109.

449 ("*[A] challenge to the validity of the contract as a whole*, and not specifically to the arbitration clause, *must go to the arbitrator*." (emphases added)); *Nanosolutions, LLC v. Prajza*, 793 F. Supp. 2d 46, 54–55 (D.D.C. 2011) ("[T]he FAA prohibits a district court from considering . . . challenges [to] the contract as a whole.").[21]  Moreover, the New York Convention instructs contracting states to "recognize an agreement in writing under which the parties undertake to submit to arbitration," with "agreement in writing" defined to include "an arbitral clause *in a contract*." N.Y. Conv. Art. II(1), (2) (emphasis added). Thus, the "agreement in writing" that must be valid under the convention is the arbitration clause, *not* the entire contract containing the clause.

Section 15.2 of the Accommodation Agreement reflects the parties' clear intent to arbitrate "[a]ny dispute arising out of or in connection with this Agreement including any question regarding its existence, validity or termination."  GOB offers no basis under Belizean law, or any other law, for this Court to find *that particular clause* invalid.[22]

---

[21] The LCIA considered the validity of the Accommodation Agreement, *see* Final Award ¶¶ 146–176, and found it "valid and enforceable against the present [GOB]," *id.* ¶ 176.

[22] GOB relies heavily on the Third Circuit's opinion in *China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp.*, but in that case, the respondent claimed that the entire agreement containing the arbitration clause had been forged and thus the parties had never agreed to arbitrate, 334 F.3d 274, 277 (3d Cir. 2003).  The court framed the question before it as "whether a foreign arbitration award might be enforceable regardless of the validity *of the arbitration clause* on which the foreign body rested its jurisdiction." *Id.* at 279 (emphasis added).  Answering in the negative, the court held "that a district court should refuse to enforce an arbitration award under the Convention where the parties did not reach a valid agreement *to arbitrate*." *Id.* at 286 (emphasis added); *see also id.* at 284 ("[T]he district court here had an obligation to determine independently the existence of an agreement *to arbitrate* . . . ." (emphasis added)).
  Given the particular facts before the court, I read *China Minmetals* as consistent with *Buckeye*, which distinguished between "[t]he issue of the contract's validity," which

## C.    The Inappropriateness of Arbitration (Articles V(1)(c) and V(2)(a))

The New York Convention allows for enforcement of an arbitral award to be refused if "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration," Art. V(1)(c), or if "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of th[e] country" being asked to recognize and enforce the award, Art. V(2)(a).  GOB contends that these articles apply because the LCIA Award and its enforcement violate the internationally-recognized common law revenue rule, *see* Resp't's Mem. at 19–24; Resp't's Prelim. Resp. at 12–16, 36–38; Resp't's Suppl. Br. at 38–40, as well as the United States' political question and act of state doctrines and principles of comity,[23] *see* Resp't's Prelim. Resp. at 38–39; Resp't's Suppl. Br. at 40.  According to GOB, U.S. courts cannot resolve disputes like the one between GOB and Telemedia, so an arbitrator in the United States could not settle such a case either.  *See* Resp't's Suppl. Br. at 40.[24]

---

is *not* for the court to resolve, and "the issue [of] whether any agreement between the alleged obligor and obligee was ever concluded," which the courts might be allowed to consider. *Buckeye*, 546 U.S. at 444 n.1.  In this case, GOB alleges that "[t]he illegality of provisions in the Accommodation Agreement is wide and major," Young Decl. at ¶ 7 [Dkt. #39-1], but unlike the respondent in *China Minmetals*, GOB does not challenge the very existence of an agreement to arbitrate between two parties who had the authority and capacity to contract on behalf of their principals, *see Buckeye*, 546 U.S. at 444 n.1.

[23] I have already discussed comity in an earlier section.  *See supra* Part I.C.

[24] It bears noting that GOB is incorrect when it says that "an arbitrator operating under U.S. law cannot have any authority that is broader than a U.S. court would have." Resp't's Suppl. Br. at 40.  At least one court has explicitly found that "[a] 'parochial

The LCIA considered the revenue rule and decided that it did not apply because this is a contract case, not an action to enforce a foreign nation's tax laws. *See* Final Award ¶ 180.[25] I agree with its reasoning. "[T]he revenue rule is often stated as prohibiting the *collection of foreign tax claims*." *Pasquantino v. United States*, 544 U.S. 349, 361 (2005) (emphasis added) (holding that revenue rule did not preclude wire fraud prosecution of defendants who had engaged in smuggling to evade Canadian taxes). It is clear from the Supreme Court's analysis in *Pasquantino* that the rule long ago derived from "the rule against foreign penal enforcement" and the "analogy between foreign revenue laws and penal laws." *Id.* In bringing the LCIA arbitration and this enforcement action, Telemedia and BSDL are not attempting to enforce Belizean tax law or collect any tax revenue. They are seeking to enforce a *contract*, and although that contract contains tax-related provisions, the arbitration award and enforcement of that award do not entail the enforcement of any foreign revenue law. Thus, the matters arbitrated were contemplated by and within the terms and scope of the submission to arbitration, and they

---

refusal' to enforce an arbitration agreement would frustrate th[e] purpose [of the New York Convention], therefore, a court *should compel arbitration even if the arbitrator could make a ruling that an American court could not*." *Belship Navigation, Inc. v. Sealift, Inc.*, 95 CIV. 2748 (RPP), 1995 WL 447656, at *6 (S.D.N.Y. 1995) (emphasis added) (quoting and citing *Mitsubishi Motors Corp.*, 473 U.S. at 629–31). In any event, for the reasons that follow, the subject matter of this case could be heard in U.S. courts.

[25] GOB characterizes the LCIA's discussion of the revenue rule as "one short paragraph" that relies on "unidentified" authorities. Resp't's Mem. at 22. To the contrary, paragraph 180 of the award is one of the longest in the Final Award, and footnote 95 provides ample support for the proposition that arbitrators can resolve tax issues in contract disputes.

relate to subject matter capable of settlement by arbitration in the United States. The

revenue rule provides no basis for declining enforcement.[26]

As for the act of state doctrine, the FAA states that "[e]nforcement of arbitral

agreements, confirmation of arbitral awards, and execution upon judgments based on

orders confirming such awards *shall not be refused on the basis of the Act of State*

*doctrine*." 9 U.S.C. § 15 (emphasis added).[27]  Given that § 15 "eliminat[ed] the Act of

State doctrine as a bar to arbitration," *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513

U.S. 265, 272 (1995), it would be nonsensical for me to find that this case was "not

capable of settlement by arbitration" in the United States because of that very doctrine.

The political question doctrine, meanwhile, "is primarily a function of the

separation of powers" and *should not* be understood to mean that "every case or

controversy which touches foreign relations lies beyond judicial cognizance." *Baker v.*

*Carr*, 369 U.S. 186, 210–11 (1962).  The subject matter of the controversy in this case—

the existence and enforceability of a contract between a state and a private party—raises

no separation of powers concerns, or any other political questions for that matter, that

---

[26] GOB does not cite a single case in which a U.S. court declines to enforce a foreign arbitral award based on the revenue rule.

[27] "Although [9 U.S.C. § 15] is located in Chapter One of the FAA rather than in the Convention-implementing Chapters Two and Three, Chapter One of the FAA applies to actions brought under the New York . . . Convention[] unless it is 'in conflict' with Chapter[] Two . . . [of] the Convention[] as ratified." *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 366 (S.D.N.Y. 2005) (quoting 9 U.S.C. § 208), *abrogation on other grounds recognized by Goel v. Ramachandran*, 823 F. Supp. 2d 206, 215–16 (S.D.N.Y. 2011).  Section 15 does not appear to conflict with the New York Convention or Chapter Two of the FAA, *see id.*, and GOB offers no argument that such a conflict exists.

would make it non-arbitrable under U.S. law.  In fact, courts in our Circuit regularly

resolve contract disputes brought by private parties against foreign countries.  *See*

*McKesson, Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012); *Gulf Res.*

*Am., Inc. v. Republic of Congo*, 370 F.3d 65 (D.C. Cir. 2004); *El-Hadad v. United Arab*

*Emirates*, 216 F.3d 29 (D.C. Cir. 2000); *Wye Oak Tech., Inc. v. Republic of Iraq*, --- F.

Supp. 2d ----, 2013 WL 1734436 (D.D.C. Apr. 23, 2013).  Given the frequency with

which these cases arise—and the fact that GOB fails to cite even one such case decided

on political question grounds—it simply cannot be that the political question doctrine

bars U.S. courts from deciding any case in which a foreign government says that it

breached a contract or committed a tort for some political reason.  That defense could

apply in *every* case of this sort, and yet, GOB cannot direct me to a single example of a

court accepting it.

    Furthermore, GOB cannot challenge enforcement by first, raising arguments that

"depart from the law and enter the realm of political theory," and then, invoking the

political question doctrine.  *Republic of Philippines v. Westinghouse Elec. Corp.*, 774 F.

Supp. 1438, 1465 (D.N.J. 1991).[28]  This case implicates no "political decisions that are by

their nature committed to the political branches to the exclusion of the judiciary,"

*Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) (internal quotation marks

---

[28] *See id.* at 1464–65 (denying motion to dismiss on political-question grounds where
defendant argued that former president's "*de facto* power negated the very existence of
[all relevant] laws," because such an argument "has no place in a court of law").  GOB
admits that its arguments are not legal in nature, *see* Resp't's Mem. at 32 ("[Resolving
this petition] is not merely a task of applying a foreign law."), but rather are "part of a
significant political controversy within Belize," *id.* at 30.  A political controversy in
Belize, however, does not necessarily create a "political question" in the United States.

omitted), nor any "separation-of-powers concerns that would justify invocation of the

political question doctrine," *de Csepel v. Republic of Hungary*, 714 F.3d 591, 604 (D.C.

Cir. 2013) (internal quotation marks omitted) (holding that political question doctrine did

not bar suit by heirs of Jewish Hungarian art collector against Hungary for breach of

bailment agreements entered during World War II).[29]

### E.      Suspension of the Award by a Competent Authority (Article V(1)(e))

In its initial motion to stay or dismiss and its preliminary response to BSDL's

petition, GOB argued that I should decline to enforce the LCIA Award under Article

V(1)(e) of the New York Convention because "enforcement of the Award has been

suspended by a competent authority (Belize Supreme Court)."  Resp't's Mem. at 15;

Resp't's Prelim. Resp. at 20–26.  Our Circuit Court addressed Article V(1)(e), saying:

> Because the arbitration occurred in London and under the
> arbitral laws of England, *the courts of England are the
> competent authority* with primary jurisdiction over the Final
> Award; absent proceedings for setting aside or suspending the
> Final Award *in those courts*, the [GOB] can offer no basis on
> which to conclude that the stay of BSDL's petition for
> enforcement was properly issued under the FAA and New
> York Convention.

*Belize Soc. Dev. Ltd.*, 668 F.3d at 731 (emphases added).  GOB has not sought or

obtained any relief in the English courts, so Article V(1)(e) does not apply.

---

[29] In its first filing, GOB raised the act of state and political question doctrines as grounds
for dismissing the case outright, rather than denying the petition under Article V(2)(a).
*See* Resp't's Mem. at 28–33.  I reach the same outcome either way.  This enforcement
action raises no greater act-of-state or political-question concerns than the underlying
arbitration does.

F.     **Public Policy (Article V(2)(b))**

Finally, GOB urges the Court to refuse recognition and enforcement of the LCIA

Award on the basis that doing otherwise would be "contrary to the public policy" of the

United States.  Resp't's Prelim. Resp. at 39–42; Resp't's Suppl. Br. at 41–43 (quoting

N.Y. Conv. Art. V(2)(b)).  As our Circuit Court has noted, courts around the country

"have been very careful not to stretch the compass of 'public policy,'" applying the

defense "'only where enforcement would violate the forum state's most basic notions of

morality and justice.'"  *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C.

Cir. 2007) (quoting *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan

Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004)).

GOB cites the Foreign Corrupt Practices Act as the "best evidence[]" that the

United States has "a strong public policy against corruption abroad."  Resp't's Suppl. Br.

41.  I agree with the general notion that the United States has a strong policy against

foreign corruption.  But it also has a countervailing policy that I mentioned earlier—an

"'emphatic federal policy in favor of arbitral dispute resolution'" that "'applies with

special force in the field of international commerce.'"  *Belize Soc. Dev. Ltd.*, 668 F.3d at

733 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 631).  This is not the first time a court

has been confronted with conflicting policies, one weighing in favor of enforcing an

arbitral award and one weighing against it, and consistently, U.S. courts have enforced

arbitral awards in the face of public policy interests *at least* as weighty as the policy

against corruption abroad.  *See Agility Pub. Warehousing Co. K.S.C., Prof'l Contract

Admins., Inc. v. Supreme Foodservice GmbH*, 495 F. App'x 149, 151 (2d Cir. 2012)

("[T]he [public policy] defense is frequently invoked but rarely successful, particularly in view of the strong United States policy favoring arbitration.").[30]  Accordingly, GOB has failed to show that, on balance, enforcing this award would so offend the United States' "most basic notions of morality and justice" that Article V(2)(b) applies.[31]

## III.  AWARD

It is "the norm" for courts enforcing arbitral awards to convert foreign currency amounts into dollars, *Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, --- F. Supp. 2d ----, 2013 WL 1201380, at *2 (D.D.C. Mar. 26, 2013), and I will follow that norm.  In addition, I will exercise my discretion to award prejudgment interest because I find that doing so is "'consistent with the underlying arbitration award,'" which "grants pre-award interest but is 'silent' on whether a party should recover post-award interest— *i.e.*, prejudgment interest."  *Id.* at *8 (quoting *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran*, 665 F.3d at 1103).  The prejudgment interest will be calculated using the average daily prime rate between the date of the Final Award and

---

[30] *See also, e.g.*, *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys.*, 665 F.3d 1091, 1096–100 (9th Cir. 2011) (regulating trade with Iran); *Steel Corp. of Philippines v. Int'l Steel Servs., Inc.*, 354 F. App'x 689, 694–95 (3d Cir. 2009) (preventing forum shopping); *Belship Navigation, Inc.*, 1995 WL 447656, at *6 (embargoing Cuba); *Nat'l Oil Corp. v. Libyan Sun Oil Co.*, 733 F. Supp. 800, 819–20 (D. Del. 1990) (cutting off funding to Libya); *Brandeis Intsel Ltd. v. Calabrian Chems. Corp.*, 656 F. Supp. 160, 165 (S.D.N.Y. 1987) (remedying arbitrator's "manifest disregard" for law).

[31] For reasons set forth in this Part and in Part II.B. ("Invalidity of Accommodation Agreement"), I find that additional briefing on a recent decision by the Caribbean Court of Justice is unnecessary, as that court's ruling would have no impact on my analysis.  I therefore will DENY GOB's Motion for Leave to Submit Additional Briefing [Dkt. #47].

the date of this opinion. *Id.* at 9.[32] Because the parties have not done so already, I will

direct them to submit proposed judgment amounts with all conversions and interest

calculations performed consistent with this opinion.

### CONCLUSION

For all the foregoing reasons, petitioner's Petition to Confirm Arbitration Award

and to Enter Judgment [Dkt. #1] is GRANTED and respondent's Motion to Stay Action

or, in the Alternative, Dismiss Petition [Dkt. #15] is DENIED.  An appropriate order shall

accompany this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[32] The "prime rate" is the "'the rate that banks charge for short-term unsecured loans to credit-worthy customers,'" *id.* at *8 (quoting *Oldham v. Korean Air Lines Co., Ltd.*, 127 F.3d 43, 54 (D.C. Cir. 1997)).  Although the Final Award sets its own pre-award interest rate, BSDL "offers absolutely no authority, nor any reasoning, to explain why the interest rate used by an arbitral panel for pre-award interest should be mimicked by a United States district court when granting post-award, prejudgment interest." *See id.* at *9.

**TAB 6**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BELIZE SOCIAL DEVELOPMENT LIMITED,** | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **Civil Case No. 09-2170 (RJL)** |
| | ) | |
| **THE GOVERNMENT OF BELIZE,** | ) | **FILED** |
| | ) | |
| Respondent. | ) | DEC 1 1 2013 |

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## ORDER

For the reasons set forth in the Memorandum Opinion entered this date, it is this

_11th_ day of September, 2013, hereby

**ORDERED** that the petitioner's Petition to Confirm Arbitration Award and to

Enter Judgment [Dkt. #1] is **GRANTED**; it is further

**ORDERED** that judgment shall be entered in favor of Petitioner and against

Respondent for the monetary portion of the Final Award as set forth in paragraphs 342

and 343 of the Final Award [Dkt. #1-3] converted to United States Dollars, applying the

conversion rate as of the date the Final Award was rendered, March 18, 2009, plus

prejudgment interest at the average daily prime interest rate between March 18, 2009 and

the date of this Order; it is further

**ORDERED** that the parties shall within seven (7) days of this Order submit

proposed judgment amounts with conversion and interest calculated in accordance with

the  Memorandum Opinion and this Order; it is further

**ORDERED** that the respondent's Motion to Stay Action, or in the Alternative, Dismiss Petition [Dkt. #15] is **DENIED**; and it is further

**ORDERED** that respondent's Motion for Leave to Submit Additional Briefing [Dkt. #47] is **DENIED**.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge

**TAB 7**

USCA Case #14-7002   Document #1492424   Filed: 05/09/2014   Page 185 of 231

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BELIZE SOCIAL DEVELOPMENT LIMITED,** )<br>)<br>) | |
| **Petitioner** ) | |
| ) | Case No. 1:09-cv-02170-RJL |
| **v.** ) | |
| **GOVERNMENT OF BELIZE,** )<br>) | |
| **Respondent.** )<br>) | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Respondent Government of Belize hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from (1) this Court's Order dated December 11, 2013 (Docket No. 52), as well as the accompanying Memorandum Opinion (Docket No. 51), granting Petitioner Belize Social Development Limited's Petition to Confirm Arbitration Award; (2) this Court's underlying Minute Order of October 18, 2010, denying Respondent Government of Belize's Motion to Bifurcate; and (3) this Court's underlying Minute Order of February 8, 2013, denying Respondent Government of Belize's Motion for Leave to Conduct Limited Discovery.

Dated: January 8, 2014                    Respectfully submitted,


                                          */s/ Creighton R. Magid*
                                          Creighton R. Magid (D.C. Bar #476961)
                                          DORSEY & WHITNEY LLP
                                          1801 K Street, NW
                                          Suite 750
                                          Washington, DC 20006
                                          Tel: 202-442-3000
                                          Fax: 202-442-3199
                                          magid.chip@dorsey.com

                                          Juan C. Basombrio (admitted *Pro Hac Vice*)
                                          DORSEY & WHITNEY LLP
                                          600 Anton Boulevard, Suite 2000
                                          Costa Mesa, California 92626
                                          Tel: 714-800-1405
                                          Fax: 714-800-1499
                                          basombrio.juan@dorsey.com

                                          *Counsel for Respondent*
                                          *Government of Belize*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of January, 2014, I electronically filed the foregoing

Notice of Appeal with the Clerk of the Court for the United States District Court for the District

of Columbia using the CM/ECF system, which automatically served all counsel in this case.

/s/ Creighton R. Magid
Creighton R. Magid

**TAB 8**

| From: | DCD_ECFNotice@dcd.uscourts.gov |
|---|---|
| To: | DCD_ECFNotice@dcd.uscourts.gov |
| Subject: | Activity in Case 1:09-cv-02170-RJL BELIZE SOCIAL DEVELOPMENT LIMITED v. GOVERNMENT OF BELIZE Order |
| Date: | Thursday, January 09, 2014 12:26:28 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of Columbia

### Notice of Electronic Filing

The following transaction was entered on 1/9/2014 at 12:25 PM EDT and filed on 1/9/2014

| Case Name: | BELIZE SOCIAL DEVELOPMENT LIMITED v. GOVERNMENT OF BELIZE |
|---|---|
| Case Number: | 1:09-cv-02170-RJL |
| Filer: | |
| Document Number: | 59 |

**Docket Text:**
**MEMORANDUM ORDER: Upon consideration of the petitioner's [53] Notice of Proposed Judgment Amounts and the response by the Respondent the next day. It is hereby ordered that the petitioner is awarded $22,484,961.94 in U.S. dollars. Signed by Judge Richard J. Leon on 01/08/14. (tb, )**

**1:09-cv-02170-RJL Notice has been electronically mailed to:**

Joseph S. Hall    jhall@khhte.com, bmurphy@khhte.com, yisaac@khhte.com

Kenneth Chris Todd    ctodd@khhte.com, dkasparek@khhte.com

Creighton R. Magid    magid.chip@dorseylaw.com, flores.sandra@dorsey.com

Louis B. Kimmelman    bkimmelman@sidley.com, nyefiling@Sidley.com

Juan C. Basombrio    basombrio.juan@dorsey.com

Dana C. MacGrath      dmacgrath@sidley.com, nyefiling@Sidley.com

**1:09-cv-02170-RJL Notice will be delivered by other means to::**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**suppressed
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=1/9/2014] [FileNumber=3876346-0]
[00421937a2468916f4852b488d68443258b265fa7463b450056e03a4f40bfe1626614
9d957be5826055d8bcc5952a16b87f18b9ddfdccc390f75467662b5fe78]]

# TAB 9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RECEIVED

MAR 1 4 2014

BY:_____

|  |  |
|---|---|
| BELIZE SOCIAL DEVELOPMENT LIMITED, | ) ) ) |
| Petitioner, | ) ) |
| vs. | ) Case No. 09-2170 (RJL) |
| THE GOVERNMENT OF BELIZE, | ) ) ) |
| Respondent. | ) ) |

<u>**PETITIONER'S FIRST SET OF POST-JUDGMENT INTERROGATORIES**</u>

Pursuant to Federal Rules of Civil Procedure 33 and 69(a), Petitioner Belize Social

Development Limited ("BSDL") hereby propounds the following Interrogatories to Respondent

The Government of Belize ("Belize"). Petitioner requests that full answers to the following

Interrogatories in accordance with the Definitions and Instructions herein be delivered to the

undersigned at to the offices of Sidley Austin LLP, 787 Seventh Ave., New York, NY 10019.

**DEFINITIONS**

1.      "Any," "all," and "each" are used in their broadest sense and means any and all,

every, each and should be construed as necessary to bring within the scope of these

interrogatories any information that might otherwise be construed to be outside their scope.

2.      "Belize" means The Government of Belize and all of its subdivisions, its

ministries, agencies and instrumentalities, and any officials, representatives, employees, servants,

attorneys, agents, contractors, subcontractors, or any other person acting for or on its behalf.

3.      "Communications" or "Correspondence" means any transmittal of information in

the form of facts, ideas, inquiries or otherwise, including a letter, memorandum, note, facsimile,

conversation, meeting, telephone call, e-mail, or other communication, whether written or oral between two or more of the persons or entities identified in the requests below.

4.    "Document" or "documents" is used in its broadest sense, as illustrated by Federal Rule of Civil Procedure 34(a), and includes, without limitation, all written or printed matter of any kind, including drafts, originals and non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise, and records of any type of description, including without limitation the following:  correspondence; interoffice and intraoffice communications; notes; letters; memoranda; work papers; analyses; plans; studies; statistical records; reports; press releases; contracts and agreements; records, summaries, agendas, minutes or notes of conferences, meetings, telephone calls, or other conversations; calendars, diaries, and appointment books; message pads; telephone messages and telephone logs; facsimiles; photographs, tapes or other recordings; handwritten notes or notations in any form; data compilations, including, but not limited to, computer-generated and computer-stored information, whether or not ever printed out or displayed, such as documents stored on a computer drive, CD or floppy disk and voicemail messages; and electronic mail, whether or not ever printed out or displayed, and any enclosures or attachments thereto.

5.    "Final Award" means the London Court of International Arbitration final arbitral award rendered against the Government of Belize on March 18, 2009 upon which Judgment against the Government of Belize in the amount of US $ 22,484,961.94 was entered on February 7, 2014 in the above-captioned case.

6.    "Person," unless otherwise specified, means any natural person, office, corporation, association, group, organization, or agency.

2

7.    "Relate to" or "relating to" means any information or document that addresses, constitutes, contains, embodies, evidences, reflects, concerns, identifies, states, refers to, regards, records, responds to, deals with, describes, discusses, explains, or is in any way pertinent to the subject of the request.

8.    "You" and "your" refer to Belize as previously defined.

9.    "2038 Bonds" means the U.S. Dollar Bonds Due 2038 issued by Belize pursuant to an indenture with The Bank of New York Mellon as Trustee for the bondholders and delivered on March 20, 2013.

## INSTRUCTIONS

1.    Unless otherwise stated, the applicable time period is November 17, 2009, until the date the interrogatories are answered by the Respondent.

2.    Each interrogatory is to be fully and separately answered, and before each answer is given, the interrogatory in question is to be set forth in full.

3.    Each interrogatory shall be construed independently.  No interrogatory shall be construed by reference to any other interrogatory for the purpose of limiting the response to such interrogatory.

4.    These interrogatories should be deemed continuing and you are requested to provide, pursuant to Federal Rule of Civil Procedure 26(e), such additional information as you or any other person acting on your behalf may hereafter obtain relating to the interrogatories which will augment or otherwise modify or supplement your responses.  Pursuant to Federal Rule of Civil Procedure 33(b)(2), you shall serve upon the undersigned attorneys each supplemental response no later than thirty (30) days after discovery of further information.

5.    The present tense is to be construed to include the past tense and the past

3

tense is to be construed to include the present tense, as necessary to bring within the scope of these interrogatories any response that might otherwise be construed to be outside their scope.

      6.    The singular is to be construed to include the plural and the plural is to be construed to include the singular, as necessary to bring within the scope of these interrogatories any response that might otherwise be construed to be outside their scope.

      7.    The terms "and" and "or" are construed either disjunctively or conjunctively, as necessary to bring within the scope of these interrogatories any responses that might otherwise be construed to be outside their scope.

      8.    If you are unable to answer or respond fully to any interrogatory, you shall answer or respond to the extent possible and specify the reason for your inability to answer or respond in full.  If you are unable to provide the exact date or number requested by any interrogatory, provide your best estimate of the date or number and indicate that your response is an approximation.

      9.    In any event that any conversation, statement, or interview called for identification by these interrogatories is not identified by reason of a claim of privilege, work product, or similar doctrine, you shall provide an explanation signed by attorney representing you as to the specific nature of the privilege claims as the reason for your refusal to answer and all facts supporting your refusal to answer.  If any conversation, statement, or interview is withheld under a claim of privilege (including, but not limited to, the work product doctrine), provide a log of the information set forth in Federal Rule of Civil Procedure 26(b)(5), including the date and place of such conversation, statement, or interview, the identity of the person who made the privileged statement, the identity of each and every person who was present during such conversation, statement, or interview, the nature and subject matter of the conversation,

statement, or interview, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by you.

10.    In the event that any document called for identification by these interrogatories is not identified by reason of a claim of privilege, work product, or similar doctrine, you shall provide an explanation signed by an attorney representing you as to the specific nature of the privilege claimed as the reason for your refusal to answer and all facts supporting your refusal to answer. If any document called for identification by these interrogatories is withheld under a claim of privilege (including, but not limited to, the work product doctrine), provide a log of the information set forth in Federal Rule of Civil Procedure 26(b)(5), including the type of document, the general subject matter of the document, the date of the document, the specific nature of and basis for each claim of privilege or work product or other similar doctrine, and such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by you.

11.    Each request below calls for the identification of all documents and things in your actual or constructive possession, custody, or control or to which you have access, including documents that have been provided by you to your attorneys, to your consultants, or to your attorney's consultants. In the event that any document called for identification by these interrogatories is not identified on the ground that it has been lost, destroyed, or otherwise disposed of since its creation or receipt, identify the document, including, but not limited to, the

date of the document, the author(s) of the document, the document's signatory (signatories) and those who participated in its preparation, the type of document it is (e.g., letter, chart, memorandum, etc.), a description of the non-produced subject matter and the length thereof, a list identifying those persons and entities to whom said document(s) was disseminated, the last custodian of the document and any copies thereof, and the circumstances whereby the document and copies thereof were lost, destroyed or otherwise disposed of.

## INTERROGATORIES

1.     Provide a list of each and every person who has, or you believe to have, any knowledge relating to the information sought herein and in Petitioner's First Request for Post-Judgment Production of Documents dated March 13, 2014; specify the subject matter about which every such person has the knowledge; describe the substance of that knowledge; and provide contact information for every such person.

2.     List and provide the value and location of all real property (other than embassy or consulate) owned by Belize, the nature of Belize's interest in the property, the date the property was acquired by Belize, and the amount paid by Belize for the property within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

3.     List and provide the location and value of all fixtures or other immovable property associated with real property identified in response to Interrogatory No. 2 above, and the nature of Belize's interest in this property, the date this property was acquired by Belize, and amount paid by Belize for this property within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

4.     List and provide the location, value, and use of all airplanes, trucks, boats, cars, or vehicles in which Belize has an ownership interest, whether direct or indirect, and the nature of Belize's interest in this property, the date this property was acquired by Belize, and amount paid by Belize for this property within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

5.     List and provide the location, value, and use of all gold or other precious metals, works of art, precious gems, and jewelry in which Belize has an ownership interest, whether direct or indirect, and the nature of Belize's interest in this property, the date this property was acquired by Belize, and amount paid by Belize for this property within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

6.     Provide a list of all accounts at all banks or financial institutions held by, in the name of, or for the benefit of Belize, including for each account, the address and phone numbers of the institution and branch or subsidiary at which the account is maintained, the name or title on the account, the account number, the currency in which the account is maintained, the identities of authorized signatories for the account, whether the account is currently open or closed, and, if the account is closed, the date of closing and current balance of an open account or balance at the time of closing within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

7.     Provide a list of all accounts at all brokerage houses, securities firms, or other institutions that hold securities or commodities held by, in the name of, or for the benefit of

Belize, including the address and phone number of the institution and branch and subsidiary at which the account is maintained, the name or title on the account, the account number, the securities, commercial paper, or other asset, interest, or property held in the account, the identities of authorized signatories for the account, whether the account is currently open or closed, and, if the account is closed, the date of closing and current balance of an open account or balance at the time of closing within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

8.    Provide a list of any safe deposit box in the name of, or for the benefit of, Belize within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

9.    List and describe any loan extended by Belize to any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, including the identity of the borrower, the name, address and phone number of the borrower, the principal amount, the repayment schedule, and the identity of the account to which payments are made.

10.    List and describe any and all loans extended to Belize by any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, including the identity of the lender, the name, address and phone number of the lender, the principal amount, the repayment schedule, and the identity of the account to which payments are made.

11.     List and describe any right of Belize to receive payments from or by any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, including the identity and address of the individual or entity obligated to make such payments and the amounts to be paid.

12.     List and describe any completed or proposed assignment or transfer of any right of Belize to any payments due to Belize by any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

13.     List and describe all agreements between or among Belize and any person or entity, or any branch, subsidiary or affiliate thereof, present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, concerning the exploration for and/or development or operation or production of any natural resources of Belize.

14.     List and describe all existing contracts between Belize and any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, pursuant to which Belize purchases any goods or services with a value in excess of $10,000.

15.     List and describe any and all existing contracts between Belize and any person or entity present, doing business, headquartered, domiciled, or incorporated within the territorial limits of Washington D.C. and outside the territorial limits of Washington D.C. but within the

territorial limits of the United States of America, pursuant to which Belize sells any goods or services with a value in excess of $10,000.

16. List and describe any ownership interest of Belize, whether direct or indirect, outside Belize, in any corporation, partnership, limited liability entity, stock, bond, or mutual fund, or other entity that is present, doing business, headquartered, domiciled, or incorporated within the territorial limits of Washington D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

17. List and describe any money judgment currently outstanding in favor of Belize and against a person or entity that is present, doing business, headquartered, domiciled or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington D.C. but within the territorial limits of the United States of America and the amount owed.

18. List and describe all contracts, agreements, or other arrangements between Belize and any person or entity that is present, doing business, headquartered, domiciled or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington D.C. but within the territorial limits of the United States of America to serve as Belize's agent for the payment or collection of any monies due to Belize or payments due from Belize.

19. Provide a list of all prospectuses, listing memoranda, press releases, and indentures relating to the 2038 Bonds and the listing of the 2038 Bonds on any stock exchange.

20. List and describe the location, amount, and date of interest payments previously made and to be made on the 2038 Bonds.

21. List and describe each and every step in the process by which Belize makes any payments of interest or any other amounts under the 2038 Bonds.

22.    List and describe any and all of the current and former paying agents, transfer agents, registrars, clearing agencies, clearing corporations, and offices or agencies where the 2038 Bonds may be presented for exchange, transfers, and registration of transfer, or where interest on the 2038 Bonds may be paid, and describe the locations of such entities.


Dated: March 13, 2014

                                        SIDLEY AUSTIN LLP

                                        By: _____

                                        Louis B. Kimmelman (admitted pro hac vice)
                                        Dana C. MacGrath (admitted pro hac vice)

                                        787 Seventh Avenue
                                        New York, New York 10019
                                        Telephone: (212) 839-5300
                                        Facsimile: (212) 839-5599
                                        bkimmelman@sidley.com
                                        dmacgrath@sidley.com

                                        Kristin Graham Koehler

                                        1501 K Street, NW
                                        Washington, D.C. 20005
                                        Telephone: (202) 736-8359
                                        Facsimile: (202) 736-8711
                                        kkoehler@sidley.com

                                        Counsel for Petitioner
                                        Belize Social Development Limited

## CERTIFICATE OF SERVICE

I certify that today, March 13, 2014, I served the foregoing Petitioner's First Set of Post-

Judgment Interrogatories, on the following via Federal Express:

Creighton R. Magid
Dorsey & Whitney LLP
1801 K Street NW
Suite 750
Washington, D.C. 20006

Juan C. Basombrio
Dorsey & Whitney LLP
600 Anton Blvd.
Suite 2000
Costa Mesa, CA 92646

By: _____

Ritu K. Ghai

# TAB 10

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

BELIZE SOCIAL DEVELOPMENT )
LIMITED, )
)
　　　　　Petitioner, )
vs. )　Case No. 09-2170 (RJL)
)
THE GOVERNMENT OF BELIZE, )
)
　　　　　Respondent. )
)

<div align="center">

**PETITIONER'S FIRST REQUEST FOR**
**POST-JUDGMENT PRODUCTION OF DOCUMENTS**

</div>

　　　　Pursuant to Federal Rules of Civil Procedure 34 and 69(a), Petitioner Belize Social

Development Limited ("BSDL") requests that Respondent The Government of Belize ("Belize")

produce and/or permit counsel for Petitioner to inspect and copy the documents described below,

in accordance with the Definitions and Instructions herein, at the offices of Sidley Austin LLP,

787 Seventh Ave., New York, NY 10019.

<div align="center">

**DEFINITIONS**

</div>

　　1.　　"Any," "all," and "each" are used in their broadest sense and means any and all,

every, each and should be construed as necessary to bring within the scope of these document

requests any information that might otherwise be construed to be outside their scope.

　　2.　　"Belize" means The Government of Belize and all of its political subdivisions,

ministries, agencies and instrumentalities, and any officials, representatives, employees, servants,

attorneys, agents, contractors, subcontractors, or any other person or entity acting for or on its

behalf.

3.      "Communications" or "Correspondence" means any transmittal of information in the form of facts, ideas, inquiries or otherwise, including a letter, memorandum, note, facsimile, conversation, meeting, telephone call, e-mail, or other communication, whether written or oral between two or more of the persons or entities identified in the requests below.

4.      "Document" or "documents" is used in its broadest sense, as illustrated by Federal Rule of Civil Procedure 34(a), and includes, without limitation, all written or printed matter of any kind, including drafts, originals and non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise, and records of any type of description, including without limitation the following:  correspondence; interoffice and intraoffice communications; notes; letters; memoranda; work papers; analyses; plans; studies; statistical records; reports; press releases; contracts and agreements; records, summaries, agendas, minutes or notes of conferences, meetings, telephone calls, or other conversations; calendars, diaries, and appointment books; message pads; telephone messages and telephone logs; facsimiles; photographs, tapes or other recordings; handwritten notes or notations in any form; data compilations, including, but not limited to, computer-generated and computer-stored information, whether or not ever printed out or displayed, such as documents stored on a computer drive, CD or floppy disk and voicemail messages; and electronic mail, whether or not ever printed out or displayed, and any enclosures or attachments thereto.

5.      "Final Award" means the London Court of International Arbitration final arbitral award rendered against the Government of Belize on March 18, 2009 upon which Judgment against the Government of Belize in the amount of US $22,484,961.94 was entered on February 4, 2014 in this case.

6.      "Person," unless otherwise specified, means any natural person, office, corporation, association, group, organization, or agency.

7.      "Relate to" or "relating to" means any information or document that addresses, constitutes, contains, embodies, evidences, reflects, concerns, identifies, states, refers to, regards, records, responds to, deals with, describes, discusses, explains, or is in any way pertinent to the subject of the request.

8.      "You" and "your" refer to Belize as previously defined.

9.      "2038 Bonds" means the U.S. Dollar Bonds Due 2038 issued by Belize pursuant to an indenture with The Bank of New York Mellon as Trustee for the bondholders and delivered on March 20, 2013.

## INSTRUCTIONS

1.      Unless otherwise stated, these requests seek all responsive documents created from November 17, 2009, through the present day.

2.      These requests should be deemed continuing and you are requested to provide, pursuant to Federal Rule of Civil Procedure 26(e), such additional information as you or any other person acting on your behalf may hereafter obtain relating to the requested documents which will augment or otherwise modify or supplement your responses.  You shall serve upon the undersigned attorneys each supplemental response no later than thirty (30) days after discovery of further information.

3.      The present tense is to be construed to include the past tense and the past tense is to be construed to include the present tense, as necessary to bring within the scope of these document requests any document that might otherwise be construed to be outside their scope.

3

4.      The singular is to be construed to include the plural and the plural is to be construed to include the singular, as necessary to bring within the scope of these document requests any documents that might otherwise be construed to be outside their scope.

5.      The terms "and" and "or" are construed either disjunctively or conjunctively, as necessary to bring within the scope of these document requests any documents that might otherwise be construed to be outside their scope.

6.      Where only a portion of a document relates to a document request, the entire document shall be produced nonetheless, along with any attachments, exhibits, or appendices.

7.      If any documents cannot be made available in full, provide those documents to the extent possible, specifying the reasons for the inability to make the remainder available.

8.      All documents shall be made available as they are kept in Belize's files in the usual and regular course of business, along with any identifying labels, file markings, or similar identifying features.

9.      In the event that any document is not produced by reason of a claim of privilege, work product, or similar doctrine, you shall provide an explanation signed by an attorney representing you as to the specific nature of the privilege claimed as the reason for your refusal to produce and all facts supporting your refusal to produce. If any document is withheld under a claim of privilege (including, but not limited to, the work product doctrine), provide a log of the information set forth in Federal Rule of Civil Procedure 26(b)(5), including the type of document, the general subject matter of the document, the date of the document, and such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a

manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by you.

10. Each request below calls for the production of all documents and things in your actual or constructive possession, custody, or control or to which you have access, including documents that have been provided by you to your attorneys, to your consultants, or to your attorney's consultants. In the event that any document is not identified or produced on the ground that it has been lost, destroyed, or otherwise disposed of since its creation or receipt, identify the document, including, but not limited to, the date of the document, the author(s) of the document, the document's signatory (signatories) and those who participated in its preparation, the type of document it is (e.g., letter, chart, memorandum, etc.), a description of the non-produced subject matter and the length thereof, a list identifying those persons and entities to whom said document(s) was disseminated, the last custodian of the document and any copies thereof, and the circumstances whereby the document and copies thereof were lost, destroyed, or otherwise disposed of.

## DOCUMENTS REQUESTED

1. Documents sufficient to identify the location, value, and use of all real property (other than embassy or consulate) owned by Belize within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

2. Documents sufficient to identify the location and value of all fixtures or other immovable property associated with real property identified pursuant to Request No. 1 above within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

3.      Documents sufficient to identify the location, value, and use of all airplanes, trucks, boats, cars, or vehicles in which Belize has an ownership interest, whether direct or indirect, within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

4.      All documents relating to the identification, location, value, and use of all gold, or other precious metals, works of art, precious gems, and jewelry in which Belize has an ownership interest, whether direct or indirect, within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

5.      All documents relating to the identification of all accounts at all banks or financial institutions held by, in the name of, or for the benefit of Belize, including for each account, the address and phone numbers of the institution and branch or subsidiary at which the account is maintained, the name or title on the account, the account number, the currency in which the account is maintained, the identities of authorized signatories for the account, whether the account is currently open or closed, and, if the account is closed, the date of closing and current balance of an open account or balance at the time of closing within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

6.      All documents relating to the identification of all accounts at all brokerage houses, securities firms, or other institutions that hold securities or commodities held by, in the name of, or for the benefit of Belize, including the address and phone number of the institution and branch and subsidiary at which the account is maintained, the name or title on the account, the account number, the securities, commercial paper, or other asset, interest, or property held in

the account, the identities of authorized signatories for the account, whether the account is currently open or closed, and, if the account is closed, the date of closing and current balance of an open account or balance at the time of closing within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

7.     All documents relating to the identification of any safe deposit box in the name of, or for the benefit of, Belize within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

8.     Documents sufficient to identify any loan extended by Belize to any person or entity headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, including the identity of the borrower, the name, address and phone number of the borrower, the principal amount, the repayment schedule, and the identity of the account to which payments are made.

9.     Documents sufficient to identify any and all loans extended to Belize by any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, including the identity of the lender, the name, address, and phone number of the lender, the principal amount, the repayment schedule, and the identity of the account to which payments are made.

10.     Documents sufficient to identify all rights of Belize to receive payments from or by any person or entity present, headquartered, domiciled, or incorporated within the territorial

limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, including the identity and address of the person or entity obligated to make such payments and the amounts to be paid.

11.    All documents relating to any completed or proposed assignment or transfer of any right of Belize to any payments due from or by any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

12.    All documents relating to all agreements between or among Belize and any person or entity, or any branch, subsidiary or affiliate thereof, present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, concerning the exploration for and/or development or operation or production of any natural resources of Belize.

13.    All documents relating to all contracts between Belize and any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, pursuant to which Belize purchases any goods or services with a value in excess of $10,000.

14.    All documents relating to all contracts between Belize and any person or entity present, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America, pursuant to which Belize sells any goods or services with a value in excess of $10,000.

15.    All documents relating to any ownership interest of Belize, whether direct or indirect, in any corporation, partnership, limited liability entity, stock, bond, or mutual fund or other entity that is present, doing business, headquartered, domiciled, or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America.

16.    All documents relating to any money judgments currently outstanding in favor of Belize and against a person or entity that is present, doing business, headquartered, domiciled or incorporated within the territorial limits of Washington, D.C. and outside the territorial limits of Washington, D.C. but within the territorial limits of the United States of America and the amounts owed.

17.    All documents relating to any contracts, agreements, or other arrangements between Belize and any person or entity to serve as Belize's agent for the payment or collection of any monies due to Belize or payments due from Belize.

18.    All prospectuses, listing memoranda, press releases, and indentures relating to the 2038 Bonds.

19.    All communications relating to interest payments on the 2038 Bonds, including, but not limited to, the timing and amounts of the interest payments.

20.    All documents relating to each and every step in the process by which Belize makes any payments of interest or any other amounts under the 2038 Bonds.

21.    All communications between Belize and all current and former paying agents, transfer agents, registrars, clearing agencies, clearing corporations and offices or agencies where the 2038 Bonds may be presented for exchange, transfer, and registration of transfer, or where interest on the 2038 bonds may be paid.

Dated: March 13, 2014

SIDLEY AUSTIN LLP

By: _____

Louis B. Kimmelman (admitted pro hac vice)
Dana C. MacGrath (admitted pro hac vice)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
bkimmelman@sidley.com
dmacgrath@sidley.com

Kristin Graham Koehler

1501 K Street, NW
Washington, D.C. 20005
Telephone: (202) 736-8359
Facsimile: (202) 736-8711
kkoehler@sidley.com

Counsel for Petitioner
Belize Social Development Limited

## CERTIFICATE OF SERVICE

I certify that today, March 13, 2014, I served the foregoing Petitioner's First Request for

Post-Judgment Production of Documents on counsel for Respondent by Federal Express delivery

to the following:

Creighton R. Magid
Dorsey & Whitney LLP
1801 K Street NW
Suite 750
Washington, D.C. 20006

Juan C. Basombrio
Dorsey & Whitney LLP
600 Anton Blvd.
Suite 2000
Costa Mesa, CA 92646

By: _____

Ritu K. Ghai

**TAB 11**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BELIZE SOCIAL DEVELOPMENT LIMITED | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 1:09-CV-02170-RJL |
| v. | ) | |
| | ) | |
| THE GOVERNMENT OF BELIZE | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## RESPONDENT'S MOTION TO STAY PROCEEDINGS PENDING APPEAL AND FOR EMERGENCY RELIEF

Respondent Government of Belize ("GOB") hereby moves the Court for a stay of proceedings in this Court against GOB, including but not limited to a stay of discovery in aid execution and a stay of enforcement, pending resolution of GOB's pending appeals to the D.C. Circuit in this matter.

GOB's January 8, 2014, interlocutory appeal [Docket No. 57] from this Court's December 11, 2013, Order [Docket No. 52] and Memorandum Opinion [Docket No. 51] divested this Court of jurisdiction to proceed with the litigation.  This Court's Order, filed on January 9, 2014 [Docket No. 59] is therefore invalid, as is any attempt to execute upon the invalid January 9 award or to conduct further discovery in this matter.

Because petitioner Belize Social Development Limited ("BSDL") has not consented to hold its "post-judgment" interrogatories and document requests in abeyance pending the outcome of this motion, GOB also respectfully requests that the Court issue a preliminary order suspending all discovery until after this Court has an opportunity to resolve the motion to stay.

## PROCEEDINGS TO DATE

BSDL brought this action to confirm a purported arbitration award.  GOB moved to stay the action or, in the alternative, dismiss the petition based on several grounds, including GOB's entitlement to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA").  This Court, by minute entry dated October 12, 2010, granted the motion to stay pending the outcome of litigation between the parties before the Belizean Supreme Court.

BSDL appealed from the stay order or, in the alternative, petitioned for a writ of mandamus.  The Court of Appeals granted the writ of mandamus and remanded the matter to this Court.  *See Belize Social Development Ltd. v. Government of Belize*, 668 F.3d 724 (D.C. Cir. 2012 ), *cert denied,* 133 S.Ct. 274 (2012) ("*BSDL*").

On December 11, 2013, this Court denied GOB's motion to dismiss the petition, concluding, among other things, that Belize did not enjoy foreign sovereign immunity from suit in this confirmation action under the FSIA, and granted BSDL's petition to confirm the purported arbitration award.

GOB appealed from the Court's order on January 8, 2014.  [Docket No. 57]  The following day, the Court filed an Order (which was hand-dated January 8) awarding BSDL $22,484,961.94.  [Docket No. 59.]  The clerk entered judgment in that amount in favor of BSDL on February 4, 2014. [Docket No. 66.]

On March 14, 2014, GOB received BSDL's First Set of Post-Judgment Interrogatories, containing 22 extremely broad interrogatories regarding GOB's assets, and BSDL's First Request for Post-Judgment Production of Documents, comprised of 21 extremely broad

document requests pertaining to GOB's assets.  *See* Declaration of Creighton R. Magid at ¶ 2 and

Exhibits A and B thereto.  The purported deadline for GOB to respond is April 14, 2014.

## ARGUMENT

### A.   GOB's Interlocutory Appeal Divested This Court of Jurisdiction.

GOB properly brought an interlocutory appeal from this Court's denial of its motion to

dismiss the petition on sovereign immunity grounds.  *See, e.g., Ungar v. Palestine Liberation

Org.*, 402 F.3d 274, 293 (1st Cir. 2005) ("a district court's denial of a motion to dismiss a

complaint on the ground of foreign sovereign immunity is immediately appealable under the

collateral order doctrine").  GOB's appeal therefore divested this Court of jurisdiction to proceed

with the litigation pending resolution of the appeal.  Id. at 293 (an appeal from a denial of a

motion to dismiss on foreign sovereign immunity grounds "divests the district court of

jurisdiction to proceed with the litigation pending [the appeal's] resolution"); *Eckert Int'l, Inc. v.

Gov't of Sovereign Dem. Rep. of Fiji*, 834 F.Supp.2d 167, 174 (E.D.Va. 1993) (same);  *Licea v.

Curacao Drydock Co., Inc.*, 870 F.Supp.2d 1360, 1366 (S.D. Fla. 2012) (same).

Such a divestiture of jurisdiction prevents any discovery from going forward in the

district court.  *See Licea*, 870 F.Supp.2d at 1366 ("a district court properly stays litigation,

including discovery, pending appeal of a denial of sovereign immunity"); *see also Bradford-

Scott Data Corp., Inc. v. Physician Computer Network, Inc.*, 128 F.3d 504, 506 (7th Cir. 1997)

(discovery may not proceed in the district court after the filing of an interlocutory appeal).

Because GOB properly brought an interlocutory appeal on January 8, 2014, neither

BSDL's attempt to conduct discovery nor any other action related to the substance of the appeal

may proceed.

The effect of GOB's interlocutory appeal mandates a stay for another reason as well. Because the filing of GOB's appeal immediately divested this Court of jurisdiction, this Court was without jurisdiction to enter its order of January 9, 2014, awarding BSDL $22,484,961.94. *See Garcia v. Burlington Northern Railroad Co*., 818 F.2d 713, 721 (10th Cir. 1987) (once a district court is divested of jurisdiction, "[a]ny subsequent action by it is null and void."). A determination of damages is precisely the type of action that is rendered void by previously-filed interlocutory appeal. *Id*. at 721 ("the determination of damages is an integral part of the merits decision [as to which a district court is divested of jurisdiction by an appeal] and not a collateral matter"). For the same reason, the clerk had no authority to enter judgment in favor of BSDL on February 4.

Accordingly, because GOB had previously appealed from the denial of the motion to dismiss on sovereign immunity grounds, has been no valid determination of damages or entry of judgment that can be the proper subject of the post-judgment discovery as sought by BSDL.

> **B.      GOB's Appeal Raises Serious Issues Regarding Foreign Sovereign Immunity in The Context Of Arbitration Confirmation Proceedings.**

There is only one exception to the rule that an interlocutory appeal divests a district court of jurisdiction, but that exception is inapplicable here.

An interlocutory appeal does not divest a district court of jurisdiction if the appeal is "frivolous" and filed solely for tactical reasons. *See Eckert Int'l*, 834 F.Supp. at 174. GOB's appeal, however, raises serious issues regarding sovereign immunity under the FSIA. For an interlocutory appeal to be deemed frivolous, "it must be both meritless and substantively inappropriate." *Eckert Int'l*, 834 F.Supp. at 174. Even an appeal based on arguments that are "unconvincing and contrary to existing precedent" cannot be deemed "frivolous" absent a showing that the appeal is both "wholly lacking in merit" and unsupported by substantive facts.

4

*Id*. at 174 – 75 (*citing United States v. Head*, 697 F.2d U.S. 1200, 1204-05 (4th Cir. 1982), *cert.*

*denied*, 462 U.S. 1132 (1983)).  Neither element is present here, where GOB's status as a foreign

sovereign and the fact that it is not a party to the New York Convention are not in dispute, and

where GOB's position is supported by Supreme Court precedent, cases from other Circuits, and

prior holdings of this Circuit and of courts of this District.  Consequently, the divestiture of this

Court's jurisdiction by GOB's interlocutory appeal cannot be avoided by reference to the

"frivolous appeal" exception.

 GOB raises the meritorious argument as to whether, even though GOB is not a signatory

to the New York Convention, the New York Convention can nonetheless be asserted against

GOB to give effect to the arbitration exception in the FSIA.  If, as GOB maintains, a treaty to

which it is not a party cannot be asserted against it, the arbitration exception does not apply and

this Court lacks subject matter jurisdiction to confirm the purported arbitration award.

 In its December 11 order, this Court concluded that Belize's status under the New York

Convention is "irrelevant," based on the Court of Appeals' decision in *BSDL*, which held:

> The fact that Belize is not a party to the New York Convention is irrelevant. If the place
> of the award is 'in the territory of a party to the Convention, all other Convention states
> are required to recognize and enforce the award, regardless of the citizenship or domicile
> of the parties to the arbitration.' *Creighton Ltd. v. Gov't of the State of Qatar,* 181 F.3d
> 118, 121 (D.C.Cir. 1999).  The Award was rendered in London, and BSDL seeks
> enforcement in the United States; both England and the United States are parties to the
> New York Convention.

*BSDL*, 668 F.3d at 731 n. 3.

 The authority cited by the Court of Appeals in *BSDL,* however, does not support the

conclusion reached.  In *Creighton*, Qatar, although not a signatory to the New York Convention,

did not dispute the Convention's application and willingly participated in the arbitration action

that gave rise to the award that the petitioner sought to enforce applied.  *See Creighton*, 181 F.3d

at 120-21.  By contrast, GOB has *always* disputed the applicability of the New York Convention

and did *not* participate in the arbitration action brought by BSDL.

Similarly, in *Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria,* 697 F.Supp.2d 46,

55–56 (D.D.C. 2010), which this Court cited in support of its holding, Nigeria, the party against

whom the petitioner sought to enforce the arbitration award, *had* ratified the New York

Convention.   *Cont'l Transfer* , 697 F.Supp.2d at 55.  GOB stands in a vastly different posture,

since it has *not* ratified the New York Convention.

The Court of Appeals' decision in *BSDL* decision also warrants re-evaluation because it

is in conflict with prior Supreme Court decisions.  The Supreme Court has consistently held that

a treaty does not apply unless it is both signed and ratified.  *See, e.g., Medellin v. Texas*, 552 U.S.

491, 505 (2008) (a treaty is not enforceable unless it is ratified); *Minnesota v. Mille Lacs Band of

Chippewa Indians*, 526 U.S. 172, 214 (1999) (holding that only after a treaty was executed and

ratified did the treaty have legal effect).

*BSDL* also creates a Circuit split.  *See, e.g., Flores v. S. Peru Copper Corp.,* 414 F.3d

233, 256 (2d Cir. 2003) ("A state only becomes bound by -- that is, becomes a party to -- a treaty

when it ratifies the treaty.") (citing *Haver v. Yaker,* 76 U.S. (9 Wall.) 32, 35, 19 L.Ed. 571

(1869)); *Flores-Nova v. Attorney General of U.S.*, 652 F.3d 488, 494 note 6 (3d Cir. 2011)

("Unratified treaties are not binding on the United States and do not have the force of law.");

*Garza v. Lappin*, 253 F.3d 918, 925 (7th Cir. 2001) (an unratified treaty does not create "binding

obligations" on the United States).  GOB recognizes that this Court considered itself bound by

the decision in *BSDL*.  However, *BSDL* effectively posits that one set of rules applies to the

United States and another set of rules applies to GOB.  That inconsistency is untenable in the

field of international relations and must be addressed and resolved by the Court of Appeals.  *See*

*e.g., The Amistad*, 40 U.S. 518, 578 (1841) ("Let us recollect that there is among nations as among men, a golden rule; let us do to them, as we wish them to do to us . . ..").

GOB's position is also supported by established case law in this District.

For example, Judge Hogan held in *U.S. v. Pineda* that a treaty is "judicially unenforceable" as against a non-ratifying party:

> Although the United States was a signatory to that treaty, the United States' signature was never ratified, so the treaty is not binding to our country.  […]  As a result, that treaty has never taken effect with regard to the United States and the Court is unwilling to judicially enforce a treaty that the legislative branch, in its proper discretion, elected not to ratify.

*U.S. v. Pineda*, 2006 WL 785287 at *3 note 5 (D.D.C. 2006).

Judge Collyer, in a case involving the Republic of China, held – consistent with GOB's position here – that a non-signatory to the New York Convention, merely by agreeing to arbitrate in a signatory country, does not waive sovereign immunity:

> Like Qatar, the ROC is not a signatory to the New York Convention. *See* Pl.'s Opp. to First Mot. to Dismiss at 5 n. 3 (Strategic Tech concedes that the ROC is not a signatory). Just as Qatar did not waive sovereign immunity by agreeing to arbitrate in France, the ROC did not waive sovereign immunity by agreeing to arbitrate in Singapore, as the election to arbitrate in another country alone does not demonstrate the intent to waive sovereign immunity. *See Creighton,* 181 F.3d at 122-23.

*Strategic Technologies PTE, Ltd. v. Republic of China (Taiwan)*, 2007 WL 1378492 at *3 (D.D.C. 2007).

GOB also raises substantial questions as to whether BSDL had standing to seek confirmation under the New York Convention, and whether this Court should have granted jurisdictional discovery to GOB regarding that issue.

BSDL claimed standing based on a purported "partial assignment" from BTL (the claimant in the LCIA arbitration) to BSDL of the "payment portion" of the award.  However, the pertinent assignment clause required a full assignment of all rights and obligations under the

award to a wholly owned subsidiary of BTL.  BTL supposedly incorporated BSDL in the British

Virgin Islands only two days after the award was rendered, purportedly assigned only the

payment portion of the award to BSDL, and then purportedly immediately distributed the shares

that BTL held in BSDL as a dividend in specie to the shareholders of BTL, meaning that BSDL

was no longer a subsidiary of BTL.  GOB contends that this transaction was a sham and did not

comply with the assignment requirements of the agreement, such that BSDL lacked standing to

seek confirmation of the arbitration award.

GOB's position is well supported by existing law.  It is axiomatic that a non-party to an

award does not have standing to enforce it in the absence of a valid assignment.  *See I.S. Joseph*

*Co., Inc. v. Michigan Sugar Co.*, 803 F.2d 396, 400 (8th Cir. 1986) (holding, in the context of a

dispute over assignability, that "the enforceability of an arbitration clause is a question for the

court when one party denies the existence of a contract with the other").  BSDL responded that

the prior assignment clause was deleted and replaced with a new assignment provision that

contained none of these requirements.

GOB requested jurisdictional discovery on these issues:

> BSDL was not a party to the accommodation agreements, was not a party to the LCIA
> arbitration, and is not a named party under the subject arbitration award. BSDL's
> only purported standing to enforce the award is an alleged 'assignment' of the 'monetary
> portion' of the award that BTL supposedly executed in favor of BSDL. GOB was not a
> party to the assignment, does not know who BSDL is, and has disputed the validity of the
> assignment, as discussed in the GOB's papers. There also is a dispute between BTL and
> whoever has directed the filing of this action in the name of BSDL over who controls
> BSDL (which is relevant because under the accommodation agreements an assignment
> could only be made to an entity controlled by BTL). The only witness who has come
> forward so far is BSDL's counsel (Mr. Kimmelman), who claims in a letter he wrote to
> the director of BSDL nominated by BTL that said director cannot instruct BSDL on what
> to do because the shares of BSDL were allegedly distributed to shareholders of BTL.
> Thus, there also is a dispute between BTL and whoever it is from which Mr. Kimmelman
> takes his instructions as to who controls BSDL and whether this action can even proceed.

*See* Docket No. 44.

8

This jurisdictional discovery was necessary to establish or dispute the very same facts upon which the Court found that there was standing. That BSDL was a third party to the arbitration agreement, the arbitration process, and the eventual award, and that GOB had never had any dealings with BSDL, made the discovery particularly important. "[C]ourts rarely find that a nation has waived its sovereign immunity, particularly with respect to suits brought by third parties, without some strong evidence that this is what the foreign sovereign intended." *Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1150 (7th Cir. 2001).

As a further example, this jurisdictional discovery was necessary to elaborate on GOB's defenses to the claim of standing. For example, under Belizean law, it may be that BTL violated its legal obligations by issuing the subject dividend in specie, which left BTL with noting, and simply transferred the "asset" (that is, the award) to its shareholders. *See* Docket No. 39 at page 21. Thus, the requested jurisdictional discovery could have invalidated the entire assignment transaction (which was governed by Belize law since BTL is a Belizean entity).

This Court denied GOB's discovery request and took BSDL at its word. This Court concluded that "Paragraph 7.3 of the Settlement Deed, which was in effect at the relevant time, contains *none* of the terms in Section 19 that GOB claims were offended by the assignment." *Belize Social Development Limited*, 2013 WL 6502416 at *6 (emphasis in the original). GOB is entitled to review of the standing decision and decision to deny discovery, because if BSDL lacked standing to enforce the award under the Convention, then the arbitration exception to sovereign immunity would not apply and this Court would lack subject matter jurisdiction.

GOB's third basis of appeal – whether this Court should have analyzed the validity of the underlying agreements containing the arbitration clause – is likewise meritorious, involving a split among the Circuits.

In addressing this issue, this Court held:

> GOB challenges the application of § 1605(a)(6), claiming that the LCIA's final arbitral award is unenforceable because the Accommodation Agreements containing the arbitration clause 'are void *ab initio* under Belizean law.' *See* Resp't's Suppl. Br. at 25; *see also* Final Award ¶ 17 (quoting relevant arbitration clause). I agree with my colleague, Judge Boasberg, who recently noted a lack of authority for the proposition 'that the Court must conduct [ ] an independent, *de novo* determination of the arbitrability of a dispute to satisfy the FSIA's arbitration exception.' *Chevron Corp. v. Republic of Equador*, -- F.Supp.2d --, --, 2013 WL 2449172, at *3 (D.D.C. June 6, 2013).

*Belize Social Development Limited*, 2013 WL 6502416 at *5.

However, a differing view has been expressed in the Third Circuit.  In *China Minmetals Material Export Co. Ltd. v. Chi Mei Corp.*, 334 F.3d 274 (3rd Cir. 2003), the Third Circuit held that federal courts applying the New York Convention must analyze the validity of the underlying agreement when a party opposing enforcement disputes the validity of the agreement, regardless of whether the arbitrator concluded that the agreement was valid:

> a party that opposed enforcement of a foreign arbitration award under the Convention on the ground that the alleged agreement containing the arbitration clause on which the panel rested its jurisdiction was *vid ab initio* is entitled to present evidence of such invalidity to the district court, which must make an independent determination of the agreement's validity and therefore of the arbitrability of the dispute, at least in the absence of a waiver precluding the defense.

*China Minmetals*, 334 F.3d at 289 (emphasis added).

This Court concluded that *China Minmetals* was inapposite because "in that case, the respondent claimed that the entire agreement containing the arbitration clause had been forged and thus the parties had never agreed to arbitrate." *Belize Social Development Limited*, 2013 WL 6502416 at *9.  However, the Court of Appeals has ample basis to disagree, since GOB, too, claimed that the underlying agreement was invalid in its entirety.

It is undisputed that Section 15 of the underlying agreement provided that it is governed by the laws of Belize.  GOB made this Court aware of the decision of the Caribbean Court of Justice ("CCJ") in *BCB Holdings, Ltd., et al. v. Attorney General of Belize*.  The CCJ declined to

enforce an LCIA award against the GOB on the grounds that the underlying agreement was illegal and invalid under the laws of Belize.  Based on the *BSDL* decision, this Court considered the CCJ decision to be "irrelevant."  However, the CCJ decision defines Belizean law on the issue, and the agreement is governed by Belizean law.  Thus, the Court of Appeals confronts a substantial question whether the choice-of-law provision in an agreement determines the law to be applied to the question of the agreement's validity, or whether, following the Third Circuit, a choice-of-law provision cannot be given effect until the validity of the agreement itself is determined under the law of the nation where the agreement was made.

Because this interlocutory appeal presents serious issues related to the existence and exercise of FSIA jurisdiction, the immediate divestiture of this Court's jurisdiction by the filing of the interlocutory appeal cannot be circumvented by reference to the "frivolous" exception.

## CONCLUSION

For the above-stated reasons, this Court should stay all further proceedings before it, including but not limited to discovery and attempts to execute on the void judgment entered by the clerk in this matter.  Further, to avoid any issue concerning deadlines for responding to the purported post-judgment discovery served by BSDL, GOB also requests that the Court issue a preliminary order suspending the obligation of GOB to respond to the subject discovery until after this motion to stay has been resolved.

4840-8924-4697False1False

Respectfully submitted,

Dated:  April 3, 2014

_____/s/ Creighton R. Magid_____
Creighton R. Magid (D.C. Bar No. 476961)
Dorsey & Whitney LLP
1801 K Street NW, Suite 750
Washington, DC 20006
(202) 442-3555 (telephone)
(202) 442-3199 (facsimile)
magid.chip@dorsey.com

Juan C. Basombrio(Admitted *Pro Hac Vice*)
Dorsey & Whitney LLP
600 Anton Boulevard
Costa Mesa, California 92626
(714) 800-1405 (telephone)
(714) 800-1499 (facsimile)
basombrio.juan@dorsey.com

Counsel for Respondent
**GOVERNMENT OF BELIZE**

Pursuant to Local Civil Rule 7(m), counsel for the GOB conferred with counsel for BSDL on March 31, 2014, regarding this motion.  Counsel for BSDL was to confer with his client and respond with BSDL's position no later than April 2.  As of April 3, 2014, BSDL had not indicated whether it intends to oppose this motion.

4840-8924-4697False1False

**TAB 12**

| | |
|---|---|
| **From:** | DCD_ECFNotice@dcd.uscourts.gov |
| **To:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Subject:** | Activity in Case 1:09-cv-02170-RJL BELIZE SOCIAL DEVELOPMENT LIMITED v. GOVERNMENT OF BELIZE Order on Motion to Stay |
| **Date:** | Tuesday, April 29, 2014 5:05:56 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of Columbia

### Notice of Electronic Filing

The following transaction was entered on 4/29/2014 at 5:04 PM and filed on 4/29/2014

**Case Name:**     BELIZE SOCIAL DEVELOPMENT LIMITED v. GOVERNMENT OF BELIZE

**Case Number:**     1:09-cv-02170-RJL

**Filer:**

**WARNING: CASE CLOSED on 01/16/2014**

**Document Number:**     No document attached

**Docket Text:**
**MINUTE ORDER denying [72] Respondent's Motion to Stay Proceedings Pending Appeal and for Emergency Relief. It is hereby ORDERED that Respondent's motion is DENIED. Signed by Judge Richard J. Leon on 4/29/2014. (lcrjl3)**

**1:09-cv-02170-RJL Notice has been electronically mailed to:**

Joseph S. Hall      jhall@khhte.com, bmurphy@khhte.com, yisaac@khhte.com

Kenneth Chris Todd      ctodd@khhte.com, dkasparek@khhte.com

Kristin Graham Koehler      kkoehler@sidley.com, nyefiling@sidley.com

Creighton R. Magid      magid.chip@dorseylaw.com, flores.sandra@dorsey.com

Louis B. Kimmelman        bkimmelman@sidley.com, nyefiling@Sidley.com

Juan C. Basombrio        basombrio.juan@dorsey.com

Dana C. MacGrath        dmacgrath@sidley.com, nyefiling@Sidley.com

**1:09-cv-02170-RJL Notice will be delivered by other means to::**