*INITIAL VERSION*
ORAL ARGUMENT HAS NOT BEEN SCHEDULED

---

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

Nos. 14-7002, 14-7003 and 14-7018

————————

BELIZE SOCIAL DEVELOPMENT LIMITED,

*Petitioner-Appellee*,

v.

GOVERNMENT OF BELIZE,

*Respondent-Appellant.*

————————

*On Appeal from the District Court for the District of Columbia,*
*Case No. 1:09-cv-02170-RJL (Hon. Richard J. Leon, Judge)*

————————

## BRIEF OF RESPONDENT-APPELLANT GOVERNMENT OF BELIZE

————————

JUAN C. BASOMBRIO (of counsel)
Dorsey & Whitney LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, California 92626
Telephone:  (714) 800-1405
basombrio.juan@dorsey.com

CREIGHTON R. MAGID
Dorsey & Whitney LLP
1801 K Street, NW, Suite 750
Washington, DC 20006
Telephone:  (202) 442-3555
Fax:  (202) 442-3199
magid.chip@dorsey.com

Counsel for Respondent-Appellant
**GOVERNMENT OF BELIZE**

June 18, 2014

## STATEMENT REGARDING ORAL ARGUMENT

Respondent-Appellant Government of Belize requests oral argument, believing that oral argument will assist in the resolution of this appeal.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Respondent-Appellant Government of Belize hereby certifies that:

**A.**    ***Parties and Amici***.

Appellant in this appeal is the Government of Belize ("GOB"), and appeared as Respondent in the District Court action.

Appellee in this appeal is Belize Social Development Limited ("BSDL"), and appeared as Petitioner in the District Court action.

There were no amici or intervenors in the District Court action and Respondent-Appellant is aware of none before this Court at this time.

**B.**    ***Rulings Under Review***.

This appeal involves three consolidated appeals:

No. 14-7002:  This appeal is taken from the District Court's Order, dated December 11, 2013, granting confirmation of BSDL's petition, denying GOB's motion to dismiss and denying GOB's motion for supplemental briefing and discovery.  ECF 52, Order (JA-___) and ECF 51, Memorandum and Opinion (JA-___).  The District Court's decision is reported at *Belize Social Development Ltd. v. Government of Belize*, -- F.Supp.2d -- , 2013 WL 6502416 (D.D.C. 2013) ("*BSDL*") (JA-___).  On January 8, 2014, GOB filed a notice of appeal of the December 11, 2013 Order and Memorandum and Opinion.  ECF 57 (JA-___).

No. 14-7003:  This appeal is taken from The District Court's Order, dated January 9, 2014, awarding BSDL the amount of $22,484,961.94.  ECF 59 (JA-__). On January 13, 2014, GOB filed a notice of appeal of the January 9, 2014 Order. ECF 61 (JA-__).

No. 14-7018:  This appeal is taken from the Judgment entered by the Clerk of the District Court, on February 4, 2014, in favor of BSDL.  ECF 66 (JA-__).  On February 4, 2014, GOB filed a notice of appeal of the February 4, 2014 Judgment. ECF 67 (JA-__).

## C.    *Related Cases*.

This case was previously before this Court in *Belize Social Development Limited v. Government of Belize*, No. 10-7167, which decision is reported at *Belize Social Development Limited. v. Government of Belize*, 668 F.3d 724 (D.C. Cir. 2012), *cert. denied,* -- U.S. -- , 133 S.Ct. 274 (2012).

This case involves three related appeals:  *Belize Social Development Limited v. Government of Belize*, No. 14-7002; *Belize Social Development Limited v. Government of Belize*, No. 14-7003 and *Belize Social Development Limited v. Government of Belize*, No. 14-7018, which have been consolidated by orders of this Court.  *See* January 14, 2014 and February 20, 2014 Clerk's orders consolidating these three appeals.

Other than as indicated above, this case has not previously been before this Court or any other Court as defined in D.C. Cir. Rule 28(1)(C) other than the District Court.

Dated:  June 18, 2014

Respectfully submitted,

*/s/ Creighton R. Magid*

CREIGHTON R. MAGID
Dorsey & Whitney LLP
1801 K Street, NW, Suite 750
Washington, DC 20006
Telephone:  (202) 442-3555
Fax:  (202) 442-3199
magid.chip@dorsey.com

JUAN C. BASOMBRIO (of counsel)
Dorsey & Whitney LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, California 92626
Telephone:  (714) 800-1405
basombrio.juan@dorsey.com

Counsel for Respondent-Appellant
GOVERNMENT OF BELIZE

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to D.C. Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1, Respondent-Appellant submits the following corporate disclosure statement:

Respondent-Appellant Government of Belize is a foreign sovereign, and, therefore, does not have a parent company and no entity has any ownership interest in the Government of Belize.

## **TABLE OF CONTENTS**

Page

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF ISSUES ON APPEAL .............................................................2

STATEMENT OF THE CASE.......................................................................3

STATEMENT OF FACTS ...........................................................................5

    A.     LORD ASHCROFT AND HIS FINANCIAL CHOKE ON BELIZE. ...............................................................5

    B.     THE SECRET AND VOID ACCOMMODATION AGREEMENTS. .................................................6

    C.     THE *EX PARTE* LCIA ARBITRATION.................................................8

    D.     THE ACCOMMODATION AGREEMENTS ARE VOID *AB INITIO* BECAUSE THE FORMER PRIME MINISTER LACKED ACTUAL AUTHORITY TO EXECUTE THEM. ..............9

    E.     CREATION OF BSDL TO CIRCUMVENT THE BELIZE COURTS. ..............................................12

    F.     GOB ASSUMES CONTROL OVER TELECOMMUNICATIONS. ..............................................12

    G.     LITIGATION IN BELIZE. .................................................13

    H.     BSDL FILES ITS PETITION TO CONFIRM THE AWARD, AND ITS STAY IS REVIEWED BY A PRIOR PANEL THIS COURT. ..............................................14

    I.     THE CARIBBEAN COURT OF JUSTICE HOLDS THAT THE TAX LAWS CANNOT BE MODIFIED BY EXECUTIVE AGREEMENT. ..............................................14

    J.     FURTHER PROCEEDINGS BEFORE THE DISTRICT COURT. ..............................................15

SUMMARY OF THE ARGUMENT ................................................................16

ARGUMENT ..............................................................................................17

I.    THE ACTION MUST BE DISMISSED ON FOREIGN SOVEREIGN
IMMUNITY GROUNDS. ..........................................................................17

      A.    FSIA IS THE SOLE BASIS FOR OBTAINING SUBJECT-
MATTER JURISDICTION OVER A FOREIGN STATE. ..............17

      B.    THE ARBITRATION EXCEPTION CANNOT APPLY
BECAUSE THE SUBJECT AGREEMENT CANNOT BE
IMPUTED TO GOB. ......................................................................18

      C.    THE ARBITRATION EXCEPTION CANNOT APPLY
SINCE THE CONVENTION IS INAPPLICABLE TO THE
AWARD. .......................................................................................25

      D.    THE DISTRICT COURT FAILED TO CONDUCT AN FSIA
ANALYSIS AND MISAPPLIED THE *BSDL* DECISION...............27

II.    THE ACTION SHOULD BE DISMISSED ON *FORUM NON
CONVENIENS* GROUNDS.........................................................................29

      A.    THE LAW OF THE CIRCUIT DOCTRINE IS NOT A BAR...........30

      B.    *TMR ENERGY* CONFLICTS WITH SUPREME COURT
PRECEDENTS..............................................................................31

      C.    *TMR ENERGY* HAS CREATED A CIRCUIT SPLIT.......................32

      D.    *FORUM NON CONVENIENS* DISMISSAL IS WARRANTED.......33

III.    THE ACTION SHOULD BE DISMISSED ON INTERNATIONAL
COMITY GROUNDS. ...............................................................................36

IV.    THE ACTION SHOULD BE DISMISSED FOR LACK FOR PERSONAL
JURISDICTION. ......................................................................................40

V.    IN THE ALTERNATIVE, THE PETITION SHOULD BE DENIED
UNDER THE NEW YORK CONVENTION. ...............................................43

      A.    THE PETITION SHOULD BE DENIED BECAUSE BELIZE

        HAS NOT RATIFIED THE NEW YORK CONVENTION..............44

    B.    THE PETITION SHOULD BE DENIED BECAUSE GOB
        WAS NOT A PARTY TO THE SUBJECT AGREEMENT
        AND IT IS VOID (ARTICLE V(1)(a)). .............................................47

    C.    THE PETITION SHOULD BE DENIED BECAUSE THE
        MATTER IS NOT SUBJECT TO SETTLEMENT BY
        ARBITRATION (ARTICLE V(2)(a)). ...............................................50

    D.    THE PETITION SHOULD HAVE BEEN DENIED BASED
        ON PUBLIC POLICY GROUNDS (ARTICLE V(2)(b)). .................52

VI.    THE JANUARY 9, 2014 ORDER AND FEBRUARY 4, 2014 JUDGMENT
        ALSO MUST BE REVERSED. ....................................................................55

CONCLUSION ......................................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aamer v. Obama*,
    742 F.3d 1023 (D.C. Cir. 2014)........................................................................30

*Agudas Chasidei Chabad of U.S. v. Russian Fed.*,
    528 F.3d 934 (D.C. Cir. 2008)..........................................................................29

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008)...........................................................................................24

*Allfreight Worldwide Cargo, Inc. v. Ethiopian Airlines Ent.*,
    307 Fed. Appx. 721 (4th Cir. 2009)...................................................................23

*American Dredging Co. v. Miller*,
    510 U.S. 443 (1994)...........................................................................................31

*In re Arbitration Between Monegasque De Reassurances S.A.M. v.
    Nak Naftogaz of Ukraine*,
    311 F.3d 488 (2d Cir. 2002) ..............................................................................33

*Argentine Rep. v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)...........................................................................................17

*Atlantic Marine Const. Co., Inc. v. U.S. Dist. Ct.*,
    --U.S. --, 134 S.Ct. 568 (2013) ...................................................................31, 41

*Att'y General v. Belize Telemedia Ltd. and Belize Soc. Develop. Ltd.*,
    No. 317 of 2009 ................................................................................................13

*Attorney General v. R.J. Reynolds Tobacco Holdings, Inc.*,
    268 F.3d 103 (2d Cir. 2001) .......................................................................50, 51

*Avero Belgium Ins. v. Am. Airlines, Inc.*,
    423 F.3d 73 (2d Cir. 2005) ...............................................................................46

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
    -- F.Supp.2d --, 2013 WL 6502416 (D.D.C. 2013)
    ................................................ 15, 19, 21, 27, 28, 29, 30, 39, 40, 43, 49, 51, 53

*Authorities upon which we chiefly rely are marked with asterisks.

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
  688 F.3d 724 (D.C. Cir. 2011)............................................ 14, 28, 29, 38, 39, 40

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006)........................................................................21

*C.f. Doe v. Qi*,
  349 F. Supp. 2d 1258 (N.D. Cal. 2004)...........................................22

*Chacon v. Eighty-Nine Bales of Cochineal*,
  1 Brock 478, 5 F.Cas. 390 (Cir. Ct. D. Va. 1821), *aff'd Santissima Trinidad & St. An De*, 20 U.S. 283 (1822) .........................................44

*Chevron Corp. v. Rep. of Equador*, -- F. Supp. 2d -- ,
  2013 WL 2449172 (D.D.C. 2013) ....................................................21

*China Minmetals Materials Import and Export Co., Ltd. v. Chi Mei Corp.*,
  334 F.3d 274 (3d Cir. 2003) ......................................................47, 48

*Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*,
  697 F. Supp. 2d 46 (D.D.C. 2010).........................................27, 28, 32

*Creighton Ltd. v. Gov't of the State of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999)..................................27, 28, 42, 45, 46

*D.H. Blair & Co., Inc. v. Gottdiener*,
  462 F.3d 95 (2d Cir. 2006) ..............................................................35

*Daimler AG v. Bauman*,
  -- U.S. -- , 134 S.Ct. 746 (2014) ....................................................40

*Dale v. Colagiovanni*,
  443 F.3d 425 (5th Cir. 2006) ..........................................................23

*Dallah Real Estate & Tourism Holding Co v. Pakistan*,
  [2010] UKSC 46, [2011] 1 A.C. 763................................................49

*Dayton v. Czechoslovak Socialist Rep.*,
  834 F.2d 203 (D.C. Cir. 1987).........................................................36

*De Sanchez v. Banco Central de Nicaragua*,
  770 F.2d 1385 (5th Cir. 1985) .........................................................45

*Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011), *vacated on other grounds*, 527 Fed.
  Appx. 7 (D.C. Cir. 2013) ...................................................................44

*Figueiredo Ferraz E Engenharia de Projecto Ltda. v. Rep. of Peru*,
  665 F.3d 384 (2d Cir. 2011) ......................................32, 33, 34, 35, 39

*First Investment Corp. v. Fujian Mawei Shipbuilding, Ltd.*,
  703 F.3d 742 (5th Cir. 2013) .....................................................42, 43

*Flores v. S. Peru Copper Corp.*,
  414 F.3d 233 (2d Cir. 2003) ............................................................44

*Flores-Nova v. Attorney Gen.*,
  652 F.3d 488 (3d Cir. 2011) ............................................................45

*Fountain v. U.S.*,
  357 F.3d 250 (2d Cir. 2004) ............................................................50

*Garcia v. Burlington N. RR. Co.*,
  818 F.2d 713 (10th Cir. 1987) ........................................................55

*GSS Group Ltd. v. Nat'l Port Auth.*,
  680 F.3d 805 (D.C. Cir. 2012).....................................................41, 43

*Gulf Oil Co. v. Gilbert*,
  330 U.S. 501 (1947)........................................................................34

*Hammerstein v. Fed. Rep. of Germany*,
  2011 WL 9975796 (E.D.N.Y. 2011) ...............................................21

*Haver v. Yaker*,
  75 U.S. (9 Wall.) 32 (1869) .............................................................44

*Helvering v. Stockholms Enskilda Bank*,
  293 U.S. 84 (1990).........................................................................24

*Holman v. Williams*,
  436 F. Supp. 2d 68 (D.D.C. 2006)...................................................53

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)......................................................40, 41, 42, 43

*Irving v. U.S.*,
    162 F.3d 154 (1st Cir. 1988) ............................................................31

*J. McIntyre Machinery, Ltd. v. Nicastro*, -- U.S. -- ,
    131 S.Ct. 2780 (2011) ..................................................................41

*Jerez v. Rep. of Cuba*,
    777 F. Supp. 2d 6 (D.D.C. 2011) ....................................................21

*In re Korean Air Lines Disaster of Sept. 1, 1983*,
    932 F.2d 1475 (D.C. Cir. 1991) ....................................................44

*Koster v. (American) Lumbermens Mut. Casualty Co.*,
    330 U.S. 518 (1947) ......................................................................31

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
    731 F.2d 909 (D.C. Cir.1984) ......................................................39

*LaShawn A. v. Barry*,
    87 F.3d 1389 (D.C. Cir. 1996) ....................................................30

*LG Display Co. Ltd. v. Obayashi Seikou Co., Ltd.*,
    919 F. Supp. 2d 17 (D.D.C. 2013) ................................................54

*Limtiaco v. Camacho*,
    549 U.S. 483 (2007) ......................................................................24

*Loucks v. Std. Oil Co.*,
    224 N.Y. 99 (1918) ......................................................................54

*In re Maxwell Comm. Corp.*,
    93 F.3d 1036 (2d Cir. 1996) ........................................................38

*MBI Group, Inc. v. Credit Foncier Du Cameroun*,
    616 F.3d 568 (D.C. Cir. 2010) ................................................34, 35

*Ministry of Defense of the Islamic Rep. of Iran v. Gould, Inc.*,
    887 F.2d 1357 (9th Cir.1989), *cert. denied*, 494 U.S. 1016 (1990) ..................26

*Moore v. Mitchell*,
    30 F.2d 600 (2d Cir. 1929) ..........................................................51

*Moses H. Cone Mem. Hosp. v. Mercury Const. Co.*,
  460 U.S. 1 (1983)..............................................................................21

*Nanosolutions, LLC v. Prajza*,
  793 F. Supp. 2d 46 (D.D.C. 2011)..................................................26

*New Regency Prods., Inc. v. Nippon Herald Films, Inc.*,
  501 F.3d 1101 (9th Cir. 2007) ........................................................43

*NYSA-ILA Pension Trust Fund By and Through Bowers v. Garuda
  Indonesia*,
  7 F.3d 35 (2d Cir. 1993) .................................................................19

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't. of Transp.*,
  724 F.3d 230 (D.D.C. 2013) ...........................................................44

*Parsons & Whittemore Overseas Co., Inc. v. Societe Gen. de
  L'Industrie du Papier*,
  508 F.2d 969 (2d Cir.1974) .............................................................53

*Peterson v. Royal Kingdom of Saudi Arabia*,
  416 F.3d 83 (D.C. Cir. 2005) ..........................................................20

*\*Phaneuf v. Rep. of Indonesia*,
  106 F.3d 302 (9th Cir. 1997) ...............................................22, 23, 24

*Phoenix Consulting Inc. v. Rep. of Angola*,
  216 F.3d 36 (D.C. Cir. 2000) ..........................................................24

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981)........................................................................31

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002)...........................................................40

*Productos Mercantiles etc. v. Faberge USA, Inc.*,
  23 F.3d 41 (2d Cir. 1994) ...............................................................36

*\*Rep. of Argentina v. NML Capital, Ltd.*,
  -- U.S. --, 2014 WL 2675854 (2014).....................................19, 20, 42

*\*Rep. of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992)...............................................................26, 27, 40

*Rep. of Austria v. Altmann*,
   541 U.S. 677 (2004)........................................................................24

*\*Rep. of Honduras v. Philip Morris Companies, Inc.*,
   341 F.3d 1253 (11th Cir. 2003) ....................................................50

*Samantar* v. *Yousuf*,
   560 U. S. 305 (2010)......................................................................20

*\*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993)..................................................................17, 27

*Schooner Exchange v. M'Faddon*,
   11 U.S. (7 Cranch) 116 (1812) .....................................................44

*Siderman de Blake v. Rep. of Argentina*,
   965 F.2d 699 (9th Cir. 1992) .........................................................27

*\*Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*,
   549 U.S. 422 (2007)...........................................................20, 31, 32

*Soriano v. U.S.*,
   352 U.S. 270 (1957)........................................................................45

*Soudavar v. Islamic Rep. of Iran*,
   67 Fed. Appx. 618 (D.C. Cir. 2003) .............................................21

*Tahan v. Hodgson*,
   662 F.2d 862 (D.C. Cir. 1981).......................................................54

*\*TermoRio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007)...........................................25, 28, 53

*In re Terrorist Attacks on Sept. 11, 2001*,
   538 F.3d 71 (2d Cir. 2008) ............................................................18

*\*TJGEM LLC v. Rep. of Ghana*,
   -- F. Supp.2d -- , 2013 WL 6857988 (D.D.C. 2013) .....................23

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
   411 F.3d 296 (D.C. Cir. 2005)..............................30, 31, 32, 33, 36

*Tobar v. U.S.*,
  639 F.3d 1191 (9th Cir. 2011) ........................................................45

*U.S. v. Guzman*,
  419 F.3d 27 (1st Cir. 2005)............................................................31

*\*Velasco v. Gov't of Indonesia*,
  370 F.3d 392 (4th Cir. 2004) .........................................................23

*\*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983)........................................................18, 19, 20, 29

*Virginia Office for Protection and Advocacy v. Stewart*,
  -- U.S. -- , 131 S.Ct. 1632 (2011) ...................................................42

*Volvo Trucks N. America, Inc. v. Crescent Ford Truck Sales, Inc.*,
  666 F.3d 932 (5th Cir. 2012) ..........................................................18

## Statutes

9 U.S.C.A. § 202 ...........................................................................25, 26

9 U.S.C. § 1 ......................................................................................1

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1602................................................................................1, 20

28 U.S.C. § 1605(a)(6)......................................................................22

28 U.S.C. § 1605(a)(6)(A)-(D) .........................................................18

28 U.S.C. § 1605(a)(6)(B) .................................................................27

## Other Authorities

*2009 Investment Climate Statement – Belize* (Feb. 2009), *available at*
  http://www.state.gov/e/eb/rls/othr/ics/2009/117851.htm ...................55

Fed. R. App. P. 28(a)(4)....................................................................1

H.R. REP. NO. 94-1487 (1976)....................................................42, 43, 45

U.S. State Department, *Keeping Foreign Corruption Out of the United States: Four Case Studies* (2010), *available at* http://www.state.gov/j/inl/rls/rm/136527.htm ....................................................54

# **GLOSSARY**

| | |
|---|---|
| BTL | Belize Telecommunications Limited |
| BSDL | Petitioner-Appellee Belize Social Development Limited |
| BVI | British Virgin Islands |
| CCJ | Caribbean Court of Justice |
| Convention or New York Convention | New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3. |
| ECF | Electronic Case Filing |
| FAA | Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* |
| FSIA | Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* |
| GOB | Respondent-Appellant Government of Belize |
| JA | Joint Appendix |
| LCIA | London Court of International Arbitration |
| Telemedia | Belize Telemedia Limited (and its predecessor BTL) |

## **STATUTES AND REGULATIONS**

The pertinent statutes and other materials are set forth in the Addendum of

Pertinent Treaties and Statutes to this Brief.

## STATEMENT OF JURISDICTION

Pursuant to Rule 28(a)(4) of the Federal Rules of Appellate Procedure, Respondent-Appellant Government of Belize submits the following statement of jurisdiction.

This Court has jurisdiction over these consolidated appeals pursuant to (a) the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.*, (b) the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* and (c) 28 U.S.C. § 1291.

## STATEMENT OF ISSUES ON APPEAL

1.      Whether the arbitration exception to sovereign immunity applies where the award arises from an agreement that cannot be imputed to the sovereign.

2.      Whether the doctrine of *forum non conveniens* applies where Belize is an adequate alternative forum and the private and public factors favor that forum.

3.      Whether the doctrine of international comity requires abstention where there is actual conflict with a decision of the highest court of a foreign state.

4.      Whether, in the context of personal jurisdiction analysis, Due Process protection may be extended to a foreign sovereign on international comity grounds.

5.      Whether an arbitration award can be confirmed against a foreign state that has not ratified the Convention.

6.      Whether confirmation should be denied under Article V(1)(a) of the Convention because the subject agreement is void.

7.      Whether confirmation should be denied under Article V(2)(a) of the Convention because the Award is contrary to the Revenue Rule.

8.      Whether confirmation should be denied on public policy grounds under Article V(2)(b) of the Convention where there has been corruption.

## STATEMENT OF THE CASE

The District Court has confirmed a foreign arbitration award based on *secret and corrupt* so-called "Accommodation Agreements" entered into, in 2005, between the government of the former Belizean Prime Minister Said Musa and Telemedia, the largest Belizean private telecommunications company, which at the time was controlled by Lord Michael Ashcroft, a powerful and wealthy U.K. politician with dual citizenship in Belize often accused of tax evasion.

Under the Accommodation Agreements, the former Prime Minister illegally purported to provide Telemedia with tax and duty exemptions. The Prime Minister *lacked actual authority* to execute the Agreements which violate the Belizean Constitution and laws. The Caribbean Court of Justice, the highest appellate court from Belize, has held that such agreements are repugnant to the Belizean constitutional order, under which the Legislature enacts tax laws and the Executive cannot contract with a private entity to another regime.

Only after the General Election of 2008, after the new administration of the Honorable Belizean Prime Minister Dean Barrow took power determined to eradicate past corruption, was the nature of the Accommodation Agreements made public. Telemedia executives threatened Mr. Barrow not to disclose these Agreements, but he did so anyway stating: "*[a]rrangements that are immoral, made in secret and that defy our very democracy, will ... be resisted at all costs.*"

3

Telemedia responded by initiating arbitration against Respondent-Appellant Government of Belize ("GOB") in the LCIA under an arbitration clause inserted into the Accommodation Agreements to deprive Belizean courts of jurisdiction. GOB did not appear before the LCIA because the Agreements are void and arbitration should not be *abused* in this manner.  Corrupt politicians should not be permitted to insert arbitration clauses into illegal agreements, *when they lack authority to execute the agreements in the first place*, and thereby, in collusion with a private entity, force governments to arbitrate in a foreign forum issues involving *such sovereign prerogatives as the power to tax*.  The legality of the Agreements and enforceability of the award in favor of Telemedia (assigned to Petitioner-Appellee BSDL—which was created in the BVI just two days after the award was rendered solely to seek enforcement in the U.S.) is a matter of great importance to the Belizean people and must be adjudicated in Belizean courts.

The District Court "rubber stamped" the LCIA award granting damages based on the Prime Minister's illegal promises to provide tax and duty exemptions. The Court adopted as its judgment a foreign award resulting from a *corrupt arrangement* between a Prime Minister and private company.  Rather, the Court should have dismissed or denied the Petition.  The Belizean people *should not be burdened* with corrupt and illegal agreements, cleverly cloaked with *non bona fide* arbitration clauses, designed to *favor the few at the cost of the many*.

4

## STATEMENT OF FACTS

**A.     LORD ASHCROFT AND HIS FINANCIAL CHOKE ON BELIZE.**

Lord Michael Ashcroft is a member of the U.K. House of Lords (Declaration of Juan Basombrio ("Basombrio Decl.") at Exhibit 10 (ECF 15-32 at 9 (JA-__)) with nationality in both U.K. and Belize (*id.* at Exhibit 11 (ECF 15-32 at 21 (JA-__)). He is a major political figure, embroiled in tax-related controversy. His tenure as Conservative Party Treasurer "was marked by a number of controversies: he was seen to pay little U.K. income tax due to his domicile in Belize; and he was at the centre of a debate about openness and accountability of political funding." *Id.* at Exhibit 11 (ECF 15-32 at 24 (JA-__)). Lord Ashcroft admits that he is "a major investor in Belize." *Id.* at Exhibit 10 (ECF 15-32 at 12 (JA-__)). He is one of the wealthiest persons in the U.K. (*Id.* at Exhibit 11 (ECF 15-32 at 21 (JA-__)), and the wealthiest in Belize (*id.* at Exhibit 11 (Prime Minister Barrow noted: "Ashcroft is an extremely powerful man. His net worth may well be equal to Belize's entire GDP. He is nobody to cross.") (ECF 15-32 at 23 (JA-__)), amassing his fortune through Belizean businesses, including the largest bank (Belize Bank) (*id.* at Exhibit 12 (ECF 15-32 at 33, 36, 37, 47 (JA-__)), Exhibit 10 (ECF 15-32 at 14 (JA-__)) and Exhibit 24 ("If Lord Ashcroft is an influential man in Britain, in Belize he is a colossus.") (ECF 15-34 at 17 (JA-__)), and largest telecommunications company (Telemedia) (*id.* at Exhibit 11 (ECF 15-32 at 23 (JA-

__)).  In his biography, Lord Ashcroft admitted that Belize "is a country where his interests have been 'exempt from certain taxes for 30 years.'"  *Id.* at Exhibit 11 (ECF 15-32 at 23 (JA-__)).

## B.     THE SECRET AND VOID ACCOMMODATION AGREEMENTS.

Secret "Accommodation Agreements" were entered into between Ashcroft controlled BTL (*id.* at Exhibit 18 (ECF 15-33 at 28 (JA-__)), predecessor of Telemedia, and the government of former Prime Minister Musa (*id.* at Exhibit 11 (ECF 15-32 at 25 (JA-__)) ("Ashcroft allegedly gave the People's United Party [of former Prime Minister Musa] in Belize $1 m when it was in opposition.  During its period in power, it introduced laws that are claimed by opponents and media commentators to be financially advantageous to Ashcroft.")).

As detailed below, starting in 2005, Telemedia entered into four secret "Accommodation Agreements" with former Prime Minister Musa that purportedly granted it lower tax rates, offsets of tax liabilities, exemptions from duties, and other privileges in violation of the Constitution and law of Belize.

Only after the General Election of 2008, after the new administration of the Honorable Prime Minister Dean Barrow came into place, determined to eradicate preferential treatments and past government corruption, was the nature of the secret Accommodation Agreements made known to the public by Mr. Barrow.

On April 30, 2008, <u>Amandala</u> reported that "[m]ore secret deals are coming out of the closet of the former political administration." *Id.* at Exhibit 23 (ECF 15-34 at 14-15 (JA-__)). Prime Minister Barrow disclosed that "under a secret agreement that former Prime Minister Said Musa signed with [BTL, Telemedia] is withholding business tax from the Government -- $6 million ...."

> "According to Barrow, he was first aware of the accommodation agreement after he took office in February. . . . [BTL informed] him of the accommodation agreement, which had been signed way back in 2005 by his predecessor, Said Musa. Barrow said that he checked [with] relevant government officials in the Ministry of Finance … to see if he could lay hand on a copy of the agreement, but there was none. BTL had to supply them, but the company demanded that Barrow keeps [sic] silent on its contents, citing a secrecy clause. Barrow said that he does not know how a central agreement like this cannot be in the public domain. 'This is so utterly against the interest of the people of this country, and I don't know how Musa … could have signed such a thing,' said Prime Minister Barrow. [ …]

> Barrow said, '…we were written to by BTL, referring to this … secret agreement as it were, handcuffing the government, shackling the government, making it impossible, legally, contractually, for the government to do anything about rates because that agreement guaranteed BTL a rate of return of 15%, and said that if BTL didn't make that rate of return they could withhold the payment of their business tax—which they've done for the past three months.' … the [Telemedia] CEO had said, 'I am sending you the agreement but I point out to you that the agreement commits you to secrecy, and if you dare tell the Belizean people about it, I will take legal action.' But it was a deal that was signed by the former administration, and Barrow said that his government would not tolerate any demands to keep it secret."

*Id.* (ECF 15-34 at 14-15 (JA-__)). Prime Minister Barrow stated that Telemedia told him that:

7

> "'[W]e don't have to pay you business tax because of the commitments in the accommodation agreement . . . .' [Barrow explained:] I remember writing them to tell them nobody currently in the . . . government of Belize has ever seen a copy of this accommodation agreement . . . . [T]he new administration, has never seen it. It is that Said Musa … entered into these agreements and kept them hidden even from public officers."

*Id*. at Exhibit 26 (ECF 15-34 at 36 (JA-___)).

## C.    THE *EX PARTE* LCIA ARBITRATION.

When Prime Minister Barrow challenged the Accommodation Agreements, Telemedia began arbitration in the LCIA against GOB, resulting in the March 18, 2009 award ("Award"). Kimmelman Decl. at Exhibit A (ECF 1-3 (JA-___). To give effect to the illegal Accommodation Agreements, an arbitration clause was inserted in them, so that the dispute could be exported out of Belize.

GOB did not participate in the arbitration, because Prime Minister Barrow stated that "the secret agreement between Musa and Ashcroft is illegal and he will not honor it." Basombrio Decl. at Exhibit 29 (ECF 15-35 at 2 (JA-___)).

> "[GOB] has learnt, through reports in the local media, that a ruling has been made by a London Arbitration panel awarding [Telemedia] $38.5 million in damages to be paid by the Government for failing to honor the secret Accommodation Agreement signed by former Prime Minister Said Musa.
>
> That Agreement … prevented the introduction of telecommunications competition in Belize; outlawed voice over Internet Protocol as a way of bringing down rates; and exempted Telemedia from paying taxes under Belize law whenever it claimed not to have the minimum 15% rate of return that the … Agreement, without any reference to the PUC as the only legal rate setting authority in the country, gave Telemedia. […]
>
> It [is] the government's position that the Accommodation Agreement is illegal and invalid. In that connection government notes that our local courts

8

have already rejected the Agreement to the extent that the Agreement purports to authorize Telemedia not to pay taxes. […]

Finally, the government reiterates its commitment to the continued protection always of the interests of Belize.  Arrangements that are immoral, made in secret and that defy our very democracy, will continue to be resisted at all costs."

*Id.* (The Reporter, March 31, 2009) (ECF 15-35 at 2-3 (JA-__)).

### D.    THE ACCOMMODATION AGREEMENTS ARE VOID *AB INITIO* BECAUSE THE FORMER PRIME MINISTER LACKED ACTUAL AUTHORITY TO EXECUTE THEM.

Before the District Court, GOB presented evidence that the Accommodation Agreements are illegal and void *ab initio*.  The Prime Minister *lacked actual authority* to provide Telemedia tax and duty exemptions, encroaching into the Legislature's constitutional authority.  *See* Declaration of Michael C. Young, S.C. ("Young Decl.") at ¶ 11 (ECF 15-3 at 3 (JA-__)).

As indicated in paragraph 11 of the Affidavit of Mr. Gian C. Gandhi, Legal Adviser to the GOB Ministry of Finance, *see* Young Decl. at Exhibit 3 (ECF 15-4 at 5 (JA-__)), there are four "Accommodation Agreements."  Copies are attached to the Gandhi Affidavit as exhibits GCG5, GCG6, GCG7 and GCG8 (*see* ECF15-4 at 20-40, ECF 15-5 at 1-39 (JA-__)).  *See also* Young Decl. at ¶ 10 (ECF 15-3 at 3 (JA-__)).

The Accommodation Agreements (and resulting LCIA Award) violate various provisions of the Belizean Constitution, Belizean law and public policy, as discussed in paragraphs 13-16 of the Young Declaration.

9

First, the Award is contrary to the Belizean Constitution, Finance & Audit (Ref.) Act and Income & Business Tax Act (IBT). The Award's fallacy is that it held that the Prime Minister can contract with a private party and allow it to avoid tax liabilities. Tax rates are set by the Legislature. Prime Ministers lack power to exempt private entities from taxes and duties. The Award also seeks to bar future tax and duty assessments on Telemedia, violating the IBT and Revenue Rule. *See* Young Decl. at ¶¶ 14, 17 (ECF 15-3 at 4-5, 8-9 (JA-__)).

Second, the Accommodation Agreements, upon which the Award is based, are illegal and void *ab initio*, as follows:

    (a)    The Accommodation Agreements are void because the Prime Minister lacked power to exempt Telemedia from tax and duty liabilities under Belize law. *Therefore, the former Prime Minister lacked actual authority to enter into the Accommodation Agreements.*

    (b)    Application of the "Agreed Rate" of business tax payable by Telemedia is contrary to the Belize Income and Business Tax Act, which prescribes tax rates. The Prime Minister had no power to reduce Telemedia's tax rates.

    (c)    The exemption of Telemedia from custom duties is contrary to the Customs and Excise Duties Act, which provides for raising, levying and collection of duties. The Prime Minister cannot modify the Act.

    (d)    The unilateral entitlement of Telemedia to use the frequencies 2.496 Ghz to 2.69 Ghz is contrary to the Belize Telecommunications Act of 2002 ("BTA"). The Executive lacks power to grant entitlements like those purportedly provided to Telemedia.

    (e)    The requirement that only BTL and SpeedNet [another Ashcroft company] be allowed to provide telecommunications services involving VoIP, and that customers only use their services, violate the

10

BTA and PUC Act.  Nothing in the BTA or PUC Act allows the Prime Minister to grant such monopolies.

(f)    Finally, the "setting off" of "short fall" differences (between actual profit and the return guaranteed in the Agreements) against Telemedia's tax liability violates Belizean law because GOB must collect taxes at rates set by the Legislature without offset.  *The Prime Minister cannot guarantee a profit to a private entity, and allow the entity to offset profit shortfalls against taxes.*

*See* Young Decl. at ¶ 15 (ECF 15-3 at 5-7 (JA-__)).

The Award also contains "declarations" which act as *prospective injunctions* that have serious ongoing consequences in Belize, including:

(a)    Affecting GOB's ability to impose on Telemedia tax rates mandated by law.

(b)    Affecting GOB's ability to collect full revenue from Telemedia as mandated by law.

(c)    Enforcing preferential taxes for Telemedia through an agreement with the executive and not by statute or regulation.

(d)    Affecting GOB's ability to impose on Telemedia custom duties mandated by law.

(e)    Affecting PUC's ability to manage and regulate as mandated by law.

(f)    Affecting PUC's ability to receive and process applications for telecommunications licences as mandated by law.

(g)    Affecting PUC's authority to promote competition in telecommunications.

(h)    Affecting PUC's power to regulate rates which impact customers.

*See* Young Decl. at ¶ 16 (ECF 15-3 at 7-8 (JA-__)).

11

### E.    CREATION OF BSDL TO CIRCUMVENT THE BELIZE COURTS.

On March 20, 2009, two days after the LCIA issued the Award, associates of Lord Ashcroft formed Petitioner-Appellee BSDL in BVI.  *See* Decl. of Stephen J. Ruzika at Exhibit A (ECF 1-17 (JA-__)).  *On the same day*, Telemedia assigned the Award to BSDL, *id.* at Exhibit C (ECF 1-19 (JA-__)).  The assignment was prepared by BSDL's initial counsel herein (Allen & Overy LLP).  *Id.*  This *sham* transaction was intended to remove the Award from Telemedia's assets.

### F.    GOB ASSUMES CONTROL OVER TELECOMMUNICATIONS.

On August 25, 2009, GOB exercised its sovereign power and enacted legislation assuming control over telecommunications, including Telemedia.  *See* Gandhi Decl. at ¶¶ 5-6 and Exhibits 1 and 2 (ECF 15-9 at 2, 8-20 and 22-28 (JA-__)).  Prime Minister Barrow disclosed the prior administration's preferential tax treatment of Telemedia and stated that the situation had become "intolerable."  *See* Basombrio Decl. at Exhibit 34 (ECF 15-35 at 19-21 (JA-__)).  "Ashcroft could in any year declare that Telemedia has not made [a 15% profit guaranteed under the Agreements]; declare how much the shortfall was; and simply not pay his taxes until the so-called shortfall had been recovered."  *Id.*  GOB nationalized Telemedia in the national interest.  *Id.; see also* Gandhi Decl., Exhibit 1 § 65 *et seq.* (ECF-15-9 at pp. 13-20 (JA-__)).  These events were widely reported in the Belizean press.  *See, e.g.,* Basombrio Decl. at Exhibit 34 (ECF 15-35 at 19-21 (JA-__)); Exhibit 36

12

(ECF 15-35 at 26 (JA-__)); Exhibit 38 (the move was necessary "to improve poor state of the country's telecom industry … strangled and prevented from growing because the monopoly [Telemedia] is controlled by businessman Michael Ashcroft.") (ECF 15-35 at 32 (JA-__)); Exhibit 40 ("Ashcroft 'subjugated nation' claims Belize Prime Minister.") (ECF 15-35 at 38-39 (JA-__)).

## G.    LITIGATION IN BELIZE.

In April 2009, GOB filed suit against Telemedia and BSDL, *Att'y General v. Belize Telemedia Ltd. and Belize Soc. Develop. Ltd.*, No. 317 of 2009, in the Belize Supreme Court, Young Decl. at ¶¶ 1-5 and Exhibit 1 (ECF 15-3 at 1-2, 16-26 (JA-__)), seeking a declaration that the Accommodation Agreements are void and the Award is unenforceable, *id.* at ¶ 6 (ECF 15-3 at 18).

On July 20, 2009, the Belize Supreme Court issued a preliminary injunction prohibiting BSDL from enforcing the Award until after conclusion of that action. Young Decl. at ¶ 29, and Exhibits 12 (Order) and 13 (Decision) (ECF 15-3 at 11, ECF 15-8 at 2-4, 6-28 (JA-__)):  "[I]t is obvious that serious questions arise in the several contentions of illegality of the agreement, raised by the Attorney General. That in turn raises a serious question as to whether enforcement of the award will not be contrary to the Constitution, the other statutory laws and public policy."  *Id.* at Exhibit 13, at ¶ 17 (ECF 15-8 at 15-16 (JA-__)).

13

## H.    BSDL FILES ITS PETITION TO CONFIRM THE AWARD, AND ITS STAY IS REVIEWED BY A PRIOR PANEL THIS COURT.

On November 17, 2009, BSDL responded by filing its Petition to confirm the "payment portion" of Award, as purported assignee of Telemedia, in violation of the Belize Supreme Court's injunction.  ECF 1, Petition (JA-__).

On March 29, 2010, GOB filed a Motion to Dismiss or Stay the Petition (ECF 15 (JA-__)), Preliminary Response to the Petition (ECF 16, Petition (JA-__)), and Motion to Bifurcate (ECF 17 (JA-__)).

On October 18, 2010, the District Court issued a stay "pending resolution of the parties' case before the Belize Supreme Court."  ECF, Minute Order (JA-__).

On January 13, 2012, a *split* panel of this Court held that the Convention did not provide authority to stay, because Belize is not where the Award was rendered.  *See Belize Soc. Dev. Ltd. v. Gov't of Belize*, 688 F.3d 724, 731 (D.C. Cir. 2011) ("*BSDL Appeal*") (JA-__).  The panel also held that courts may stay "pursuant to inherent authority," but the stay was improper because it was for "an indefinite amount of time."  *Id*. at 731-33.  The panel held that "there is no need to vacate the stay or mandate any action by the district court."  *Id.* at 733-34.

## I.    THE CARIBBEAN COURT OF JUSTICE HOLDS THAT THE TAX LAWS CANNOT BE MODIFIED BY EXECUTIVE AGREEMENT.

GOB requested leave to provide additional briefing regarding the effect of a then-recent decision, dated July 26, 2013, of the CCJ in *BCB Holdings Ltd. et al. v.*

14

*Att'y General of Belize*.  *See* GOB's Motion for Leave to Submit Additional Briefing (ECF 47 (JA-__)) and attached the CCJ decision as Exhibit 1 to the Juan Basombrio Decl. in support of GOB's request for additional briefing (ECF 48-2) (JA-__).  However, the District Court improperly denied the request.  The CCJ Decision should have been considered by the Court, because the Accommodation Agreements are governed by Belizean law and the CCJ held that agreements that purport to provide tax and duty exemptions are illegal because the former Prime Minister lacked actual authority to alter the tax and duty regime.

## J.     FURTHER PROCEEDINGS BEFORE THE DISTRICT COURT.

The District Court then ordered, and the parties filed, supplemental briefing. ECF 39 (JA-__), ECF 43 (JA-__) and ECF 45 (JA-__).  On February 25, 2013, the Court heard oral argument on the motion to dismiss and petition.  *See* Transcript (JA-__).  The Court expressed the view that it thought that the Appeals panel had directed it to confirm the Award.  *Id.* at 5-8.  On December 11, 2013, the Court entered an order confirming the Award, denying GOB's motion to dismiss and denying motion for briefing on the CCJ decision.  ECF 52, Order (JA-__) and ECF 51, Memorandum and Opinion (JA-__), reported at *Belize Soc. Dev. Ltd. v. Gov't of Belize*, -- F.Supp.2d --, 2013 WL 6502416 (D.D.C. 2013) ("*BSDL*") (JA-__). On January 8, 2014, GOB filed a notice of appeal.  ECF 57 (JA-__).

The next day, January 9, 2014, after being divested of jurisdiction, the District Court entered an Order awarding BSDL the amount of $22,484,961.94. ECF 59 (JA-__).  On January 13, 2014, GOB filed a notice of appeal from that Order.  ECF 61 (JA-__).  On February 4, 2014, the Clerk entered Judgment in favor of BSDL.  ECF 66 (JA-__).  On February 4, 2014, GOB filed a notice of appeal from the Judgment.  ECF 67 (JA-__).  This Court consolidated the three appeals.  *See* January 14, 2014 and February 20, 2014 Clerk's orders.

## SUMMARY OF THE ARGUMENT

Confirmation of the LCIA award must be denied because it is based on an illegal agreement entered into by a former Belizean Prime Minister without actual authority.  It is void and cannot be grounds to deny GOB its sovereign immunity.  Because it purported to grant tax exemptions, the agreement is not "commercial" under the Convention.  Thus, the FSIA arbitration exception cannot apply.

The District Court confirmed an award resulting from a corrupt and secret arrangement between a high-level politician and private party.  The arrangement is offensive to our most basic concepts of morality and justice.  This dispute also is entirely foreign to the U.S.  The Petition should have been dismissed on grounds of *forum non conveniens*, international comity and lack of personal jurisdictional.

Even if the case proceeded onto the merits, confirmation of the award should have been denied, because Belize is not a party to the Convention, GOB cannot be

16

considered to be a party to the arbitration agreement, our courts are barred by the Revenue Rule from adjudicating this dispute (whether Telemedia was bound by established tax rates in Belize), and the award violates our public policy. The award, granting damages based on the Prime Minister's illegal promises to provide tax exemptions to a private company, must be rejected under the Convention.

Accordingly, GOB respectfully requests that this Court reverse the District Court's confirmation orders and judgment, and order the District Court to dismiss or, alternatively, deny confirmation of the Petition.

## ARGUMENT

## I.    THE ACTION MUST BE DISMISSED ON FOREIGN SOVEREIGN IMMUNITY GROUNDS.

### A.    FSIA IS THE SOLE BASIS FOR OBTAINING SUBJECT-MATTER JURISDICTION OVER A FOREIGN STATE.

The FSIA "provides *the sole basis* for obtaining jurisdiction over an action against a foreign state in federal court." *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989) (emphasis added). "[A] foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993). "[E]ven if the foreign state does not … assert an immunity defense, a District Court still must determine whether immunity is unavailable under [the FSIA]."

17

*Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 495 n.20 (1983).  GOB

raised the FSIA defense below, but it can be asserted at any time including initially

on appeal.  *Volvo Trucks N. America, Inc. v. Crescent Ford Truck Sales, Inc.*, 666

F.3d 932, 935 (5th Cir. 2012).

> The FSIA arbitration exception applied by the District Court provides:

> "(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

> (6) in which the action is brought, either to enforce *an agreement made by the foreign state* with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, *or to confirm an award made pursuant to such an agreement to arbitrate*, if

> (A) the arbitration takes place or is intended to take place in the United States,
> (B) the agreement or *award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards*,
> (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or
> (D) paragraph (1) of this subsection is otherwise applicable."

28 U.S.C. § 1605(a)(6)(A)-(D) (emphasis added).

## B.     THE ARBITRATION EXCEPTION CANNOT APPLY BECAUSE THE SUBJECT AGREEMENT CANNOT BE IMPUTED TO GOB.

Orders denying a motion to dismiss on FSIA grounds are reviewed *de novo*.

*In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 79 (2d Cir. 2008).

The arbitration exception cannot apply to this action because it requires the existence of an agreement to arbitrate made "*by the foreign state*" and an award rendered pursuant to such an agreement, but neither requirement is satisfied.

GOB argued that the Accommodation Agreement and its arbitration clause are void *ab initio* because the Prime Minister lacked actual authority. The District Court refused to consider the evidence or engage in that determination. It applied FAA law (the principle of "severability") and relied on the LCIA decision that the Accommodation Agreement was valid. *See BSDL*, 2013 WL 6502416 at *5.

However, the issue whether the FSIA's arbitration exception applies is *not* governed by FAA law, but by FSIA law. "Before a federal court may apply ... any ... rule of law [like the FAA] in a case involving a foreign state … it must, as a threshold matter, find an exception to the FSIA's grant of sovereign immunity." *NYSA-ILA Pension Trust Fund By and Through Bowers v. Garuda Indonesia*, 7 F.3d 35, 39 (2d Cir. 1993).

The Supreme Court has held that the immunity determination is governed by FSIA law (not by other statutes like the FAA):

> "At the threshold of every action in a District Court against a foreign state, therefore, the court must satisfy itself that one of the exceptions applies—and in doing so it *must apply the detailed federal law standards set forth in the Act [FSIA]*."

*Verlinden*, 461 U.S. at 493-494.

In *Rep. of Argentina v. NML Capital, Ltd.*, -- U.S. --, 2014 WL 2675854

19

(2014), the Supreme Court reiterated that the FSIA sets forth a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.  The key word there—which goes a long way toward deciding this case—is *comprehensive*."  *Id.* at *4.

> "This means that '[a]fter the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity.' *Samantar* v. *Yousuf*, 560 U. S. 305, 313 (2010).  As the Act itself instructs, '[c]laims of foreign states to immunity should henceforth be decided by courts ... in conformity with the principles *set forth in this [Act]*.'  28 U.S.C. §1602 (emphasis added).  Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text.  Or it must fall."

*Id.* at *4 (emphasis in the original).  *NML Capital* held that, in making the immunity determination, courts "*must apply the detailed federal law standards set forth in the [FSIA]*."  461 U.S. at 493-94.  Only the FSIA governs the analysis, *period*.

Before a court may apply FAA substantive provisions, it must hold that an exception applies under FSIA law, because a "court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)," *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 430 (2007).  "[T]here is only one way for a court to obtain jurisdiction over a foreign state and it is not particularly generous one—the FSIA."  *Peterson v. Royal*

*Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005).

However, instead of applying the *federal law standards in the FSIA*, the District Court relied on FAA substantive law to hold that the arbitration exception applied. *See BSDL*, 2013 WL 6502416 at *5, 9 (applying the FAA rule that "an arbitration provision is severable from the reminder of the contract" to the determination whether the arbitration exception applies under the FSIA where the foreign state challenges the validity of the underlying agreement). The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Moses H. Cone Mem. Hosp. v. Mercury Const. Co.*, 460 U.S. 1, 26 (1983). "Severability" is a substantive law concept of the FAA. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is *severable* from the remainder of the contract."). Thus, the Court erroneously applied FAA substantive law to the FSIA immunity determination. (*Chevron Corp. v. Rep. of Ecuador*, -- F. Supp. 2d --, 2013 WL 2449172 at *3 (D.D.C. 2013), made the same mistake by focusing on FAA instead of FSIA law.)

Courts cannot import legal principles to create jurisdiction under the FSIA. S*ee Soudavar v. Islamic Rep. of Iran*, 67 Fed. Appx. 618, 619-20 (D.C. Cir. 2003); *Jerez v. Rep. of Cuba*, 777 F. Supp. 2d 6, 20 (D.D.C. 2011); *Hammerstein v. Fed. Rep. of Germany*, 2011 WL 9975796 at *2 n.2 (E.D.N.Y. 2011). The FSIA trumps

the FAA.  *C.f. Doe v. Qi*, 349 F. Supp. 2d 1258, 1280 (N.D. Cal. 2004).

The arbitration exception requires the existence of an "an agreement *made by the foreign state* … to submit to arbitration" but *has no 'severability' rule*.  *See* 28 U.S.C. § 1605(a)(6) (emphasis added).  The District Court should have applied only FSIA law to determine whether such agreement "by the foreign state" exists.

Under FSIA law, if the former Prime Minister lacked *actual authority* to execute the Accommodation Agreement, then the agreement (including all of its provisions) is not considered to be an act "*by the foreign state*" and cannot be *imputed* to the foreign state to apply an FSIA exception.  If the evidence shows that the former Prime Minister lacked actual authority to execute the Accommodation Agreement, there was no agreement "by the foreign state" *at all*, and the arbitration exception cannot apply to the resulting award.

Under FSIA law, "actual authority" is required to impute an act to a foreign state.  The seminal case is *Phaneuf v. Rep. of Indonesia*, 106 F.3d 302 (9th Cir. 1997).  In *Phaneuf*, holders of promissory notes allegedly issued by an Indonesian instrumentality sued Indonesia, invoking the FSIA commercial activity exception.  Indonesia "contend[ed] that there was no commercial activity *of the foreign state*" because the subject foreign government officials "exceeded the scope of their authority in issuing and certifying the validity of the notes."  *Id.* at 307 (emphasis in the original).  The Ninth Circuit held that "an agent must have acted *with actual*

*authority* in order to invoke the commercial activity exception against a foreign state." *Id.* at 308 (emphasis added). "When an agent acts beyond the scope of his authority, however, that agent is not doing business which the sovereign has empowered him to do." *Id.* "If the foreign state has not empowered its agent to act, *the agent's unauthorized acts cannot be attributed to the foreign state*; there is no activity by the foreign state." *Id.* (emphasis added).

Similarly, in *Velasco v. Gov't of Indonesia*, 370 F.3d 392 (4th Cir. 2004), a holder of a promissory note issued by an Indonesian ambassador sued Indonesia and invoked the commercial activity exception. The Fourth Circuit noted: "[u]nder Indonesia law, an Ambassador does not have the inherent power to execute a loan or other financial instrument to receive foreign credit on behalf of the Republic of Indonesia." *Id.* at 396 n.2. "[W]e concur with the position of the Ninth Circuit and hold that the commercial activity exception *may be invoked against a foreign state only when its officials have actual authority*." *Id.* at 400 (emphasis added); *accord Allfreight Worldwide Cargo, Inc. v. Ethiopian Airlines Ent.*, 307 Fed. Appx. 721, 724 (4th Cir. 2009); *Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006).

Whether *Phaneuf* should apply to the arbitration exception is a question of first impression before this Court. Judge Howell recently applied *Phaneuf* to the commercial activity exception. *See TJGEM LLC v. Rep. of Ghana*, -- F. Supp.2d

23

--, 2013 WL 6857988 at *4-7 (D.D.C. 2013) ("Since the actions of Defendant Vanderpuije are at the crux of all of the plaintiff's claims, and the plaintiff admits that Defendant Vanderpuije *did not have actual authority to award the contract at issue*, those claims, even if assumed to be true, *cannot be attributed to Ghana or AMA*.") (emphasis added).

There is no reason not to apply *Phaneuf* to the arbitration exception. Like the commercial activity exception, which requires commercial activity "of the foreign state," the arbitration exception requires an agreement to arbitrate made "*by the foreign state*" and an award rendered pursuant to such an agreement. The phrase "by the foreign state" must be interpreted *consistently* throughout the FSIA. Courts begin their analysis with "the text of the statute." *Limtiaco v. Camacho*, 549 U.S. 483, 488 (2007). "[I]dentical words used in different parts of the same act are intended to have the same meaning." *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1990); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (courts "ensure that the statutory scheme is coherent and consistent."). The FSIA must be applied consistently, for it "is a comprehensive statute containing a set of legal standards governing claims of immunity in every civil action against a foreign state …." *Rep. of Austria v. Altmann*, 541 U.S. 677, 691 (2004).

GOB presented evidence that the Prime Minister lacked actual authority to execute the Accommodation Agreement, and thus it cannot be imputed to GOB.

24

The Court was required to address it.  *See Phoenix Consulting Inc. v. Rep. of Angola*, 216 F.3d 36, 40-41 (D.C. Cir. 2000).  Because there was no agreement to arbitrate made "*by the foreign state*," the arbitration exception does not apply.

### C.     THE ARBITRATION EXCEPTION CANNOT APPLY SINCE THE CONVENTION IS INAPPLICABLE TO THE AWARD.

The arbitration exception requires that the "award is or may be governed by a treaty … calling for the recognition and enforcement of arbitral awards." Although the Convention may be the type of treaty that Congress had in mind, that does not end the analysis.  A court *must still* determine whether the Convention *applies in that particular case*.  The District Court failed to conduct such analysis. The Accommodation Agreement does *not* fall within the Convention because it is not a "commercial" contract.  It purported to provide tax and duty exemptions, and powers to impose taxes and duties cannot be "exercised by private citizens."  They are "peculiar to sovereigns."  As such, the Award is not a *commercial* award governed by the Convention, and the FSIA arbitration exception does not apply.

The Convention applies *only* to *commercial* agreements and arbitration awards.  The Convention's "purpose [is] to 'encourage the recognition and enforcement of *commercial arbitration agreements* in international contracts.'" *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933-34 (D.C. Cir. 2007) (emphasis added).  The Convention is implemented by 9 U.S.C.A. § 202:

"An arbitration agreement or *arbitral award arising out of a legal*

*relationship*, whether contractual or not, *which is considered as commercial*, including a transaction, contract, or agreement described in section 2 of this title, *falls under the Convention*."

9 U.S.C.A. § 202 (emphasis added). "The United States will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are *considered as commercial under the national law of the United States*."

*See* T.I.A.S. No. 6997, 21 U.S.T. 2517 (1970) (emphasis added).

Hence, under Section 202, "*the [arbitration] award* (1) must arise out of a legal relationship (2) *which is commercial in nature* and (3) which is not entirely domestic in scope." *Ministry of Defense of the Islamic Rep. of Iran v. Gould, Inc.*, 887 F.2d 1357, 1362 (9th Cir.1989), *cert. denied*, 494 U.S. 1016 (1990) (emphasis added); *c.f. Nanosolutions, LLC v. Prajza*, 793 F. Supp. 2d 46, 53 (D.D.C. 2011).

The Supreme Court has defined what is "commercial" activity in the FSIA:

> "*when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA. … [T]he issue is whether the particular actions that the foreign state performs* (whatever the motive behind them) *are the type of actions by which a private party engages in "trade and traffic or commerce"* … Thus, a foreign government's issuance of regulations limiting foreign currency exchange *is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party*; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods …."

*Rep. of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614-615 (1992) (citations omitted; emphasis added). A state engages in commercial activity if it exercises

"only those powers that can also be exercised by private citizens," as distinct from "powers peculiar to sovereigns."  *Id.*; *Nelson*, 507 U.S. at 360 (same).  "The central question is whether the activity is of a kind in which a private party might engage." *Siderman de Blake v. Rep. of Argentina*, 965 F.2d 699, 708 (9th Cir. 1992).

The evidence before the District Court established that the Accommodation Agreement was not a "commercial" agreement because it purported to grant tax and duty exemptions.  The powers to levy taxes and duties are powers peculiar to sovereigns, and are not powers that can be exercised by private citizens.

As such, the arbitration exception, which requires that the "*award is or may be governed* by a treaty … calling for the recognition and enforcement of arbitral awards," cannot apply because the Convention does not apply to this Award.

### D.    THE DISTRICT COURT FAILED TO CONDUCT AN FSIA ANALYSIS AND MISAPPLIED THE *BSDL* DECISION.

The District Court noted that "an action to confirm an arbitration award under the ... Convention falls squarely within the ambit of the § 1605(a)(6)(B) immunity exception."  *BSDL*, 2013 WL 6502416 at *4 (citing *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999) and *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46 (D.D.C. 2010)).

Although it is true that a confirmation action under the Convention *may* fall within the arbitration exception, courts must still determine whether *the particular confirmation action does*.  The *mere* filing of a confirmation action does not

27

*automatically* make the exception applicable.  *Creighton* and *Cont'l Transfer* do not support a *summary* application of the exception.  *Creighton* did not reach the issue because it was "undisputed" that the Convention applied.  *See* 181 F.3d at 121.  *Cont'l Transfer* cited this Court's ruling that the "Convention is exactly the sort of treaty Congress intended to include in the arbitration exception" to the FSIA.  697 F. Supp. 2d at 56 (citing *Creighton*, 181 F.3d at 123-24).  However, again, just because the Convention may be the sort of treaty envisioned by Congress, it does not *necessarily* follow that the Convention applies to the subject award.  *Cont'l Transfer* also held that the Convention applies to an "arbitral award arising out of a legal relationship … which is considered as commercial …."  697 F. Supp. 2d at 56 (citing *TermoRio*, 487 F.3d at 933).  Yet, the District Court never analyzed whether this Award arose from a legal relationship that is "commercial."

The District Court also relied on footnote 3 of the *BSDL Appeal* decision to hold that "[t]he LCIA's award … is clearly governed by the New York Convention because both England (where the arbitration took place) and the United States are parties to the Convention" and "Belize's status under the convention is irrelevant."  *BSDL*, 2013 WL 6502416 at *4 (citing *BSDL Appeal*, 668 F.3d at 731 n.3).  But the cited *BSDL Appeal* holding had nothing to do with the FSIA.  *The FSIA arbitration exception was not before the Court in the BSDL Appeal.  See* 668 F.3d at 731 n.3.  Even if the Convention may apply ("because both England … and the

United States are parties to the Convention"), BSDL must still satisfy *all* requirements of the arbitration exception.  There is nothing in the *BSDL Appeal* that contradicts GOB's contention that the Convention does *not* apply where, like here, (a) there was no agreement to arbitrate "by the foreign state" and an award rendered pursuant to such an agreement and/or (b) the contractual relation is not "commercial."  *See id.*

It is clear that the District Court applied FAA law, instead of FSIA law: "regardless of whether I consider contract validity now, the question will be addressed anyway—as it always is, though under a deferential standard … when I turn to the Article V(1)(a) exception to the … Convention, *see infra* Part II.B." *See BSDL*, 2013 WL 6502416 at *5.  The Court was required to *apply the detailed federal law standards set forth in the Act [FSIA].*"  *Verlinden*, 461 U.S. at 493-94.

The record establishes that the FSIA arbitration exception does not apply. GOB has foreign sovereign immunity.  Thus, the District Court must be reversed and this action must be dismissed for lack of subject-matter jurisdiction.

## II.    THE ACTION SHOULD BE DISMISSED ON *FORUM NON CONVENIENS* GROUNDS.

Under the *forum non conveniens* ("FNC") doctrine, courts must decide whether an adequate alternative forum is available and, if so, whether a balancing of private and public interest factors strongly favors dismissal.  *Agudas Chasidei*

*Chabad of U.S. v. Russian Fed.*, 528 F.3d 934, 950 (D.C. Cir. 2008).  The District

Court's FNC determination is reviewed for abuse of discretion.  *Id.*

GOB moved to dismiss based on FNC grounds because the courts of Belize

are an adequate alternative forum and this dispute has no connection to the U.S.

This action presents a *textbook* example for application of the FNC doctrine.

The District Court denied dismissal based on *TMR Energy Ltd. v. State

Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005), which held that there

can be no adequate alternative forum where a plaintiff seeks to attach assets in the

U.S.:

> "Unfortunately for GOB, there is no adequate alternative forum for this case
> because 'only a court of the United States (or of one of them) may attach the
> commercial property of a foreign nation located in the United States.'  TMR
> Energy Ltd., [411 F.3d at 303] ...  This is the controlling law in our Circuit,
> and I will therefore apply it faithfully.  Because GOB's *forum non
> conveniens* argument falters at the first step, I need not consider the second."

*BSDL*, 2013 WL 6502416 at *5.  *TMR Energy* should be revisited, and this action

should be dismissed on FNC grounds.

## A.     THE LAW OF THE CIRCUIT DOCTRINE IS NOT A BAR.

The "law of the circuit" doctrine provides that "[o]ne three-judge panel …

does not have the authority to overrule another three-judge panel of the court,"

*LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996).  The first exception

applies when the decision "conflicts with a decision of the Supreme Court."

*Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014).  A second exception

30

applies when later authority "offer[s] a compelling reason for believing that the former panel, in light of new developments, would change its collective mind." *U.S. v. Guzman*, 419 F.3d 27, 31 (1st Cir. 2005); *Irving v. U.S.*, 162 F.3d 154, 160 (1st Cir. 1988) ("when newly emergent authority … offers a clear and convincing reason to conclude that the earlier panel would have decided the issue differently").

## B.  *TMR ENERGY* CONFLICTS WITH SUPREME COURT PRECEDENTS.

The first exception applies because *TMR Energy* conflicts with Supreme Court precedent.  In *Sinochem*, the Court held that "[a] federal court *has discretion* to dismiss a case on the ground of *forum non conveniens* 'when an alternative forum has jurisdiction to hear [the] case . . . .'"  549 U.S. at 429 (emphasis added). The only limitation is that the alternative forum have "jurisdiction to hear the case."  *See id.*  None of the decisions cited by *Sinochem* limit a court's discretion like *TMR Energy*.  *See American Dredging Co. v. Miller*, 510 U.S. 443, 447-48 (1994); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981); *Koster v. (American) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 524 (1947).

*TMR Energy* also creates an impermissible litmus test.  A single factor (pursuit of assets here) governs the outcome.  This result is contrary to Supreme Court holdings, which instruct that "[d]ismissal for *forum non conveniens* [should] reflect[] a court's assessment of a 'range of considerations . . . .'"  *Sinochem*, 549 U.S. at 429; *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Ct.*, --U.S. --, 134 S.Ct.

31

568, 580 (2013) ( the FNC doctrine "entail[s a] … balancing-of-interests …").

Because "*forum non conveniens* has continuing application only in cases where the alternative forum is abroad," *Sinochem*, 549 U.S. at 429, *TMR Energy eviscerates* the FNC doctrine, since a foreign court cannot reach assets in the U.S. In fact, *TMR Energy* does not even require the existence of assets in the U.S. The bare assumption that a defendant "may own" property here in the future renders an alternative forum inadequate. *TMR Energy*, 411 F.3d at 303-4. In this Circuit, *TMR Energy* has *eviscerated* the FNC doctrine. *See, e.g.*, *Cont. Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46, 57 (D.D.C. 2010).

### C.    *TMR ENERGY* HAS CREATED A CIRCUIT SPLIT.

The second exception also applies. *Figueiredo Ferraz E Engenharia de Projecto Ltda. v. Rep. of Peru*, 665 F.3d 384 (2d Cir. 2011), is a subsequent decision that offers a compelling reason for believing that the *TMR Energy* panel, in that light, would have changed its collective mind. A Brazilian company (Figueiredo) contracted with a Republic of Peru entity to provide consultant services regarding projects in Peru, subject to Peruvian law. Arbitration in Peru yielded an award for Figueiredo. Figueiredo sought confirm in New York under the Convention. The District Court denied dismissal on FNC grounds, citing *TMR Energy*. The Second Circuit reversed. *Id.* at 386-94.

The *Figueiredo* court explained that if an alternative foreign forum is

32

rendered inadequate simply because the plaintiff seeks to attach assets in the U.S., then "every suit having the ultimate objective of executing upon assets located in this country could never be dismissed because of [FNC]." *See Figueiredo*, 665 F.3d at 390. "It is no doubt true that only a United States court may attach a defendant's particular assets located here, but that circumstance cannot render a foreign forum inadequate." *Id.* "Where adequacy of an alternative forum is assessed in the context of a suit to obtain a judgment and ultimately execution on a defendant' assets, the adequacy of the alternate forum depends on whether there are some assets of the defendant in the alternate forum, not whether the precise asset located here can be executed upon there." *Id.* at 391. "To the extent that the District of Columbia Circuit in *TMR Energy* considered a foreign forum inadequate because the foreign defendant's precise asset in this country can be attached only here, we respectfully disagree." *Id. Figueiredo* offers a clear and convincing reason to conclude that the *TMR Energy* panel would have decided the issue differently if it had considered the reasoning in *Figueiredo*.

## D.     *FORUM NON CONVENIENS* DISMISSAL IS WARRANTED.

The FNC doctrine applies to confirmation actions under the Convention, because such actions "are subject to the rules of procedure that are applied in the courts where enforcement is sought," and the FNC doctrine is "procedural." *See In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of*

*Ukraine*, 311 F.3d 488, 495-97 (2d Cir. 2002); *Figueiredo*, 665 F.3d at 392.  Here, the FNC doctrine requires dismissal.

First, the courts of Belize are an adequate alternative forum, because GOB is subject to jurisdiction in Belize and (in any event) has assets in Belize.

Second, the private interest factors favor Belize because Telemedia and GOB (the parties to the Accommodation Agreement and Award) are Belizean, the agreement was executed in Belize and is subject to Belizean law, the witnesses and documents are in Belize, and this dispute has no connection to the U.S.  The assignment to BSDL (a BVI entity) is afforded little weight.  Such private factors favor FNC dismissal.  *See Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 508 (1947).

And third, the public interest factors favor Belize.  As in *Figueiredo*, 665 F.3d at 391-94 , the U.S.' "general policy" in favor of arbitration must "give way" to GOB's strong public interest in having this dispute adjudicated in Belize:

1.      GOB is seeking to eradicate past corruption, including preferential accommodation agreements.  The U.S. supports such initiatives, and our courts should not get embroiled in such sensitive foreign issues. "There is a local interest in having localized controversies decided at home."  *Gilbert*, 330 U.S. at 509; *MBI Group, Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 576 (D.C. Cir. 2010).

2.      This dispute requires adjudication of the validity of the Accommodation Agreement.  If this Court affirmed, it would limit the manner in

34

which GOB may enforce tax laws against a Belizean entity, and confirm damages based on GOB's enforcement of its tax laws. A sovereign's power to tax is supreme to a general policy interest in arbitration. Deferring to Belize is appropriate because this case is "intimately involved with sovereign prerogative." *Figueiredo*, 665 F.3d at 392 (internal quotation marks omitted).

       3.    The Accommodation Agreement and Award violate the Belizean Constitution, Finance and Audit Reform Act, Income and Business Tax Act, Customs and Excise Duties Act, and Telecommunications Act and Public Utilities Commission Act, as discussed above. FNC public factors favor dismissal where a U.S. court would have to "untangle" foreign law. *MBI Group*, 616 F.3d at 576. Further, if this Court affirmed, it would be giving effect to an illegal tax and duty exemption for a private party. *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (a confirmed arbitration award is a "judgment of the court.").

       4.    The subject assignment violates Belize Exchange Control Regulations by facilitating transfer of monies to a foreign entity (BSDL) without Belize Central Bank approval. *See* GOB's Response to the Court's December 11, 2013 Order to Submit Proposed Judgment Amounts (ECF 54 at 1-2 (JA-__)). BSDL seeks to evade Belizean law, just like the petitioner in *Figueiredo* sought to avoid the 3% cap in Peruvian law. *See* 665 F.3d at 386-94.

       5.    GOB assumed control over telecommunications in Belize. BSDL

responded by filing this Petition claiming that Telemedia unilaterally assigned it the award. If this Court affirmed, it would be interfering with the expropriation, allowing former shareholders to dispose of an asset of Telemedia. The FSIA prohibits the exercise of jurisdiction over disputes related to foreign expropriations. *See Dayton v. Czechoslovak Socialist Rep.*, 834 F.2d 203, 206 (D.C. Cir. 1987).

There are many complex issues which render a confirmation action inappropriate to resolve this dispute. *See Productos Mercantiles etc. v. Faberge USA, Inc.*, 23 F.3d 41, 46-47 (2d Cir. 1994). The District Court bypassed all these issues, relying on *TMR Energy*. This action should be dismissed on FNC grounds.

## III.   THE ACTION SHOULD BE DISMISSED ON INTERNATIONAL COMITY GROUNDS.

On July 26, 2013, in *BCB Holdings Ltd. et al. v. Attorney General of Belize*, the CCJ ruled that an agreement signed also by a Belizean Prime Minister that sought to alter the tax regime applicable to private companies was illegal and refused to enforce an LCIA award. *See* Exhibit 1 to Juan Basombrio Decl. in support of GOB's request for additional briefing (ECF 48-2) (JA-__).

The CCJ noted that the LCIA awarded damages based on an agreement ("Deed") that provided that two Belizean companies controlled by Lord Ashcroft (BCB Holdings and BCB Bank) should enjoy "a tax regime specially crafted for them and at variance with the tax laws of Belize." *Id.* at ¶ 1. The CCJ held that it would be against public policy to recognize the LCIA award. *Id.* at ¶ 3.

36

Like the Accommodation Agreements, the Deed was executed by the same former Prime Minister and deemed confidential." *Id.* at ¶ 5. GOB also did not participate in that arbitration. *Id.* at ¶ 8. The CCJ disagreed with the view that, "because the [LCIA] had considered and rejected the idea that the Deed was illegal, we are necessarily precluded from considering afresh that issue ... any such estoppel must yield to the public policy against giving effect to transactions obviously offensive to the court." *Id.* at ¶ 32. The CCJ reviewed the Deed, and concluded that "[t]he promises made by the Minister were designed to effect, indeed to alter the Companies' obligations under existing law." *Id.* at ¶¶ 32-36.

> "Section 68 of the Constitution empowers the National Assembly to make laws. The power to impose, alter, regulate and remit taxes and duties is a power constitutionally vested in the legislature. Only Parliament, or a body specifically delegated by Parliament, may lawfully grant exceptions to the obligations to obey the country's revenue laws."

*Id.* at ¶ 43.

> "In our judgment, implementation of the provisions of the Deed, without legislative approval and without the intention on the part of its makers to seek such approval, is indeed repugnant to the established legal order of Belize. "

*Id.* at ¶ 53.

> "The rights and freedoms of the citizenry and democracy itself would be imperiled if courts permitted the Executive to assume unto itself essential law-making functions in the absence of constitutional or legislative authority to do so. It would be utterly disastrous if the Executive could do so, selectively, via confidential documents. In young States especially, keen observance by the courts of the separation of powers principle remains vital

37

> to maintaining the checks and balances that guarantee the rule of law and democratic governance."

*Id.* at ¶ 42.

The CCJ concluded that "it is clear that the Minister had no power to guarantee fulfilment of the promises he gave."  *Id.* at ¶ 58.  The CCJ refused to recognize the LCIA award as contrary to public policy.  *Id.* at ¶¶ 54-61.

> "The grounds for not enforcing the Award are compelling.  The sovereignty of Parliament subject only to the supremacy of the Constitution is a core constitutional value.  So too is the principle of Separation of Powers … To disregard these values is to attack the foundations upon which the rule of law and democracy are constructed throughout the Caribbean."

*Id.* at ¶ 59.

> "If this Court ordered the enforcement of this Award we would effectively be rewarding corporate citizens for participating in the violation of the fundamental law of Belize and punishing the State for refusing to acquiesce in the violation.  No court can properly do this."

*Id.* at ¶ 61.

The CCJ ruling creates an *actual conflict* between Belizean law and U.S. law, as interpreted by the District Court, requiring abstention based on comity grounds.  *See In re Maxwell Comm. Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996).

The District Court rejected the international comity defense:

> "The Circuit Court's decision remanding this case essentially forecloses these arguments, as the Court held that litigation in Belize '*has no preclusive effect* on the district court's disposition of the petition to enforce,' *Belize Soc. Dev. Ltd.*, 668 F.3d at 730, and '[t]he fact that Belize is not a party to the New York Convention is irrelevant,' *id.* at 731 n.3. Our Circuit Court, of course, was well aware that courts in Belize were reaching conflicting

38

decisions regarding the enforceability of the Final Award, *see id.* at 728–29, *and it instructed me to proceed with enforcement anyway*.  Regardless of whether our Circuit Court's 'holding has the potential for straining relations between the United States and Belize,' Resp't's Suppl. Br. at 17, *I am, in the final analysis, bound by that decision.*"

*BSDL*, 2013 WL 6502416 at *5 (emphasis added).

The District Court's interpretation of *BSDL Appeal* is totally flawed.  *BSDL Appeal did not* address international comity as grounds for *dismissal*.  The issue whether the Belizean action has *preclusive* effect under the Convention is *different* from the issue whether comity warrants *discretionary abstention* based on the CCJ decision.  The Convention is no obstacle to dismissal on comity grounds because it "contemplate[s] application of a signatory forum's procedural doctrines."  *See Figueiredo*, 665 F.3d at 392-93.  *BSDL Appeal* did not hold otherwise.

The District Court also stated:  "I am also not convinced that there really is a 'true conflict' between U.S. and Belizean law."  *BSDL*, 2013 WL 6502416 at *5, n.10.  However, the CCJ held that awards resulting from agreements signed by the Executive that purport to alter the tax regime with respect to a company are unenforceable under Belizean law; that ruling conflicts with the Judgment below.

The District Court concluded:  "GOB ignores that 'the central precept of comity teaches that, *when possible, the decisions of foreign tribunals should be given effect in domestic courts,* since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability.'

*Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir.1984) (emphasis added)." *BSDL*, 2013 WL 6502416 at *5, n.11. GOB did not ignore this doctrine. GOB *invokes* it. This action should be dismissed in deference to the CCJ decision (the law of the land in Belize), and not the contrary and *ex parte* LCIA award. However, the Court refused to permit GOB to submit briefing on the cited CCJ decision based on its incorrect reading of *BSDL Appeal*. *See* 2013 WL 6502416 at *12 n.31. As a result, the Court reached the wrong conclusion and committed reversible error by failing to dismiss on international comity grounds.

## IV.   THE ACTION SHOULD BE DISMISSED FOR LACK FOR PERSONAL JURISDICTION.

In *Weltover*, 504 U.S. at 619-20, the Supreme Court questioned whether foreign states are "persons" under the Due Process clause (since States of the Union are not) and are entitled to the protections of *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Then, this Circuit held in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96-100 (D.C. Cir. 2002), that foreign states are not "persons." "[W]e are unwilling to interpret the Due Process Clause as conferring rights on foreign nations that States of the Union do not possess." *Id.* at 99. "[A]bsent some compelling reason to treat foreign sovereigns more favorably than 'States of the Union,' it would make no sense to view foreign states as 'persons' under the Due Process Clause." *Id.* at 96. *Compelling reasons exist to safeguard sovereigns against the unfettered exercise of personal jurisdiction.*

40

Recently, in *Daimler AG v. Bauman*, -- U.S. --, 134 S.Ct. 746 (2014), the

Court limited personal jurisdiction over foreign private corporations:

> "The Ninth Circuit *paid little heed to the risks to international comity its expansive view of general jurisdiction posed. Other nations do not share the uninhibited approach* to personal jurisdiction advanced by the Court of Appeals in this case. . . . The Solicitor General informs us . . . that *'foreign governments' objections to some domestic courts' expansive views of general jurisdiction have in the past impeded negotiations of international agreements on the reciprocal recognition and enforcement of judgments.' Considerations of international rapport thus reinforce our determination ...*"

134 S.Ct. at 763 (emphasis added).

These considerations cut against holding that a foreign state should not

benefit from *Int'l Shoe*. *A contrary result would make personal jurisdiction over*

*foreign states broader than personal jurisdiction over foreign private*

*corporations.* *GSS Group Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 817 (D.C. Cir.

2012). ("Supreme Court has reaffirmed … that foreign corporations are entitled to

due process protection, despite the fact they have no meaningful connection to the

United States."). Thus, even if the Due Process clause does not *technically* apply

to foreign states because they are not "persons," the principles in *Int'l Shoe* can and

should be *extended* to foreign states based on international comity.

Further, "[a]s a general rule, neither *statute* nor judicial decree *may bind*

*strangers to the State."* *J. McIntyre Machinery, Ltd. v. Nicastro*, -- U.S. --, 131

S.Ct. 2780, 2786-87 (2011) (emphasis added). This rule is independent of Due

Process and goes "to the power of a sovereign to prescribe rules of conduct for

those within its sphere." *Id.*  Thus, the principles in *Int'l Shoe* should be extended

to foreign states despite of a lack of constitutional connection.  Foreign sovereign

immunity "is a matter of grace and comity on the part of the United States, and not

a restriction imposed by the Constitution." *NML Capital*, 2014 WL 2675854 at *4.

Another reason why foreign states should not be treated like States is

because "States entered the Union with their sovereign immunity intact" under the

Eleventh Amendment.  *See Virginia Office for Protection and Advocacy v.*

*Stewart*, -- U.S. --, 131 S.Ct. 1632, 1637 (2011).  *Int'l Shoe* has been used to create

a similar "consent-based" gatekeeper to the exercise of personal jurisdiction over

foreign states in confirmation actions.  *See Creighton*, 181 F.3d at 125-28; *First*

*Investment Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 749-51 (5th

Cir. 2013).  This is particularly appropriate if the FSIA arbitration exception

applies regardless of whether a foreign state has ratified the Convention, because it

would mean jurisdiction is not being asserted on a "consent" basis.

The concept of requiring "contacts" with the forum is part of the so-called

"restrictive theory" of sovereign immunity, codified in the FSIA.  The FSIA was

enacted in response to U.S. experience that its "pleas of immunity were routinely

denied [by foreign courts] in tort and contract cases where the necessary contacts

with the forum were present."  H.R. REP. NO. 94-1487 at *9 (1976).  The FSIA was

intended to replace the first prong (long-arm statute) of the personal jurisdictional

42

analysis, not the second prong (minimum contacts).  *Id.* at *13.  Congress intended to incorporate Due Process protections in the FSIA:  "Significantly, each of the immunity provisions in the bill, sections 1605-1607, requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction."  *Id.*  "The requirements of minimum jurisdictional contacts … are embodied in the" FSIA.  *Id.* (citing *Int'l Shoe*).  It is consistent with the FSIA to extend *Int'l Shoe* to foreign states.

Here, the minimum contacts requirements cannot be satisfied, for GOB has done *nothing* to subject itself to personal jurisdiction in the U.S.  *GSS Group*, 680 F.3d at 817.  GOB did not even participate in the arbitration.  *First Investment*, 703 F.3d at 752 n.6 ("We also reject any argument that the Fujian Entities were on notice that they might be haled into court in the United States, having willingly submitted to arbitration in the United Kingdom.")  The District Court did not engage in a Due Process analysis.  *BSDL*, 2013 WL 6502416 at *4 n.7.  This action should be dismissed for lack of personal jurisdiction.

## V.     IN THE ALTERNATIVE, THE PETITION SHOULD BE DENIED UNDER THE NEW YORK CONVENTION.

An order confirming an arbitration award is subject to *de novo* review.  *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1105 (9th Cir. 2007).

### A.     THE PETITION SHOULD BE DENIED BECAUSE BELIZE HAS NOT RATIFIED THE NEW YORK CONVENTION.

It is a cardinal principle of international law that two sovereigns can bind each other, but cannot bind *another* sovereign: "America and Spain may bind themselves, but they cannot bind foreign nations." *Chacon v. Eighty-Nine Bales of Cochineal*, 1 Brock 478, 5 F.Cas. 390, 393 (Cir. Ct. D. Va. 1821), *aff'd Santissima Trinidad & St. An De*, 20 U.S. 283 (1822). "Sovereigns are equal," as Chief Justice John Marshall said in *Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 134 (1812). Although the U.S. and U.K. may bind private parties regardless of their citizenship by ratifying the Convention, they cannot bind a sovereign, particularly given that GOB did not even participate in the LCIA arbitration.

Our courts have *consistently* held that the U.S. is *not* bound by a treaty it has not ratified. This Court has held that "a treaty … binds only those countries that have ratified it." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 35-36 (D.C. Cir. 2011), *vacated on other grounds*, 527 Fed. Appx. 7 (D.C. Cir. 2013); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1489 (D.C. Cir. 1991); *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't. of Transp.*, 724 F.3d 230, 232 (D.D.C. 2013). The Supreme Court also holds that the U.S. is bound on by ratified treaties. *Haver v. Yaker*, 75 U.S. (9 Wall.) 32, 35 (1869). Other Circuits concur. *E.g., Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003) ("State only becomes bound by—that is, becomes a party to—a treaty when it ratifies the

44

treaty."); *Flores-Nova v. Attorney Gen.*, 652 F.3d 488, 494 n.6 (3d Cir. 2011)

("Unratified treaties are not binding … and do not have the force of law.").

The Convention is a treaty and Belize has not ratified it.  Belize is not bound

by the Convention because it has not *consented* to jurisdiction in U.S. courts vis-à-

vis that treaty.  "It is elementary that the United States, as sovereign, is immune

from suit save as it consents to be sued, and the terms of its consent to be sued in

any court define that court's jurisdiction to entertain the suit."  *Tobar v. U.S.*, 639

F.3d 1191, 1194 (9th Cir. 2011).  The same rule must be applied to a *friendly*

*foreign sovereign*, like Belize.  "In the field of international law, where no single

sovereign reigns supreme, the Golden Rule takes on added poignancy."  *De*

*Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1398 (5th Cir. 1985).

Equal treatment of the U.S. government and foreign states also is supported by the

FSIA.  For instance, "[a]s in suits against the U.S. Government, jury trials are

excluded" against foreign states under the FSIA.  H.R. Rep. No. 94-1487 at *13.

"Limitations and conditions upon which the Government consents to be sued

must be strictly observed and exceptions thereto are not to be implied."  *Soriano v.*

*U.S.*, 352 U.S. 270, 276 (1957).  In *Creighton*, this Court observed:  "Qatar not

having signed the Convention, we do not think that its agreement to arbitrate in a

signatory country, without more, demonstrates the requisite intent to waive its

sovereign immunity in the United States." 181 F.3d at 123.  While this holding was

made in the context of the FSIA waiver exception, its relevance is that, by agreeing to arbitrate in a signatory state, a sovereign (like Belize, that has not ratified the Convention) does not "consent" to be sued in the U.S.

To determine when a multi-lateral treaty goes into force as to a sovereign, one must review "the terms of the treaty." *Avero Belgium Ins. v. Am. Airlines, Inc.*, 423 F.3d 73, 81-82 n.10 (2d Cir. 2005). Article XII of the Convention requires ratification before it "*enters into force*" as to a sovereign; thus, regardless of *what the substantive provisions of the Convention state* (*i.e.*, that it applies where a party arbitrates in a signatory state), those substantive provisions cannot "enter into force" against a sovereign (as opposed to a private party) until after that sovereign ratifies the Convention under Article XII.

This Court has held that, under the Convention, "the critical element is the place of the award: if that place is in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration." *Creighton*, 181 F.3d at 121. However, *Creighton* applied Article I(1) of the Convention and, again, that *substantive* provision does not "enter into force" against a sovereign until after it has ratified under the specific provisions of Article XII. The Petition should be denied because Belize has not ratified the Convention.

**B.    THE PETITION SHOULD BE DENIED BECAUSE GOB WAS NOT A PARTY TO THE SUBJECT AGREEMENT AND IT IS VOID (ARTICLE V(1)(a)).**

Article V(1)(a) of the Convention provides:  "Recognition and enforcement of the award may be refused [if] . . . [t]he parties to the agreement referred to in article II were … under some incapacity, or the *said agreement is not valid under the law to which the parties have subjected it* …."

In *China Minmetals Materials Import and Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 286 (3d Cir. 2003), the Third Circuit held that courts applying Article V must examine the validity of the underlying agreement when a party opposing enforcement disputes its validity.  It involved a claim by Chi Mei Corp. that the agreement containing the arbitration clause was a forgery and not binding on it.  *Id.* at 278.  The arbitrator determined that the signature was not a forgery and issued an award against Chi Mei Corp.  *Id.*  The district court confirmed the award, declining to determine whether the agreement was forged.  *Id.*

The Third Circuit reversed, rejecting the argument that courts do not have authority under the Convention to determine arbitrability when the validity of the contract containing the arbitration clause disputed.

> "We therefore find that the absence of any reference to a valid written agreement to arbitrate in Article V does not foreclose a defense to enforcement on the grounds *that there never was a valid agreement to arbitrate*.  Minmetals cannot point to any case interpreting Article V … so narrowly as to preclude that defense and we are aware of none.  Nor do the text and structure of the Convention compel such an interpretation.  …

47

Article V expressly provides that the party opposing enforcement may furnish 'to the competent authority where the recognition and enforcement is sought proof that ... the said agreement is not valid ....' Read as a whole, therefore, the Convention contemplates that a court should enforce only valid agreements to arbitrate and only awards based on those agreements."

*China Minmetals*, 334 F.3d at 286 (emphasis added).

The LCIA held that "an 'agreement to arbitrate' is independent of the main contract … [under] the principle of *competens/competens*."  Award at ¶¶ 134-135.

*China Minmetals* explains *competens/competens*:

"In its simplest form, competence-competence simply means that the arbitrators can examine their own jurisdiction without waiting for a court to do so; if one side says the arbitration clause is invalid, there is no need to adjourn arbitration proceedings to refer the matter to a judge . . . .  Under this brand of competence-competence, however, *the arbitrators' jurisdictional decision is subject to judicial review* at any time before, after, or during arbitration proceedings, as was traditionally the case *under English law* … [France and Germany have different approaches].

*Despite these different formulations, however, and despite the principle's presumption in favor of allowing arbitrators to decide their own jurisdiction, it appears that every country adhering to the competence-competence principle allows some form of judicial review of the arbitrator's jurisdictional decision where the party seeking to avoid enforcement of an award argues that no valid arbitration agreement ever existed.*  […]

*It therefore seems clear that international law overwhelmingly favors some form of judicial review of an arbitral tribunal's decision that it has jurisdiction over a dispute, at least where the challenging party claims that the contract on which the tribunal rested its jurisdiction was invalid.*"

*China Minmetals*, 334 F.3d at 288-89 (emphasis added).  This is particularly true where "the contract on which arbitral jurisdiction was founded is and always has been void." *Id.* at 289.

48

Indeed, "[a]lthough article V(1)(a) … deals expressly only with the case where the arbitration agreement is not valid, *the consistent international practice shows that* there is no doubt that it also covers the case where a party claims that the agreement is not binding on it because that party *was never a party* to the arbitration agreement." *Dallah Real Estate & Tourism Holding Co v. Pakistan*, [2010] UKSC 46, [2011] 1 A.C. 763 (emphasis added).

The District Court refused to consider GOB's evidence of invalidity of the Accommodation Agreements, relying on the severability doctrine. *See* 2013 WL 6502416 at *8-9. But, the Award did not bar judicial review because (a) *GOB was never a party to the Accommodation Agreement, including its arbitration clause,* since the Prime Minister *lacked actual authority*, and (b) the Accommodation Agreement is *void ab initio under the Constitution and laws of Belize*.

If the Prime Minister lacked actual authority to contract over the tax regime, and the Accommodation Agreement is void *ab initio*, he also lacked authority to bind GOB to an arbitration clause within that void contract. Otherwise, a corrupt official could bind a sovereign to arbitrate a matter over which he has *no power to contract. BSDL never cited any Belizean law that the Prime Minister could bind GOB to arbitrate the validity of an agreement concerning a subject matter outside of his sphere of competence.* In this regard, the CCJ also disagreed with the view that "because the [LCIA] had considered and rejected the idea that the [subject

49

agreement] was illegal, we are necessarily precluded from considering afresh that issue ... any such estoppel must yield to the public policy against giving effect to transactions obviously offensive to the court."  (ECF 48-2 at ¶ 32 (JA-__)).

Because the Accommodation Agreements and arbitration clause are void, confirmation should be denied under Article V(1)(a).

## C.     THE PETITION SHOULD BE DENIED BECAUSE THE MATTER IS NOT SUBJECT TO SETTLEMENT BY ARBITRATION (ARTICLE V(2)(a)).

Article V(2)(a) of the Convention allows a court to deny confirmation where "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country."   Under the Revenue Rule, U.S courts cannot *adjudicate* foreign tax liabilities.  But, the District Court has done just that.

"The revenue rule is a long-standing common law rule that prevents the courts of one sovereign from enforcing *or adjudicating* tax claims from another sovereign."  *Rep. of Honduras v. Philip Morris Companies, Inc.*, 341 F.3d 1253, 1256 (11th Cir. 2003) (emphasis added); *Fountain v. U.S.*, 357 F.3d 250, 252 (2d Cir. 2004) ("[W]here a domestic court is effectively passing on the validity and operation of the revenue laws of a foreign country, the important concerns underlying the revenue rule are implicated.").  "[T]he rule has entered United States common law, international law and the national law of other common law jurisdictions."  *Attorney General v. R.J. Reynolds Tobacco Holdings, Inc.*, 268

50

F.3d 103, 110 (2d Cir. 2001).  The "reluctance of courts to delve into such matters is based on the desire to avoid embarrassing another state by scrutinizing its … revenue laws."  *Id.* at 112.  Judge Learned Hand noted the danger in having courts "pass upon the provisions for the public order of another state," something that is "beyond the powers of a court." *Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929).  "Tax laws embody a sovereign's political will . . . .  They mirror the moral and social sensibilities of a society."  *R.J. Reynolds*, 268 F.3d at 111.

> The District Court incorrectly held that the Revenue Rule did not apply:
>
> "In bringing the LCIA arbitration and this enforcement action, Telemedia and BSDL are not attempting to enforce Belizean tax law or collect any tax revenue. They are seeking to enforce a *contract,* and although that contract contains tax-related provisions, the arbitration award and enforcement of that award do not entail the enforcement of any foreign revenue law . . . . The revenue rule provides no basis for declining enforcement."

*BSDL*, 2013 WL 6502416 at *10 (emphasis in the original).

The District Court was wrong.  The Award granted damages holding that Telemedia was entitled to the specific *tax and duty exemptions* provided in the Accommodation Agreements.  Thus, the Award makes an *adjudication* regarding Telemedia's tax liabilities to GOB.  The Award specifically held that the existing tax rates and duties cannot apply to Telemedia and that the tax scheme in the Agreements applied instead.  *See generally* Award, Exhibit A to Kimmelman Declaration (ECF 1- 3 (JA-__)).

"[T]he Tribunal is being asked to determine the disputes that have arisen *as regards the application* of the bespoken *tax arrangements* included in the Accommodation Agreement relating to the *rate of Business Tax to be paid* by [Telemedia], its right to *set off the Shortfall Amount against its tax liabilities*, and its entitlement to be *exempted from import duties*."

Award at ¶ 180 (JA-__) (Emphasis added).

The Belize Supreme Court has ruled on this issue, and BSDL is estopped as assignee of Telemedia.  In 2008, Telemedia filed a petition against GOB in Belize, *Belize Telemedia Ltd. v. Att'y General*, seeking to enjoin GOB from enforcing tax laws pending the LCIA arbitration, pursuant to an order from a U.K. Commercial Court.  The Belizean Court denied the petition because it is not in "the province of *either the arbitral tribunal* or English Commercial Court" to "pronounce upon such a *fundamentally sovereign preserve as the taxation regime of a foreign sovereign state*."  Gandhi Decl. at Exhibit 17 (opinion at ¶ 19) (ECF 15-21 at 9) (JA-__).  Telemedia "is a Belizean corporation liable to pay business taxes in Belize, doing business in Belize from whence all or most of its income is derived." *Id.* at ¶ 4.  "Taxes and duties are quintessentially territorial.  I am therefore at a loss to understand how a foreign court, with the greatest respect, can enjoin a foreign government from the process of collecting taxes in its own domain." *Id.* at ¶ 9. Indeed, confirmation of the Award is barred by the Revenue Rule.

### D. THE PETITION SHOULD HAVE BEEN DENIED BASED ON PUBLIC POLICY GROUNDS (ARTICLE V(2)(b)).

Article V(2)(b) of the Convention allows a court to refuse confirmation

where "*recognition or enforcement of the award would be contrary to the public policy of that country.*"   It "incorporates an express public policy exception." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007).

"Enforcement of foreign arbitral awards may be denied on [the basis of public policy] only where enforcement would violate the forum state's most basic notions of morality and justice." *Parsons & Whittemore Overseas Co., Inc. v. Societe Gen. de L'Industrie du Papier*, 508 F.2d 969, 974 (2d Cir.1974).

The District Court held:

> "I agree with the general notion that the United States has a strong policy against foreign corruption. But it also has a countervailing policy that I mentioned earlier—an 'emphatic federal policy in favor of arbitral dispute resolution' that 'applies with special force in the field of international commerce' … GOB has failed to show that, on balance, enforcing this award would so offend the United States' 'most basic notions of morality and justice" that Article V(2)(b) applies.'"

*BSDL*, 2013 WL 6502416 at *12 (citations omitted).

To the contrary, the record establishes that the general policy in favor of arbitration must give way to the "strong" public policy in favor of prevention of corruption. *Holman v. Williams*, 436 F. Supp. 2d 68, 78 (D.D.C. 2006).  Corrupt foreign officials should not be permitted to insert arbitration clauses into their illegal agreements, *when they lack authority to execute the agreements in the first place*, and thereby, in collusion with a private entity, force governments to arbitrate in a foreign forum issues involving *such sovereign prerogatives as the power to*

*tax.*  The District Court "rubber stamped" the Award granting damages based on the Prime Minister's *illegal* promises to give tax and duty exemptions.  The Court adopted as its judgment a foreign award resulting from a *corrupt arrangement* between a Prime Minister and private company.  As the CCJ held, such arrangements are *repugnant* to Separation of Powers principles, which are at the core of the U.S. constitutional order.

Moreover, the Accommodation Agreements were entered in "secret" by the prior Prime Minister, and Telemedia executives threatened this Prime Minister when he made them public.  Such actions are "repugnant to fundamental notions of what is decent and just."  *Tahan v. Hodgson,* 662 F.2d 862, 864 (D.C. Cir. 1981).

The Accommodation Agreement and Award impose on the Belizean people the burden to compensate Telemedia (now, BSDL) under an *illegal tax scheme*. Justice Cardozo noted that a foreign judgment is repugnant if it "offends our sense of justice or menaces the public welfare."  *Loucks v. Std. Oil Co.*, 224 N.Y. 99, 110 (1918).  The Award "is repugnant to U.S. policy" because "it tends to undermine the public interest [and] confidence in the administration of the law."  *LG Display Co. Ltd. v. Obayashi Seikou Co., Ltd.*, 919 F. Supp. 2d 17, 31 (D.D.C. 2013).  "The United States has long been a leader in the fight against corruption."  There is a "strong U.S. commitment to combat corruption."  *See* U.S. State Department, *Keeping Foreign Corruption Out of the United States: Four Case Studies* (2010),

54

*available at* http://www.state.gov/j/inl/rls/rm/136527.htm.  The State Department

has taken notice of "indications of government corruption" in the administration of

former Prime Minister Musa.  *See 2009 Investment Climate Statement – Belize* (Feb.

2009), *available at* http://www.state.gov/e/eb/rls/othr/ics/2009/117851.htm.

Justice and the U.S. public policy against corruption will not be served by

allowing this corrupt agreement and tainted Award to *burden* the people of Belize.

**VI.   THE JANUARY 9, 2014 ORDER AND FEBRUARY 4, 2014 JUDGMENT ALSO MUST BE REVERSED.**

The January 9, 2014 Order (setting damages) and February 4, 2014

Judgment must be reversed for the reasons discussed above and because the Court

was divested of jurisdiction by the prior Notice of Appeal.  *See* May 16, 2014 *per*

*curiam* order; *Garcia v. Burlington N. RR. Co.*, 818 F.2d 713, 721 (10th Cir. 1987)

(once divested of jurisdiction, any subsequent action is void).

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the appealed orders and judgment and order the District Court to dismiss or deny BSDL's Petition.

Dated:  June 18, 2014                          Respectfully submitted,

                                               */s/* Creighton R. Magid
                                               Creighton R. Magid (#49713)
                                               DORSEY & WHITNEY LLP
                                               1801 K Street, NW, Suite 750
                                               Washington, DC 20006
                                               (202) 442-3555
                                               magid.chip@dorsey.com

                                               JUAN C. BASOMBRIO (of counsel)
                                               Dorsey & Whitney LLP
                                               600 Anton Boulevard, Suite 2000
                                               Costa Mesa, California 92626
                                               (714) 800-1405
                                               basombrio.juan@dorsey.com

                                               Counsel for Respondent-Appellant
                                               GOVERNMENT OF BELIZE

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), D.C. Circuit Rule 32(a), the undersigned certifies that this brief complies with the applicable type-volume limitations.  This brief was prepared using a proportionally spaced type (Times New Roman, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1), this brief contains 13,943 words.  This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2003) used to prepare this brief.

Dated:  June 18, 2014                           */s/* Creighton R. Magid
                                                Creighton R. Magid

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 18th day of June, 2014, I electronically filed the

foregoing Brief of Respondent-Appellant Government of Belize with the Clerk of

the Court for the United States Court of Appeals for the D.C. Circuit by using the

Court's CM/ECF system, which will send notice of such filing to the following

registered CM/ECF users:

> Louis B. Kimmelman
> SIDLEY AUSTIN LLP
> 787 Seventh Avenue
> New York, New York 10019

/s/ Creighton R. Magid
Creighton R. Magid

## <u>ADDENDUM OF STATUTES, TREATIES</u>
## <u>AND OTHER AUTHORITIES</u>

In addition to the following listed documents, all other applicable statutes, treaties and authorities are contained in the brief of Respondent-Appellant Government of Belize.

New York Convention on the Recognition
and Enforcement of Foreign Arbitral Awards,
June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3                    GOB Authority1

# ADDENDUM

# GOB AUTHORITY 1

# UNITED NATIONS CONFERENCE
## ON INTERNATIONAL COMMERCIAL ARBITRATION

# CONVENTION

## ON THE RECOGNITION AND ENFORCEMENT
## OF FOREIGN ARBITRAL AWARDS



*UNITED NATIONS*
*1958*

# CONVENTION ON THE RECOGNITION AND ENFORCEMENT
## OF FOREIGN ARBITRAL AWARDS

### Article I

1. This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

2. The term "arbitral awards" shall include not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted.

3. When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

### Article II

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

### Article III

Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

### Article IV

1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforce-

ment shall, at the time of the application, supply:

(*a*) The duly authenticated original award or a duly certified copy thereof;

(*b*) The original agreement referred to in article II or a duly certified copy thereof.

2. If the said award or agreement is not made in an official language of the country in which the award is relied upon, the party applying for recognition and enforcement of the award shall produce a translation of these documents into such language. The translation shall be certified by an official or sworn translator or by a diplomatic or consular agent.

## Article V

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(*a*) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(*b*) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(*c*) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains

decisions on matters submitted to arbitration may be recognized and enforced; or

(*d*) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(*e*) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(*a*) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(*b*) The recognition or enforcement of the award would be contrary to the public policy of that country.

## Article VI

If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V (1) (*e*), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

## Article VII

1. The provisions of the present Convention shall not affect the validity of multilateral or bilateral agreements concerning the recognition and enforcement of arbitral awards entered into by the Contracting States nor deprive

any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon.

2. The Geneva Protocol on Arbitration Clauses of 1923 and the Geneva Convention on the Execution of Foreign Arbitral Awards of 1927 shall cease to have effect between Contracting States on their becoming bound and to the extent that they become bound, by this Convention.

### Article VIII

1. This Convention shall be open until 31 December 1958 for signature on behalf of any Member of the United Nations and also on behalf of any other State which is or hereafter becomes a member of any specialized agency of the United Nations, or which is or hereafter becomes a party to the Statute of the International Court of Justice, or any other State to which an invitation has been addressed by the General Assembly of the United Nations.

2. This Convention shall be ratified and the instrument of ratification shall be deposited with the Secretary-General of the United Nations.

### Article IX

1. This Convention shall be open for accession to all States referred to in article VIII.

2. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

### Article X

1. Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which

it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

2. At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3. With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

### Article XI

In the case of a federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of this Convention that come within the legislative jurisdiction of the federal authority, the obligations of the federal Government shall to this extent be the same as those of Contracting States which are not federal States;

(b) With respect to those articles of this Convention that come within the legislative jurisdiction of constituent states or provinces which are not, under the constitutional system of the federation, bound to take legislative action, the federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of constituent states or provinces at the earliest possible moment;

(c) A federal State Party to this Convention shall, at the request of any other Contracting

State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the federation and its constituent units in regard to any particular provision of this Convention, showing the extent to which effect has been given to that provision by legislative or other action.

### Article XII

1. This Convention shall come into force on the ninetieth day following the date of deposit of the third instrument of ratification or accession.

2. For each State ratifying or acceding to this Convention after the deposit of the third instrument of ratification or accession, this Convention shall enter into force on the ninetieth day after deposit by such State of its instrument of ratification or accession.

### Article XIII

1. Any Contracting State may denounce this Convention by a written notification to the Secretary-General of the United Nations. Denunciation shall take effect one year after the date of receipt of the notification by the Secretary-General.

2. Any State which has made a declaration or notification under article X may, at any time thereafter, by notification to the Secretary-General of the United Nations, declare that this Convention shall cease to extend to the territory concerned one year after the date of the receipt of the notification by the Secretary-General.

3. This Convention shall continue to be applicable to arbitral awards in respect of which recognition or enforcement proceedings have been instituted before the denunciation takes effect.

### Article XIV

A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention.

### Article XV

The Secretary-General of the United Nations shall notify the States contemplated in article VIII of the following:

(a) Signatures and ratifications in accordance with article VIII;

(b) Accessions in accordance with article IX;

(c) Declarations and notifications under articles I, X and XI;

(d) The date upon which this Convention enters into force in accordance with article XII;

(e) Denunciations and notifications in accordance with article XIII.

### Article XVI

1. This Convention, of which the Chinese, English, French, Russian and Spanish texts shall be equally authentic, shall be deposited in the archives of the United Nations.

2. The Secretary-General of the United Nations shall transmit a certified copy of this Convention to the States contemplated in article VIII.

I hereby certify that the foregoing text is a true copy of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York on 10 June 1958, the original of which is deposited with the Secretary-General of the United Nations, as the said Convention was opened for signature, and that it includes the necessary rectifications of typographical errors, as approved by the Parties.

Je certifie que le texte qui précède est une copie conforme de la Convention pour la reconnaissance et l'exécution des sentences arbitrales étrangères, conclue à New York le 10 juin 1958 et dont l'original se trouve déposé auprès du Secrétaire général de l'Organisation des Nations Unies telle que ladite Convention a été ouverte à la signature, et que les rectifications matérielles nécessaires, telles qu'approuvées par les Parties, y ont été incorporées.

For the Secretary-General,
The Legal Counsel:

Pour le Secrétaire général,
Le Conseiller juridique :

Carl-August Fleischhauer

United Nations, New York
6 July 1988

Organisation des Nations Unies
New York, le 6 juillet 1988

Certified true copy XXII-1
Copie certifiée conforme XXII.1
October 2004