ORAL ARGUMENT HAS NOT BEEN SCHEDULED

Nos. 14-7002 et al.

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――

BELIZE SOCIAL DEVELOPMENT LIMITED,

*Petitioner-Appellee,*

v.

GOVERNMENT OF BELIZE,

*Respondent-Appellant.*

―――――――

On Appeal from the District Court for the District of Columbia,
Case No. 1:09-cv-02170-RJL, Judge Richard J. Leon

―――――――

## BRIEF OF BELIZE SOCIAL DEVELOPMENT LIMITED

―――――――

Ryan C. Morris
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000

Louis B. Kimmelman
*Counsel of Record*
Dana C. MacGrath
David W. Denton, Jr.
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Fax: (212) 839-5599
bkimmelman@sidley.com

*Counsel for Appellee Belize Social Development Limited*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Belize Social Development Limited hereby certifies as follows:

**A.**    *Parties.*  Petitioner Belize Social Development Limited ("BSDL") is the appellee in this appeal.  Respondent Government of Belize is the appellant in this appeal.

**B.**    *Ruling Under Review.*  The rulings under review are the following district court orders/judgment:

(i)    Memorandum Opinion and Order dated December 11, 2013, granting BSDL's petition to confirm a foreign arbitration award and enter judgment and denying the Government of Belize's motion to stay or, alternatively, dismiss the petition (DE 51-52) (JA-___);

(ii)   Memorandum Order dated January 8, 2014, fixing the amount of the judgment in favor of BSDL based on the conversion of foreign currency into U.S. Dollars and the calculation of interest as required in the Memorandum Opinion and Order dated December 11, 2013 (DE 59) (JA-___); and

(iii)  Judgment dated February 4, 2014 (DE 66) (JA-___).

Notices of Appeal were filed by the Government of Belize from each of the two orders and from the final judgment (JA-___, ___, & ___).

      **C.**    ***Related Cases.***  This case was previously before this Court and resulted in an opinion dated January 13, 2012 and the issuance of a writ of mandamus.  *See Belize Social Development Ltd. v. Government of Belize*, 668 F.3d 724 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 274 (2012).  There are no related cases currently pending in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1, Appellee Belize Social Development Limited ("BSDL") states that it has no parent company and that no publicly held company owns 10 percent or more of BSDL's stock.

## ORAL ARGUMENT

Pursuant to D.C. Circuit Rule 34 and Federal Rule of Appellate Procedure Rule 34, Appellee Belize Social Development Limited hereby requests oral argument because this case presents important issues concerning the enforcement of a foreign arbitration award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, which was implemented in the United States by Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201-208.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

ORAL ARGUMENT ............................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATUTES AND REGULATIONS ...............................................1

STATEMENT OF ISSUES ........................................................1

STATEMENT OF THE CASE.........................................................2

    1.    The Accommodation Agreement ................................2

    2.    The LCIA Arbitration ..........................................6

    3.    The Government of Belize's Campaign to Resist the Award ...................................................................9

    4.    The Proceedings in the District Court........................11

    5.    The Prior Appeal ..............................................12

    6.    Remand to the District Court ..................................13

SUMMARY OF ARGUMENT ......................................................13

ARGUMENT ....................................................................14

I.    THE DISTRICT COURT HAD SUBJECT MATTER JURISDICTION TO CONFIRM THE AWARD.......................................................14

    A.    The FSIA's Arbitration Exception to Sovereign Immunity Applies to Confirmation of the Award...............................15

        1.    The Government of Belize's Position Is Based on a Misreading of the FSIA. ........................................17

2.      The Arbitration Agreement Was Made by the Government of Belize. ..............................................................20

3.      The Relationship Between the Parties Was Commercial. ........22

B.      The Government of Belize Seeks to Turn the Threshold Inquiry of Subject Matter Jurisdiction under the FSIA into an Analysis of the Merits Under the FAA. ..............................................................26

C.      Application of the FSIA's Arbitration Exception Is the Law of the Case. ..............................................................27

II.     THE DISTRICT COURT PROPERLY DECLINED TO DISMISS BSDL'S PETITION UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*. ..............................................................28

A.      There Is No Adequate Alternative Forum in an Award Enforcement Proceeding. ..............................................................29

B.      The Contrary Decisions of the Second Circuit Are Inapplicable and Incorrect. ..............................................................31

C.      The New York Convention Does Not Permit a *Forum Non Conveniens* Dismissal ..............................................................34

III.    THE DISTRICT COURT CORRECTLY REFUSED TO DISMISS BASED ON THE DOCTRINE OF INTERNATIONAL COMITY.............36

IV.     PERSONAL JURISDICTION OVER THE GOVERNMENT OF BELIZE EXISTS. ..............................................................39

V.      THE GOVERNMENT OF BELIZE HAS FAILED TO ESTABLISH A NEW YORK CONVENTION DEFENSE TO ENFORCEMENT OF THE AWARD. ..............................................................42

A.      The Award Is Governed By the New York Convention. ...................43

B.      The Government of Belize Has Failed to Establish An Article V(1)(a) Defense. ..............................................................44

C.      The Revenue Rule Does Not Bar Enforcement of the Award. ...........48

D. The Arbitral Award Is Not Contrary to United States Public Policy. ................................................................................. 50

VI. BSDL SHOULD BE PERMITTED TO CONDUCT POST-JUDGMENT DISCOVERY. ......................................................... 53

CONCLUSION ....................................................................................... 56

CERTIFICATE OF COMPLIANCE .................................................... 57

CERTIFICATE OF FILING AND SERVICE ...................................... 58

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
  528 F.3d 934 (D.C. Cir. 2008) ..................................................................30

*Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*,
  179 F.3d 1279 (11th Cir. 1999) ...........................................................22

*Argentine Republic v. Nat'l Grid PLC*,
  637 F.3d 365 (D.C. Cir. 2011) ..............................................................38

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
  268 F.3d 103 (2d Cir. 2001) ................................................................48

*Bautista v. Star Cruises*,
  396 F.3d 1289 (11th Cir. 2005) ..........................................................24

*Belize Social Development Ltd. v. Government of Belize*,
  668 F.3d 724 (D.C. Cir. 2012).......................... 13, 27, 34, 35, 36, 37, 38, 39, 43

*Brewster v. C. I. R.*,
  607 F.2d 1369 (D.C. Cir. 1979) ..........................................................30

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006) ..........................................................................45

*Chevron Corp. v. Republic of Ecuador*,
  949 F. Supp. 2d 57 (D.D.C. 2013) ...............................................26, 27, 51

*China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp.*,
  334 F.3d 274 (3d Cir. 2003) ..............................................................45

*Citizens Bank v. Alafabco, Inc.*,
  539 U.S. 52 (2003) ............................................................................25

*Comm'ns Imp. Exp. S.A. v. Republic of the Congo*,
  No. 13-7004, 2014 WL 3377337 (D.C. Cir. July 11, 2014).......................34, 42

*Creighton Ltd. v. Gov't of Qatar*,
  181 F.3d 118 (D.C. Cir. 1999)..........................................................17

*Crocker v. Piedmont Aviation, Inc.*,
  49 F.3d 735 (D.C. Cir. 1995)..............................................................28

*Deering Milliken, Inc. v. Fed. Trade Comm.*,
  647 F.2d 1124 (D.C. Cir. 1980)..........................................................55

*El-Fadl v. Cent. Bank of Jordan*,
  75 F.3d 668 (D.C. Cir. 1996)..............................................................29

*\*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
  156 F.3d 310 (2d Cir. 1998) .........................................................50, 51

*European Community v. RJR Nabisco, Inc.*,
  150 F. Supp. 2d 456 (E.D.N.Y. 2001) ................................................49

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
  665 F.3d 384 (2d Cir. 2011) ...........................................31, 32, 34, 35

*First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda*,
  877 F.2d 189 (2d Cir. 1989) ...............................................................22

*Francisco v. STOLT ACHIEVEMENT MT*,
  293 F.3d 270 (5th Cir. 2002), *cert. denied*, 537 U.S. 1030 (2002) ...................24

*GSS Grp. Ltd v. Nat'l Port Auth.*,
  680 F.3d 805 (D.C. Cir. 2012)............................................................40

*Gulf Res. Am., Inc. v. Republic of Congo*,
  370 F.3d 65 (D.C. Cir. 2004)........................................................21, 22

*Holzer v. Mondadori*,
  No. 12 Civ. 5234, 2013 WL 1104269 (S.D.N.Y. Mar. 14, 2013) ......................25

*Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*,
  843 F.2d 546 (D.C. Cir. 1988)............................................................53

*In re Arbitration Between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*,
  311 F.3d 488 (2d Cir. 2002) ...............................................................31

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  335 F.3d 357 (5th Cir. 2003) ..............................................................38

*McKesson Corp. v. Islamic Republic of Iran*,
  672 F.3d 1066 (D.C. Cir. 2012), *cert. denied,* 133 S. Ct. 1582 (2013) ..............24

*Mercier v. Sheraton Int'l, Inc.*,
  935 F.2d 419 (1st Cir. 1991) ................................................................29

*MGM Prods. Grp., Inc. v. Aeroflot Russian Airlines*,
  91 Fed App'x 716 (2d Cir. 2004) .......................................................52

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*,
  665 F.3d 1091 (9th Cir. 2011) ...........................................................51

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985)............................................................................52

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir.2001)............................................................41

*Nat'l Serv. Indus., Inc. v. Vafla Corp.*,
  694 F.2d 246 (11th Cir. 1982) ..........................................................55

*Ottley v. Schwartzberg*,
  819 F.2d 373 (2d Cir. 1987) ..............................................................38

*\*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier (RAKTA)*,
  508 F.2d 969 (2d Cir. 1974) ..............................................................51

*Pasquantino v. United States*,
  544 U.S. 349 (2004)......................................................................48, 49

*Phaneuf v. Republic of Indonesia*,
  106 F.3d 302 (9th Cir. 1997) .......................................................21, 22

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981)..............................................................28, 32, 33

*Practical Concepts, Inc. v. Repub. of Bolivia*,
  811 F.2d 1543 (D.C. Cir. 1987).........................................................40

*\*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002)................................................39, 40, 41

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,
  388 U.S. 395 (1967)...............................................................................19

Princz v. Federal Republic of Germany,
  998 F.2d 1 (D.C. Cir. 1993)...................................................................54

Republic of Argentina v. NML Capital, Ltd.,
  134 S. Ct. 2250 (2014)..................................................................54, 55, 56

Republic of Argentina v. Weltover, Inc.,
  504 U.S. 607 (1992)..............................................................................23, 55

Shaffer v. Heitner,
  433 U.S. 186 (1977)...............................................................................33

Singleton v. Wuff,
  428 U.S. 106 (1976)...............................................................................21

Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.,
  549 U.S. 422 (2007)...............................................................................30

Steel Corp. of Phil. v. Int'l Steel Servs., Inc.,
  354 F. App'x 689 (3d Cir. 2009) ..........................................................38

Swiss Inst. of Bioinformatics v. Global Initiative on Sharing All Influenza
  Data, No. 13-1274, 2014 WL 2810500 (D.C. Cir. June 23, 2014) ............37, 42

Tahan v. Hodgson,
  662 F.2d 862 (D.C. Cir.1981)................................................................52

Telenor Mobile Communic's AS v. Storm LLC,
  524 F. Supp. 2d 332 (S.D.N.Y. 2007) ..................................................44

*TermoRio S.A. E.S.P. v. Electranta S.P.,
  487 F.3d 928 (D.C. Cir. 2007).................................................................52

*TMR Energy Ltd. v. State Prop. Fund of Ukraine,
  411 F.3d 296 (D.C. Cir. 2005)................................. 18, 19, 29, 30, 41, 42, 43, 47

United States v. Maragh,
  894 F.2d 415 (D.C. Cir. 1990)...............................................................31

*Velasco v. Gov't of Indonesia*,
  370 F.3d 392 (4th Cir. 2004) ................................................................22

**STATUTES, TREATIES, AND RULES**

9 U.S.C. § 202 ....................................................................................19, 23

*9 U.S.C. § 207 ...............................................................................1, 34, 37

28 U.S.C. § 1330 ......................................................................................1, 28

28 U.S.C. § 1605(a)(2) ....................................................................................23

*28 U.S.C. § 1605(a)(6) ................................................. 1, 15, 16, 18, 20, 23, 26, 28

Fed. R. App. P. 32.1 ..................................................................................38, 52

Fed. R. Civ. P. 69(a) .....................................................................................56

*Convention on the Recognition and Enforcement of Foreign Arbitral
  Awards of June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330
  U.N.T.S. 38 (1970) ................................................. 1, 19, 23, 35, 44, 47, 48, 49

Pub. L. No. 100-669, § 2, 102 Stat. 3969 ..............................................................19

**OTHER AUTHORITIES**

Albert Jan van den Berg, *The New York Arbitration Convention of 1958:
  Towards a Uniform Judicial Interpretation* (1981).....................................24, 44

Restatement (Third) of Foreign Relations Law (1987) ..........................................49

Restatement (Third) of Int'l Comm. Arb. (Tentative Draft No. 2, 2012) ..............34

Restatement (Third) of Int'l Comm. Arb.
  (Council Draft No. 3, 2011)............................................................23, 24, 44, 45

Gary B. Born, *International Commercial Arbitration* 3964 (2d ed. 2014) .............49

*Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY

| | |
|---|---|
| BSDL | Belize Social Development Limited |
| BSDL I | *Belize Social Development Ltd. v. Government of Belize,* 668 F.3d 724, 733 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 274 (2012) |
| BTL | Belize Telecommunications Limited |
| CCJ | Caribbean Court of Justice |
| DE | Docket Entry |
| FAA | Federal Arbitration Act |
| FSIA | Foreign Sovereign Immunities Act |
| GOB Br. | Brief of Respondent-Appellant Government of Belize, dated June 18, 2014 |
| JA | Joint Appendix |
| LCIA | London Court of International Arbitration |
| Mem. Op. | Memorandum Opinion and Order, dated December 11, 2013 (DE 51-52) |
| New York Convention or Convention | Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 |
| Telemedia | Belize Telemedia Limited |

xiii

## JURISDICTIONAL STATEMENT

This is an appeal from a final order and judgment confirming the monetary portion of a foreign arbitration award pursuant to Section 207 of the Federal Arbitration Act, 9 U.S.C. § 207 ("FAA"), and Article III of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38 (1970) ("New York Convention").

The district court had subject matter jurisdiction to confirm a foreign arbitration award against the Government of Belize, a foreign state, pursuant to 28 U.S.C. § 1330(a), since the Government of Belize is not entitled to immunity under 28 U.S.C. § 1605(a)(6).

The Government of Belize filed notices of appeal on January 8, 2014, January 13, 2014, and February 4, 2014 (JA-___, ___, & ___).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATUTES AND REGULATIONS

The pertinent treaties and statutes are set forth in the Addendum of Pertinent Treaties and Statutes to this Brief.

## STATEMENT OF ISSUES

Did the district court properly confirm and enforce a foreign arbitration award pursuant to Section 207 of the Federal Arbitration Act and enter judgment thereon?

## INTRODUCTION

This is an appeal from a proceeding to confirm and enforce a foreign arbitration award. The award was rendered by a tribunal of three distinguished arbitrators in London, England, pursuant to an arbitration clause in a commercial agreement. Although the Government of Belize was given repeated notice of the arbitration, it chose to boycott the proceedings and refused to participate. Now, more than five years after the tribunal rendered its final award, the Government of Belize has attempted to raise issues that it deliberately chose not to present to the arbitral tribunal and that the tribunal thoroughly considered and addressed in its award. The district court correctly rejected all of these challenges raised by the Government of Belize and entered judgment confirming the award. That judgment should now be affirmed.

## STATEMENT OF THE CASE

### 1.     The Accommodation Agreement

In September 2005, the Government of Belize entered into the Government Telecommunications Accommodation Agreement (the "Accommodation Agreement") with Belize Telecommunications Limited ("BTL"). The purpose of the Accommodation Agreement was commercial—BTL agreed to purchase certain properties that the Government of Belize wanted to sell. Section 2 of the Accommodation Agreement states:

2

> In order to better accommodate the Government's telecommunications needs and other requirements, BTL has agreed to acquire certain properties from the Government, and in consideration for the acquisition of these properties and this accommodation, the Government has agreed to afford BTL the benefits, covenants and undertakings contained in this Agreement.

Declaration of Louis B. Kimmelman, dated Nov. 17, 2009 (Docket Entry ("DE") 1-2) ("Kimmelman Decl."), Ex. B (Accommodation Agreement) (JA-___).  In exchange for BTL's purchase of the properties, the Government of Belize agreed to give BTL preferential tax treatment, exempt BTL from certain import duties, guarantee BTL a minimum rate of return on investments, pay any shortfall that might occur between the minimum rate of return and the actual rate of return, and ensure certain controls on the use of "Voice Over Internet Protocol."  *Id.*, Ex. A (Award) ¶¶ 33-73 (JA-___).

The Accommodation Agreement was amended three times.  In the original Accommodation Agreement and each amendment, the parties incorporated an international arbitration clause providing for arbitration of all disputes in London, England, pursuant to the Arbitration Rules of the London Court of International Arbitration ("LCIA").  The arbitration clause, Section 15 of the Accommodation Agreement, provides:

> 15.2  Any dispute arising out of or in connection with this Agreement including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to

and finally resolved by arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this Section. There shall be 3 arbitrators.

15.3 The arbitral proceedings shall be conducted in the English language.

15.4 The seat or legal place of the arbitral proceedings shall be London, England.

*Id.*, Exs. B (Accommodation Agreement) § 15, C (First Amendment) § 4.1, D (Second Amendment) § 7.1, E (Third Amendment) § 11.1 (JA-___, ___, & ___).

The Government of Belize expressly waived its sovereign immunity with respect to the Accommodation Agreement. Section 15.5 of the Accommodation Agreement states:

The Government irrevocably and unconditionally:

(i) agrees that if BTL brings proceedings against it or its assets in relation to this Agreement no immunity from such legal proceedings (which will be deemed to include without limitation, suit, attachment prior to judgment, other attachment, the obtaining of judgment, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

(ii) waives any right of immunity which it or its assets now has or may in the future acquire;

*Id.*, Ex. B (Accommodation Agreement) (JA-___). This express waiver of sovereign immunity was incorporated in each amendment to the Accommodation Agreement. *Id.*, Ex. D (Second Amendment) § 7.1; Ex. E (Third Amendment) § 11.1 (JA- ___ & ___).

4

The Accommodation Agreement and the first amendment were executed by the Prime Minister/Minister of Finance of Belize.  However, the second and third amendments, which incorporated all prior terms that had not been amended, were signed by both the Prime Minister/Minister of Finance and the Attorney General of Belize before a Justice of the Peace.  *Id*., Ex. A (Award) ¶¶ 22-25 (JA-___).

In the Accommodation Agreement, the Government of Belize represented and warranted that "execution, delivery and performance of this Agreement":

> (a) are its legal, valid and binding obligation, enforceable against it by BTL in accordance with its terms, and that it has all powers, authorities, consents and approvals necessary to enter into this [Accommodation] Agreement; (b) have been duly ratified by all necessary constitutional and legal action; [and] (c) do not contravene the constitution of Belize or any law, rule, regulation, treaty, regulated practice, procedure or internal policy . . . .

*Id*., Ex. B (Accommodation Agreement) § 7.1 (JA-___).

There is no dispute that Telemedia (previously BTL) purchased the properties identified in the Accommodation Agreement from the Government of Belize and paid the Government of Belize BZ$19,200,000 by way of a loan note. *Id*., Ex. A (Award) ¶ 35 (JA-___).  Nor is there any dispute that Telemedia made each payment due under that loan note up to and including March 2008.  *Id.*

Finally, the Accommodation Agreement included a provision with respect to severability and construction:

5

20.1 <u>Severability, Construction</u>.  The invalidity of any provision of this Agreement as determined at the time of arbitration, or by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof, so long as the original purpose of the Agreement is not substantially frustrated by reason of this severance of such provision.  This Agreement shall be construed in accordance with the general tenor of the language in order to give it business effect and to achieve an equitable result.

*Id*., Ex. B (Accommodation Agreement) § 20.1 (JA-___).

## 2.    The LCIA Arbitration

After a new government came to power in Belize in February 2008, the Government of Belize refused to honor the Accommodation Agreement.  As a result, Telemedia commenced arbitration proceedings before the LCIA in London, England, in accordance with the arbitration clause in Section 15 of the Accommodation Agreement, as amended.  Although the Government of Belize was given repeated notice of the arbitration, the Government chose to boycott the arbitration proceedings and refused to participate or appear in the arbitration.  *Id*., Ex. A (Award) ¶¶ 81, 88, 90, 102 (JA-___).  The arbitral tribunal made clear that "despite the absence of the [Government of Belize], [Telemedia] could not take anything for granted; it would have to prove its case to the satisfaction of the Tribunal."  *Id*. ¶ 137 (JA-___).

6

That is exactly what Telemedia did.  Telemedia submitted extensive evidence to the arbitral tribunal, including six witness statements, four expert reports and a substantial amount of documentation.  *Id*. ¶¶ 138-144 (JA-___).  The evidentiary hearing lasted three days and the tribunal heard live testimony from two fact witnesses and an expert.  *Id*. (JA-___)

These witnesses addressed the various allegations that the Government of Belize made in the press, including the assertion that the Accommodation Agreement was "secret" and was "invalid," "illegal," "null" and "void."  *Id*. ¶ 132 (JA-___).

The arbitral tribunal concluded as an initial matter that the Accommodation Agreement was not secret.  *Id*. ¶¶ 146-152 (JA-___).  This conclusion was based on evidence that the parties performed their respective obligations under the Accommodation Agreement as amended, including the actual transfer of the properties from the Government of Belize to BTL, the processing of import duty exemptions by the Government of Belize, steps taken by the Government of Belize to enforce the loan note given by BTL to pay for the properties purchased, and correspondence between BTL (and its attorneys) and the Government of Belize with regard to performance.  *Id*. (JA-___).

The tribunal also considered and resolved issues relating to the validity and legality of the Accommodation Agreement as amended.[1]  The tribunal noted that the Accommodation Agreement as amended had been signed by both the Prime Minister/Minister of Finance as well as the Attorney General of Belize, who under the Belize Constitution was "'the principal legal advisor to the Government . . . with responsibility for the administration of legal affairs in Belize.'"  *Id*. ¶ 155 (JA-___).  In reviewing the applicable Belizean law, the tribunal found that the Belize Constitution gave government ministers "a significant degree of latitude to pursue the business of Government" and that in the absence of any specific statutory limitation to the contrary, the Prime Minister "as the most senior Government Minister in dealing with public services and taxation, acting on the advice of the Attorney General" had "the authority to enter into the Accommodation Agreement and to grant the benefits afforded to BTL/Telemedia in circumstances where it was necessary to stabilize the telecommunications industry in Belize and to develop it for future generations."  *Id*. ¶ 163 (JA-___).  Based on the evidence, the tribunal concluded that the Government "had actual authority to enter into the

---

[1] The arbitration clause specifically provided that issues as to the "existence, validity or termination" of the Accommodation Agreement would be resolved by arbitration.  Kimmelman Decl., Ex. B (Accommodation Agreement) § 15.2 (JA-___).

Accommodation Agreement and that it was lawful for the Government to agree to the provisions that are now in dispute." *Id.* ¶ 171 (JA-___).

The arbitral tribunal issued an unanimous award on March 18, 2009 ("Award"). *Id.* ¶¶ 341-343 (JA-___). It determined that the Government of Belize had breached its obligations under the Accommodation Agreement as amended and granted relief in favor of Telemedia, including damages. *Id.* (JA-___). Telemedia assigned the monetary portion of the Award to BSDL by deed of assignment dated March 20, 2009, in accordance with English law.[2] Declaration of Stephen J. Ruzika, dated Nov. 10, 2009 (DE 1-16) ("Ruzika Decl.") ¶¶ 8-9 & Ex. C (Assignment) (JA-___& ___).

### 3. The Government of Belize's Campaign to Resist the Award

Immediately after the LCIA tribunal issued its Award, the Government of Belize launched a campaign to prevent enforcement of the Award. The Prime Minister of Belize announced, "I will resist with every fiber of my legal being any attempts to enforce the rulings." Declaration of Juan C. Basombrio, dated Mar. 26, 2010 (DE 15-25) ("Basombrio Decl.") ¶ 35 & Ex. 31 (Media Disclosure 1) at 2 (JA-___ & ___). The Prime Minister also stated in the press—and to the Belize House of Representatives—that "as God is my witness I will never pay that award." *Id.* ¶ 38 & Ex. 34 (Media Disclosure 2) at 2 (JA-___ &___).

---

[2] BSDL is a company incorporated in the British Virgin Islands, with its registered office in Tortola, British Virgin Islands. Ruzika Decl. ¶ 4 (JA-___).

The Government of Belize implemented this strategy by commencing a

lawsuit in Belize against Telemedia and BSDL on April 6, 2009, to block

enforcement of the Award.  Declaration of Michael C. Young, dated Mar. 26, 2010

(DE 15-3) ("Young Decl.") ¶ 5 (JA-___).  The Government asserted in its Belize

court filing that enforcement of the Award "would be contrary and repugnant to the

Constitution and Laws of Belize (which is the governing law of the underlying

agreements) and that, accordingly, the said Final Award is tainted with illegality

and unconstitutionality and ought not to be enforced."  *Id.*, Ex. 1 (Fixed Date

Claim Form), at 2 (JA-___).

When the Government of Belize commenced this lawsuit in Belize, it sought

an ex parte interim injunction prohibiting BTL and BSDL from enforcing the

Award in any judicial proceeding in the United Kingdom (the place of arbitration)

or any other state or territory until after the proceedings in Belize had been

completed.  *Id.* ¶ 7 & Ex. 2 (GOB Notice of Application) (JA-___ &___).  On July

20, 2009, the Belize Supreme Court extended the ex parte restraining order until

the conclusion of this Belize action.[3]  *Id.* ¶ 29 & Ex. 12 (Supreme Court of Belize

Order) (JA-___&____).

---

[3] BSDL was not present at this hearing.  Young Decl., Ex. 13 (Supreme Court of
Belize Decision) ¶ 8 (JA-___).

In August 2009, the Government of Belize expropriated Telemedia. Kimmelman Decl. ¶¶ 17-18 & Exs. L (Media Disclosure 3), M (Media Disclosure 4) (JA-___, ___&___).  Thus, since August 2009, the Government of Belize has owned and controlled the company that assigned the monetary portion of the Award to BSDL and that retained the portions of the Award providing declaratory relief.

### 4.     The Proceedings in the District Court

BSDL commenced this award enforcement proceeding in November 2009.[4] On March 29, 2010, the Government of Belize filed its opposition to BSDL's award enforcement petition, (DE 16) (JA-___), as well as a motion to stay or, alternatively, dismiss the petition (DE 15) (JA-___).  Two days later, on March 31, 2010, the Government of Belize enacted a new criminal statute purporting to make it a criminal offense in Belize for BSDL and its counsel to respond to the Government's papers because of the ex parte injunction obtained against BSDL in the lawsuit filed in Belize.  The criminal statute created mandatory penalties, including substantial fines, imprisonment of not less than five years, or both.

---

[4] At the time it commenced this proceeding, BSDL submitted sworn testimony that it had not been served with process in any Belize judicial proceeding.  Ruzika Decl. ¶ 12 (JA-___).  In fact, service was never made on BSDL and, as a result, the case was dismissed.  Mem. Op. at 5 n.4 (JA-___); Declaration of Eamon H. Courtenay, dated Feb. 14, 2013 (DE 45-6) ("Courtenay Decl.") ¶¶ 8-9 & Exs. A (GOB's Leave to Discontinue Claim), B (Order on Discontinuation of Claim) (JA-___, ___, &___).

Motion to Suspend (May 25, 2010) (DE 21), at 2 & Ex. A (Criminal Statute)

(JA-___&___).

On October 18, 2010, the district court issued a minute order staying the

award enforcement proceeding "pending resolution of the parties' case before the

Belize Supreme Court," without providing any reasons or holding a hearing.

Minute Order (Oct. 18, 2010) (JA-___).

5.    **The Prior Appeal**

BSDL appealed from the district court's minute order.  This Court granted a

writ of mandamus based on the clear dictates of Section 207 of the FAA and the

New York Convention.  In reaching that decision, this Court concluded that there

was no basis to stay enforcement of a foreign arbitral award under the New York

Convention:

> Mandamus is appropriate because the FAA, by codifying
> the New York Convention, provides a carefully
> structured scheme for the enforcement of foreign arbitral
> awards . . . .  The plain terms of the FAA instruct a
> district court reviewing a foreign arbitral award to
> "confirm the award unless it *finds* one of the grounds for
> refusal or deferral of recognition or enforcement . . .
> specified in the [New York] Convention." . . . No such
> finding supported issuance of the stay here, and that
> alone is sufficient to justify mandamus.  Moreover, there
> could not have been such a finding under Article VI of
> the Convention, for no "application for the setting aside
> or suspension of the award" had been made to a
> "competent authority" in England, the "country in
> which" and "under the laws of which [the] award was
> made."

*Belize Social Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 733 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 274 (2012) ("*BSDL I*").

### 6.    Remand to the District Court

Following remand, the district court permitted the parties to supplement the papers previously filed and thereafter held oral argument.  Order (Dec. 11, 2012) (DE 37) (JA-___); Transcript of Oral Argument (DE 64) (Feb. 25, 2013) (JA-___). The district court issued a memorandum opinion addressing and disposing of each of the Government of Belize's arguments in support of its motion to stay or, alternatively, dismiss the petition and its opposition to enforcement of the Award. Memorandum Opinion and Order (Dec. 11, 2013) (DE 51-52) ("Mem. Op.") (JA-___).  The district court directed that judgment be entered in favor of BSDL for the monetary portion of the Award.  Judgment (Feb. 4, 2014) (DE 66) ("Judgment") (JA-___).  That decision was correct and should now be affirmed.

### SUMMARY OF ARGUMENT

The Government of Belize raises numerous issues on appeal in an effort to defeat enforcement of the Award in any way it can.  The district court considered and rejected each issue, concluding that none of them has any merit.  The court's decision should be affirmed.

First, the district court had subject matter jurisdiction because the arbitration exception to sovereign immunity applies in this case.

13

Second, the district court properly followed the law of this circuit and denied the Government of Belize's motion to dismiss based on the doctrine of *forum non conveniens.*

Third, the district court correctly concluded that the doctrine of international comity has no application in this award enforcement proceeding.

Fourth, the district court properly followed the law of this circuit and rejected the Government of Belize's challenge to personal jurisdiction.

Finally, the district court correctly rejected each of the Government of Belize's alleged New York Convention defenses.  The Government has failed to raise and establish any proper defense to enforcement of the Award.

As a result, the final order and judgment confirming the Award should be affirmed, and BSDL should be permitted to continue post-judgment discovery in aid of enforcement.

## ARGUMENT

## I.    THE DISTRICT COURT HAD SUBJECT MATTER JURISDICTION TO CONFIRM THE AWARD.

The district court correctly concluded that there is subject matter jurisdiction to confirm this foreign arbitration award.  Mem. Op. at 8-10 (JA-___).  Foreign sovereign immunity is not an obstacle.  As the district court recognized, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611 (2014),

14

provides an exception to sovereign immunity in a proceeding to confirm an award under the New York Convention, like the award here.

### A.     The FSIA's Arbitration Exception to Sovereign Immunity Applies to Confirmation of the Award.

The FSIA explicitly denies a foreign state immunity from a suit "to confirm an award made pursuant to . . . an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6)(B).  This exception requires two elements.

First, the action must be brought to confirm an award made pursuant to "*an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration* all or any differences . . . with respect to a defined legal relationship . . . concerning a subject matter capable of settlement by arbitration under the laws of the United States."  28 U.S.C. § 1605(a)(6) (emphasis added). This element makes clear that existence of "an agreement . . . to submit to arbitration," is the trigger for the application of the arbitration exception, rather than the whole contract between the parties.  *Id.*

Second, this exception to immunity applies "if . . . the agreement or award *is or may be governed* by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6)(B) (emphasis added).  By its terms, this requirement only

15

involves a showing that an award "*may be* governed" by an applicable treaty, *not* that the award is in fact governed by an applicable treaty.  *Id.* (emphasis added).

Both of these requirements were satisfied in this case.  First, the Award was rendered pursuant to an arbitration agreement to which the Government of Belize and BTL/Telemedia were parties.  Although the Government of Belize has challenged the validity of the Accommodation Agreement (as amended) as a whole, claiming that certain provisions violated Belizean law, it has never challenged the existence, validity, or enforceability of the arbitration clause itself. *See* Respondent's Motion to Stay Action or, in the Alternative, Dismiss Petition (Mar. 29, 2010) (DE 15), at 11 ("GOB's Motion to Stay"); Respondent's Preliminary Response to Petition to Confirm Arbitration Award (Mar. 29, 2010) (DE 16), at 8-9 ("GOB's Response to Petition"); GOB's Supplemental Brief (Jan. 14, 2013) (DE 39), at 10-11 (JA___, ___, & ___).  Nor is there any dispute that the Government of Belize is a party to the arbitration clause.  The Accommodation Agreement as amended was signed by both the Prime Minister *and* the Attorney General of Belize on behalf of the Government of Belize, Kimmelman Decl., Ex. A (Award) ¶¶ 22-25 (JA-___), and the Government of Belize has never alleged or established that these two senior government officials lacked authority to agree to an arbitration clause on behalf of the Government.

16

Second, this Court has already recognized that the Award is governed by the New York Convention because both England—as the seat of the arbitration—and the United States—as the place of enforcement—are parties to the New York Convention. *See BSDL I*, 668 F.3d at 731 n.3. There is no doubt that the New York Convention satisfies the treaty requirement in Section 1605(a)(6). *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 123-24 (D.C. Cir. 1999) ("[I]t has been said with authority that the New York Convention 'is exactly the sort of treaty Congress intended to include in the arbitration exception.'") (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993)). Although Section 1605(a)(6) only requires a prima facie showing that the Award "may be governed" by the New York Convention, both this Court and the district court have already determined that the Award is in fact governed by the New York Convention. *BSDL I*, 668 F.3d at 731 n.3; Mem. Op. at 8-10 (JA-___).

Since both elements of the arbitration exception to immunity are satisfied, the Government of Belize is not entitled to sovereign immunity in this case.

### 1.    The Government of Belize's Position Is Based on a Misreading of the FSIA.

In the district court, the Government of Belize argued that Section 1605(a)(6) of the FSIA did not apply here because "the underlying Accommodation Agreements are void *ab initio* under Belizean law." GOB's Supplemental Brief (DE 39), at 25 (JA-___); GOB Br. at 9. The Government of

17

Belize attacked the Accommodation Agreement (as amended) as a whole, not the arbitration clause specifically. Based on the language of Section 1605(a)(6), the district court properly rejected this argument.[5] Mem. Op. at 19-20 (JA-___). The court recognized that the FSIA requires only that an award be made pursuant to an "agreement . . . to submit to arbitration." *Id.*

The Government of Belize argues that the district court erred by applying FAA law, rather than FSIA law, to determine whether the arbitration exception applied in this case. GOB Br. at 19. This is incorrect. The district court analyzed the arbitration exception in Section 1605(a)(6) of the FSIA without reference to the FAA or federal arbitration law. Mem. Op. at 8-10 (JA-___). It focused only, as the FSIA requires, on whether an "agreement . . . to submit to arbitration" exists, and properly concluded that such an agreement does exist.[6] 28 U.S.C. § 1605(a)(6).

---

[5] The Government of Belize now claims that it argued in the district court that "the Accommodation Agreement and its arbitration clause are void *ab initio* because the Prime Minister lacked actual authority." GOB Br. at 19. However, the Government of Belize never challenged the arbitration clause before the district court. It argued only that the Accommodation Agreement was illegal and void *ab initio* because the Prime Minister lacked authority to provide tax and duty exemptions. GOB Br. at 9-10; *see* Mem. Op. at 19-20 (JA-___).

[6] As discussed below, the district court did use the FAA and federal arbitration law when considering the Government of Belize's objection to enforcement of the Award under Article V(1)(a) of the New York Convention. Mem. Op. at 19-20 (JA-___). Any defenses to enforcement of the Award are clearly governed by the FAA and the New York Convention. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 304 (D.C. Cir. 2005) ("[The New York Convention]

Moreover, the Government of Belize's suggestion that the phrase "agreement . . . to submit to arbitration" as used in the FSIA somehow makes the Accommodation Agreement as a whole relevant to the FSIA inquiry is contrary to the statutory language.  Congress could have based the arbitration exception to immunity on the parties' contract as a whole, but did not.  It chose instead to tie the immunity exception solely to the existence of an agreement to arbitrate.  The language Congress chose to use in the FSIA is very similar to the phrase "agreement in writing . . . to submit to arbitration" as used in Article II(1) of the New York Convention and the phrase "arbitration agreement" as used in Section 202 of the FAA.  This is not surprising.  When Congress amended the FSIA to add Section 1605(a)(6) in 1988,[7] it did so against a backdrop of federal law in which these words had a well recognized meaning—an arbitration agreement that is separate and distinct from the contract in which it is contained.  *See, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967) (differentiating between "the agreement to arbitrate" and "the contract generally.").

---

enumerates the few reasons for which a court may refuse to enforce an arbitration award and assigns the burden of persuasion to the party opposing enforcement.").

[7] Act of Nov. 16, 1988, Pub. L. No. 100-669, § 2, 102 Stat. 3969.

### 2.    The Arbitration Agreement Was Made by the Government of Belize.

The Government of Belize also claims that the arbitration agreement was not "made by" it, because the Prime Minister lacked "actual" authority to execute the Accommodation Agreement. GOB Br. at 22. This argument fails for several reasons.

First, the "agreement" that must be made by the Government of Belize under Section 1605(a)(6) of the FSIA is an "agreement . . . to submit to arbitration," *not* the Accommodation Agreement as a whole. The Government of Belize argues that it "presented evidence that the Prime Minister lacked authority to execute the Accommodation Agreement" based on certain tax and duty provisions contained in that contract. GOB Br. at 9-11, 24. However, the Government of Belize presented no evidence with respect to the Prime Minister's authority to sign an arbitration agreement on behalf of the Government.

Second, the Government of Belize has ignored the indisputable fact that the Accommodation Agreement as amended was signed not only by the Prime Minister/Minister of Finance, but also by the Attorney General. Kimmelman Decl., Ex. A (Award) ¶¶ 22-25. The Government of Belize failed to submit any evidence that the Attorney General lacked authority to sign an arbitration agreement on behalf of the Government of Belize.

20

Finally, if the Government of Belize seriously contended that it was not a party to the arbitration agreement,[8] then under the FSIA it had the burden of establishing that it had not made the "agreement . . . to submit to arbitration." *Gulf Res. Am., Inc. v. Republic of Congo*, 370 F.3d 65, 70 (D.C. Cir. 2004) ("[T]he defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity."). The Government of Belize failed to carry this burden. Therefore, the district court correctly concluded that the requirements of Section 1605(a)(6) have been satisfied. Mem. Op. at 9-10; *see also id.* at 19-20 (JA-___).

The Government of Belize's reliance on the Ninth Circuit decision in *Phaneuf v. Republic of Indonesia*, 106 F.3d 302 (9th Cir. 1997), is misplaced. GOB Br. at 22-24. In *Phaneuf*, the court considered whether the commercial activity exception to immunity, 28 U.S.C. § 1605(a)(2), applied to the facts of a case based on the actions of an agent of Indonesia. The issue was whether the agent needed to have actual authority for the exception to apply, or whether apparent authority sufficed. The Ninth Circuit concluded that actual authority was

---

[8] The Government of Belize never made this argument—that it was not a party to the arbitration agreement—in the district court. This is why the district court did not address this argument and why it should be deemed waived. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.") (citation and internal quotations omitted).

needed.[9]  106 F.3d at 308.  Other circuits have concluded that evidence of apparent

authority is sufficient for there to be an exception to immunity.  *See First Fidelity*

*Bank, N.A. v. Gov't of Antigua & Barbuda*, 877 F.2d 189, 200 (2d Cir. 1989) (an

agent with "apparent authority [may] bind [the sovereign]"); *see also Aquamar*

*S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1299 (11th Cir. 1999)

(applying *First Fidelity Bank* and holding that "courts should assume that an

ambassador possesses the authority to . . . waive sovereign immunity").

But regardless of which standard applies, the Government of Belize failed to

meet its burden of establishing that both the Prime Minister and the Attorney

General lacked either actual or apparent authority to enter into an arbitration

agreement on behalf of the Government of Belize.  *Gulf Res. Am.*, 370 F.3d at 70.

Therefore, the arbitration agreement requirement of Section 1605(a)(6) has been

satisfied.

### 3.    The Relationship Between the Parties Was Commercial.

Finally, the Government contends that the district court lacked subject

matter jurisdiction because the relationship between the parties was not

"commercial."[10]  GOB Br. at 25-26.  As noted above, the text of the FSIA requires

---

[9] The Fourth Circuit followed the Ninth Circuit in holding that evidence of actual
authority is required.  *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 399-400 (4th
Cir. 2004).

[10] Article I(3) of the New York Convention provides that a ratifying State "may . . .
declare that it will apply the Convention only to differences arising out of legal

only that the arbitral award "may be" governed by a treaty such as the New York

Convention.  28 U.S.C. § 1605(a)(6).  The statute does not require a finding that an

award is governed by a treaty or that the relationship between the parties under that

treaty is in fact commercial.

Initially, the Government of Belize incorrectly asserts that the meaning of

the FAA is determined by the FSIA, a later statute.  Specifically, the Government

contends that the requirement that there is "a legal relationship . . . which is

considered as commercial" under Section 202 of the FAA means the same thing as

the requirement in Section 1605(a)(2) of the FSIA that an action is "based upon a

commercial activity" for purposes of determining a waiver of immunity under the

FSIA.  GOB Br. at 26, 28.  However, Congress defined "commercial activity" in

the FSIA to codify the "meaning of 'commercial' . . . attached to that term under

the restrictive theory [of sovereign immunity] at the time the statute was enacted."

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612-13 (1992).  In contrast,

the FAA's requirement of commercial relationship was meant to cover transactions

involving commerce.  *See* Restatement (Third) of Int'l Comm. Arb. § 1-1(e)

(Council Draft No. 3, 2011) ("'Commercial' matters or relationships are those

matters or relationships, whether contractual or not, that arise out of or in

---

relationships . . . which are considered as commercial."  N.Y. Convention art. I(3).
The United States adopted this reservation to the Convention as implemented in
Section 202 of the FAA.

connection with commerce."); *see also* Albert Jan van den Berg, *The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 51 (1981) ("Under the New York Convention, most courts have so far . . . given a broad interpretation to the meaning of commercial.").

Moreover, the interpretive principles that apply to these statutes are different.  Whereas the commercial activity exception to the FSIA is "narrowly drawn," *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012), *cert. denied,* 133 S. Ct. 1582 (2013), the "commercial" relationship requirement under Section 202 of the FAA is construed broadly and consistently with the policy in favor of enforcing arbitration agreements, such that "doubts as to whether a contract falls under the Convention Act should be resolved in favor of arbitration."  *Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 274 (5th Cir. 2002), *cert. denied*, 537 U.S. 1030 (2002); *accord Bautista v. Star Cruises*, 396 F.3d 1289, 1298 (11th Cir. 2005) (the term "commercial" must be read broadly "to consist of contracts evidencing a commercial transaction . . . *as well as similar agreements*" (emphasis in original)), *cert. denied*, 545 U.S. 1136.

Even if—contrary to the statutory language—it were appropriate to determine whether the relationship between the parties here was in fact "commercial," the Government of Belize's argument would still fail.  There can be no serious doubt that the relationship between the parties to the Accommodation

Agreement was commercial in nature. The Government of Belize sold and BTL/Telemedia purchased certain real property for almost 20 million Belize dollars. Kimmelman Decl., Ex. A (Award) ¶ 35 (JA-___). In exchange, the Government of Belize made various promises.

There is no dispute that the Government of Belize actually transferred the properties and that BTL/Telemedia made payments in accordance with the terms of the sale. *Id.* ¶ 35 (JA-___). Furthermore, the Government of Belize explicitly waived sovereign immunity in the contract and the parties agreed to international arbitration to resolve all disputes. *Id.*, Ex. B (Accommodation Agreement) §§ 15.2, 15.5 (JA-___). All of these factors confirm that the relationship between the parties was "commercial." *See, e.g.*, *Holzer v. Mondadori*, No. 12 Civ. 5234, 2013 WL 1104269, at *5 (S.D.N.Y. Mar. 14, 2013) (purchase and sale of real property is a "commercial" transaction under the New York Convention); *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) ("We have interpreted the term ['commercial'] in the FAA as the functional equivalent of the more familiar term 'affecting commerce' —words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power."). In recognition of the commercial nature of the relationship, the parties expressly agreed that the Accommodation Agreement "shall be construed . . . in order to give it *business*

25

effect."  Kimmelman Decl., Ex. B (Accommodation Agreement) § 20 (emphasis

added) (JA-___).

### B.    The Government of Belize Seeks to Turn the Threshold Inquiry of Subject Matter Jurisdiction under the FSIA into an Analysis of the Merits Under the FAA.

The Government of Belize's argument also fails because, by framing its

arguments based on the Accommodation Agreement as a whole rather the parties'

arbitration agreement, the Government of Belize inappropriately attempts to turn

the determination of subject matter jurisdiction into a resolution of the merits of

this enforcement proceeding.  GOB Br. at 18-29.  This is contrary to the FSIA.

The FSIA imposes limits on the scope of the jurisdictional inquiry.  The

statute requires only "an award" made pursuant to "an agreement to arbitrate"

made by the "foreign state" that "may be governed" by an applicable treaty.  28

U.S.C. § 1605(a)(6).  The district court correctly recognized that the FSIA

jurisdictional issue analysis is a "cabined" one.  Mem. Op. at 9-10 (JA-___).  It is

defined by the specific requirements of Section 1605(a)(6).  The Government of

Belize cannot turn this threshold inquiry into an examination of the merits of the

award enforcement proceeding.  *See Chevron Corp. v. Republic of Ecuador*, 949 F.

Supp. 2d 57, 63 (D.D.C. 2013) ("Such an argument appears to be an attempt by

Ecuador to get two bites at the apple of the merits of its dispute with Chevron, by

26

seeking to have this Court separately determine the arbitrability of the underlying dispute under both the FSIA and the New York Convention.").

**C.    Application of the FSIA's Arbitration Exception Is the Law of the Case.**

The applicability of Section 1605(a)(6) is the law of the case.  In the prior appeal from the district court's erroneous stay order, BSDL argued that "the district court had subject matter jurisdiction to confirm an award against the [Government of Belize], a foreign state, pursuant to 28 U.S.C. § 1330(a), since the [Government of Belize] is not entitled to immunity in a New York Convention award enforcement proceeding under 28 U.S.C. § 1605(a)(6)."  Brief for Petitioner Appellant (Aug. 19, 2011), at 1 (JA-___).  The Government of Belize did not dispute this statement in its brief to this Court, arguing only that this Court lacked appellate jurisdiction.  Brief of Respondent-Appellee Government of Belize (Aug. 24, 2011), at 1 (JA- ___).

In the mandamus decision, this Court essentially agreed that the elements of § 1605(a)(6) had been met.  The Court granted BSDL's petition for mandamus on the grounds that there was "no basis on which to conclude that the stay of BSDL's petition for enforcement was properly issued under the FAA and New York Convention."  *BSDL I*, 668 F.3d at 731.  For the FAA and the New York Convention to apply in this case, the Court had to be satisfied that there was an award pursuant to an agreement to arbitrate governed by the Convention.  And, of

27

course, this Court would not have granted a writ of mandamus in the absence of subject matter jurisdiction.

Those determinations are now the law of this case.  It is well established that the "law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court."  *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995).  The doctrine applies equally to determinations made either "explicitly or by necessary implication."  *Id.*

The Government of Belize is also bound by the "bar on raising issues omitted from prior appeals—best understood as a species of waiver doctrine."  *Id.*  Given the opportunity to dispute the applicability of the arbitration exception to the FSIA, the Government of Belize chose not to do so.  It may not now reverse course and argue that the district court was devoid of power in the first place.

Since there is an exception to immunity under FSIA § 1605(a)(6), the district court had subject matter jurisdiction under 28 U.S.C. § 1330.

## II.     THE DISTRICT COURT PROPERLY DECLINED TO DISMISS BSDL'S PETITION UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.

The district court refused to dismiss this award enforcement proceeding based on the doctrine of *forum non conveniens*.  That exercise of discretion was entirely proper.  Mem. Op. at 10-11 (JA-___).

28

"The *forum non conveniens* determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981). Here, the district court committed no error, much less abused its discretion, in concluding that the Government of Belize had failed to carry its threshold "burden of proving that there is an adequate alternative forum." *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996) *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 425 (1st Cir. 1991).

## A.    There Is No Adequate Alternative Forum in an Award Enforcement Proceeding.

In deciding the threshold question whether there is an adequate alternative forum, the district court properly recognized that it was bound by "the controlling law in our Circuit" articulated in *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005). Mem. Op. at 10-11 (JA- ___). In *TMR Energy*, this Court recognized that "only a court of the United States (or of one of them) may attach the commercial property of a foreign nation located in the United States" in a New York Convention award enforcement proceeding. 411 F.3d at 303. Whether there is property already identified is of no moment—this Court recognized that "[e]ven if the [judgment debtor] currently has no attachable property in the United States, however, it may own property here in the future, and

29

[the petitioner]'s having a judgment in hand will expedite the process of attachment.  In any event, the possibility that the judgment of the district court may go unenforced does not bear upon whether that court is an inconvenient forum in which to defend." *Id.*  Because no other forum could attach property located in the United States, no other forum could be adequate, and dismissal on *forum non conveniens* grounds would not be appropriate.  *Id.* at 304.  The district court properly applied *TMR* to conclude that there is no adequate alternative forum and to deny the Government of Belize's request.

The Government of Belize does not dispute that *TMR* establishes the controlling law of this circuit or that it was properly applied by the district court.[11] Instead, it asserts that *TMR Energy* conflicts with Supreme Court precedent instructing that the *forum non conveniens* analysis requires a balancing of many factors.  *See* GOB Br. at 31 (citing *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007)).  But the Government of Belize misunderstands the two steps of the *forum non conveniens* inquiry.  As this Court has explained, before conducting the balancing contemplated by *Sinochem*, the district court must first determine "whether an adequate alternative forum for the

---

[11] Of course, this Court is also bound by the determination in *TMR Energy* that no alternative adequate forum exists for the award enforcement claim asserted here. *See Brewster v. C. I. R.*, 607 F.2d 1369, 1373 (D.C. Cir. 1979) ("Stare decisis demands that we abide by a recent decision of one panel of this court unless the panel has withdrawn the opinion or the court En banc has overruled it.").

dispute is available." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008). The district court has no discretion to dismiss a case in favor of an *inadequate* forum, so the moving party (the Government of Belize) must meet its burden on that point before any balancing of other factors is appropriate. *See id.* *TMR Energy*'s holding is directed at this first prong of the inquiry, whereas the precedent cited by the Government of Belize addresses the second prong, which only comes into play if the first prong has been satisfied. There is thus no conflict between *TMR Energy* and any applicable Supreme Court precedent.

### B. The Contrary Decisions of the Second Circuit Are Inapplicable and Incorrect.

Taking a different tack, the Government of Belize points to decisions of the Second Circuit adopting the view that a petition to confirm an arbitration award may be dismissed on the basis of *forum non conveniens* even if enforcement against assets in the United States cannot be obtained in the alternative forum. *See Figueiredo Ferraz E Engenharia de Projeto Ltd. v. Republic of Peru*, 665 F.3d 384, 390-91 (2d Cir. 2011); *In re Arbitration Between Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 500 (2d Cir. 2002). However, these Second Circuit decisions do not change the binding precedent of this Court or undermine the district court's proper reliance on this Court's decision in *TMR Energy*. *See United States v. Maragh*, 894 F.2d 415, 419

(D.C. Cir. 1990) (reversing where district court "relied on cases from other circuits which came to a contrary conclusion . . . inconsistent with the law of this circuit").

Moreover, in contrast to the Second Circuit cases cited by the Government of Belize, this Court's holding in *TMR Energy* is faithful both to Supreme Court precedent and to the underlying objectives of our nation's commitment to the enforcement of arbitral awards.  In *Figueiredo*, the Second Circuit citing *Piper Aircraft* determined that even if a foreign court was unable to order the attachment of foreign assets, that did not preclude a *forum non conveniens* dismissal because "the fact that a plaintiff might recover less in an alternate forum does not render that forum inadequate."  665 F.3d at 391.

Contrary to the Second Circuit's assumption, this conclusion does not follow from the Supreme Court's statement in *Piper Aircraft Co.*, that "dismissal on grounds of *forum non conveniens* may be granted even though the law applicable in the alternative forum is less favorable to the plaintiff's chance of recovery."  454 U.S. at 250.  As cited by this Court in *TMR Energy*, the Supreme Court in *Piper Aircraft* explicitly acknowledged that "dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute" because that other forum would "not be an adequate alternative."  *Id.* at 254 n.22. It is undisputed that the courts of Belize—or of any other nation—are not competent to order the attachment of assets in the United States, and therefore

32

cannot "permit litigation" relevant to the enforcement of an arbitral award in the United States.

More fundamentally, however, the Second Circuit's decision in *Figueiredo* ignores the important distinction between a determination of the merits of a claim and a subsequent proceeding to enforce a judgment. Courts of this country have long recognized a distinction between these two types of actions. *See Shaffer v. Heitner*, 433 U.S. 186, 210 n.36 (1977) ("Once it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff, there would seem to be no unfairness in allowing an action to realize on that debt in a State where the defendant has property, whether or not that State would have jurisdiction to determine the existence of the debt as an original matter."). Unlike an action to resolve liability, an action to enforce a judgment does not raise "complex exercises in comparative law." *Piper Aircraft,* 454 U.S. at 251. And while the courts of multiple nations may be competent to adjudicate the rights and liabilities of the parties, only the courts of this nation are capable of turning an arbitral award into a United States judgment that can be enforced through attachment of property located here.

Accordingly, the Second Circuit's position has been roundly criticized. For instance, the Restatement (Third) of International Commercial Arbitration adopts the position of this Circuit and of Judge Lynch's dissent in *Figueiredo* that "[a]n

33

action to . . . enforce a foreign Convention award is not subject to a stay or

dismissal in favor of a foreign court on forum non conveniens grounds."

Restatement (Third) of Int'l Comm. Arb. § 4-29(a) (Tentative Draft No. 2, 2012).

### C.    The New York Convention Does Not Permit a *Forum Non Conveniens* Dismissal

Applying the doctrine of *forum non conveniens* in this case would also

violate the mandate of Section 207 of the FAA, which requires that any court

hearing a petition for enforcement of an arbitral award "*shall confirm* the award

unless it finds one of the grounds for refusal or deferral of recognition or

enforcement of the award specified in the said Convention."  9 U.S.C. § 207

(emphasis added); *BSDL I*, 668 F.3d at 727.  The doctrine of *forum non conveniens*

is not enumerated as one of the Convention's defenses to enforcement.

Accordingly, the limited discretion afforded to a district court by the New York

Convention does not permit a *forum non conveniens* dismissal.

Permitting a *forum non conveniens* dismissal when one is not expressly

authorized by the New York Convention would undermine the treaty framework.

One of the purposes of the New York Convention is "to unify the standards by

which agreements "to arbitrate are observed and arbitral awards are enforced in the

Signatory Countries." *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, No. 13-

7004, 2014 WL 3377337, at *4 (D.C. Cir. July 11, 2014).  As Judge Lynch noted

in his dissent in *Figueiredo*:

34

> The value of international arbitration, especially in
> contracts involving sovereign states, is that it provides a
> mechanism by which commercial actors may avoid the
> "home court advantage" of proceeding in the courts of an
> adversary state. But this advantage is negated if a party
> may obtain an independent adjudication on the merits,
> but is prevented from enforcing any award it obtains
> anywhere but in the courts of the very country that is to
> pay the award. The Convention seeks to open the doors
> of foreign courts to efforts to enforce arbitration awards
> wherever assets are available, free of local prejudice or
> obstructive local rules that make enforcement difficult in
> the courts of the adversary state.

665 F.3d at 402 (Lynch, J., dissenting).

When this Court remanded the case to the district court, it recognized that "the limitations on [the court's discretionary] authority under section 207 of the FAA defined the district court's task." *BSDL I*, 668 F.3d at 733. Those limitations are defined in Section 207 of the FAA, which "affords the district court *little discretion* in refusing or deferring enforcement of foreign arbitral awards: the Convention is 'clear' that a court 'may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.'" *Id.* at 727 (emphasis added) (quoting *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007)).[12] Because the doctrine of *forum non conveniens* is "not . . . a ground

---

[12] Nor can a dismissal based on *forum non conveniens* be justified based on Article III of the New York Convention, which provides that awards will be enforced "in accordance with the rules of procedure of the territory where the award is relied upon." N.Y. Convention art. III. Article III subjects such local procedure to "the conditions laid down in the following articles." *Id.* These conditions include the

set forth in the New York Convention," such a dismissal would not be permissible under the FAA. *BSDL I*, 668 F.3d at 731. The district court properly denied the motion to dismiss based on the doctrine of *forum non conveniens*.

## III. THE DISTRICT COURT CORRECTLY REFUSED TO DISMISS BASED ON THE DOCTRINE OF INTERNATIONAL COMITY.

The Government of Belize argues that the district court should have dismissed this award enforcement proceeding based on the doctrine of international comity "in deference to the [Caribbean Court of Justice] decision." GOB Br. at 40. The Caribbean Court of Justice ("CCJ") decision referred to is *BCB Holdings Ltd. v. Attorney General of Belize*, [2013] CCJ 5 (AJ), a case involving different parties with a claim against the Government of Belize under a different contract that was resolved in a different arbitration. The issue in that case was whether that arbitration award should be enforced *in Belize*. The CCJ held that because "[i]t is in Belize that the Companies seek to enforce the Award, . . . it is the courts of Belize that must make the assessment as to what, if anything is offensive to public policy." Declaration of Juan C. Basombrio, dated Sept. 30, 2013 (DE 47) ¶ 2 & Ex. 1 ¶ 23 (JA- ___&___).

---

exclusive grounds for non-enforcement of an award in Article V of the Convention. *BSDL I*, 668 F.3d at 727. Thus, Article III cannot expand the grounds for non-enforcement of an award that are exclusively defined in Article V of the Convention.

The Government of Belize's comity argument is foreclosed by the Court's prior decision and by Section 207 of the FAA.  This Court previously emphasized in this very case that the "plain terms" of Section 207 "instruct a district court reviewing a foreign arbitral award to 'confirm the award unless it *finds* one of the grounds for refusal or deferral of recognition or enforcement . . . specified in the [New York] Convention.'"  *BSDL I*, 668 F.3d at 733 (quoting 9 U.S.C. § 207) (emphasis in original); *see also Swiss Inst. of Bioinformatics v. Global Initiative on Sharing All Influenza Data*, No. 13-1274, 2014 WL 2810500, at *3 (D.C. Cir. June 23, 2014) ("A federal district court *shall* confirm an arbitral award that falls under the New York Convention unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the awards specified in the said Convention.") (emphasis in original) (citation and internal quotations omitted).  Just as with the doctrine of *forum non conveniens*, there is no ground in the New York Convention to refuse or defer enforcement based on the doctrine of international comity.

Nor does the Government of Belize's attempt to invoke "discretionary abstention" make any difference.  GOB Br. at 39.  This Court has emphasized that the FAA "affords the district court little discretion in refusing or deferring the enforcement of foreign arbitral awards."  *BSDL I*, 668 F.3d at 727 (quoting *Termo Rio S.A.*, 487 F.3d at 935).  The discretion to refuse confirmation is limited "only"

37

to the grounds "explicitly set forth in Article V(1)(e) of the Convention." *Id*.

Again, international comity is not a ground set forth in the New York Convention.

Finally, the Government of Belize's argument must be rejected because it is based on a fundamental misunderstanding of the New York Convention award enforcement process. Enforcement proceedings "under the Convention are summary in nature, and the court must grant the confirmation [of the arbitration award] unless it finds that the arbitration suffers from one of the defects listed in the Convention." *Argentine Republic v. Nat'l Grid PLC*, 637 F.3d 365, 369 (D.C. Cir. 2011) (citing *Zeiler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007)). This means that a federal court "merely makes what is already a final arbitration award a judgment of the court." *Ottley v. Schwartzberg*, 819 F.2d 373, 377 (2d Cir. 1987) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)).

As a result, "multiple judicial proceedings on the same legal issues are characteristic of the confirmation and enforcement of international arbitral awards under the Convention." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 368 (5th Cir. 2003). "[P]arties may bring suit to enforce awards notwithstanding the existence of ongoing proceedings elsewhere." *Steel Corp. of Phil. v. Int'l Steel Servs., Inc.*, 354 F. App'x 689, 694 (3d Cir. 2009); *see* Fed. R. App. P. 32.1. The New York Convention envisions that enforcement jurisdictions may also reach different conclusions as to enforcement

38

of an award since the exceptions to enforcement in Article V(2)(a) and (b) are based on the law of the state in which enforcement is sought. Therefore, consistent with the New York Convention, an award may be enforced in one jurisdiction and not another.[13]

In recognizing that any litigation "in Belize has no preclusive effect on the district court's disposition of the petition to enforce pursuant to the FAA and the New York Convention," *BSDL I*, 668 F.3d at 730, this Court has already concluded that this confirmation proceeding must proceed in accordance with Section 207 of the FAA, regardless of any litigation in other jurisdictions. The district court properly rejected the doctrine of comity as a basis for dismissing the case.

## IV.    PERSONAL JURISDICTION OVER THE GOVERNMENT OF BELIZE EXISTS.

The district court properly concluded that there is personal jurisdiction over the Government of Belize. Mem. Op. at 9 n.7 (JA- ___). The Government of Belize does not dispute that the district court correctly applied the binding law of this circuit—"foreign states are not 'persons' protected by the Fifth Amendment," and therefore they are not entitled to the due process guarantee of minimum

---

[13] The only exception to this is Article V(1)(e) of the New York Convention, which provides a defense to enforcement where an award has been set aside in the country in which or under the law of which the award was rendered. This Court has recognized that the Article V(1)(e) defense does not apply in this case, since the Government of Belize has not sought to set aside the Award in London, England, the place where, and under the law of which, the Award was rendered. *BSDL I*, 668 F.3d at 731.

39

contacts with the forum as a prerequisite to personal jurisdiction. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). Instead, the Government of Belize offers policy arguments as to why that law is incorrect. GOB Br. at 40-43. This Court must of course abide by the binding law of this Circuit and affirm the district court.

Moreover, in the past, this Court has already repeatedly rejected the very policy arguments that Government of Belize now advances, and has consistently held that "foreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012). The D.C. Circuit has adopted a simple rule that was correctly applied by the district court: "under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." *Practical Concepts, Inc. v. Repub. of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987).[14]

With respect to those policy arguments, the Government of Belize claims that it would be inappropriate to afford foreign states less protection under the Due Process Clause than foreign corporations. GOB Br. at 41. On the contrary, as this Court has recognized, there are powerful reasons for treating foreign states

---

[14] The Government of Belize does not dispute that service of process was proper. Transcript of Oral Argument (DE 64), at 23; Mem. Op. at 9 n.7 (JA-___ & ___).

40

differently.  "[S]overeign states interact with each other through diplomacy and

even coercion in ways not affected by constitutional protections such as the Due

Process Clause."  *Nat'l Council of Resistance of Iran v. Dep't of State,* 251 F.3d

192, 202 (D.C. Cir. 2001).  Whereas a foreign corporation has no recourse if U.S.

courts accept jurisdiction over it, a foreign sovereign has many political options.

Not only can a foreign sovereign better protect itself against the improper exercise

of jurisdiction, but extending the protections of due process to foreign states as the

Government of Belize suggests would severely harm "the flexibility and discretion

of the political branches in conducting this country's relations with other nations."

*Price*, 294 F.3d at 97.  For instance, "the power of Congress and the President to

freeze the assets of foreign nations, or to impose economic sanctions on them,

could be challenged as deprivations of property without due process of law."  *Id.* at

99.

        Likewise, this Court has rejected the Government of Belize's argument

(GOB Br. at 42-43) that implicit in the theory of international relations underlying

the FSIA is some notion of due process.  On the contrary, the FSIA "clearly

expresses the decision of the Congress to confer upon the federal courts personal

jurisdiction over a properly served foreign state . . . coextensive with the

exceptions to foreign sovereign immunity in the FSIA."  *TMR Energy Ltd.*, 411

F.3d at 303.

41

There is no basis for revisiting the sound conclusions reached by the Court
and embodied in the law of this circuit.  The district court correctly applied that
law in finding that there was personal jurisdiction over the Government of Belize.

## V.   THE GOVERNMENT OF BELIZE HAS FAILED TO ESTABLISH A NEW YORK CONVENTION DEFENSE TO ENFORCEMENT OF THE AWARD.

In applying the New York Convention, courts are guided by the "emphatic
federal policy in favor of arbitral dispute resolution" which "affords the district
court little discretion in refusing or deferring enforcement of foreign arbitral
awards."  *Swiss Institute of Bioinformatics*, 2014 WL 2810500, at *3 (citing *BSDL
I*, 668 F.3d at 724, 727);  *see also Comm. Imp. Exp. S.A*, 2014 WL 3377337, at *4
("The goal of the Convention, and the principal purpose underlying American
adoption and implementation of it, was to encourage the recognition and
enforcement of commercial arbitration agreements in international contracts and to
unify the standards by which agreements to arbitrate are observed and arbitral
awards are enforced in the signatory countries.") (citing *Scherk v. Alberto-Culver
Co.*, 417 U.S. 506, 520 n.15 (1974)).

The grounds for non-enforcement of an arbitral award under the New York
Convention are limited and are narrowly construed, and the party challenging the
award has the burden of establishing a New York Convention defense.  *TMR*

*Energy*, 411 F.3d at 304.  The district court correctly determined that the

Government of Belize failed to carry that burden.  Mem. Op. at 7-8 (JA- ___).

### A.    The Award Is Governed By the New York Convention.

The Government of Belize's first defense is that the New York Convention

does not even apply here because Belize has not ratified the Convention.  GOB Br.

at 44-46.  This Court has already rejected this argument:

> The fact that Belize is not a party to the New York
> Convention is irrelevant. If the place of the award is "in
> the territory of a party to the Convention, all other
> Convention states are required to recognize and enforce
> the award, regardless of the citizenship or domicile of the
> parties to the arbitration." *Creighton Ltd. v. Gov't of the
> State of Qatar,* 181 F.3d 118, 121 (D.C. Cir. 1999). The
> Award was rendered in London, and BSDL seeks
> enforcement in the United States; both England and the
> United States are parties to the New York Convention.

*BSDL I*, 668 F.3d at 731 n.3.

Whether the Convention is binding on Belize is irrelevant.  A New York

Convention award rendered in a New York Convention nation (Great Britain) has

been presented for enforcement in the United States (a New York Convention

nation).  It is the treaty obligations of the United States, as the place of

enforcement, that matters in this case.  This Court properly resolved that issue in

the prior appeal, and the district court followed that decision.  Mem. Op. at 11-12

(JA- ___).

43

## B.    The Government of Belize Has Failed to Establish An Article V(1)(a) Defense.

The Government of Belize continues to argue that the alleged invalidity and illegality of the Accommodation Agreement as amended is a New York Convention defense to enforcement of the Award.  GOB Br. at 49.  It is not.

Article V(1)(a) of the New York Convention provides a defense to enforcement if there is a challenge to the validity of agreement to arbitrate, *not* to the contract containing the arbitration clause.  Article V(1)(a) ("the said agreement [referred to in article II] is not valid . . . ."); Article II (defining agreement to arbitrate as including "an arbitral clause in a contract or an arbitration agreement").[15]  Challenges to the contract as a whole, as have been made in this case, do not constitute an Article V(1)(a) defense.  *See Telenor Mobile Communic's AS v. Storm LLC*, 524 F. Supp. 2d 332, 355, 368 (S.D.N.Y. 2007) (rejecting Article V(1)(a) defense where a foreign court's decision "could be, at most, evidence of the Shareholders Agreement's invalidity, and not of the invalidity of the separate arbitration clause"), *aff'd on other grounds*, 584 F.3d 396, 410 (2d Cir. 2009); *see also* Restatement of the Law (Third) of Int'l Comm. Arb. § 4-12 cmt. e. (Council Draft No. 3, 2011) (In the context of Article V(1)(a),

---

[15] *See* van den Berg, *The New York Convention of 1958* 156 (a lack-of-consent defense under Article II(3) of the Convention "must concern the arbitral clause specifically" as "the lack of consent for the main contract does not necessarily constitute lack of consent for the arbitral clause contained in it").

44

"courts do not review the arbitral tribunal's rulings on challenges to the validity of the contract as a whole, such as a claim that a contract including an arbitration clause was fraudulently induced or is illegal").  The district court correctly recognized that the New York Convention requires that the arbitral clause in a contract must be valid, "*not* the entire contract containing the clause."  Mem. Op. at 20 (JA-___).[16]

The focus in the New York Convention on the agreement to arbitrate rather than the contract as a whole is consistent with the FAA and the rule of severability. In *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), the Supreme Court explained that a claim "which goes to the making of the agreement to arbitrate" is for the court to adjudicate, but that claims as to the validity and legality of the "contract as a whole" must be resolved by the arbitrator.  *Id*. at 445.

---

[16] In its brief, the Government of Belize relies on *China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274 (3d Cir. 2003), for the proposition that the district court was required to consider the validity of the parties' agreement, the Accommodation Agreement.  GOB Br. at 47-48.  *China Minmetals* does not support the Government's argument.  First, the appellant in *China Minmetals* specifically challenged the existence or validity of the agreement to arbitrate.  By contrast, the Government of Belize has challenged the legality of the contract as a whole, but *not* the agreement to arbitrate.  Second, the appellant in *China Minmetals* had made a timely objection to the validity of the arbitration agreement before the arbitral tribunal.  Here, the Government of Belize boycotted the arbitration and failed to make any objection to the validity of the agreement to arbitrate.

45

The only defense that is available under the New York Convention is a defense that goes to the making of the arbitration agreement. The Government of Belize never challenged or established that the arbitration clause in the Accommodation Agreement was invalid or nonexistent.

Instead, the Government of Belize asserts that "GOB was never a party to the Accommodation Agreement, including the arbitration clause, since the Prime Minister lacked actual authority." GOB Br. at 49. This is simply not true. The Government of Belize was a party to the Accommodation Agreement; that contract was signed by both the Prime Minister and the Attorney General (Kimmelman Decl., Ex. A (Award) ¶¶ 22-25) and contained representations and warranties that the agreement was legal, valid and binding. Kimmelman Decl., Ex. B (Accommodation Agreement) § 7.1 (JA- ___ & ___). Although the Government has alleged that certain provisions of the Accommodation Agreement were illegal (GOB Br. at 9-11), it has never challenged many of the provisions, including specifically the arbitration clause. The Government of Belize actually relied on one of the provisions of the Accommodation Agreement to argue (unsuccessfully) that the assignment to BSDL was improper.[17] Mem. Op. at 12-14 (JA- ___). And

_____

[17] The Government of Belize asserted in the district court that "said Assignment violated the assignment clause in the Accommodation Agreement, and thus it is invalid." GOB's Motion to Stay (DE 15), at 33. The district court rejected this argument. Mem. Op. at 12-14 (JA- ___).

the Government of Belize has failed to demonstrate that both the Prime Minister and the Attorney General lacked authority to sign an arbitration agreement on behalf of the Government.  There is no evidence to support the assertion that the Government of Belize is not a party to the arbitration clause in this case.

Finally, ignoring the words of the New York Convention, the Government of Belize argues that "BSDL never cited any Belizean law" establishing that the Prime Minister's authority to bind the Government of Belize in arbitration.  GOB Br. at 49.  The New York Convention puts the burden of proving a defense to enforcement squarely on the party challenging the award, the Government of Belize.  New York Convention art. V ("Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes [proof] to the competent authority where the recognition and enforcement is sought . . . .").  This circuit has reiterated that "Article V of the New York Convention . . assigns the burden of persuasion to the party opposing enforcement" of an arbitral award.  *TMR Energy*, 411 F.3d at 304.  Here, the Government of Belize did not offer any evidence that the Prime Minister *and* the Attorney General lacked authority to enter into an arbitration agreement binding

the Government.[18]  As a result, the district court properly concluded that there is no Article V(1)(a) defense.

### C.    The Revenue Rule Does Not Bar Enforcement of the Award.

The Government of Belize's third defense for non-enforcement reiterates the claim it raised before the district court that this dispute is "not capable of settlement by arbitration under the law" of the United States because adjudication of this dispute violates the "revenue rule."  N.Y. Convention art. V(2)(a); *see* GOB Br. at 50-52.  The district court properly rejected this defense.  Mem. Op. at 21-23 (JA- ___).

Generally, the revenue rule prohibits a United States court from collecting foreign tax claims.  *See Pasquantino v. United States*, 544 U.S. 349, 361 (2004).  The revenue rule applies where "a foreign sovereign attempts to sue directly in its own right to enforce a tax judgment in the courts of another nation."  *Id.* (citation and internal quotations omitted).  The revenue rule is founded on the notion that "courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns."  *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001).  In other words, the revenue rule

---

[18] The issue of the actual and apparent authority of the two senior ministers of the Government of Belize was carefully analyzed by the arbitral tribunal.  It concluded based on the evidence presented and the applicable legal authorities that the Prime Minister and the Attorney General had actual authority and apparent authority to enter into the entire transaction with BTL/Telemedia.  Kimmelman Decl., Ex. A (Award) ¶¶ 155, 163 (JA-___).

48

bars an action whose "main object" is the "collection of money that would pay

foreign tax claims." *Pasquantino*, 544 U.S. at 364.

The revenue rule does not, however, provide that claims pertaining to

foreign taxes are "not capable of settlement . . . under the law of the United

States." N.Y. Convention art. V(2)(a). The revenue rule is a *discretionary* rule of

abstention, which the Supreme Court has recognized "never proscribed all

enforcement of foreign revenue law." *Pasquaninto*, 544 U.S. at 361. The rule is

merely a function of a court's discretion to promote international comity pursuant

to the powers vested in it. *European Community v. RJR Nabisco, Inc.*, 150 F.

Supp. 2d 456, 477 (E.D.N.Y. 2001); Restatement (Third) of Foreign Relations Law

§ 483 (1987) ("Courts in the United States are *not required* to recognize or to

enforce judgments for the collection of taxes, fines, or penalties rendered by the

courts of other states.") (emphasis added). Because the revenue rule is not

mandatory, it does not make a dispute "not capable of settlement by arbitration"

under United States law. Gary B. Born, *International Commercial Arbitration*

3964 (2d ed. 2014) ("[A]rticle V(2)(a)'s exception . . . is applied where . . .

mandatory national law forbids or restricts the arbitrability of particular claims or

disputes.").

Moreover, application of the revenue rule would be inappropriate in this

case. The district court correctly recognized that this is a proceeding to confirm an

arbitral award on "a *contract*, and although that contract contains tax-related provisions, the arbitration award and enforcement of that award do not entail the enforcement of any foreign revenue law." Mem. Op. at 22 (emphasis in original) (JA- ___). The district court's analysis is correct.

### D.    The Arbitral Award Is Not Contrary to United States Public Policy.

Finally, the Government of Belize asserts a public policy defense, claiming that Article V(2)(b) of the New York Convention justifies refusing recognition of this award because it is "contrary to the public policy" of the United States. GOB Br. at 52-55. This argument fails for two reasons.

First, the Government of Belize improperly seeks to litigate a claim that goes to the validity of the underlying contract rather than address any public policy applicable to enforcement of the Award itself. A claim of corruption in the making of the underlying agreement is "a matter to be determined exclusively by the arbitrators." *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998). The Government of Belize "has apparently confused the issue of a fraudulently obtained arbitration agreement or award, which might violate public policy and therefore preclude enforcement, . . . with the issue of whether the underlying contract that is the subject of the arbitrated dispute was forged or fraudulently induced . . . ." *Id.* (citation omitted). The Government of Belize's vague allegations about the making of the Accommodation Agreement should have

50

been raised during the LCIA arbitration.  "[I]f [Respondent] failed to raise the issue . . . to the arbitrators, the issue is forfeited."  *Id.*

Second, the Government of Belize's argument assumes that enforcing the Award would undermine the United States' public policy against international corruption.  Of course, the Government of Belize has presented no evidence of any corruption.  In addition, the Government of Belize commits the fundamental error of "equating 'national' policy with United States 'public' policy."  *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir. 1974).  In *Parsons*, the Second Circuit emphasized that the public policy defense "should be construed narrowly" and invoked "only where enforcement would violate the forum state's most basic notions of morality and justice."  *Id.*  As such, "equating 'national' policy with United States 'public' policy . . . would seriously undermine the Convention's utility."  *Id.*  In the forty years since the *Parsons* decision, courts have routinely agreed that "[a]n expression of national policy is not necessarily dispositive of the public policy issue under the Convention."  *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1099 (9th Cir. 2011); *see also Chevron*, 949 F. Supp. 2d at 69 (The New York Convention "does not provide that awards that might contravene U.S. interests may be resisted on such grounds.").  The Government of Belize commits

the same error that courts have identified time and again—it has conflated national

policy with public policy in contravention of the New York Convention.

This Court has "carefully limited the occasions when a foreign judgment is

ignored on grounds of public policy." *TermoRio S.A. E.S.P.*, 487 F.3d at 938. As

the district court correctly recognized, to overcome the "emphatic federal policy in

favor of arbitral dispute resolution" that applies with special force in the field of

international commerce," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*

*Inc.*, 473 U.S. 614, 631 (1985), an arbitral award must be so offensive that it is

"repugnant to fundamental notions of what is decent and just in the State where

enforcement is sought." *Tahan v. Hodgson,* 662 F.2d 862, 864 (D.C. Cir. 1981)

(quoting Restatement (Second) Conflict of Laws § 117 cmt. c. (1971)); *see* Mem.

Op. at 26-27 (JA- ___).

The Government of Belize has not shown that the vague unsubstantiated

allegations of corruption supposedly underlying the Accommodation Agreement as

amended rise to the level of a public policy defense to the Award. *See MGM*

*Prods. Grp., Inc. v. Aeroflot Russian Airlines*, 91 Fed App'x 716, 718 (2d Cir.

2004) (where claim of violating national policy is "doubtful," "the Agreement

cannot be said to violate fundamental public policy"); *see also* Fed. R. App. P.

32.1. Therefore, this defense must be rejected.

52

## VI.   BSDL SHOULD BE PERMITTED TO CONDUCT POST-JUDGMENT DISCOVERY.

The Court should affirm the district court's decision to confirm the arbitral award in this case.  In affirming the judgment, the Court should also make clear that BSDL can immediately continue post-judgment discovery regardless of any further appellate avenues that the Government of Belize may pursue.

The district court resolved all the issues raised in this proceeding in its December 11, 2013 Memorandum Opinion and Order.  DE 51-52 (JA-___).  It specifically provided for the conversion of the currencies in which the Award was rendered and the calculation of interest.  *Id.* at 1 (JA-___).  On January 8, 2014, the district court fixed the amount of the judgment based on its December 11, 2013 Memorandum Opinion and Order.  Memorandum Order (DE 59) (JA-___).  On February 4, 2014, the clerk entered judgment in the amount calculated on January 8.  Judgment (DE 66), at 1 (JA-___).  The calculation of the dollar equivalent of the Award and the entry of judgment were well within the district court's powers.  *See Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546, 548 (D.C. Cir. 1988) ("when a party files a notice of appeal the district court *only* surrenders 'its control over those aspects of the case involved in the appeal'") (emphasis added) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)).

Following the entry of judgment, BSDL served discovery requests on the Government of Belize for the specific purpose of identifying assets. On March 4, 2014, the Government of Belize moved to stay proceedings pending appeal in the district court. Respondent's Motion to Stay Proceedings Pending Appeal and for Emergency Relief (Apr. 3, 2014) (DE 72) (JA-___). On April 28, 2014, the district court denied the motion in a minute order. On May 5, 2014, the Government of Belize filed an emergency motion to stay proceedings pending appeal in this Court, which this Court denied as unnecessary on May 16, 2014, holding that the district court lacked jurisdiction to conduct further proceedings because the question of Belize's sovereign immunity is before the Court on appeal.[19] Appellant's Emergency Motion to Stay Proceedings Pending Appeal (May 9, 2014); Order (May 16, 2014).

Since this Court's order was issued, the Supreme Court decided *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014). In light of that decision and the clear exception to immunity discussed above, BSDL is entitled to pursue post-judgment discovery under the Federal Rules of Civil Procedure.

First, it is well-established that the filing of a notice of appeal does not divest the district court of jurisdiction to enforce a judgment, absent a stay pending

---

[19] This Court cited *Princz v. Federal Republic of Germany*, 998 F.2d 1 (D.C. Cir. 1993), an interlocutory appeal from a pending lawsuit. In contrast, all issues in this award enforcement proceeding were resolved at the time the appeal was taken.

54

appeal.  *See Deering Milliken, Inc. v. Fed. Trade Comm.*, 647 F.2d 1124, 1128-29

(D.C. Cir. 1980) ("It is well established that the District Court is without

jurisdiction to alter a judgment of its own while an appeal therefrom is ongoing.

But it is equally clear that the vitality of the judgment is undiminished by the

pendency of the appeal.  Unless a stay is granted either by the court rendering the

judgment or by the court to which the appeal is taken, the judgment remains

operative.").  Since a district court is not divested of jurisdiction to enforce a

judgment, it is certainly not divested of jurisdiction to supervise discovery in the

aid of enforcing a judgment.  *Nat'l Serv. Indus., Inc. v. Vafla Corp.*, 694 F.2d 246,

250 (11th Cir. 1982) ("Defendants did not post a supersedeas bond or obtain a stay

of the judgment pending appeal.  Therefore, plaintiff may treat the judgment as

final and execute upon it. . . . If a judgment may be executed upon after an appeal

has been filed, certain discovery in aid of its execution is not precluded by the

filing of an appeal.").

      The fact that that Government of Belize is a foreign state does not change

this analysis.  In *Republic of Argentina*, the Supreme Court emphasized the breadth

of post-judgment discovery, explaining that "[t]he general rule in the federal

system is that, subject to the district court's discretion, parties may obtain

discovery regarding any nonprivileged matter that is relevant to any party's claim

or defense."  134 S. Ct. at 2254 (citation and internal quotations omitted).  The

Court then rejected Argentina's argument that the FSIA imposed limitations on post-judgment discovery, and held that "[t]here is no third provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets." *Id*. at 2256.

Similarly, in this case, post-judgment discovery in aid of enforcing a judgment is proper pursuant to Fed. R. Civ. P. 69(a), unless a stay is granted or a supersedeas bond is posted.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment and permit post-judgment discovery in aid of the award enforcement process to go forward as expeditiously as possible.

Dated:  July 18, 2014                                  Respectfully submitted,


                                                       /s/ Louis B. Kimmelman
                                                       _____
Ryan C. Morris                                         Louis B. Kimmelman
SIDLEY AUSTIN LLP                                          *Counsel of Record*
1501 K Street, N.W.                                    Dana C. MacGrath
Washington, DC 20005                                   David W. Denton, Jr.
Telephone: (202) 736-8000                              SIDLEY AUSTIN LLP
                                                       787 Seventh Avenue
                                                       New York, NY 10019
                                                       Telephone: (212) 839-5300
                                                       Fax: (212) 839-5599
                                                       bkimmelman@sidley.com


*Counsel for Appellee Belize Social Development Limited*

56

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,607 words (as determined by the Microsoft Word 2007 word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing system in 14-point Times New Roman font.

/s/ Louis B. Kimmelman

Louis B. Kimmelman
*Counsel for Appellee*

57

## CERTIFICATE OF FILING AND SERVICE

I certify that on this 18th day of July 2014, I caused the foregoing Brief to be filed via the Court's CM/ECF System; all of the parties listed on the attorney service preference report have been served, via the Court's CM/ECF system or by Federal Express.

It is further certified that on this 18th day of July 2014, the undersigned has caused eight copies of the foregoing Brief to be delivered to the Clerk of the United States Court of Appeals for the District of Columbia Circuit.

/s/ Louis B. Kimmelman

Louis B. Kimmelman
*Counsel for Appellee*

# <u>Addendum Table of Contents</u>

Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2157, T.I.A.S. No. 6997, 330 U.N.T.S. 38 (1970)...........................................................A-1

Federal Arbitration Act, 9 U.S.C. § 201 *et seq.* (1970).............A-8

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* (2014).......................................................................A-10

28 U.S.C. § 1330 (1976) ..........................................................A-30

# UNITED NATIONS CONFERENCE
## ON INTERNATIONAL COMMERCIAL ARBITRATION

# CONVENTION

## ON THE RECOGNITION AND ENFORCEMENT
## OF FOREIGN ARBITRAL AWARDS



*UNITED NATIONS*
*1958*

**A-1**

# CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

## Article I

1. This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

2. The term "arbitral awards" shall include not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted.

3. When signing, ratifying or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State. It may also declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

## Article II

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

## Article III

Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

## Article IV

1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforce-

49

A-2

ment shall, at the time of the application, supply:

(*a*) The duly authenticated original award or a duly certified copy thereof;

(*b*) The original agreement referred to in article II or a duly certified copy thereof.

2. If the said award or agreement is not made in an official language of the country in which the award is relied upon, the party applying for recognition and enforcement of the award shall produce a translation of these documents into such language. The translation shall be certified by an official or sworn translator or by a diplomatic or consular agent.

## Article V

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(*a*) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(*b*) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(*c*) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains

decisions on matters submitted to arbitration may be recognized and enforced; or

(*d*) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(*e*) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(*a*) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(*b*) The recognition or enforcement of the award would be contrary to the public policy of that country.

## Article VI

If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V (1) (*e*), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

## Article VII

1. The provisions of the present Convention shall not affect the validity of multilateral or bilateral agreements concerning the recognition and enforcement of arbitral awards entered into by the Contracting States nor deprive

50

**A-3**

any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon.

2. The Geneva Protocol on Arbitration Clauses of 1923 and the Geneva Convention on the Execution of Foreign Arbitral Awards of 1927 shall cease to have effect between Contracting States on their becoming bound and to the extent that they become bound, by this Convention.

### Article VIII

1. This Convention shall be open until 31 December 1958 for signature on behalf of any Member of the United Nations and also on behalf of any other State which is or hereafter becomes a member of any specialized agency of the United Nations, or which is or hereafter becomes a party to the Statute of the International Court of Justice, or any other State to which an invitation has been addressed by the General Assembly of the United Nations.

2. This Convention shall be ratified and the instrument of ratification shall be deposited with the Secretary-General of the United Nations.

### Article IX

1. This Convention shall be open for accession to all States referred to in article VIII.

2. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

### Article X

1. Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which

it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

2. At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

3. With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

### Article XI

In the case of a federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of this Convention that come within the legislative jurisdiction of the federal authority, the obligations of the federal Government shall to this extent be the same as those of Contracting States which are not federal States;

(b) With respect to those articles of this Convention that come within the legislative jurisdiction of constituent states or provinces which are not, under the constitutional system of the federation, bound to take legislative action, the federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of constituent states or provinces at the earliest possible moment;

(c) A federal State Party to this Convention shall, at the request of any other Contracting

51

State transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the federation and its constituent units in regard to any particular provision of this Convention, showing the extent to which effect has been given to that provision by legislative or other action.

## Article XII

1. This Convention shall come into force on the ninetieth day following the date of deposit of the third instrument of ratification or accession.

2. For each State ratifying or acceeding to this Convention after the deposit of the third instrument of ratification or accession, this Convention shall enter into force on the ninetieth day after deposit by such State of its instrument of ratification or accession.

## Article XIII

1. Any Contracting State may denounce this Convention by a written notification to the Secretary-General of the United Nations. Denunciation shall take effect one year after the date of receipt of the notification by the Secretary-General.

2. Any State which has made a declaration or notification under article X may, at any time thereafter, by notification to the Secretary-General of the United Nations, declare that this Convention shall cease to extend to the territory concerned one year after the date of the receipt of the notification by the Secretary-General.

3. This Convention shall continue to be applicable to arbitral awards in respect of which recognition or enforcement proceedings have been instituted before the denunciation takes effect.

## Article XIV

A Contracting State shall not be entitled to avail itself of the present Convention against other Contracting States except to the extent that it is itself bound to apply the Convention.

## Article XV

The Secretary-General of the United Nations shall notify the States contemplated in article VIII of the following:

(a) Signatures and ratifications in accordance with article VIII;

(b) Accessions in accordance with article IX;

(c) Declarations and notifications under articles I, X and XI;

(d) The date upon which this Convention enters into force in accordance with article XII;

(e) Denunciations and notifications in accordance with article XIII.

## Article XVI

1. This Convention, of which the Chinese, English, French, Russian and Spanish texts shall be equally authentic, shall be deposited in the archives of the United Nations.

2. The Secretary-General of the United Nations shall transmit a certified copy of this Convention to the States contemplated in article VIII.

52

I hereby certify that the foregoing text is a true copy of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York on 10 June 1958, the original of which is deposited with the Secretary-General of the United Nations, as the said Convention was opened for signature, and that it includes the necessary rectifications of typographical errors, as approved by the Parties.

Je certifie que le texte qui précède est une copie conforme de la Convention pour la reconnaissance et l'exécution des sentences arbitrales étrangères, conclue à New York le 10 juin 1958 et dont l'original se trouve déposé auprès du Secrétaire général de l'Organisation des Nations Unies telle que ladite Convention a été ouverte à la signature, et que les rectifications matérielles nécessaires, telles qu'approuvées par les Parties, y ont été incorporées.

For the Secretary-General,
The Legal Counsel:

Pour le Secrétaire général,
Le Conseiller juridique :

Carl-August Fleischhauer

United Nations, New York
6 July 1988

Organisation des Nations Unies
New York, le 6 juillet 1988

**A-6**

Certified true copy XXII-1
Copie certifiée conforme XXII.1
October 2004

**A-7**

(E) modifying, correcting, or vacating an award;

(2) an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

(3) a final decision with respect to an arbitration that is subject to this title.

(b) Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order—

(1) granting a stay of any action under section 3 of this title;

(2) directing arbitration to proceed under section 4 of this title;

(3) compelling arbitration under section 206 of this title; or

(4) refusing to enjoin an arbitration that is subject to this title.

(Added Pub. L. 100–702, title X, §1019(a), Nov. 19, 1988, 102 Stat. 4670, §15; renumbered §16, Pub. L. 101–650, title III, §325(a)(1), Dec. 1, 1990, 104 Stat. 5120.)

AMENDMENTS

1990—Pub. L. 101–650 renumbered the second section 15 of this title as this section.

## CHAPTER 2—CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS

Sec.
201.    Enforcement of Convention.
202.    Agreement or award falling under the Convention.
203.    Jurisdiction; amount in controversy.
204.    Venue.
205.    Removal of cases from State courts.
206.    Order to compel arbitration; appointment of arbitrators.
207.    Award of arbitrators; confirmation; jurisdiction; proceeding.
208.    Chapter 1; residual application.

AMENDMENTS

1970—Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692, added heading for chapter 2 and analysis of sections for such chapter.

### § 201. Enforcement of Convention

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

EFFECTIVE DATE

Pub. L. 91–368, §4, July 31, 1970, 84 Stat. 693, provided that: ''This Act [enacting this chapter] shall be effective upon the entry into force of the Convention on Recognition and Enforcement of Foreign Arbitral Awards with respect to the United States.'' The Convention was entered into force for the United States on Dec. 29, 1970.

### § 202. Agreement or award falling under the Convention

An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

### § 203. Jurisdiction; amount in controversy

An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

### § 204. Venue

An action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

### § 205. Removal of cases from State courts

Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 692.)

### § 206. Order to compel arbitration; appointment of arbitrators

A court having jurisdiction under this chapter may direct that arbitration be held in accord-

ance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 693.)

## § 207. Award of arbitrators; confirmation; jurisdiction; proceeding

Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 693.)

## § 208. Chapter 1; residual application

Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States.

(Added Pub. L. 91–368, §1, July 31, 1970, 84 Stat. 693.)

## CHAPTER 3—INTER-AMERICAN CONVENTION ON INTERNATIONAL COMMERCIAL ARBITRATION

Sec.
301.    Enforcement of Convention.
302.    Incorporation by reference.
303.    Order to compel arbitration; appointment of arbitrators; locale.
304.    Recognition and enforcement of foreign arbitral decisions and awards; reciprocity.
305.    Relationship between the Inter-American Convention and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958.
306.    Applicable rules of Inter-American Commercial Arbitration Commission.
307.    Chapter 1; residual application.

## § 301. Enforcement of Convention

The Inter-American Convention on International Commercial Arbitration of January 30, 1975, shall be enforced in United States courts in accordance with this chapter.

(Added Pub. L. 101–369, §1, Aug. 15, 1990, 104 Stat. 448.)

### EFFECTIVE DATE

Pub. L. 101–369, §3, Aug. 15, 1990, 104 Stat. 450, provided that: ''This Act [enacting this chapter] shall take effect upon the entry into force of the Inter-American Convention on International Commercial Arbitration of January 30, 1975, with respect to the United States.'' The Convention entered into force for the United States on Oct. 27, 1990.

## § 302. Incorporation by reference

Sections 202, 203, 204, 205, and 207 of this title shall apply to this chapter as if specifically set forth herein, except that for the purposes of this chapter ''the Convention'' shall mean the Inter-American Convention.

(Added Pub. L. 101–369, §1, Aug. 15, 1990, 104 Stat. 448.)

## § 303. Order to compel arbitration; appointment of arbitrators; locale

(a) A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. The court may also appoint arbitrators in accordance with the provisions of the agreement.

(b) In the event the agreement does not make provision for the place of arbitration or the appointment of arbitrators, the court shall direct that the arbitration shall be held and the arbitrators be appointed in accordance with Article 3 of the Inter-American Convention.

(Added Pub. L. 101–369, §1, Aug. 15, 1990, 104 Stat. 449.)

## § 304. Recognition and enforcement of foreign arbitral decisions and awards; reciprocity

Arbitral decisions or awards made in the territory of a foreign State shall, on the basis of reciprocity, be recognized and enforced under this chapter only if that State has ratified or acceded to the Inter-American Convention.

(Added Pub. L. 101–369, §1, Aug. 15, 1990, 104 Stat. 449.)

## § 305. Relationship between the Inter-American Convention and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958

When the requirements for application of both the Inter-American Convention and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, are met, determination as to which Convention applies shall, unless otherwise expressly agreed, be made as follows:

(1) If a majority of the parties to the arbitration agreement are citizens of a State or States that have ratified or acceded to the Inter-American Convention and are member States of the Organization of American States, the Inter-American Convention shall apply.

(2) In all other cases the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall apply.

(Added Pub. L. 101–369, §1, Aug. 15, 1990, 104 Stat. 449.)

## § 306. Applicable rules of Inter-American Commercial Arbitration Commission

(a) For the purposes of this chapter the rules of procedure of the Inter-American Commercial Arbitration Commission referred to in Article 3 of the Inter-American Convention shall, subject to subsection (b) of this section, be those rules as promulgated by the Commission on July 1, 1988.

(b) In the event the rules of procedure of the Inter-American Commercial Arbitration Commission are modified or amended in accordance with the procedures for amendment of the rules

---

**28 USC Ch. 97: JURISDICTIONAL IMMUNITIES OF FOREIGN STATES**

From Title 28—**JUDICIARY AND JUDICIAL PROCEDURE**
    PART IV—JURISDICTION AND VENUE

---

### CHAPTER 97—JURISDICTIONAL IMMUNITIES OF FOREIGN STATES

Sec.
1602.
Findings and declaration of purpose.
1603.
Definitions.
1604.
Immunity of a foreign state from jurisdiction.
1605.
General exceptions to the jurisdictional immunity of a foreign state.
1605A.
Terrorism exception to the jurisdictional immunity of a foreign state.
1606.
Extent of liability.
1607.
Counterclaims.
1608.
Service; time to answer default.[1]

1609.
Immunity from attachment and execution of property of a foreign state.
1610.
Exceptions to the immunity from attachment or execution.
1611.
Certain types of property immune from execution.

### AMENDMENTS

**2008**—Pub. L. 110–181, div. A, title X, §1083(a)(2), Jan. 28, 2008, 122 Stat. 341, added item 1605A.

[1] *So in original. Does not conform to section catchline.*

# §1602. Findings and declaration of purpose

   The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2892.)

### EFFECTIVE DATE

   Pub. L. 94–583, §8, Oct. 21, 1976, 90 Stat. 2898, provided that: "This Act [enacting this chapter and section 1330 of this title, amending sections 1332, 1391, and 1441 of this title, and enacting provisions set out as notes under this section and section 1 of this title] shall take effect ninety days after the date of its enactment [Oct. 21, 1976]."

### A-10

## SHORT TITLE

For short title of Pub. L. 94–583 as the "Foreign Sovereign Immunities Act of 1976", see section 1 of Pub. L. 94–583, set out as a Short Title of 1976 Amendments note under section 1 of this title.

## SEPARABILITY

Pub. L. 94–583, §7, Oct. 21, 1976, 90 Stat. 2898, provided that: "If any provision of this Act [enacting this chapter and section 1330 of this title, amending sections 1332, 1391, and 1441 of this title, and enacting provisions set out as notes under this section and section 1 of this title] or the application thereof to any foreign state is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable."

# §1603. Definitions

For purposes of this chapter—

(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

(c) The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

(e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub. L. 109–2, §4(b)(2), Feb. 18, 2005, 119 Stat. 12.)

## AMENDMENTS

**2005**—Subsec. (b)(3). Pub. L. 109–2 substituted "(e)" for "(d)".

## EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by Pub. L. 109–2 applicable to any civil action commenced on or after Feb. 18, 2005, see section 9 of Pub. L. 109–2, set out as a note under section 1332 of this title.

# §1604. Immunity of a foreign state from jurisdiction

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2892.)

## REFERENCES IN TEXT

The time of enactment of this Act, referred to in text, probably means the time of enactment of Pub. L. 94–583, which was approved Oct. 21, 1976.

# §1605. General exceptions to the jurisdictional immunity of a foreign state

## A-11

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That—

(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

(c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

**A-12**

(d) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

[(e), (f) Repealed. Pub. L. 110–181, div. A, title X, §1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341.]

(g) Limitation on Discovery.—

(1) In general.—(A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

(B) A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

(2) Sunset.—(A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would—

(i) create a serious threat of death or serious bodily injury to any person;

(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

(3) Evaluation of evidence.—The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

(4) Bar on motions to dismiss.—A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

(5) Construction.—Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2892; amended Pub. L. 100–640, §1, Nov. 9, 1988, 102 Stat. 3333; Pub. L. 100–669, §2, Nov. 16, 1988, 102 Stat. 3969; Pub. L. 101–650, title III, §325(b)(8), Dec. 1, 1990, 104 Stat. 5121; Pub. L. 104–132, title II, §221(a), Apr. 24, 1996, 110 Stat. 1241; Pub. L. 105–11, Apr. 25, 1997, 111 Stat. 22; Pub. L. 107–77, title VI, §626(c), Nov. 28, 2001, 115 Stat. 803; Pub. L. 107–117, div. B, §208, Jan. 10, 2002, 115 Stat. 2299; Pub. L. 109–304, §17(f)(2), Oct. 6, 2006, 120 Stat. 1708; Pub. L. 110–181, div. A, title X, §1083(b)(1), Jan. 28, 2008, 122 Stat. 341.)

## REFERENCES IN TEXT

Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, referred to in subsec. (g)(4), are set out in the Appendix to this title.

## AMENDMENTS

**2008**—Subsec. (a)(7). Pub. L. 110–181, §1083(b)(1)(A), struck out par. (7) which provided for lack of jurisdictional immunity in certain cases in which money damages were sought against a foreign state for personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.

Subsecs. (e), (f). Pub. L. 110–181, §1083(b)(1)(B), struck out subsecs. (e) and (f) which defined "torture", "extrajudicial killing", "hostage taking", and "aircraft sabotage" and provided for a 10-year statute of limitations for actions brought under former subsec. (a)(7) of this section.

Subsec. (g)(1)(A). Pub. L. 110–181, §1083(b)(1)(C), substituted "but for section 1605A" for "but for subsection (a)(7)".

**2006**—Subsec. (d). Pub. L. 109–304 substituted "section 31301 of title 46" and "chapter 313 of title 46" for "the Ship Mortgage Act, 1920 (46 U.S.C. 911 and following)" and "that Act", respectively.

**2002**—Subsec. (a)(7)(A). Pub. L. 107–117 amended Pub. L. 107–77. See 2001 Amendment note below.

**2001**—Subsec. (a)(7)(A). Pub. L. 107–77, as amended by Pub. L. 107–117, inserted before semicolon "or the act is related to Case Number 1:00CV03110(EGS) in the United States District Court for the District of Columbia".

**1997**—Subsec. (a)(7)(B)(ii). Pub. L. 105–11 substituted "neither the claimant nor the victim was" for "the claimant or victim was not".

**1996**—Subsec. (a)(7). Pub. L. 104–132, §221(a)(1), added par. (7).

Subsecs. (e) to (g). Pub. L. 104–132, §221(a)(2), added subsecs. (e) to (g).

**1990**—Subsec. (a)(6). Pub. L. 101–650 substituted "state" for "State" after "foreign".

**1988**—Subsec. (a)(6). Pub. L. 100–669 added par. (6).

Subsec. (b). Pub. L. 100–702, §1(3), struck out at end "Whenever notice is delivered under subsection (b)(1) of this section, the maritime lien shall thereafter be deemed to be an in personam claim against the foreign state which at that time owns the vessel or cargo involved: *Provided*, That a court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose, such value to be determined as of the time notice is served under subsection (b)(1) of this section."

Subsec. (b)(1). Pub. L. 100–640, §1(1), substituted "and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved" for "but such notice shall not be deemed to have been delivered, nor may it thereafter be delivered, if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit—unless the party was unaware that the vessel or cargo of a foreign state was involved, in which event the service of process of arrest shall be deemed to constitute valid delivery of such notice".

Subsec. (b)(2). Pub. L. 100–640, §1(2), substituted "paragraph (1) of this subsection" for "subsection (b)(1) of this section".

Subsecs. (c), (d). Pub. L. 100–702, §1(3), added subsecs. (c) and (d).

### EFFECTIVE DATE OF 2008 AMENDMENT

For applicability of amendments by Pub. L. 110–181 to pending cases, see section 1083(c) of Pub. L. 110–181, set out as an Effective Date note under section 1605A of this title.

### EFFECTIVE DATE OF 1997 AMENDMENT

Pub. L. 105–11 provided that the amendment made by that Act was effective with respect to any cause of action arising before, on, or after Apr. 25, 1997.

### EFFECTIVE DATE OF 1996 AMENDMENT

Pub. L. 104–132, title II, §221(c), Apr. 24, 1996, 110 Stat. 1243, provided that: "The amendments made by this subtitle [subtitle B (§221) of title II of Pub. L. 104–132, amending this section and section 1610 of this title] shall apply to any cause of action arising before, on, or after the date of the enactment of this Act [Apr. 24, 1996]."

### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–640, §3, Nov. 9, 1988, 102 Stat. 3334, provided that: "The amendments made by this Act [amending this section and section 1610 of this title] shall apply to actions commenced on or after the date of the enactment of this Act [Nov. 9, 1988]."

### CIVIL LIABILITY FOR ACTS OF STATE SPONSORED TERRORISM

Pub. L. 104–208, div. A, title I, §101(c) [title V, §589], Sept. 30, 1996, 110 Stat. 3009–121, 3009–172, provided that:

"(a) an [sic] official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated [sic] under section 6(j) of the Export Administration Act of 1979 [50 U.S.C.

### A–14

App. 2405(j)] while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under [former] section 1605(a)(7) of title 28, United States Code, for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in [former] section 1605(a)(7).

"(b) Provisions related to statute of limitations and limitations on discovery that would apply to an action brought under 28 U.S.C. 1605(f) and (g) shall also apply to actions brought under this section. No action shall be maintained under this action [sic] if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States."

## §1605A. Terrorism exception to the jurisdictional immunity of a foreign state

(a) In General.—

(1) No immunity.—A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

(2) Claim heard.—The court shall hear a claim under this section if—

(A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

(II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208) was filed;

(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred—

(I) a national of the United States;

(II) a member of the armed forces; or

(III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or

(B) the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.

(b) Limitations.—An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208) not later than the latter of—

(1) 10 years after April 24, 1996; or

(2) 10 years after the date on which the cause of action arose.

(c) Private Right of Action.—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—

(1) a national of the United States,

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

**A-15**

(4) the legal representative of a person described in paragraph (1), (2), or (3),

for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

(d) Additional Damages.—After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

(e) Special Masters.—

(1) In general.—The courts of the United States may appoint special masters to hear damage claims brought under this section.

(2) Transfer of funds.—The Attorney General shall transfer, from funds available for the program under section 1404C of the Victims of Crime Act of 1984 (42 U.S.C. 10603c), to the Administrator of the United States district court in which any case is pending which has been brought or maintained under this section such funds as may be required to cover the costs of special masters appointed under paragraph (1). Any amount paid in compensation to any such special master shall constitute an item of court costs.

(f) Appeal.—In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section 1292(b) of this title.

(g) Property Disposition.—

(1) In general.—In every action filed in a United States district court in which jurisdiction is alleged under this section, the filing of a notice of pending action pursuant to this section, to which is attached a copy of the complaint filed in the action, shall have the effect of establishing a lien of lis pendens upon any real property or tangible personal property that is—

(A) subject to attachment in aid of execution, or execution, under section 1610;

(B) located within that judicial district; and

(C) titled in the name of any defendant, or titled in the name of any entity controlled by any defendant if such notice contains a statement listing such controlled entity.

(2) Notice.—A notice of pending action pursuant to this section shall be filed by the clerk of the district court in the same manner as any pending action and shall be indexed by listing as defendants all named defendants and all entities listed as controlled by any defendant.

(3) Enforceability.—Liens established by reason of this subsection shall be enforceable as provided in chapter 111 of this title.

(h) Definitions.—For purposes of this section—

(1) the term "aircraft sabotage" has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation;

(2) the term "hostage taking" has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages;

(3) the term "material support or resources" has the meaning given that term in section 2339A of title 18;

(4) the term "armed forces" has the meaning given that term in section 101 of title 10;

(5) the term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

(6) the term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism; and

(7) the terms "torture" and "extrajudicial killing" have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note).

(Added Pub. L. 110–181, div. A, title X, §1083(a)(1), Jan. 28, 2008, 122 Stat. 338.)

## References in Text

Section 1083(c) of the National Defense Authorization Act for Fiscal Year 2008, referred to in subsec. (a)(2)(A)(i)(II), is section 1083(c) of Pub. L. 110–181, which is set out as a note below.

The enactment of this section and the date of the enactment of this section, referred to in subsecs. (a)(2)(A)(i)(II) and (b), refers to the date of enactment of Pub. L. 110–181, which was

**A-16**

approved Jan. 28, 2008.

Section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, referred to in subsecs. (a)(2)(A)(i)(II) and (b), is Pub. L. 104–208, div. A, title I, §101(c) [title V, §589], which is set out as a note under section 1605 of this title.

Section 3 of the Torture Victim Protection Act of 1991, referred to in subsec. (h)(7), is section 3 of Pub. L. 102–256, which is set out as a note under section 1350 of this title.

## EFFECTIVE DATE

Pub. L. 110–181, div. A, title X, §1083(c), Jan. 28, 2008, 122 Stat. 342, provided that:

"(1) In general.—The amendments made by this section [enacting this section and amending sections 1605, 1607 and 1610 of this title and section 10603a of Title 42, The Public Health and Welfare] shall apply to any claim arising under section 1605A of title 28, United States Code.

"(2) Prior actions.—

"(A) In general.—With respect to any action that—

"(i) was brought under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208) [28 U.S.C. 1605 note], before the date of the enactment of this Act [Jan. 28, 2008],

"(ii) relied upon either such provision as creating a cause of action,

"(iii) has been adversely affected on the grounds that either or both of these provisions fail to create a cause of action against the state, and

"(iv) as of such date of enactment, is before the courts in any form, including on appeal or motion under rule 60(b) of the Federal Rules of Civil Procedure [28 U.S.C. App.], that action, and any judgment in the action shall, on motion made by plaintiffs to the United States district court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had originally been filed under section 1605A(c) of title 28, United States Code.

"(B) Defenses waived.—The defenses of res judicata, collateral estoppel, and limitation period are waived—

"(i) in any action with respect to which a motion is made under subparagraph (A), or

"(ii) in any action that was originally brought, before the date of the enactment of this Act, under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208), and is refiled under section 1605A(c) of title 28, United States Code, to the extent such defenses are based on the claim in the action.

"(C) Time limitations.—A motion may be made or an action may be refiled under subparagraph (A) only—

"(i) if the original action was commenced not later than the latter of—

"(I) 10 years after April 24, 1996; or

"(II) 10 years after the cause of action arose; and

"(ii) within the 60-day period beginning on the date of the enactment of this Act.

"(3) Related actions.—If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104–208) [28 U.S.C. 1605 note], any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code, if the action is commenced not later than the latter of 60 days after—

"(A) the date of the entry of judgment in the original action; or

"(B) the date of the enactment of this Act [Jan. 28, 2008].

"(4) Preserving the jurisdiction of the courts.—Nothing in section 1503 of the Emergency Wartime Supplemental Appropriations Act, 2003 (Public Law 108–11, 117 Stat. 579) has ever authorized, directly or indirectly, the making inapplicable of any provision of chapter 97 of title 28, United States Code, or the removal of the jurisdiction of any court of the United States."

## SEVERABILITY

Pub. L. 110–181, div. A, title X, §1083(e), Jan. 28, 2008, 122 Stat. 344, provided that: "If any

## A-17

provision of this section [enacting this section and amending sections 1605, 1607 and 1610 of this title and section 10603a of Title 42, The Public Health and Welfare] or the amendments made by this section, or the application of such provision to any person or circumstance, is held invalid, the remainder of this section and such amendments, and the application of such provision to other persons not similarly situated or to other circumstances, shall not be affected by such invalidation."

## LIBYA CLAIMS RESOLUTION

Pub. L. 110–301, Aug. 4, 2008, 122 Stat. 2999, provided that:

"SECTION 1. SHORT TITLE.

"This Act may be cited as the 'Libyan Claims Resolution Act'.

"SEC. 2. DEFINITIONS.

"In this Act—

"(1) the term 'appropriate congressional committees' means the Committee on Foreign Relations and the Committee on the Judiciary of the Senate and the Committee on Foreign Affairs and the Committee on the Judiciary of the House of Representatives;

"(2) the term 'claims agreement' means an international agreement between the United States and Libya, binding under international law, that provides for the settlement of terrorism-related claims of nationals of the United States against Libya through fair compensation;

"(3) the term 'national of the United States' has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

"(4) the term 'Secretary' means the Secretary of State; and

"(5) the term 'state sponsor of terrorism' means a country the government of which the Secretary has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

"SEC. 3. SENSE OF CONGRESS.

"Congress supports the President in his efforts to provide fair compensation to all nationals of the United States who have terrorism-related claims against Libya through a comprehensive settlement of claims by such nationals against Libya pursuant to an international agreement between the United States and Libya as a part of the process of restoring normal relations between Libya and the United States.

"SEC. 4. ENTITY TO ASSIST IN IMPLEMENTATION OF CLAIMS AGREEMENT.

"(a) Designation of Entity.—

"(1) Designation.—The Secretary, by publication in the Federal Register, may, after consultation with the appropriate congressional committees, designate 1 or more entities to assist in providing compensation to nationals of the United States, pursuant to a claims agreement.

"(2) Authority of the secretary.—The designation of an entity under paragraph (1) is within the sole discretion of the Secretary, and may not be delegated. The designation shall not be subject to judicial review.

"(b) Immunity.—

"(1) Property.—

"(A) In general.—Notwithstanding any other provision of law, if the Secretary designates any entity under subsection (a)(1), any property described in subparagraph (B) of this paragraph shall be immune from attachment or any other judicial process. Such immunity shall be in addition to any other applicable immunity.

"(B) Property described.—The property described in this subparagraph is any property that—

"(i) relates to the claims agreement; and

"(ii) for the purpose of implementing the claims agreement, is—

"(I) held by an entity designated by the Secretary under subsection (a)(1);

## A–18

"(II) transferred to the entity; or

"(III) transferred from the entity.

"(2) Other acts.—An entity designated by the Secretary under subsection (a)(1), and any person acting through or on behalf of such entity, shall not be liable in any Federal or State court for any action taken to implement a claims agreement.

"(c) Nonapplicability of the Government Corporation Control Act.—An entity designated by the Secretary under subsection (a)(1) shall not be subject to chapter 91 of title 31, United States Code (commonly known as the 'Government Corporation Control Act').

"SEC. 5. RECEIPT OF ADEQUATE FUNDS; IMMUNITIES OF LIBYA.

"(a) Immunity.—

"(1) In general.—Notwithstanding any other provision of law, upon submission of a certification described in paragraph (2)—

"(A) Libya, an agency or instrumentality of Libya, and the property of Libya or an agency or instrumentality of Libya, shall not be subject to the exceptions to immunity from jurisdiction, liens, attachment, and execution contained in section 1605A, [former] 1605(a)(7), or 1610 (insofar as section 1610 relates to a judgment under such section 1605A or [former] 1605(a)(7)) of title 28, United States Code;

"(B) section 1605A(c) of title 28, United States Code, section 1083(c) of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181; 122 Stat. 342; 28 U.S.C. 1605A note), section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 [Pub. L. 104–208, div. A, title I, §101(c)] (28 U.S.C. 1605 note), and any other private right of action relating to acts by a state sponsor of terrorism arising under Federal, State, or foreign law shall not apply with respect to claims against Libya, or any of its agencies, instrumentalities, officials, employees, or agents in any action in a Federal or State court; and

"(C) any attachment, decree, lien, execution, garnishment, or other judicial process brought against property of Libya, or property of any agency, instrumentality, official, employee, or agent of Libya, in connection with an action that would be precluded by subparagraph (A) or (B) shall be void.

"(2) Certification.—A certification described in this paragraph is a certification—

"(A) by the Secretary to the appropriate congressional committees; and

"(B) stating that the United States Government has received funds pursuant to the claims agreement that are sufficient to ensure—

"(i) payment of the settlements referred to in section 654(b) of division J of the Consolidated Appropriations Act, 2008 (Public Law 110–161; 121 Stat. 2342); and

"(ii) fair compensation of claims of nationals of the United States for wrongful death or physical injury in cases pending on the date of enactment of this Act [Aug. 4, 2008] against Libya arising under section 1605A of title 28, United States Code (including any action brought under [former] section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (28 U.S.C. 1605 note), that has been given effect as if the action had originally been filed under [section] 1605A(c) of title 28, United States Code, pursuant to section 1083(c) of the National Defense Authorization Act for Fiscal Year 2008 (Public Law 110–181; 122 Stat. 342; 28 U.S.C. 1605A note)).

"(b) Temporal Scope.—Subsection (a) shall apply only with respect to any conduct or event occurring before June 30, 2006, regardless of whether, or the extent to which, application of that subsection affects any action filed before, on, or after that date.

"(c) Authority of the Secretary.—The certification by the Secretary referred to in subsection (a)(2) may not be delegated, and shall not be subject to judicial review."

## APPLICABILITY TO IRAQ

Pub. L. 110–181, div. A, title X, §1083(d), Jan. 28, 2008, 122 Stat. 343, provided that:

"(1) Applicability.—The President may waive any provision of this section [enacting this section and amending sections 1605, 1607 and 1610 of this title and section 10603a of Title 42, The Public Health and Welfare] with respect to Iraq, insofar as that provision may, in the

A-19

President's determination, affect Iraq or any agency or instrumentality thereof, if the President determines that—

"(A) the waiver is in the national security interest of the United States;

"(B) the waiver will promote the reconstruction of, the consolidation of democracy in, and the relations of the United States with, Iraq; and

"(C) Iraq continues to be a reliable ally of the United States and partner in combating acts of international terrorism.

"(2) Temporal scope.—The authority under paragraph (1) shall apply—

"(A) with respect to any conduct or event occurring before or on the date of the enactment of this Act [Jan. 28, 2008];

"(B) with respect to any conduct or event occurring before or on the date of the exercise of that authority; and

"(C) regardless of whether, or the extent to which, the exercise of that authority affects any action filed before, on, or after the date of the exercise of that authority or of the enactment of this Act.

"(3) Notification to congress.—A waiver by the President under paragraph (1) shall cease to be effective 30 days after it is made unless the President has notified Congress in writing of the basis for the waiver as determined by the President under paragraph (1).

"(4) Sense of congress.—It is the sense of the Congress that the President, acting through the Secretary of State, should work with the Government of Iraq on a state-to-state basis to ensure compensation for any meritorious claims based on terrorist acts committed by the Saddam Hussein regime against individuals who were United States nationals or members of the United States Armed Forces at the time of those terrorist acts and whose claims cannot be addressed in courts in the United States due to the exercise of the waiver authority under paragraph (1)."

## Ex. Ord. No. 13477. Settlement of Claims Against Libya

Ex. Ord. No. 13477, Oct. 31, 2008, 73 F.R. 65965, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, and pursuant to the August 14, 2008, claims settlement agreement between the United States of America and Libya (Claims Settlement Agreement), and in recognition of the October 31, 2008, certification of the Secretary of State, pursuant to section 5(a)(2) of the Libyan Claims Resolution Act (Public Law 110–301), and in order to continue the process of normalizing relations between the United States and Libya, it is hereby ordered as follows:

Section 1. All claims within the terms of Article I of the Claims Settlement Agreement (Article I) are settled.

(a) Claims of United States nationals within the terms of Article I are espoused by the United States and are settled according to the terms of the Claims Settlement Agreement.

(i) No United States national may assert or maintain any claim within the terms of Article I in any forum, domestic or foreign, except under the procedures provided for by the Secretary of State.

(ii) Any pending suit in any court, domestic or foreign, by United States nationals (including any suit with a judgment that is still subject to appeal or other forms of direct judicial review) coming within the terms of Article I shall be terminated.

(iii) The Secretary of State shall provide for procedures governing applications by United States nationals with claims within the terms of Article I for compensation for those claims.

(iv) The Attorney General shall enforce this subsection through all appropriate means, which may include seeking the dismissal, with prejudice, of any claim of a United States national within the terms of Article I pending or filed in any forum, domestic or foreign.

(b) Claims of foreign nationals within the terms of Article I are settled according to the terms of the Claims Settlement Agreement.

(i) No foreign national may assert or maintain any claim coming within the terms of Article I in any court in the United States.

(ii) Any pending suit in any court in the United States by foreign nationals (including any suit with a judgment that is still subject to appeal or other forms of direct judicial review) coming

**A-20**

within the terms of Article I shall be terminated.

(iii) Neither the dismissal of the lawsuit, nor anything in this order, shall affect the ability of any foreign national to pursue other available remedies for claims coming within the terms of Article I in foreign courts or through the efforts of foreign governments.

(iv) The Attorney General shall enforce this subsection through all appropriate means, which may include seeking the dismissal, with prejudice, of any claim of a foreign national within the terms of Article I pending or filed in any court in the United States.

Sec. 2. For purposes of this order:

(a) The term "United States national" has the same meaning as "national of the United States" in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)), but also includes any entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches).

(b) The term "foreign national" means any person other than a United States national.

(c) The term "person" means any individual or entity, including both natural and juridical persons.

(d) The term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization.

Sec. 3. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

GEORGE W. BUSH.

## WAIVER OF SECTION 1083 OF THE NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2008

Determination of President of the United States, No. 2008–9, Jan. 28, 2008, 73 F.R. 6571, provided:

Memorandum for the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States, including section 301 of title 3, United States Code, and section 1083(d) of the National Defense Authorization Act for Fiscal Year 2008 (the "Act"), I hereby determine that:

• All provisions of section 1083 of the Act, if applied to Iraq or any agency or instrumentality thereof, may affect Iraq or its agencies or instrumentalities, by exposing Iraq or its agencies or instrumentalities to liability in United States courts and by entangling their assets in litigation.

• The economic security and successful reconstruction of Iraq continue to be top national security priorities of the United States. Section 1083 of the Act threatens those key priorities. If permitted to apply to Iraq, section 1083 would risk the entanglement of substantial Iraqi assets in litigation in the United States—including those of the Development Fund for Iraq, the Central Bank of Iraq, and commercial entities in the United States in which Iraq has an interest. Section 1083 also would expose Iraq to new liability of at least several billion dollars by undoing judgments favorable to Iraq, by foreclosing available defenses on which Iraq is relying in pending litigation, and by creating a new Federal cause of action backed by the prospect of punitive damages to support claims that may previously have been foreclosed. If permitted to apply to Iraq, section 1083 would have a significant financial impact on Iraq and would result in the redirection of financial resources from the continued reconstruction of Iraq and the harming of Iraq's stability, contrary to the interests of the United States.

• A waiver of all provisions of section 1083 with respect to Iraq and any agency or instrumentality of Iraq is therefore in the national security interest of the United States and will promote the reconstruction of, the consolidation of democracy in, and the relations of the United States with, Iraq.

• Iraq continues to be a reliable ally of the United States and a partner in combating acts of international terrorism. The November 26, 2007, Declaration of Principles for a Long-Term Relationship of Cooperation and Friendship between the Republic of Iraq and the United States of America confirmed the commitment of the United States and Iraq to build an enduring relationship in the political, diplomatic, economic, and security arenas and to work together to

**A-21**

combat all terrorist groups, including al-Qaida.

Accordingly, I hereby waive all provisions of section 1083 of the Act with respect to Iraq and any agency or instrumentality thereof.

You are authorized and directed to notify the Congress of this determination and waiver and the accompanying memorandum of justification [not set out in the Code], incorporated by reference herein, and to arrange for their publication in the Federal Register.

GEORGE W. BUSH.

## §1606. Extent of liability

As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2894; amended Pub. L. 105–277, div. A, §101(h) [title I, §117(b)], Oct. 21, 1998, 112 Stat. 2681–480, 2681–491; Pub. L. 106–386, div. C, §2002(g)(2), formerly §2002(f)(2), Oct. 28, 2000, 114 Stat. 1543, renumbered §2002(g)(2), Pub. L. 107–297, title II, §201(c)(3), Nov. 26, 2002, 116 Stat. 2337.)

### AMENDMENTS

**2000**—Pub. L. 106–386, §2002(g)(2), formerly §2002(f)(2), as renumbered by Pub. L. 107–297, which directed repeal of section 101(h) [title I, §117(b)] of div. A of Pub. L. 105–277, was executed by striking out ", except any action under section 1605(a)(7) or 1610(f)" after "punitive damages", to reflect the probable intent of Congress. See 1998 Amendment note below.

**1998**—Pub. L. 105–277 inserted ", except any action under section 1605(a)(7) or 1610(f)" after "punitive damages".

### EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–277 applicable to any claim for which a foreign state is not immune under section 1605(a)(7) of this title arising before, on, or after Oct. 21, 1998, see section 101(h) [title I, §117(c)] of Pub. L. 105–277, set out as a note under section 1610 of this title.

## §1607. Counterclaims

In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—

(a) for which a foreign state would not be entitled to immunity under section 1605 or 1605A of this chapter had such claim been brought in a separate action against the foreign state; or

(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or

(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2894; amended Pub. L. 110–181, div. A, title X, §1083(b)(2), Jan. 28, 2008, 122 Stat. 341.)

### AMENDMENTS

**2008**—Subsec. (a). Pub. L. 110–181 inserted "or 1605A" after "section 1605".

### EFFECTIVE DATE OF 2008 AMENDMENT

For applicability of amendments by Pub. L. 110–181 to pending cases, see section 1083(c) of Pub. L. 110–181, set out as an Effective Date note under section 1605A of this title.

A-22

## §1608. Service; time to answer; default

(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As used in this subsection, a "notice of suit" shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served; or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

(c) Service shall be deemed to have been made—

(1) in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2894.)

## §1609. Immunity from attachment and execution of property of a foreign state

Subject to existing international agreements to which the United States is a party at the time of enactment

**A-23**

of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2895.)

### REFERENCES IN TEXT

The time of enactment of this Act, referred to in text, probably means the time of enactment of Pub. L. 94–583, which was approved Oct. 21, 1976.

## §1610. Exceptions to the immunity from attachment or execution

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

(2) the property is or was used for the commercial activity upon which the claim is based, or

(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

(4) the execution relates to a judgment establishing rights in property—

(A) which is acquired by succession or gift, or

(B) which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

(6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

(7) the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), or (5) or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based, or

(3) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

(1) the foreign state has explicitly waived its immunity from attachment prior to judgment,

### A-24

notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

(e) The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

(f)(1)(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701–1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

(B) Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

(2)(A) At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

(B) In providing such assistance, the Secretaries—

(i) may provide such information to the court under seal; and

(ii) should make every effort to provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

(3) Waiver.—The President may waive any provision of paragraph (1) in the interest of national security.

(g) Property in Certain Actions.—

(1) In general.—Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

(2) United states sovereign immunity inapplicable.—Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

(3) Third-party joint property holders.—Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

(Added Pub. L. 94–583, § 4(a), Oct. 21, 1976, 90 Stat. 2896; amended Pub. L. 100–640, §2, Nov. 9, 1988, 102 Stat. 3333; Pub. L. 100–669, §3, Nov. 16, 1988, 102 Stat. 3969; Pub. L. 101–650, title III, §325(b)(9), Dec. 1, 1990, 104 Stat. 5121; Pub. L. 104–132, title II, §221(b), Apr. 24, 1996, 110 Stat. 1242; Pub. L. 105–277, div. A, §101(h) [title I, §117(a)], Oct. 21, 1998, 112 Stat. 2681–480, 2681–491; Pub. L. 106–386, div. C, §2002(g)(1), formerly §2002(f)(1), Oct. 28, 2000, 114 Stat. 1543, renumbered §2002(g)(1), Pub. L. 107–297, title II, §201(c)(3), Nov. 26, 2002, 116 Stat. 2337; Pub. L. 110–181, div. A, title X, §1083(b)(3), Jan. 28, 2008, 122 Stat. 341; Pub. L. 112–158, title V, §502(e)(1), Aug. 10, 2012, 126 Stat. 1260.)

A-25

## REFERENCES IN TEXT

The effective date of this Act, referred to in subsecs. (a) and (b), is 90 days after Oct. 21, 1976, see section 8 of Pub. L. 94–583, set out as an Effective Date note under section 1602 of this title.

The enactment of section 1605A, referred to in subsec. (f)(1)(A), (2)(A), refers to the enactment of Pub. L. 110–181, which was approved Jan. 28, 2008.

The Trading with the Enemy Act, referred to in subsec. (g)(2), is act Oct. 6, 1917, ch. 106, 40 Stat. 411, which is classified to sections 1 to 6, 7 to 39 and 41 to 44 of Title 50, Appendix, War and National Defense. For complete classification of this Act to the Code, see Tables.

The International Emergency Economic Powers Act, referred to in subsec. (g)(2), is title II of Pub. L. 95–223, Dec. 28, 1977, 91 Stat. 1626, which is classified generally to chapter 35 (§1701 et seq.) of Title 50, War and National Defense. For complete classification of this Act to the Code, see Short Title note set out under section 1701 of Title 50 and Tables.

## AMENDMENTS

**2012**—Subsec. (a)(7). Pub. L. 112–158, §502(e)(1)(A), inserted "or section 1605(a)(7) (as such section was in effect on January 27, 2008)" after "section 1605A".

Subsec. (b)(2). Pub. L. 112–158, §502(e)(1)(B)(i)(I), substituted "(5) or 1605(b)" for "(5), 1605 (b), or 1605A".

Subsec. (b)(3). Pub. L. 112–158, §502(e)(1)(B)(i)(II), (ii), added par. (3).

**2008**—Subsec. (a)(7). Pub. L. 110–181, §1083(b)(3)(A), substituted "1605A" for "1605(a)(7)".

Subsec. (b)(2). Pub. L. 110–181, §1083(b)(3)(B), substituted "or (5), 1605(b), or 1605A" for "(5), or (7), or 1605(b)".

Subsec. (f)(1)(A), (2)(A). Pub. L. 110–181, §1083(b)(3)(C), inserted "(as in effect before the enactment of section 1605A) or section 1605A" after "section 1605(a)(7)".

Subsec. (g). Pub. L. 110–181, §1083(b)(3)(D), added subsec. (g).

**2000**—Subsec. (f)(2)(A), (B)(ii). Pub. L. 106–386, §2002(g)(1)(A), formerly §2002(f)(1)(A), as renumbered by Pub. L. 107–297, substituted "should make every effort to" for "shall".

Subsec. (f)(3). Pub. L. 106–386, §2002(g)(1)(B), formerly §2002(f)(1)(B), as renumbered by Pub. L. 107–297, added par. (3).

**1998**—Subsec. (f). Pub. L. 105–277 added subsec. (f).

**1996**—Subsec. (a)(7). Pub. L. 104–132, §221(b)(1), added par. (7).

Subsec. (b)(2). Pub. L. 104–132, §221(b)(2), substituted "(5), or (7)," for "or (5)," and "involved in the act" for "used for the activity".

**1990**—Subsecs. (a)(6), (e). Pub. L. 101–650 substituted "state" for "State" after "foreign".

**1988**—Subsec. (a)(6). Pub. L. 100–669 added par. (6).

Subsec. (e). Pub. L. 100–640 added subsec. (e).

## EFFECTIVE DATE OF 2008 AMENDMENT

For applicability of amendments by Pub. L. 110–181 to pending cases, see section 1083(c) of Pub. L. 110–181, set out as an Effective Date note under section 1605A of this title.

## EFFECTIVE DATE OF 1998 AMENDMENT

Pub. L. 105–277, div. A, §101(h) [title I, §117(c)], Oct. 21, 1998, 112 Stat. 2681–480, 2681–491, provided that: "The amendments made by subsections (a) and (b) [amending this section and section 1606 of this title] shall apply to any claim for which a foreign state is not immune under section 1605(a)(7) of title 28, United States Code, arising before, on, or after the date of enactment of this Act [Oct. 21, 1998]."

## EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–132 applicable to any cause of action arising before, on, or after Apr. 24, 1996, see section 221(c) of Pub. L. 104–132, set out as a note under section 1605 of this title.

## A-26

## EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–640 applicable to actions commenced on or after Nov. 9, 1988, see section 3 of Pub. L. 100–640, set out as a note under section 1605 of this title.

## SATISFACTION OF JUDGMENTS FROM BLOCKED ASSETS OF TERRORISTS, TERRORIST ORGANIZATIONS, AND STATE SPONSORS OF TERRORISM

Pub. L. 107–297, title II, §201(a), (b), (d), Nov. 26, 2002, 116 Stat. 2337, 2339, as amended by Pub. L. 112–158, title V, §502(e)(2), Aug. 10, 2012, 126 Stat. 1260, provided that:

"(a) In General.—Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

"(b) Presidential Waiver.—

"(1) In general.—Subject to paragraph (2), upon determining on an asset-by-asset basis that a waiver is necessary in the national security interest, the President may waive the requirements of subsection (a) in connection with (and prior to the enforcement of) any judicial order directing attachment in aid of execution or execution against any property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

"(2) Exception.—A waiver under this subsection shall not apply to—

"(A) property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations that has been used by the United States for any nondiplomatic purpose (including use as rental property), or the proceeds of such use; or

"(B) the proceeds of any sale or transfer for value to a third party of any asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

"(d) Definitions.—In this section, the following definitions shall apply:

"(1) Act of terrorism.—The term 'act of terrorism' means—

"(A) any act or event certified under section 102(1) [Pub. L. 107–297, set out in a note under section 6701 of Title 15, Commerce and Trade]; or

"(B) to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))).

"(2) Blocked asset.—The term 'blocked asset' means—

"(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

"(B) does not include property that—

"(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or

"(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

"(3) Certain property.—The term 'property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations' and the term 'asset

**A-27**

subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations' mean any property or asset, respectively, the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, as the case may be.

"(4) Terrorist party.—The term 'terrorist party' means a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182 (a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)."

### WAIVER OF EXCEPTION TO IMMUNITY FROM ATTACHMENT OR EXECUTION

Pub. L. 105–277, div. A, §101(h) [title I, §117(d)], Oct. 21, 1998, 112 Stat. 2681–480, 2681–492, which authorized the President to waive the requirements of section 101(h) [title I, §117] of Pub. L. 105–277, which amended this section and section 1606 of this title and enacted provisions set out as a note above, in the interest of national security, was repealed by Pub. L. 106–386, div. C, §2002(g)(2), formerly §2002(f)(2), Oct. 28, 2000, 114 Stat. 1543, renumbered §2002(g)(2), Pub. L. 107–297, title II, §201(c)(3), Nov. 26, 2002, 116 Stat. 2337.

Determination of President of the United States, No. 99–1, Oct. 21, 1998, 64 F.R. 59201, which provided for waiver of requirements of section 101(h) [title I, §117(b)] of div. A of Pub. L. 105–277, relating to blocked property of terrorist-list states, was superseded by Determination of President of the United States, No. 2001–3, Oct. 28, 2000, 65 F.R. 66483, set out below.

### DETERMINATION TO WAIVE ATTACHMENT PROVISIONS RELATING TO BLOCKED PROPERTY OF TERRORIST-LIST STATES

Determination of President of the United States, No. 2001–3, Oct. 28, 2000, 65 F.R. 66483, provided:

Memorandum for the Secretary of State [and] the Secretary of the Treasury

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 2002(f) [now 2002(g)] of H.R. 3244, "Victims of Trafficking and Violence Protection Act of 2000," (approved October 28, 2000) [section 2002(g) of Pub. L. 106–386, amending this section and section 1606 of this title and repealing provisions set out as a note above], I hereby determine that subsection (f)(1) of section 1610 of title 28, United States Code, which provides that any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.[C.] App. 5(b)[)], section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701–1702), and proclamations, orders, regulations, and licenses issued pursuant thereto, be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state claiming such property is not immune from the jurisdiction of courts of the United States or of the States under section 1605(a)(7) of title 28, United States Code, would impede the ability of the President to conduct foreign policy in the interest of national security and would, in particular, impede the effectiveness of such prohibitions and regulations upon financial transactions. Therefore, pursuant to section 2002(f) [now 2002(g)] of H.R. 3244, the "Victim's of Trafficking and Violence Protection Act of 2000," I hereby waive subsection (f)(1) of section 1610 of title 28, United States Code, in the interest of national security. This waiver, together with the amendment of subsection (f)(2) of the Foreign Sovereign Immunities Act [probably means subsec. (f)(2) of this section] and the repeal of the subsection (b) of section 117 of the Treasury and General Government Appropriations Act, 1999 [section 101(h) [title I, §117(b)] of div. A of Pub. L. 105–277, amending section 1606 of this title], supersedes my prior waiver of the requirements of subsections (a) and (b) of said section 117 [amending this section and section 1606 of this title], executed on October 21, 1998 [former Determination of President of the United States, No. 99–1, Oct. 21, 1998, 64 F.R. 59201].

The Secretary of State is authorized and directed to publish this determination in the Federal Register.

**A-28**

WILLIAM J. CLINTON.

## §1611. Certain types of property immune from execution

(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—

(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

(2) the property is, or is intended to be, used in connection with a military activity and

(A) is of a military character, or

(B) is under the control of a military authority or defense agency.

(c) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.

(Added Pub. L. 94–583, §4(a), Oct. 21, 1976, 90 Stat. 2897; amended Pub. L. 104–114, title III, §302(e), Mar. 12, 1996, 110 Stat. 818.)

### REFERENCES IN TEXT

The International Organizations Immunities Act, referred to in subsec. (a), is title I of act Dec. 29, 1945, ch. 652, 59 Stat. 669, as amended, which is classified principally to subchapter XVIII (§288 et seq.) of chapter 7 of Title 22, Foreign Relations and Intercourse. For complete classification of this Act to the Code, see Short Title note set out under section 288 of Title 22 and Tables.

Section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, referred to in subsec. (c), is section 302 of Pub. L. 104–114, which amended this section and enacted section 6082 of Title 22, Foreign Relations and Intercourse.

### AMENDMENTS

**1996**—Subsec. (c). Pub. L. 104–114 added subsec. (c).

### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–114 effective Aug. 1, 1996, or date determined pursuant to suspension authority of President under section 6085(b) or (c) of Title 22, Foreign Relations and Intercourse, see section 6085 of Title 22.

A-29

item 1330, inserted a period after ''question'' in item 1331, substituted ''plant variety protection, copyrights, mask works, trade-marks,'' for ''copyrights, and trade-marks'' in item 1338, and inserted ''and elective franchise'' in item 1343.

1986—Pub. L. 99–336, §6(a)(1)(A), June 19, 1986, 100 Stat. 638, renumbered item 1364 ''Senate actions'' and item 1364 ''Construction of references to laws of the United States or Acts of Congress'' as items 1365 and 1366, respectively.

1984—Pub. L. 98–353, title I, §101(b), July 10, 1984, 98 Stat. 333, substituted ''cases'' for ''matters'' in item 1334.

1980—Pub. L. 96–486, §2(b), Dec. 1, 1980, 94 Stat. 2369, struck out ''; amount in controversy; costs.'' after ''question'' in item 1331.

1978—Pub. L. 95–598, title II, §238(b), Nov. 6, 1978, 92 Stat. 2668, directed the substitution of ''Bankruptcy appeals'' for ''Bankruptcy matters and proceedings'' in item 1334, which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

Pub. L. 95–572, §6(b)(2), Nov. 2, 1978, 92 Stat. 2457, added item 1363 and redesignated former item 1363 ''Construction of references to laws of the United States or Acts of Congress'', as 1364.

Pub. L. 95–521, title VII, §705(f)(2), Oct. 26, 1978, 92 Stat. 1880, added item 1364 ''Senate actions''.

Pub. L. 95–486, §9(c), Oct. 20, 1978, 92 Stat. 1634, substituted ''Commerce and antitrust regulations; amount in controversy, costs'' for ''Commerce and antitrust regulations'' in item 1337.

Pub. L. 95–393, §§7(b), 8(a)(2), Sept. 30, 1978, 92 Stat. 810, substituted ''Consuls, vice consuls, and members of a diplomatic mission as defendant'' for ''Consuls and vice consuls as defendants'' in item 1351 and added item 1364 ''Direct actions against insurers of members of diplomatic missions and their families''.

1976—Pub. L. 94–583, §2(b), Oct. 21, 1976, 90 Stat. 2891, added item 1330.

1970—Pub. L. 91–358, title I, §172(c)(2), July 29, 1970, 84 Stat. 591, added item 1363.

1966—Pub. L. 89–635, §2, Oct. 10, 1966, 80 Stat. 880, added item 1362.

1962—Pub. L. 87–748, §1(b), Oct. 5, 1962, 76 Stat. 744, added item 1361.

1958—Pub. L. 85–554, §4, July 25, 1958, 72 Stat. 415, inserted ''costs'' in items 1331 and 1332.

1953—Act Aug. 15, 1953, ch. 505, §3, 67 Stat. 589, added item 1360.

## § 1330. Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

(Added Pub. L. 94–583, §2(a), Oct. 21, 1976, 90 Stat. 2891.)

### EFFECTIVE DATE

Section effective 90 days after Oct. 21, 1976, see section 8 of Pub. L. 94–583, set out as a note under section 1602 of this title.

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, ch. 646, 62 Stat. 930; Pub. L. 85–554, §1, July 25, 1958, 72 Stat. 415; Pub. L. 94–574, §2, Oct. 21, 1976, 90 Stat. 2721; Pub. L. 96–486, §2(a), Dec. 1, 1980, 94 Stat. 2369.)

### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §41(1) (Mar. 3, 1911, ch. 231, §24, par. 1, 36 Stat. 1091; May 14, 1934, ch. 283, §1, 48 Stat. 775; Aug. 21, 1937, ch. 726, §1, 50 Stat. 738; Apr. 20, 1940, ch. 117, 54 Stat. 143).

Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See annotations under former section 41 of title 28, U.S.C.A., and 35 C.J.S., p. 833 et seq., §§30–43. See, also, reviser's note under section 1332 of this title.)

Words ''wherein the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs,'' were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in *United States v. Sayward*, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; *Fishback v. Western Union Tel. Co.*, 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630; and *Halt v. Indiana Manufacturing Co.*, 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.

Words ''all civil actions'' were substituted for ''all suits of a civil nature, at common law or in equity'' to conform with Rule 2 of the Federal Rules of Civil Procedure.

Words ''or treaties'' were substituted for ''or treaties made, or which shall be made under their authority,'' for purposes of brevity.

The remaining provisions of section 41(1) of title 28, U.S.C., 1940 ed., are incorporated in sections 1332, 1341, 1342, 1345, 1354, and 1359 of this title.

Changes were made in arrangement and phraseology.

### AMENDMENTS

1980—Pub. L. 96–486 struck out ''; amount in controversy; costs'' in section catchline, struck out minimum amount in controversy requirement of $10,000 for original jurisdiction in federal question cases which necessitated striking the exception to such required minimum amount that authorized original jurisdiction in actions brought against the United States, any agency thereof, or any officer or employee thereof in an official capacity, struck out provision authorizing the district court except where express provision therefore was made in a federal statute to deny costs to a plaintiff and in fact impose such costs upon such plaintiff where plaintiff was adjudged to be entitled to recover less than the required amount in controversy, computed without regard to set-off or counterclaim and exclusive of interests and costs, and struck out existing subsection designations.

1976—Subsec. (a). Pub. L. 94–574 struck out $10,000 jurisdictional amount where action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

1958—Pub. L. 85–554 included costs in section catchline, designated existing provisions as subsec. (a), substituted ''$10,000'' for ''$3,000'', and added subsec. (b).

### EFFECTIVE DATE OF 1980 AMENDMENT; APPLICABILITY

Section 4 of Pub. L. 96–486 provided: ''This Act [amending this section and section 2072 of Title 15, Commerce and Trade, and enacting provisions set out as a note under section 1 of this title] shall apply to any civil action pending on the date of enactment of this Act [Dec. 1, 1980].''

### EFFECTIVE DATE OF 1958 AMENDMENT

Section 3 of Pub. L. 85–554 provided that: ''This Act [amending this section and sections 1332 and 1345 of this